Michael P. Cillo (CO # 14955)
Patrick J. Kanouff (CO # 26121)
Davis & Ceriani, P.C.
1350 17th Street, Suite 400
Denver, CO 80202
Telephone:   303.534.9000
Facsimile:   303.534.4618
E-mail:      mcillo@davisandceriani.com
             pkanouff@davisandceriani.com

Michael J. LaVelle, No. 002269
Matthew K. LaVelle, No. 018828
LaVelle & LaVelle, P.L.C.
Camelback Esplanade II Center
2525 East Camelback Road, Suite 888
Phoenix, AZ 85016-4280
Telephone:   602.279.2100
Facsimile:   602.279.2114
E-mail:      mjl@lavelle-lavelle.com
             matt@lavelle-lavelle.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ALLSTATE LIFE INSURANCE COMPANY, an Illinois Life Insurance Company | Case No. |
| | Case Assigned To: |
| Plaintiff, | |
| | **COMPLAINT** |
| vs. | |
| | **(Demand for Jury Trial)** |
| ROBERT W. BAIRD & CO., Inc., a Wisconsin corporation, M.L. STERN & CO., LLC, a California corporation, EDWARD JONES, L.P., a Missouri limited partnership, THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE | |

COUNTY OF YAVAPAI, a political
subdivision of the State of Arizona, THE
TOWN OF PRESCOTT VALLEY, a
political subdivision of the State of
Arizona, PRESCOTT VALLEY EVENT
CENTER, LLC, an Arizona limited
liability company, PRESCOTT VALLEY
SIGNATURE ENTERTAINMENT, LLC,
an Arizona limited liability company,
GLOBAL ENTERTAINMENT CORP., a
Nevada corporation, FAIN SIGNATURE
GROUP, LLC, an Arizona limited liability
company, KUTAK ROCK LLP, a
Nebraska limited liability partnership,
STINSON, MORRISON, HECKER LLP, a
Missouri limited liability partnership, TL
HOCKING & ASSOCIATES, LLC, an
Arizona limited liability company,
THOMAS L. HOCKING, W. JAMES
TRELIVING, RICHARD KOZUBACK,
individuals,

Defendants.

Plaintiff, Allstate Life Insurance Company, by its attorneys, Davis & Ceriani, P.C.
and LaVelle & LaVelle, P.L.C., for its Complaint against Defendants, and each of them,
states and alleges as follows.

**JURISDICTION AND VENUE**

1.    This Court has federal question jurisdiction pursuant to the Securities
Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

2.    Venue of this action lies in this Court pursuant to 28 U.S.C. § 1391(b)
because a substantial part of the events or omissions giving rise to Plaintiff's claims
occurred in this District, and the property that is the subject of this action is located in this
District.

3.     Jurisdiction also exists by virtue of diversity of citizenship pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

**SUMMARY OF COMPLAINT**

4.     This action arises from the fraudulent offering and sale of $35 million in face value of what were misrepresented to be "A-" rated, investment grade, excise tax revenue bonds ("Bonds") used to finance construction of a 5,000 seat event center in Prescott Valley, Arizona (the "Event Center").

5.     The Defendants, in connection with the offering and sale of this security, misrepresented and failed to disclose material factual information that indicated the Event Center could not generate sufficient operating revenues and sales tax revenues to make the project economically feasible.  Allstate, reasonably believing that it was buying investment grade securities, purchased the Bonds in reliance upon false and misleading representations in a prospectus called a "Preliminary Official Statement," dated November 4, 2005, and an "Official Statement" dated November 18, 2005 (collectively the "Official Statements").

6.     The key sources of revenue to pay debt service on the Bonds during the first year of operations were net operating revenues and transaction privilege taxes, which consisted of sales taxes generated by the Event Center; sales taxes generated in the "Entertainment District" adjacent to the Event Center, and sales taxes generated in a "Secondary Credit Support Area" located close to the Event Center but outside the Entertainment District.  The net-operating revenues, sales taxes generated by the Event Center and sales taxes generated within the Entertainment District were highly dependent upon both the number of events held in the Event Center and attendance at those events.  Sales tax revenues generated in the Secondary Credit Support Area were likewise dependent, in part, on expenditures made by people attending events at the Event Center.  Defendants fraudulently inflated the projected number of events and attendance at the

events in order to project revenues that could support an investment grade rating for the Bonds.

7.     Event centers generate revenues from the annual number of events and the number of people who pay to attend those events.  The annual number of events and total attendance at those events depends primarily on the population in the market area.  The amount of sales tax revenues generated by an event center and surrounding businesses is also dependent upon population.

8.     In 2001, a detailed feasibility analysis was prepared for the City of Prescott, which is located about twelve miles from Prescott Valley and is within the same market area.  This study, which was based on the population and number of households in the market area, concluded that the proposed event center could reasonably be expected to attract about 78 events per year, annual attendance of about 202,500 and generate net-operating income of about $370,000.  It was estimated that the event center would cost about $22 million to build and finance.  Prescott considered these projections and decided not to build an event center.  The projections in the 2001 feasibility analysis were reviewed by several of the Defendants prior to the issuance of the Bonds.  The projections were materially inconsistent with the projections contained in the Official Statements and cast substantial doubt on the economic feasibility of the Event Center.

9.     A detailed preliminary feasibility analysis for the Prescott Valley Event Center was prepared in February 2005 by an independent third party, Economics Research Associates ("ERA").  This feasibility analysis was based on unaudited financial projections for the Event Center.  This feasibility analysis compared the population and household base in the Prescott Valley market area to thirty-two other towns in the United States having comparable event centers.  The analysis cautioned that the population base and number of households in the Prescott Valley market area were extremely low compared to the average population and number of households in the thirty-two comparable market areas.  The comparable towns had, on average, three to four times the population base and number of households in their surrounding market areas than were

located in the Prescott Valley market area.  These material facts were not disclosed in the Official Statements when the Bonds were issued in November 2005.  The Defendants were fully aware of the existence of this analysis, but falsely represented that no feasibility report examining the unaudited projected financial performance of the project had been prepared.

10.    The projected cost of building and financing the Event Center increased dramatically between early 2004 (when serious consideration was first given to building the Event Center in Prescott Valley) and November 2005 when the Bonds were issued. As the cost of constructing the Event Center and financing costs increased to $35 million, Defendants wrongfully increased the number of events, attendance at events, resulting operational revenues and sales tax revenues to offset the increased cost of financing the Event Center.  The annual number of events was fraudulently inflated in the Official Statements from about 78 to 133, estimated attendance was fraudulently inflated from 202,500 to 458,000.  As a result, projected sales taxes from the Event Center and Entertainment District were also inflated because they are directly impacted by Event Center revenues and attendance.

11.    Defendants also failed to disclose in the Official Statements the decision by certain of the Defendants to terminate ERA (the independent third party who prepared the 2005 preliminary feasibility report) rather than have ERA review the new, artificially inflated projections in the Official Statements that were prepared in response to the increasing costs of financing the Event Center.

12.    Each of the Defendants either directly participated in making the false and misleading statements in the Official Statement or was a controlling person with respect to such Defendants.

13.    The Event Center failed to breakeven from an operational standpoint (much less generate $1.6 million in net revenue available to pay debt service), it failed to generate more than about seventy events per year, and it failed to obtain paying attendance remotely close to the inflated projections in the Official Statements.  As a

result, sales tax revenue from the Event Center and Entertainment District fell far short of what was necessary to pay debt service on the Bonds. The actual performance of the Event Center was actually close to the projections made for the City of Prescott in 2001. The Event Center was never worth anywhere close to $35 million and is expected to never generate any meaningful net operating revenues.

## PARTIES

14.     Plaintiff Allstate Life Insurance Company ("Allstate"), is an Illinois life insurance company, that, at all times pertinent to this Complaint, maintained its principal place of business in Illinois. Allstate purchased $19,270,000 in face value of the Bonds from Robert W. Baird & Co. at a purchase price of $105.032 on or about November 17, 2005, purchased $6,150,000 in face value of the Bonds from Baird at a purchase price of $100 on November 17, 2005 and purchased an additional $1 million in face value of the bonds from another broker dealer at a purchase price of $101.03 on November 23, 2005. Each purchase was made in reasonable reliance upon the Official Statements as part of the initial public distribution of the Bonds.

15.     Defendant Robert W. Baird & Co. ("Baird"), is a Wisconsin corporation that, at all times pertinent to this Complaint, maintained its principal place of business in Wisconsin. Baird acted as the lead underwriter in connection with the issuance of the Bonds, was one of the principal authors of the Official Statements, made false and misleading representations of material fact in the Official Statements and failed to disclose numerous other material facts. Baird delivered the Official Statements to Allstate, offered and, with the exception of the $1 million in face value purchased on November 17, 2005, sold the Bonds to Allstate.

16.     Defendant M.L. Stern & Co., LLC ("Stern"), is a California limited liability company that, at all times pertinent to this Complaint, maintained its principal place of business in California. Stern acted as the lead underwriter in connection with the issuance of the Bonds until it was replaced as lead underwriter by Baird. Stern was one of the principal authors of the Official Statements. Stern made false and misleading

representations of material fact in the Official Statements and failed to disclose numerous other material facts.  As an underwriter, Stern offered the Bonds to Allstate.

17.    Defendant Edward Jones ("Jones") is a Missouri corporation that, at all times pertinent to this Complaint, maintained its principal place of business in Missouri.  Jones acted as an underwriter in connection with the issuance of the Bonds and was one of the principal authors of the Official Statements.  Jones made the false and misleading representations of material fact in the Official Statements and failed to disclose other material facts.  As an underwriter, Jones offered the Bonds to Allstate.

18.    Defendant Prescott Valley Event Center, LLC ("PVEC") is an Arizona limited liability company that, at all times pertinent to this Complaint, maintained its principal place of business in Arizona.  The members of PVEC were Defendants Prescott Valley Signature Entertainment, LLC and Global Entertainment Corporation.  PVEC was the principal development entity for the Prescott Valley Event Center.  PVEC, through its principals, PVSE and Global, participated in the process of drafting the Official Statements, provided much of the information contained in the Official Statements, made false and misleading representations of material fact in the Official Statements and failed to disclose numerous other material facts.

19.    Defendant Prescott Valley Signature Entertainment, LLC ("PVSE") is an Arizona limited liability company that, at all times pertinent to this Complaint, maintained its principal place of business in Arizona.   PVSE was a member and controlling person of PVEC.  The sole member of PVSE was Fain Signature Group, LLC.

20.    Defendant Fain Signature Group, LLC ("FSG") is an Arizona limited liability company that, at all times pertinent to this Complaint, maintained its principal place of business in Arizona.  FSG was the sole member and controlling person of PVSE.  FSG is owned by the Fain family, which has significant commercial real estate holdings in Prescott Valley, and expected that the value of its real estate holdings in Prescott

1   Valley would be significantly enhanced by construction of the Event Center.  PVSE and

2   FSG are referred to collectively as the "Fain Group."

3         21.    The Fain Group participated in the process of drafting the Official

4   Statements, provided much of the information contained in the Official Statements to the

5   underwriters, made false and misleading representations of material fact in the Official

6   Statements and failed to disclose numerous other material facts.

7         22.    Defendant Global Entertainment Corporation ("Global") is a Nevada

8   corporation that, at all times pertinent to this Complaint, maintained its principal place of

9   business in Arizona.  Global was, at all times pertinent to this Complaint, engaged in the

10   business of (among other things) promoting, financing, building, operating and

11   developing small to mid-size event centers.  Global participated in the process of drafting

12   the Official Statements, provided much of the information contained in the Official

13   Statements to the underwriters, made false and misleading representations of material fact

14   in the Official Statements and failed to disclose numerous other material facts.  Global

15   was a member and controlling person of PVEC.  As alleged in more detail below, Global

16   sometimes acted through its corporate affiliate, International Coliseums Company

17   ("ICC").

18         23.    Defendant W. James Treliving is a resident of the state of Texas and, at all

19   times pertinent to this Complaint, acted as the chairman of the Board of Directors of

20   Global.  At all times pertinent to this Complaint, Treliving was a controlling person of

21   Global and PVEC.

22         24.    Defendant Richard Kozuback is a resident of the state of Arizona.  At all

23   times pertinent to this Complaint, Kozuback was the president and Chief Executive

24   Officer of Global.  At all times pertinent to this Complaint, Kozuback was also a Director

25   of Global.  Kozuback was a controlling person of Global and PVEC.

26         25.    Defendant The Industrial Development Authority of the County of Yavapai

27   (the "Authority"), is a political subdivision of the State of Arizona and was the issuer of

28   the Bonds.  As the issuer of the Bonds, the Authority offered the Bonds to the investing

public, including Allstate, during the initial public distribution.  The Authority made false and misleading representations of material fact in the Official Statements and failed to disclose numerous other material facts.

26.     Defendant Town of Prescott Valley (the "Town" or "Prescott Valley") is a political subdivision of the State of Arizona that participated in the process of underwriting the Bonds.  The Town agreed to pledge certain sales tax revenues towards repayment of the Bonds.  The Town indirectly acquired ownership of the Event Center through a Community Facilities District it established.  The Town was an active and key participant in structuring the financing of the Event Center.  The Town made false and misleading representations of material fact in the Official Statements and failed to disclose material facts.

27.     Defendant Kutak Rock LLP ("Kutak Law Firm") is a Nebraska limited liability partnership that, at all times pertinent to this Complaint, maintained its principal place of business in Nebraska and maintained an office in Arizona staffed with attorneys licensed to practice law in Arizona.  The Kutak Law Firm is experienced in municipal bond law and often acts as bond counsel or underwriters counsel for municipal bond offerings.  The Kutak Law Firm acted as bond counsel in connection with the issuance of the Bonds and was a principal author of the false and misleading Official Statements. The Kutak Law Firm had reason to believe the Official Statements were false and misleading and recklessly failed to take corrective action.  The Kutak Law Firm also negligently made false statements of material fact and failed to disclose material facts regarding errors that it made in certain Bond documents that gave the Town the ability to evade its pledge of sales tax revenues.

28.     Defendant Stinson, Morrison, Hecker LLP ("Stinson Law Firm") is a Missouri limited liability partnership that, at all times pertinent to this Complaint, maintained its principal place of business in Missouri and maintained an office in Nebraska staffed with attorneys licensed to practice law in Nebraska.  The Stinson Law Firm is experienced in municipal bond law and acted as underwriter's counsel in

connection with the issuance of the Bonds.  The Stinson Law Firm was a principal author of the false and misleading Official Statements.  The Stinson Law Firm had reason to believe the Official Statements were false and misleading and recklessly failed to take corrective action.   The Stinson Law Firm also negligently made false statements of material fact and failed to disclose material facts regarding errors in certain Bond documents that gave the Town the ability to evade its pledge of sales tax revenues.

29.     Defendant Thomas L. Hocking is a former investment banker with substantial experience in municipal bond financing.  Hocking formed and, at all times pertinent to this Complaint, did business through Defendant TL Hocking Associates, LLC (collectively "Hocking").  Defendant TL Hocking Associates is an Arizona limited liability company that, at all times pertinent to this Complaint, maintained its principle place of business in Arizona.  Thomas Hocking was a controlling person of TL Hocking Associates, LLC.  Hocking partnered with Global to promote the development of event centers, made false and misleading statements of material fact in the Official Statements and failed to disclose numerous material facts.

## GENERAL ALLEGATIONS

## GLOBAL AND ICC SOLICIT THE CITY OF PRESCOTT TO CONSTRUCT AN EVENT CENTER

30.     Global is a holding company established in April 2000 through a reverse merger with the Western Professional Hockey League, Inc.   In June 2001 Global negotiated a Joint Operating Agreement with the Central Hockey League ("CHL") and fielded sixteen teams using the CHL name.   In November 2002 Global acquired International Coliseums Company ("ICC") which was in the business of designing, managing and operating multi-purpose event centers.   According to Global (Official Statements p. 27), this vertical integration provided Global with, "the expertise to develop, design, build and manage multi-purpose event centers."   Global also arranges the financing of event centers. At all times pertinent to this Complaint, Global was

directly and indirectly controlled by its officers and directors, including Treliving and Kozuback.

31.   Global and Hocking seek to persuade communities that are not large enough to attract major league professional sports franchises to build event centers that will be anchored by a CHL hockey team or other minor league sports teams.  Global offers to develop, arrange financing, build and operate the event center.

32.   Revenues from the event centers are derived from the annual number of events and the number of people who pay to attend those events.  Net operating revenues from event centers are a function of project revenue less operating expenses.  The amount of attendance at events depends primarily on the population and number of households in the market area for the event center and disposable income.  The annual number of events an event center can attract depends upon the population and number of households in the market area.   The amount of sales tax revenues generated by an event center and surrounding businesses is also dependent upon the population and number of households in the market area.  The economic feasibility of an event center that uses both operating revenues and sales tax revenues to service the debt incurred building the event center is highly dependent upon the surrounding population and the level of disposable income.

33.   Between 2001 and 2003, Prescott, Global and the affiliate it acquired in 2002, ICC, were engaged in discussions with the City of Prescott ("Prescott") regarding the proposed construction of an event center that would host a minor league hockey team.  Prescott is located about twelve miles from Prescott Valley and is in the same market area as Prescott Valley.

34.   On November 15, 2001, ICC prepared a Feasibility Report and Needs Analysis ("2001 Feasibility Report") for Prescott that addressed the construction and financing of an event center with a seating capacity of between 3,500 and 5,000 at a cost not to exceed $22 million dollars.  The 2001 Feasibility Report recognized that two important factors in projecting the number of events and attendance that such a center could support were "demographics" and "disposable income."

35.   The 2001 Feasibility Report projected first year gross revenues of $1.7 million in recognition that the population in the surrounding market area would support no more than 78 events per year and achieve total first year attendance of 202,500.

36.   In contrast, by the time the Bonds were issued in November 2005, Global prepared projections for the Official Statements indicating that the Prescott Valley Event Center (which was of comparable size, was in the same market area and had the same overall population base as Prescott) could reasonably be expected to generate $5.8 million dollars in first year revenues (more than 200% higher than the 2001 Feasibility Report) from 133 events (more than 90% higher than the 2001 Feasibility Report) and achieve first year attendance of 486,000 (140% higher than the 2001 Feasibility Report).

**GLOBAL AND HOCKING MARKET THE EVENT CENTER TO THE TOWN AND FORM A JOINT VENTURE WITH THE FAIN GROUP**

37.   Global and Hocking approached Prescott Valley in 2004 and proposed construction of a similar event center that would host a minor league hockey team and would be financed through the sale of municipal bonds.   Global's proposal entailed establishing a CHL hockey team in Prescott Valley (now the Arizona Sundogs) that would play in a 5,000 seat event center (the "Event Center") that would be constructed and managed by Global.  Global proposed to build the Event Center on a 33-acre parcel owned by the Fain family located adjacent to a previously established "Entertainment District."   Global and the Fain Group formed PVEC to promote the Event Center and cause it to be financed with municipal revenue bonds.  As of May 2004, these Defendants estimated it would cost approximately $19 million to build the Event Center.

38.   Prescott rejected the proposal to construct an event center in Prescott after reviewing the 2001 Feasibility Report.

39.   Global acquired ICC in 2002, obtained a copy of the 2001 Feasibility Report and provided it to Hocking, the Town and the Fain Group, each of whom reviewed it before the Bonds were issued in November 2005.

40.     The Fain Group agreed to provide the Town with land on which the Event Center would be constructed and to cooperate with the Town to create a financing mechanism for the project.  Global agreed to design and build the Event Center, to provide a minor league hockey team as anchor tenant, to enter into an agreement to manage and operate the Event Center and secure all contractually obligated revenue streams for the Event Center.  The Town agreed to create a Community Facilities District to own the Event Center and to cooperate in the development and preparation of the financing structure, sources of pledged revenues and public offering disclosure documents.

41.     Global, the Fain Group and the Town each had a significant financial interest in financing the Event Center with municipal revenue bonds.  Global would be compensated for managing the Event Center and would obtain the financial benefit of expanding the CHL with a new hockey team.   The Fain Group had substantial landholdings within the Entertainment District adjacent to the Event Center and otherwise had substantial landholdings in and around Prescott Valley.  The Fain Group had the opportunity to achieve increased land values, higher rental rates and higher rebates of sales tax revenues from the Town if an Event Center was built adjacent to the existing Entertainment District.   The Town had the opportunity to benefit from substantially increased sales tax revenues.

**THE PARTICIPANTS REALIZED THE IMPORTANCE OF AN INVESTMENT GRADE RATING**

42.     It was critical to Global, the Fain Group and the Town that the Bonds receive an investment grade rating.  Such a rating would permit the Bonds to be marketed to a much broader segment of investors and allow them to be issued at the lowest possible interest rate.  The Town, Global and the Fain Group quickly concluded that without an investment grade rating it would be extremely difficult, if not impossible, to finance construction of the Event Center.

43.     In May 2004 Town representatives were advised by Global that in order to obtain an investment grade rating from a rating agency, it would be necessary to demonstrate total net cash flows of at least two times the amount of annual debt service.

44.     A working group consisting of Global, the Fain Group, Hocking and representatives from the Town began meeting to develop a financing plan that would provide the requisite level of cash flows to qualify for an investment grade rating.  These Defendants recognized that, in order to obtain an investment grade rating, debt service would have to be funded by both net-operating revenues from the Event Center and other sources, including pledged sales tax revenues.  Global began generating projections in an effort to achieve investment grade cash flow.

45.     In September 2004, the Town, Fain Group, and Global generated a "preliminary and tentative term sheet" for construction of a 4,000 seat event center to be financed through a $23.8 million bond issue.  As alleged in more detail below, because financing costs ballooned to $35 million and the interest rate increased, Global and Hocking, with the knowledge, consent and participation of the Town and the Fain Group, decided to artificially and wrongfully inflate projections so that they would generate the projected levels of revenues and sales taxes needed to obtain an investment grade rating, even though they lacked a reasonable basis to do so.

**THE TOWN RETAINS A FINANCIAL ADVISOR AND TOGETHER WITH THE FAIN GROUP AND GLOBAL RETAIN AN INDEPENDENT CONSULTANT TO PREPARE A FEASIBILITY REPORT**

46.     In late 2004 the Town retained its own independent financial advisor, the broker-dealer and investment banking firm Stone & Youngberg, LLC ("S&Y"), to assist in the development of a financing structure for the Event Center.

47.     In December 2004, S&Y, the Town, the Fain Group and Global unanimously agreed that it was appropriate to have an independent consultant address the financial feasibility of the Event Center and examine Global's projections.  They solicited

a proposal from Economics Research Associates, Inc. ("ERA") of Los Angeles, California.

48.     ERA provided a written proposal for a three phase analysis:  1) preparation of a preliminary Feasibility Report; 2) analysis of the sales tax revenues that could be used to fund revenue shortfalls; and 3) an "examination report" to be prepared at a later date that could be attached to the Official Statements for the Bonds and would specifically opine that the financial forecasts in the Official Statements were within applicable guidelines and that the underlying assumptions provided a reasonable basis for its forecast.   ERA stated that, in the event the participants proceeded with a bond financing, it would be necessary for ERA to update, revise or otherwise finalize the preliminary Feasibility Report and anticipated that only a final report, issued as part of a Phase 3 examination, would be included in the Bond offering documents.

49.     On December 31, 2004, the Town, Fain Group and Global accepted ERA's three phase proposal and signed an engagement letter.  ERA indicated it would charge $45,500 for Phases 1 and 2 and $ 33,000 for Phase 3. The Town, Fain Group and Global agreed to equally split the cost.

### ERA ISSUES A FEASIBILITY REPORT IN FEBRUARY 2005

50.     ERA issued a 97-page preliminary feasibility report, with appendices, in February 2005 ("2005 Preliminary Feasibility Report").   As contemplated in ERA's proposal, the 2005 Preliminary Feasibility Report contained the first two phases of the proposed feasibility analysis but did not include the "examination report."   The 2005 Preliminary Feasibility Report assumed the Event Center would be a 4,500 to 5,000 seat arena located in Prescott Valley and was based upon cash flow projections prepared by Global.

51.     The table below highlights the differences among the projections for first year number of events, attendance and revenue projections in the 2001 Feasibility Report, the 2005 Preliminary Feasibility Report and the November 2005 Official Statements:

| | 2001 Feasibility Report | 2005 Preliminary Feasibility Report | 2005 Official Statements |
|---|---|---|---|
| **No. of Events** | 78 | 103 | 133 |
| **First Year Attendance** | 202,500 | 321,170 | 480,000 |
| **First Year Gross Revenue** | $1.59 million | $4.5 million | $5.84 million |
| **Project Costs** | $22 million | $25 | $35 million |

52.     The base case cash flow presented in the 2005 Preliminary Feasibility Report projected 103 events annually and total first year paid attendance of 321,000.  In contrast, the 2001 Feasibility Report, prepared by Global's affiliate ICC, projected 78 events and total first year paid attendance of 202,500.  As alleged in more detail below, Global's projected 133 events per year in November 2005 (a 29% increase over the ERA report and a 71% increase over the 2001 Feasibility Report) was made to show higher revenues but had no legitimate basis.  In the Official Statements, Global also projected total first year paid attendance of 480,000 (a 50% increase over the ERA number and a 137% increase over the 2001 Feasibility Report) again to increase revenues but without any legitimate justification.

53.     The "base case" cash flow in the 2005 Preliminary Feasibility Report projected yearly operating revenues of $4.5 million in year one growing to $4.7 million in year five.  The Official Statements projected first year revenues of $5.8 million, growing to $6.2 million in year five (on average thirty percent higher than the revenue projections in the 2005 Preliminary Feasibility Report) without any legitimate justification.

54.     The wrongfully inflated event, attendance and gross revenue projections in the Official Statements were intended to offset the substantially increased financing and construction costs and did not have a reasonable basis in fact.  The dramatic increase in projected events and attendance also allowed Defendants to substantially increase revenues from parking and Event Center sales taxes ensuring that the necessary multiples of cash flows needed for an investment grade rating could be demonstrated.

1
2
3
4

**THE 2005 PRELIMINARY FEASIBILITY REPORT COMPARED THE**
**POPULATION AND NUMBER OF HOUSEHOLDS IN THE PRESCOTT**
**VALLEY MARKET AREA TO THIRTY-TWO OTHER MARKET AREAS**

5
6
7
8
9
10
11

     55.    The 2005 Preliminary Feasibility Report contained significant comparative factual information that showed the increased events, attendance and revenue projections in the Official Statements were not reasonable.  To provide a meaningful basis for evaluating the financial feasibility of the Event Center, ERA provided significant demographic information for comparable arenas located in the United States.  This factual information was critical to evaluation of the Global projections but was not disclosed in the Official Statements.

12
13
14

     56.    The 2005 Preliminary Feasibility Report placed the population and household level in Prescott Valley in context by comparing the demographics of Prescott Valley to other cities with CHL franchises:

15
16
17
18
19

> [I]n comparing the Prescott Valley demographics to the other franchises within the CHL (comparison within a 15-mile radius of the respective arenas), the Town of Prescott Valley ranks below the average in population (64,300 to 408,000), in number of households (26,000 to 155,000); and in household incomes (40,000 to 43,000).  It should be noted that some of the CHL markets have more than one sports franchise to support in their local area.

20
21
22
23

As of early 2005, the average population within a 15-mile radius of the arena for Central Hockey League franchises was 6.35 times greater than the population in Prescott Valley and the surrounding area.  This material fact was not disclosed in the Official Statements and was intentionally concealed from Bond purchasers.

24
25
26
27
28

     57.    Table 3-12 to the 2005 Preliminary Feasibility Report accurately reported population and household statistics for seventeen existing CHL markets.  The average population of the seventeen CHL markets (excluding the high and lowest locales) was 382,971 compared to the Prescott Valley population of 98,425.  Based on Table 3-12

1    (which counted the number of households within a 15 mile radius), the 2005 Preliminary

2    Feasibility Report accurately stated the following facts:

3        "[T]he average number of households among CHL franchise market areas
         is approximately 155,000. Excluding the high and low number of
4        households, the average becomes 145,600. In comparison, Prescott Valley
5        has a total of only 41,000 households."

6    As of early 2005, the average number of households within a fifteen mile radius of the

7    arena for CHL franchises was 3.5 times greater than the number of households in Prescott

8    Valley. This material fact was not disclosed in the Official Statements and was

9    intentionally concealed from Bond purchasers.

10        58.    The 2005 Preliminary Feasibility Report assumed the Arena Football 2

11   League ("AF2") was a possible second anchor tenant for the Event Center. The 2005

12   Preliminary Feasibility Report set forth the population, household and median household

13   income statistics for twenty towns hosting AF2 teams as of 2003 in Table 3-13 (p. 32).

14   Table 3-13 accurately reported the 2003 average population of the twenty AF2 markets at

15   474,279 and accurately reported the average population excluding the high and low

16   populations as 440,924. The 2005 Preliminary Feasibility Report (p. 31) accurately

17   stated that, "the average population for each of the AF2 market areas is approximately

18   474,000" and, "taking out the markets with the highest and lowest population levels, the

19   average population was just over 440,000." The 2005 Preliminary Feasibility Report

20   accurately stated that, "in comparison, Prescott Valley's population is significantly lower

21   at just over 98,400." As of early, 2005, the average population of towns hosting AF2

22   teams was 4.5 times greater than the population of Prescott Valley. This material fact

23   was not disclosed in the Official Statements and was intentionally concealed from Bond

24   purchasers.

25        59.    The 2005 Preliminary Feasibility Report also evaluated seating inventory

26   for existing event centers in various cities compared to population. Five of the twenty

27   AF2 markets were the same market areas reported with respect to CHL markets

28   (Amarillo, Texas; Memphis, Tennessee; Oklahoma City, Oklahoma; Hidalgo, Texas; and

Albany, Georgia).   Fifteen of the AF2 markets did not have a CHL team.   The 2005 Preliminary Feasibility Report identified thirty-two separate market areas with comparable mid-sized event centers that, on average, were at least three times larger than the Prescott Valley market area.   This material fact was not disclosed in the Official Statements and was intentionally concealed from bondholders.

60.   Using Global's inflated "base case" projections, Table 8-7 in the 2005 Preliminary Feasibility Report demonstrated that positive debt service coverage necessary to achieve an investment grade rating could only be achieved if a significant percentage of sales taxes from the Event Center and the Entertainment District adjacent to the Event Center were pledged to pay debt service.

## THE FAIN GROUP, GLOBAL, HOCKING AND THE TOWN AGREE TO FIRE ERA AND DISPENSE WITH THE AGREED UPON PHASE 3 FEASIBILITY EXAMINATION

61.   Following preparation of the 2005 Preliminary Feasibility Report, Hocking, the Town, Global and the Fain Group learned that it would cost substantially more to construct the Event Center than they had previously estimated, resulting in the need for a much larger bond issuance than anticipated.   Due to the increased costs, Global, Hocking and the Fain Group recognized the need to inflate the projections in the 2005 Preliminary Feasibility Report. This would obviously require the approval of ERA, which they believed could not be obtained. Consequently, the Fain Group, Hocking and Global chose to fire ERA rather than spend another $33,000 and proceed with Phase 3 analysis that would have demonstrated the project was not financially feasible at a $ 35 million dollar level.

62.   The Town's investment advisor, S&Y, strongly disagreed with this course of action.   On May 1, 2005, S&Y recommended that the Town "insist on a Phase 3 Study being completed [by ERA] as a condition subsequent and that feasibility must be proved by the report ... at the very least to confirm Hocking's assertions and assumptions."

63.     The Fain Group, Hocking and Global claimed that, because the Town did not want to assume any economic risk in the transaction, it did not have the right to ascertain the merits of the private financing being arranged by them to finance the arena. S&Y advised the Town not to accede to this ultimatum, commenting that "[t]he Town's right and ability to ascertain the merits of the private financing has already been agreed to by the parties and is fair based upon the Town's potential liability."

64.     In light of the decision to fire ERA, the Town was concerned about potential liability to purchasers of the Bonds and sought indemnification from other participants, including the Fain Group, for any liability relating to the Event Center financing.   The Town also sought to include provisos in a Development Agreement (which the parties anticipated would be attached to the Official Statements), stating that a Phase 3 Feasibility Report was necessary.   The Town demanded a "proviso X" in the Development Agreement stating that "the Town's financial advisors have advised that the Town no longer directly participate in the [Event Center] Financing determinations based on the decision by Fain and [Global] not to pursue Phase 3 of the ERA Feasibility Study."

65.     On May 2, 2005, counsel for the Fain Group criticized the Town's requests for a statement of the need for a Phase 3 Feasibility Report in the recitals to the Development Agreement as "overkill and coming dangerously close to telling potential lenders that the Town affirmatively has no faith in the process."

66.     The Town continued to demand language in the Development Agreement stating that a Phase 3 Feasibility Study was required.   It demanded language in "Proviso O" to the Development Agreement that "in accordance with the original agreement by the Town, Fain and [Global] to participate the [ERA] Feasibility Study indicated that any determination to proceed with financing the [Event Center] would require a Phase 3 update or revision by [ERA] and the Town should require the Phase 3 study be done as a condition subsequent and the Phase 3 Study must prove feasibility."

67.   Global, Hocking and the Fain Group flatly rejected the Town's demands for a Phase 3 Feasibility Report and any statement of the need for such a report in the recitals to the Development Agreement. The Town's requested "Proviso X" stating that it had been advised to no longer directly participate in the financing was ignored entirely. Instead, Proviso X of the Development Agreement merely provides: "Whereas the Town is supportive of the Developer's efforts to develop and construct a public facility, which will enhance the Town's Tourism and visitor economic base…"

68.   The Town's request for language in Proviso O about the need for a Phase 3 Feasibility Study was likewise not included. Instead, the only reference to the 2005 Preliminary Feasibility Report in the Development Agreement was in "Proviso O," which stated:

> WHEREAS, on February 24, 2005, SFCERA submitted the SFCERA Feasibility Study to the Town Council.   The Study included Phases 1 and 2 and indicated that the PVCEC would not be self-supporting but could potentially develop sufficient event-based revenues from which it could largely be financed and operated, with the assistance of certain Town, Fain and Developer revenues and other assistance.  If necessary, the SFCERA Feasibility Study will be updated and finalized by SFCERA to assist with financing the PVCEC.

69.   The final Development Agreement containing the above-quoted language was attached to the Official Statements in November 2005.  The Official Statements were misleading due to the failure to disclose the original agreement in which the Town, the Fain Group and Global all agreed that a Phase 3 Feasibility Examination was necessary and the subsequent of firing of ERA due to their belief that ERA would not approve the inflated projections in the Official Statements.

1
2
3
4

**S&Y WITHDRAWS FROM THE ENGAGEMENT BECAUSE OF THE REFUSAL OF GLOBAL, THE FAIN GROUP AND THE TOWN TO OBTAIN A PHASE 3 FEASIBILITY EXAMINATION**

5
6
7
8
9
10

70.     As the Town's investment advisor, S&Y continued to recommend that the Town: "insist on a Phase 3 Study being completed [by ERA] as a condition subsequent and that feasibility must be proved by the report . . . at the very least to confirm Hocking's assertions and assumptions."   Despite this recommendation and its previous demands, the Town acquiesced in the decision to fire ERA and not to obtain an independent Phase 3 Feasibility examination of the newly inflated projections.

11
12
13
14

71.     S&Y strongly disagreed with this course of action and refused to have further involvement in the project.  S&Y reminded the parties, in writing, of the need for a Phase 3 examination level report.  In a May 18, 2009 withdrawal letter to the Town, Global and FSG, S&Y stated:

15
16
17
18

"It should also be noted that the Agreement contemplated that if the parties determined to proceed with the development and financing of the multi-purpose event center ("MPEC") it would be necessary to have a Phase 3 or Examination Report prepared.  S&Y continues to believe this report is warranted and advises that such a Phase 3 or Examination Report be prepared."

19
20
21
22
23
24
25

The original agreement to obtain a Phase 3 "Examination Report," the subsequent dispute over the need for a Phase 3 "Examination Report," S&Y's insistence such a report be prepared and the decision of S&Y to withdraw from the project because of the refusal of the Fain Group, Global and the Town to obtain such a report were material facts that were not disclosed to Bond purchasers in the Official Statements.

26
27
28

**GLOBAL, HOCKING AND THE FAIN GROUP WRONGFULLY INFLATE PLEDGED SALES TAX REVENUES BECAUSE THE COST OF THE BOND OFFERING INCREASED TO $ 35 MILLION**

72.     The Town and the Fain Group agreed that the Town would pledge 1% out of its 2.33% share of general sales taxes derived from the Entertainment District and the Fain Group would contribute its 1% share of the Town's 2.33% share of sales taxes from the Entertainment District (which the Town was contractually obligated to rebate to the Fain Group or its affiliates under the terms of a February 2000 Development Agreement) towards repayment of the Bonds.   To demonstrate that annual revenues would be sufficient to cover debt service on the Bonds at least two times, the Town further agreed in principal to contribute 2% of the sales taxes derived from businesses in a new "Secondary Credit Support Area" located outside the Entertainment District, but near the Event Center.

73.     In total, the Town, the Fain Group and Global agreed to pledge sales tax revenues from the following four sources:

a.     Event Center sales tax revenues (2 percent out of 2.33%) on ticket sales and other taxable transactions (e.g. food, merchandise parking). This pledge was anticipated to be non-contingent and was to be paid automatically regardless of whether or not there was a shortfall in debt service.

b.     The Fain 1% share of the Town's 2.33% share of the Entertainment District tax (contingent on a shortfall in revenue to pay debt service).

c.     The Town's 1% share of the 2.33% Entertainment District Tax (contingent on a shortfall in revenue to pay debt service).

d.     The Town's 2% share of the 2.33% taxes from a defined Secondary Credit Support Area located adjacent to the Event Center but outside the Entertainment District (contingent on a shortfall in revenue to pay debt service).

The Secondary Credit Support Payments were initially capped at $ 1.4 million.  The cap was later removed to persuade the bond rating agency to give the Bonds an investment grade rating.

74.     In May 2005 it was anticipated that it would cost between $22 and $27 million dollars to finance the Event Center.  By mid June 2005, the total cost of the financing had increased to as much as $35 million.

75.   The February 2005 Preliminary Feasibility Report analyzed potential sources of sales tax revenues which could be pledged to debt service, including the sales taxes from the Event Center, together with both the Fain Group and the Town's 1% share of sales taxes generated from the existing, known and expected businesses in the "Entertainment District" adjacent to the Event Center.   In projecting these sales tax revenues, the 2005 Preliminary Feasibility Report assumed that Prescott Valley "would undergo significant development in the near future."   It assumed the creation of four new restaurants and the additional development of 24,500 square feet of businesses within the Entertainment District.   The 2005 Preliminary Feasibility Report also assumed a "dramatic increase in housing inventory" in Prescott Valley which would bring additional residents to the Town.   The 2005 Preliminary Feasibility Report assumed overly optimistic growth scenarios for the Town resulting in a population increase of 5,338 (a 20% increase) between 2005 and 2008.

76.   Based on these anticipated population increases and new additional businesses, the 2005 Preliminary Feasibility Report (p. 95) projected sales tax revenues from the Event Center in years one through five.   These projected revenues are compared to the wrongfully inflated projected sales tax revenues from the Event Center in the November 2005 Official Statements in the following table:

**SALES TAX REVENUES–EVENT CENTER**

| Year | O5 ERA | Official Statements | Δ | % Change |
|------|--------|---------------------|-----|----------|
|      | $      | $                   | $   |          |
| 1    | 145,000 | 219,392            | 74,392 | 51.30% |
|      | $      | $                   | $   |          |
| 2    | 148,000 | 222,683            | 74,683 | 50.46% |
|      | $      | $                   | $   |          |
| 3    | 148,000 | 226,023            | 78,023 | 52.72% |

| | | | |
|---|---|---|---|
| | $ | $ | $ |
| 4 | 156,000 | 229,413 | 73,413 | 47.06% |
| | $ | $ | $ |
| 5 | 155,000 | 232,855 | 77,855 | 50.23% |
| | **$** | **$** | **$** |
| **Total** | **752,000** | **1,130,366** | **378,366** | **51%** |

77.    The projections of sales tax revenue from the Event Center in the 2005 Preliminary Feasibility Report demonstrated that the sources of pledged sales taxes were insufficient to achieve an investment grade rating at the $25 million bond issuance level contemplated by the 2005 Preliminary Feasibility Report.  When the cost of the bond issuance increased to $35 million, Global, Hocking and the Fain Group wrongfully inflated projected sales tax revenues from the Event Center to the above referenced amounts in the Official Statements.

78.    The Fain Group, Global, Hocking and the Town also decided to wrongfully inflate the projected pledged sales  tax revenues from the Entertainment District above the amounts projected in the 2005 Preliminary Feasibility Report as illustrated by the following table:

**SALES TAX REVENUES-ENTERTAINMENT**

**DISTRICT**

| Year | O5 ERA | Official Statements | Δ | % Change |
|---|---|---|---|---|
| | $ | | $ | |
| 1 | 570,000 | $ 654,849 | 84,849 | 14.89% |
| | $ | | $ | |
| 2 | 710,000 | $ 822,158 | 112,158 | 15.79% |

| | | | | |
|---|---|---|---|---|
| 3 | $ 852,000 | $ 989,919 | $ 137,919 | 16.19% |
| 4 | $ 998,000 | $ 1,158,146 | $ 160,146 | 16.05% |
| 5 | $ 1,148,000 | $ 1,326,853 | $ 178,853 | 15.58% |
| **Total** | **$ 4,278,000** | **$ 4,951,925** | **$ 673,925** | **16%** |

79.    No reasonable basis existed for the increase in projected Entertainment District taxes and Event Center sales taxes over and above the projected levels in the 2005 Preliminary Feasibility Report, which already assumed extremely robust growth. The Official Statements failed to disclose the materially different projected pledged tax revenues in the 2005 Preliminary Feasibility Report.

## THE FAIN GROUP AND GLOBAL SELECT UNDERWRITERS AND COUNSEL WHILE COSTS OF BOND ISSUANCE INCREASE TO $ 35 MILLION

80.    By June 2005, the Fain Group and Global had selected Stern to be the lead underwriter and the Kutak Law Firm as bond counsel.  Stern retained Defendant Stinson as underwriter's counsel.  Baird later replaced Stern as lead underwriter.  Jones became the third underwriter because of its strong retail sales network.

81.    On August 11, 2005 the Authority granted preliminary approval to the issuance of the Bonds in the amount of no more than $35,000,000.  The increased cost put additional pressure on Global, Hocking, the Fain Group and the Town to demonstrate adequate revenues to support the issuance of the Bonds.

82.    Stern, as lead underwriter, anticipated purchasing the Bonds from the Authority as part of the initial public distribution of the Bonds and selling them to the

1   investing public, with the assistance of the other underwriters, Baird and Jones, by means

2   of the disclosure contained in the Official Statements.

3          83.     Underwriters are primarily responsible for drafting official statements and

4   owe a duty to potential purchasers of the bonds they underwrite to have a reasonable

5   basis for believing in the accuracy of the key representations of the issuer (in this case,

6   the Authority) and, based upon that belief, to make full, fair and accurate disclosure in the

7   official statements of all material facts potential purchasers of the bonds need to make

8   fully informed investment decisions.

9          84.     On November 1, 2005, following changes in the Development Agreement

10   and other bond documents, the bond rating agency, Fitch, gave an "A-" investment grade

11   rating to the $35 million bond issue.  Critical to the investment grade rating was Fitch's

12   understanding and belief that payment of the Bonds was secured by a pledge of sales tax

13   revenues:

14          Within the entertainment district, 1% of the remaining 2% is reimbursed to
            the Developer of the entertainment district, FSG, for 25 years.  However,
15          for the purpose of financing the facility, Developer has agreed to have this
            portion of TPT escrowed in an account held by a trustee for the purpose of
16          paying debt service for as long as the bonds are outstanding.  In addition,
17          the Town has agreed to have the remaining 1% generated within the district
            escrowed for debt service as well, also for a period of 25 years.
18

19   As alleged in more detail below, the Fitch rating was based on the same false and

20   misleading information that was provided to Bondholders.

21          **THE OFFICIAL STATEMENTS CONTAIN FALSE AND MISLEADING**

22                       **STATEMENTS OF MATERIAL FACT**

23

24   **The Official Statements were False and Misleading because they Represented that**

25   **the Unaudited Projected Financial Performance of the Event Center Had Not Been**

26   **Examined by Any Financial Advisor.**

27

28          85.     Page 22 of the Official Statements provides in pertinent part:

No feasibility report on the borrower and GEC's unaudited projected financial performance of the Project has been prepared and the unaudited projected financial performance of the Project has not been examined by any financial adviser or by any accounting firm in order to verify either the reasonableness of the assumptions used by the borrower and [Global], the appropriateness of the preparation and presentation of the unaudited projected financial performance of the Project or the conclusions contained in such unaudited projected financial performance of the Project.

86.     This statement was both false and misleading.  It was false because ERA had prepared the 2005 Preliminary Feasibility Report that examined the unaudited projected financial performance of the Event Center to determine the reasonableness of the assumptions and the omissions contained in the projections.  It was misleading because it: failed to disclose the belief of the Town and S&Y that an independent Phase 3 Examination Report was necessary; failed to disclose the original agreement to obtain a Phase 3 report; failed to disclose the subsequent termination of ERA to prevent the wrongfully inflated projections from being independently analyzed and failed to disclose the withdrawal of S&Y.

**The Official Statements Failed to Disclose Material Facts Contained in the 2005 Preliminary Feasibility Report that Indicated the Event Center Was Not Economically Feasible.**

87.     The Official Statements are misleading because they fail to disclose the above alleged of material facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report which would have cast significant doubt on the reasonableness of the projections in the Official Statements.

88.     "APPENDIX C – ECONOMIC AND DEMOGRAPHIC INFORMATION CONCERNING THE TOWN AND MAP OF THE DISTRICT", contains several tables that address certain demographic features of Prescott Valley and the surrounding area but is misleading due to the failure to disclose any of the above alleged material facts.

89.     Appendix C, "TABLE NO. 5 – POPULATION STATISTICS" sets forth the population of Prescott Valley in ten year increments from 1960 through 2000 and

1    reports an estimate for 2004 of 30,590 for the Town, 196,000 for Yavapai County and

2    5,833,685 for the state of Arizona.  It is misleading because it reported the dramatic

3    growth Prescott Valley had experienced, thereby creating the false impression that the

4    population base in the market area for the Event Center was sufficient to generate the

5    operating revenues and sales tax revenues needed to pay debt service on the Bonds, but

6    failed to disclose the above alleged material facts contained in the 2001 Feasibility

7    Report and the 2005 Preliminary Feasibility Report.

8          90.     Appendix C to the Official Statements reports population statistics for

9    Prescott Valley between 1960 and 2004, emphasizing the dramatic growth in population.

10    Appendix C is misleading because it fails to disclose the above alleged material facts

11    with respect to the thirty-two other municipalities with comparable event centers that

12    have much larger populations and numbers of households.  These undisclosed facts were

13    strongly indicative that the number of events and attendance projections in the Official

14    Statements had no reasonable basis and could not be achieved.

15    **The Official Statements Failed to Disclose Projected Events Were Inflated from an**

16    **Already Aggressive 97 to 100 Events Per Year to 133 Events Per Year.**

17

18          91.     The entire "Estimated Revenue" section of the Official Statements (page

19    12-13) addresses projected revenues from sources such as "Public Use Recreation

20    Revenues and Other Public Use Fees" and "Net Contractually Obligated Income" that are

21    largely dependent on population and per capita income, but is misleading because it

22    failed to disclose the above alleged of material facts contained in the 2001 Feasibility

23    Report and the 2005 Preliminary Feasibility Report which would have cast significant

24    doubt on the reasonableness of the projections in the Official Statements.

25          92.     The "Event Revenues" sub-section of the "Estimated Revenue" section of

26    the Official Statements (page 12) addresses projected revenues based on "the number of

27    attendees to events at the Facility," "average annual total paid attendance" of

28    approximately 480,000, Facility Fees, Ticket Surcharge and Facility Rental Fees and

"approximately 133 events to be held at the Facility."  This section is misleading due to the failure to disclose the above alleged material facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report which would have cast significant doubt on the reasonableness of the projections in the Official Statements.

**The Official Statements Contain Actual and Projected Sales Taxes but Failed to Disclose the Above Alleged Material Facts Contained in the 2005 Preliminary Feasibility Report.**

93.    Table 2 to the Official Statements, captioned, "Actual and Projected Pledged Sales Taxes- Entertainment District and Secondary Credit Support Area" report actual sales tax revenues for 2001 through 2004 and projected sales tax revenues for the Entertainment District and Secondary Credit Support Area for 2005 through 2009.  The projected sales taxes for the Entertainment District were provided by the Fain Group.

94.    Table 2 to the Official Statements is misleading due to the failure to disclose the above alleged material facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report which would have cast significant doubt on the reasonableness of these projections.

**The Official Statements are Misleading because they Projected the Event Center and Sales Tax Pledges would be Sufficient to Provide Two Times Debt Service Coverage.**

95.    Table 3 in the Official Statements is captioned "Estimated Pledged Revenues and Debt Service Coverage" and contains columns showing Project Net Operating Income, Project Sales Tax, Entertainment District Sales Tax, Secondary Credit Support Area, Total Estimated Pledged Revenues, Estimated Net Debt Service and Estimated Debt Service Coverage for the twenty-five year time period the Bonds would be outstanding.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

96.    Table 3 in the Official Statements is misleading due to the failure to disclose the above alleged material facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report which would have cast significant doubt on the reasonableness of this table.

**EACH OF THE DEFENDANTS EITHER KNOWINGLY, RECKLESSLY OR NEGLIGENTLY MADE THE FALSE AND MISLEADING STATEMENTS IN THE OFFICIAL STATEMENTS**

**The Defendants All Knew Any Fact that Indicated the Event Center Could Not Attract Sufficient Events or People to Attend Events Was Material and Must be Disclosed.**

97.    Each of the Defendants knew that any facts that would indicate to a potential Bond purchaser that the Event Center was not economically feasible or was not an investment grade bond would be material and must be disclosed in the Official Statements.

98.    Each of the Defendants knew the Official Statements were intended to create and did create the impression that the Event Center could reasonably be expected to attract a sufficient number of events and a sufficient number of people paying money to attend those events to generate the revenues projected in the Official Statements.

99.    Each of the Defendants knew that the ability of the Event Center to generate the revenues needed to justify an investment grade rating for the Bonds and to generate sufficient revenues to make debt service payments on the Bonds as they became due were largely dependent upon the population and number of households in the market area for the Event Center.

100.    As a result, each of the Defendants knew that any facts that indicated the population base in and around the Town was too small to support the projected events

- 31 -

and attendance in the Official Statements would be material facts that must be disclosed in the Official Statements.

**Global, Hocking, the Town, PVEC, PVSE, and FSG All Acted with Actual Knowledge that the Official Statements were Misleading.**

101.   Global, Hocking, the Town, PVEC, PVSE and FSG had actual knowledge that Global had substantially and wrongfully inflated the revenue, event and attendance figures in the Official Statements over the projections contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report because they each received and reviewed the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report.

102.   Global, Hocking, the Town, PVEC, PVSE and FSG had actual knowledge that S&Y and the Town believed an independent analysis of the new inflated Global projections were required, that the agreement with ERA providing for a Phase 3 examination level report was terminated due to the belief that ERA would not approve the inflated projections and knew that the Town's independent financial advisor, S&Y, withdrew as a result of this decision because they all directly participated in these events.

103.   Despite the fact that it was not the issuer, the Town received and reviewed all drafts of the Official Statements and the final Official Statements. As a result, the Town had actual knowledge that the Official Statements were false and misleading.

104.   As promoters of the Event Center that participated in every aspect of the issuance of the Bonds, Defendants Global, Hocking, the Town, PVEC, PVSE, and FSG reviewed the Official Statements and knew that they were misleading for the above alleged reasons and made all of the above alleged failures to disclose material facts in the Official Statements.

**The Kutak Law Firm and the Stinson Law Firm Acted with Deliberate Recklessness.**

1    105.   The Kutak Law Firm has extensive experience acting as both underwriter's

2    counsel and bond counsel in all manner of municipal bond offerings.

3    106.   The Stinson Law Firm has extensive experience acting as underwriter's

4    counsel in municipal bond offerings.

5    107.   The Stinson Law Firm, as underwriter's counsel, and the Kutak Law Firm,

6    as Bond counsel, owed a duty to purchasers of the Bonds to not approve the Official

7    Statements for distribution to the investing public unless and until they were reasonably

8    satisfied that the disclosure contained in the Official Statements was complete, accurate

9    and was not misleading in any material respects.

10    108.   The Kutak Law Firm provided drafts of various bond offering documents to

11    S&Y.  In an August 22, 2005 letter, S&Y made it clear to the Kutak Law Firm that it was

12    no longer involved in the Project and attached a copy of its May 18, 2005 withdrawal

13    letter.  As a result, the Kutak Law Firm was fully aware of the existence of the 2005

14    Preliminary Feasibility Report, was fully aware that Global, the Fain Group and the

15    Town had terminated the agreement with ERA to provide a Phase 3 feasibility

16    examination, was fully aware of the resulting withdrawal of S&Y and was fully aware

17    that Global inflated the event attendance and revenue projections after terminating ERA.

18    109.   S&Y's August 22, 2005 letter with the attached May 18, 2005 withdrawal

19    letter was provided to the Stinson Law Firm so, it too, was fully aware that Global, the

20    Fain Group and the Town had terminated the agreement with ERA to provide a Phase 3

21    feasibility examination, was fully aware of the resulting withdrawal of S&Y and was

22    fully aware that Global inflated the event attendance and revenue projections after

23    terminating ERA.

24    110.   As the primary authors of the Official Statements, the Kutak Law Firm and

25    the Stinson Law Firm made the above alleged representation on page 22 of the Official

26    Statements that the unaudited projected financial performance of the project had not been

27    examined by any financial advisor and had actual knowledge, based upon their receipt

28    and review of S&Y's August 22, 2005 letter with the attached May 18, 2005 withdrawal

letter that ERA had prepared a feasibility analysis for the Event Center that examined the unaudited projected financial performance of the Event Center for the purpose of determining the reasonableness of the underlying assumptions and the conclusions contained in the projections.  The Kutak Law Firm and the Stinson Law Firm had actual knowledge that the above alleged paragraph in the Official Statement was both false and misleading.

111.   As underwriter's counsel, the Stinson Law Firm knew and understood that its clients, Baird, Stern and Jones, owed a duty to potential Bond purchasers to form a reasonable belief regarding the accuracy of the key representations contained in the Official Statements and to make full and fair disclosure of all material facts in the Official Statements so that potential Bond purchasers could make fully informed investment decisions.

112.   The Kutak Law Firm and the Stinson Law Firm, based upon their general knowledge of financial matters, their review of S&Y's August 22, 2005 letter with the attached May 18, 2005 withdrawal letter, their knowledge that Global, the Fain Group and the Town all believed that Phase 3 examination level feasibility analysis was required, their knowledge that the agreement with ERA to provide such an analysis was terminated, their knowledge that no such analysis was ever obtained, their knowledge that the cost of the Bond issue increased after the 2005 Preliminary Feasibility Report was prepared and their knowledge that projections had been materially changed after costs increased, knew that the 2005 Preliminary Feasibility Report contained material factual information and knew the Official Statements were misleading as a result of the failure to disclose such information.  Having such knowledge, the Kutak Law Firm and the Stinson Law Firm either reviewed the 2005 Preliminary Feasibility Report and had actual knowledge of the above alleged material facts contained in that report or, deliberately and intentionally failed to review the report.

113.   The Kutak Law Firm and the Stinson Law Firm owed a duty to purchasers of the Bonds to not issue any legal opinions, regardless of  whether they were attached to

the Official Statements, unless and until they were reasonably satisfied that the disclosure contained in the Official Statements was complete, accurate and was not misleading in any material respects.   Despite having knowledge that the Official Statements were misleading, the Kutak Law Firm issued two written opinions and the Stinson Law Firm issued one written opinion that were conditions precedent to the successful issuance of the Bonds.

114.   Acting as bond counsel to the Authority, Kutak issued an opinion addressed to the Authority and the Trustee stating, among other things, that the Loan Agreement, the Trust Indenture and the Bonds were all "enforceable in accordance with their terms." An unsigned version of this opinion was attached to the Official Statements with the knowledge and consent of the Kutak Law Firm so that potential purchasers of the Bonds, could rely upon it.

115.   The Kutak Law Firm issued an opinion addressed to the underwriters and to the Stinson Law Firm opining, among other things, that the "Introduction", "Description of the Bonds", "Security for the Bonds", "Appendix D – Form of Trust Indenture", "Appendix E – Form of Opinion of Bond Counsel" and "Appendix G – Form of Deposit Only Account Agreement" contained "fair and accurate statements with respect to the information contained therein."

116.   The Stinson Law Firm issued an opinion addressed to the underwriters that acknowledged it had read, among other documents, the Loan Agreements, Indenture and Official Statements.  The Stinson Law Firm opined that:

> "Subject to the foregoing limitations with respect to our engagement, no information was disclosed to us in connection with our conferences or conversations regarding the Official Statement referred to above which has caused us to believe that the Official Statement (except with respect to any financial or other statistical data or forecasts and information about DTC), as of the date thereof, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading."

1   For the above alleged reasons, the Stinson Law Firm did not have any good faith belief

2   that the above stated opinion was accurate.

3   **The Underwriters Acted with Deliberate Recklessness.**

4

5   117.   Baird, Stern and Jones knew that, by acting as underwriters and by

6   approving the Official Statements, they were representing to the investing public that, to

7   the best of their knowledge, information and belief, the Official Statements contained full

8   and fair disclosure of all material facts and did not contain any false or misleading

9   statements of material fact.

10   118.   Baird, Stern and Jones participated in the process of drafting the Official

11   Statements and reviewed drafts of all certificates and opinions provided in connection

12   with the issuance of the Bonds and knew that no participant in the underwriting process

13   represented that it took responsibility for the accuracy and completeness of disclosure

14   regarding the economic feasibility of the Event Center in the Official Statements.  As a

15   result, Baird, Stern and Jones knew that they could not reasonably rely upon any other

16   participant in the underwriting process for the accuracy and completeness of disclosure in

17   the Official Statements.

18   119.   Baird, Stern and Jones were informed by their counsel, the Stinson Law

19   Firm, of the circumstances under which S&Y withdrew.  As a result, Baird, Stern and

20   Jones knew of the existence of the 2005 Preliminary Feasibility Report and knew that

21   Global, Hocking, the Town and the Fain Group had been evaluating the economic

22   feasibility of the Event Center for some time prior to the Development Agreement.

23   120.   Baird, Stern and Jones knew that the 2005 Preliminary Feasibility Report

24   could contain material factual information regarding the economic feasibility of the Event

25   Center that should be disclosed in the Official Statements.

26   121.   Baird, Stern and Jones also knew the cost of the Bond issue had increased

27   substantially since the 2005 Preliminary Feasibility Report was prepared and knew that

28   revenue projections for the Event Center had been materially changed as a result.

122.   As authors of the Official Statements, Baird, Stern and Jones made the above alleged representation on page 22 of the Official Statements that the unaudited financial performance of the Event Center had not been examined by any financial advisor to determine the reasonableness of the assumptions and conclusions contained therein.  Baird Stern and Jones had actual knowledge that the above alleged paragraph in the Official Statements was both false and misleading.

123.   Baird, Stern and Jones also knew that they could not form a reasonable basis for believing in the economic feasibility of the Event Center until they reviewed the records of PVEC, Global, the Fain Group and the Town.  The 2001 Feasibility Report and the 2005 Preliminary Feasibility Report were contained among the records of the Town, Global, PVEC and the Fain Group.

124.   Baird, Stern and Jones either reviewed the records of the Town, PVEC, the Fain Group and Global and reviewed the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report or knowingly failed to conduct any such due diligence inquiry and knew that they had no idea whether the Official Statements made full and fair disclosure of all material facts or were, instead, false and misleading.

**The Authority Acted Negligently with Respect to the Issuance and Offering of the Bonds.**

125.   As the issuer of the Bonds, the Authority made all the representations in the Official Statements and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts and did not make any false or misleading statements of material fact.

126.   The records of the Town, PVEC, Global and the Fain Group, including the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report were available to the Authority.  The Authority negligently failed to review the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report.

**Defendants, Global, Kozuback, Treliving, PVSE and FSG Are Controlling Persons.**

127.   The officers and board of directors of Global, including Defendants Kozuback and Treliving, directly and indirectly controlled all of the actions of Global and PVEC and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts and did not make any false or misleading statements of material fact.

128.   Defendant PVSE, as a manager of PVEC, directly and indirectly controlled all of the actions of Defendants PVEC and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts and did not make any false or misleading statements of material fact.

129.   Defendant FSG, as the manager of Defendant PVSE, directly and indirectly controlled all of the actions of Defendants PVSE and PVEC and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts and did not make any false or misleading statements of material fact.

## THE DEFENDANTS NEGLIGENTLY DRAFTED OR APPROVED DEFECTIVE BOND DOCUMENTS GIVING THE TOWN THE ABILITY TO EVADE THE PLEDGE

130.   As alleged in more detail below, the Official Statements represented to the Bondholders that debt service on the Bonds was secured by the contractual assignment or pledge of sales tax revenues.   The Official Statements failed to disclose the Bond documents used to create such sales tax pledges and ensure they were enforceable by the Trustee for the Bonds were defective and gave the Town the ability to evade the pledges.

131.   By August 2005, the Kutak Law Firm began drafting various documents necessary to accomplish the financing, including an Indenture of Trust ("Indenture"), a

Loan Agreement between the Authority and PVEC (pursuant to which PVEC would borrow proceeds from the Bonds) and the Preliminary Official Statement. The Kutak Law Firm circulated drafts of each of these documents to the Town and the Fain Group. The Town and the Fain Group, through their attorneys, monitored and commented upon changes in the draft documents, including the Preliminary Official Statement and Indenture, and continued to receive drafts of critical documents, including a final draft of the Preliminary Official Statement.

132.   To obtain an investment grade rating it was critical that debt service on the bonds be secured by a pledge of tax revenues in an amount sufficient to provide a sufficient cushion in the event revenues from the Event Center were insufficient. All Defendants knew this was the case. The Official Statements, as alleged in more detail below, repeatedly represent that debt service was secured by a pledge of tax revenues. For the reasons alleged below, the "pledge" was defective and gave the Town the ability to evade its pledge.

133.   An Indenture Trust ("Indenture"), which was drafted by the Kutak Law Firm, governed the contractual rights of Bondholders, through the Trustee, to collect the revenues the Bond documents promised would be paid to the Trustee.

134.   Section 6.12(g) of the Indenture states, among other things, that funds obtained from the Secondary Credit Support Area are applied to debt service after "application" is made by the Trustee. Arizona statute, ARS §42-17106(A), prohibits municipalities such as the Town from spending money for a purpose not included in their annual budgets. Arizona municipalities are also subject to expenditure limitations under Section 20, Article 9 of the Arizona Constitution. At the time the Loan Agreement and Indenture were drafted, the Kutak Law Firm, as experienced Arizona bond counsel, was aware of the above alleged limitations of municipalities, like the Town, to expend public funds. The Town was likewise acutely aware of these requirements.

135.   The Fain Group, Global and the Town signed the final Development Agreement in May 2005. Pursuant to its express terms, the Town would transfer certain

sales tax revenues and other related payments to a lender to pay debt service on the Event Center financing.  Under the Terms of the Development Agreement, the Town was to pay the Fain's 1% share of out of the 2.33% Entertainment District Tax into a "Lockbox Account" through June 1, 2005 and thereafter into a "Fain Escrow Account" and its 1% share of the Entertainment Tax and 2% out of the 2.33% tax rate from the area surrounding the Event Center into a "Town Escrow Account."

136.   As bond counsel, the Kutak Law Firm had an obligation to Bond purchasers to take reasonable steps to ensure that the sales tax pledges created in the bond documents were properly structured and readily enforceable against the Town.   The Kutak Law Firm, as Bond counsel, and the Stinson Law Firm, as underwriter's counsel, had an obligation to Bond purchasers to take reasonable steps to ensure that all material aspects of the sales tax pledges were accurately disclosed in the Official Statements.

137.   The Development Agreement between the Town, Global and the Fain Group did not contain any self-effectuating mechanism pursuant to which any debt service shortfalls could be calculated prior to July 1, the date by which the Town was required to include all known contingent liabilities in establishing its annual budget.

138.   The Bonds were structured with semi-annual interest payment dates on April 1 and October 1, commencing April 1, 2006.  Principal payments were structured to be made annually on October 1, beginning in 2010.  The Town's fiscal year begins on July 1 of each year.  As a result of the statutory and constitutional constraints, the Town required certification of any debt service deficiency sufficiently in advance of July 1 each year to permit it time to budget the required amounts.   Section 8.18 of the Loan Agreement drafted by the Kutak Law Firm did not require the Borrower (PVEC) to provide financial statements to the Trustee sufficiently in advance of July 1 each year to permit the Trustee to calculate the deficiency and provide it to the Town.  Instead, it only required PVEC to provide annual financial statements to the trustee. These defects in the bond documents were not disclosed in the Official Statements.

139.   Section 4.3.7.4 of the Development Agreement provided that the Town's payments, which were triggered by operational revenue shortfalls, would be "credited in quarterly installments."  The Bond documents, however, were structured such that the financial information the Trustee needed to determine the amount of debt service shortfalls was only to be provided on an annual basis.  As a result, the Trustee could not give quarterly notice to the Town of debt service shortfalls.  As a consequence, the Trustee would be unable to calculate the deficiency on a timely basis and provide it to the Town so that it could be included as part of the Town budget in advance.

140.   These defects in the drafting of the Bond documents gave the Town the ability to evade payment of sales tax revenues by arguing it was not required to make payments to the Trustee out of the Escrow Accounts unless and until it received sufficient advance notice of the deficiency.

141.   As a result of negligent draftsmanship of the Indenture, Loan Agreement and ancillary documents, the Town's "pledge" of sales tax revenues from the Entertainment District and Secondary Credit Support Area to pay debt service on the Bonds in the event of revenue shortfalls was rendered defective because no adequate mechanism existed for the Trustee to receive pledged tax revenues in the event of operational revenue shortfalls.

142.   In addition, a "lockbox" account was supposed to be created, held by the Trustee, and funded with sales tax revenues from the Entertainment District and Secondary Credit Support Area.  No such lockbox was ever created and the Trustee was never provided control and dominion over the pledged sales tax revenue.  The Official Statements did not disclose these critical defects in the underlying bond documents.  Nor were these defects brought to the attention of the Fitch rating agency, which assumed that the Trustee had control and dominion over escrowed funds in a lock box when it gave the Bonds an investment grade rating.  The defects are elaborated below.

143.   Section 6.12(a) of the Indenture, citing section 4.14 of the Development Agreement, called for the Fain sales tax pledge to paid into the "Lockbox Account" from

"July 5, 2005 continuing until the opening of a material portion of the Project" and thereafter into the Fain Escrow Account. Section 6.12(d) and (e) of the Indenture called for the Lockbox Account to be drained before payments were made from the Escrow Accounts to the Trustee. Section 6.12(f) of the Indenture further provided that the Town would make quarterly deposits into the Lockbox Account of the sales tax revenues associated with 1.00% of the total 2.33% tax rate received from the Entertainment District, excluding revenues from the Event Center, as provided in the Development Agreement.

144. Section 6.12(g) of the Indenture provided that the Trustee would not apply to the Town for payments from the Secondary Credit Support Area until the amounts in the Lockbox Account, the Fain Escrow Account and the Town Escrow Account had been fully expended.

145. A Debt Service Reserve Fund was established in section 6.5 of the Indenture to be "held by the Trustee separate and apart from all other Funds and Accounts held under this Indenture and from all other moneys of the Trustee." About $2.4 million in Bond proceeds were deposited into the Debt Service Reserve Fund when the Bonds were issued in November 2005. The Debt Service reserve was established to provide the Bondholders with a cushion against unforeseen contingencies and was never intended to limit or modify the Town's obligations to pay pledged tax revenues in the event of debt service shortfalls. For this reason, it was critical to the structure of the Bonds that the Lockbox Account be a separate and distinct account from the Debt Service Reserve Account.

146. Section 4.2.7.2(f) of the Development Agreement, however, defined the Lockbox Account as the Debt Service Reserve Account:

> "Sixth, to the "lockbox" debt service reserve account required under the PVCEC financing (the "Lockbox Account", which amount shall be held in and disbursed from the Lockbox Account in accordance with the requirements of the PVCEC Financing."

147.   Section 6.5 of the Indenture, was negligently drafted by the Kutak Law Firm because it makes no reference to the Lockbox Account and provided that the Trustee shall transfer the amount of any debt service deficiency from the Debt Service Reserve Fund into the appropriate account for payment of debt service on the Bonds.

148.   Acting as bond counsel to the Authority, Kutak issued an opinion addressed to the Authority and the Trustee stating, among other things, that the Loan Agreement, the Trust Indenture and the Bonds were all "enforceable in accordance with their terms." An unsigned version of this opinion was attached to the Official Statements with the knowledge and consent of the Kutak Law Firm, so that potential purchasers of the Bonds could rely upon it.  Before making the representation, the Kutak Law Firm had a duty to carefully review the Official Statements, Development Agreement, Loan Agreement, the Indenture and other associated documents.   For all the above alleged reasons, this representation was inaccurate and misleading and the Kutak Law Firm should have known it was inaccurate and misleading.

149.   The Kutak Law Firm issued an opinion addressed to the underwriters and to the Stinson Law Firm opining, among other things, that the "Introduction", "Description of the Bonds", "Security for the Bonds", "Appendix D – Form of Trust Indenture", "Appendix E – Form of Opinion of Bond Counsel" and "Appendix G – Form of Deposit Only Account Agreement" contained "fair and accurate statements with respect to the information contained therein."  For all the above alleged reasons, this representation was inaccurate and misleading and the Kutak Law Firm should have known it was inaccurate and misleading.

150.   The above alleged drafting defects permitted the Town to claim that until the Trustee had completely drained the Debt Service Reserve Fund, no event of default existed, despite the fact that the Event Center was not generating any net operating revenues and the Town refused to pay pledged tax revenues to the Trustee.

# THE OFFICIAL STATEMENTS FAILED TO DISCLOSE
# THE DEFECTS IN THE BOND DOCUMENTS

151.  The Official Statements are filled with false and misleading representations regarding the sales tax pledges.  For example:

a.     The cover page of the Official Statements provides:

The Bonds are special, limited obligations of the Issuer payable only from certain amounts paid by the Borrower pursuant to the Loan Agreement and other amounts held in certain funds and accounts established under the Indenture and pledged therefore.  The Bonds are secured by . . . certain transaction privilege tax revenues (TPT Revenues")  paid  by  the  Town  to  the  Trustee  (the  "Pledged Revenues").   The Pledged Revenues will be applied to pay the principal of, premium, if any, and interest on the Bonds.   See "SECURITY FOR THE BONDS" herein.  (Cover Page).

b.     In the "Introduction" section, the Official Statements represent that:

"The principle of redemption premium, if any, and interest on the Bonds are secured by a pledge and assignment and a lien upon. . . all transaction privilege (sales) taxes ("TPT Revenues") (as described herein) received by the Trustee pursuant to the assignment and the Deposit Only Account Agreement (as described herein), and (iii) all monies on deposit in the funds and accounts established under the Indenture (the "Pledged Revenues").  **See "Security for the Bonds" herein."**

c.     The "Description of the Bonds" section of the Official Statements addresses interest payment dates:

"Interest on the bonds will be computed on the basis of a 360 day year consisting of (12) thirty day months and will be payable semi-annually on each April 1st and October 1st, commencing April 1, 2006."

d.     In the "CERTAIN BONDHOLDER RISKS" SECTION OF THE Official Statements, under the sub-heading "Adequacy of Pledged Revenues", the Official Statements represent:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"The security for repayment of the principal and interest on the Bonds is the Pledged revenues. There is no assurance that the Pledged Revenues will be sufficient to pay debt service on the Bonds.

In addition to the legal delays that could result from the bankruptcy of the Borrower or the Town, the ability of the Borrower to enforce collection of the TPT Revenues will be dependent upon various factors, including the delay inherent in all judicial proceedings to enforce the pledge under the Assignment."

152. Each of the above alleged representations in the Official Statements, and other sections which refer to the security for the bonds, are misleading due to the failure to disclose the above alleged defects in the Bond documents that gave the Town the ability to evade its obligation to actually pay the pledged sales tax revenues to the Trustee for application to debt service on the Bonds.

**THE BONDS WERE ISSUED IN NOVEMBER 2005 AND WERE PURCHASED BY ALLSTATE IN RELIANCE UPON THE FALSE AND MISLEADING OFFICIAL STATEMENTS**

153. The Preliminary Official Statement was dated November 4, 2005 and was provided to Allstate by Baird. The Official Statement was dated November 22, 2005 and was provided to potential Bond purchasers by the underwriters in November 2005.

154. Allstate purchased $19,270,000 in face value of the Bonds from Baird at a purchase price of $105.032 on or about November 17, 2005, purchased $6,150,000 in face value of the Bonds from Baird at a purchase price of $100 on November 17, 2005 and purchased an additional $1 million in face value of the Bonds from another broker dealer at a purchase price of $101.03 on November 23, 2005.

155. Allstate reviewed the Official Statements and made all of the above alleged purchases of the Bonds during the initial public distribution of the Bonds in reasonable reliance upon the Official Statements that were prepared and issued on behalf of the

Authority in Arizona.  Allstate would not have purchased the Bonds if they had not received an investment grade rating.

156.    The Bonds were issued with $3,167,434.95 in capitalized interest that would be used to pay interest on the Bonds while the Event Center was being constructed.

157.    Capitalized interest was used to make the April 2006, October 2006 and April 2007 interest payments on the Bonds.

158.    The Event Center was under Construction from November 2005 until late 2006 and began operations in late 2006.

159.    The Trustee determined that it had not yet received revenues and made application to the Town on September 20, 2007.

160.    No payments of sales tax revenues were made by the Town in response to the application.  The Trustee was forced to pay the October 1, 2007 debt service payment from the debt service reserve fund.

161.    The Trustee issued a notice of default on the Bonds in April 2008.

162.    In June 2008, the Trustee demanded that the Town fulfill its obligations under the Development Agreement and the Indenture and pay over to the Trustee all tax revenues pledged to payment of debt service.  The Town responded that it would not make payments without a specific demand from the Trustee addressing the nature of the underlying deficiency and the amount of payment needed, even though the Town knew full well that the Indenture and Development Agreement, which allowed the Trustee to receive only annual financial information, did not contain provisions that would give the Trustee timely access to such information.  The Town further told the Trustee that Arizona law prohibits municipalities from spending money for a purpose not included in their annual budgets, and that the Arizona Constitution imposed expenditure limits on municipalities as well.

163.   The Trustee for the Bonds engaged Economic Research Associates ("ERA"), to prepare a market and financial feasibility study.  ERA issued a draft report in December 2008 (the "2008 ERA Report").

164.   The 2008 ERA Report stated, "ERA prepared an original market and financial feasibility study in early 2005 on this project."

165.   The 2008 ERA Report stated that, since opening in 2006, the Event Center had generated 70 annual events with 200,000 annual attendees.

166.   The 2008 ERA Report indicated that the Event Center was only expected to generate between 88 and 91 events per year between 2009 and 2013 and would continue to have an operating deficit in each of those years.

167.   In the exercise of reasonable diligence, Allstate did not have reason to believe it may have been deceived in connection with its purchase of the Bonds until after it received the December 2008 ERA Report.

168.   In March 2009 the Town issued correspondence to the Trustee stating that it would apply sales tax revenues towards a partial payment of the principal and interest on the Bonds in April 2009 but would only do so under full reservation of its rights to contest its legal obligation to make such payments in the future.

169.   After reserving its right to contest the obligation to make payments to the Trustee, the Town provided a partial payment that was sufficient to make the April 2009 interest payment.

170.   Allstate provided notice of its intent to rescind its purchase of the Bonds to the Defendants in May 2009.

171.   As a direct and proximate result of the small population of Prescott Valley and the surrounding market area for the Event Center compared to comparable event centers, the Event Center was not able to generate any net operating income to pay debt service (much less the $1.6 million that was projected in the Official Statements).  As a result, the Event Center generated minimal sales tax revenues and sales tax revenues from the Entertainment District fell far short of projections.  The actual financial performance

1    of the Event Center was remarkably close to what was projected in the 2001 Feasibility
2    Report that was concealed from Bond purchasers.

3        172.   As a direct and proximate result of the wrongful conducts of Defendants,
4    and each of them, Allstate seeks to rescind its purchases of the Bonds and, in the
5    alternative, seeks out-of-pocket damages in an amount which is presently unknown but
6    which is believed to exceed $15 million.

**FIRST CLAIM FOR RELIEF**

**(Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5**
**Promulgated Thereunder Asserted Against Baird, Stern, Jones, the Town, Global,**
**Hocking, Hocking Associates, PVEC, PVSE, FSG, the Kutak Law Firm, and the**
**Stinson Law Firm)**

13       173.   Allstate repeats the allegations of all preceding paragraphs of the Complaint
14   and incorporates the same by reference.

15       174.   Baird, Stern, Jones, the Town, Global, Hocking, Hocking Associates,
16   PVEC, PVSE, FSG, the Kutak Law Firm and the Stinson Law Firm, directly and
17   indirectly, singly and in concert, in connection with the offering and sale of the Bonds to
18   Allstate, recklessly, knowingly or with an intention to defraud, made one or more
19   misrepresentations or failures to disclose material facts, which material facts were
20   necessary in order to make the statements made in connection with those offerings and
21   sales not misleading in light of the circumstances under which those statements were
22   made all in violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C.
23   § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

24       175.   The Official Statements and the appendices thereto were the principal
25   selling documents for the Bonds and were specifically intended and designed for the
26   benefit and guidance of prospective investors, including Allstate.   The above named
27   Defendants all knew that investors would rely on the information contained in the
28   Official Statements when deciding whether or not to purchase the Bonds.

176.   Allstate, acting through its authorized representatives, reasonably relied upon the Official Statements.

177.   The purpose, effect and result of the violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 by the above named Defendants was to induce Allstate to purchase the Bonds, something it would not otherwise have done.

178.   As a direct and proximate result of the hereinabove-alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, Allstate has suffered damages.

**SECOND CLAIM FOR RELIEF**

**(Section 20(a) of the Securities Exchange Act of 1934,**

**Asserted Against PVSE, FSG, Global, Kozuback and Treliving)**

179.   Allstate repeats the allegations of all preceding paragraphs of the Complaint and incorporates the same by reference.

180.   PVSE, FSG and Global directly or indirectly controlled the above alleged activities of PVEC that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 within the meaning of Section 20(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78t(a)].

181.   Defendants Kozuback and Treliving directly or indirectly controlled the above alleged activities of Global and PVEC that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 within the meaning of Section 20(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78t(a)].

182.   As a direct and proximate result of the above alleged violations of Section 20(a) of the Securities Exchange Act of 1934, Allstate has suffered damages.

**THIRD CLAIM FOR RELIEF**

**(Violation of Arizona State Securities Act, A.R.S. § 44-1991, Against All Defendants)**

183.   Allstate repeats the allegations of all preceding paragraphs of the Complaint and incorporates the same by reference.

184.   In connection with the offer or sale of securities within or from Arizona, Defendants directly or indirectly:  (i) knowingly employed a device, scheme or artifice to defraud; (ii) made untrue statements of material fact or omitted to state material facts which were necessary in order to make the statements not misleading in light of the circumstances under which they were made; and (iii) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon Allstate.

185.   The Defendants' conduct violated A.R.S. § 44-1991.

186.   PVSE, FSG, Global, Kozuback and Treliving directly or indirectly controlled PVEC within the meaning of § 44-1999 and are liable to the same extent as the PVEC for its violations of § 44-1991.

187.   Kozuback and Treliving, directly or indirectly controlled Global within the meaning of A.R.S. § 44-1999 and are liable to the same extent as Global for its violations of § 44-1991.

188.   As a result of Defendants' violation of A.R.S. § 44-1991, Allstate has been damaged and is, pursuant to A.R.S. § 44-2001, entitled to complete rescission  and return of its investment, plus interest, attorneys' fees and costs, or, alternatively, is entitled to recover damages  plus interest, attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**

**(Illinois Securities Act Asserted Against All Defendants)**

189.   Allstate repeats the allegations of all preceding paragraphs of the Complaint and incorporates the same by reference.

190.   Baird sold the Bonds to Allstate in violation of 815 ILL. COMP. STAT. 5/12 and 5/13 (2006).

191.   Baird, Stern, Jones and the Authority offered the Bonds for sale to Allstate in violation of 815 ILL. COMP. STAT. 5/12 and 5/13 (2006).

192.   The Bonds were issued on behalf of the Authority, the Town, Global, PVEC, PVSE and FSG within the meaning of 815 ILCS 5/12.

193.   Baird, Jones, Stern, the Authority, the Town, PVEC, PVSE, FSG, Global, the Kutak Law Firm, the Stinson Law Firm, Hocking, Hocking Associates, Treliving and Kozuback all, in connection with Allstate's purchases of the Bonds, directly and indirectly, negligently, recklessly, knowingly or with an intention to defraud, participated in, aided in any way in, engaged in, offered for sale or sold Allstate securities in Illinois by means of one or more misrepresentations of or failures to disclose material facts, which material facts were necessary in order to make the statements made in connection with those offerings and sales not misleading in light of the circumstances under which those statements were made and, in addition, employed a device, scheme or artifice to defraud Allstate, engaged in acts, practices and a course of business which operated as a fraud or deceit upon Allstate, or signed or circulated the Official Statements knowing or having reasonable grounds to know the material representations therein to be false or untrue, all in violation of 815 ILL. COMP. STAT. 5/12(F), (G), (H) and (I) (2006).

194.   As a direct and proximate result of the wrongful conduct of those Defendants, Allstate has suffered damages.

**FIFTH CLAIM FOR RELIEF**

**(Violation of Sections 25400 and 25500 of the California Corporate Securities Act Asserted Against Defendant Stern)**

195.   Allstate repeats the allegations of all preceding paragraphs of the Counterclaim and incorporates the same by reference.

196.   As an underwriter participating in the initial public distribution of the Bonds, Stern was a person offering the Bonds to members of the investing public, including Allstate, for the purpose of inducing the purchase of the Bonds and made statements that, at the time and in light of the circumstances under which the statements were made, were false and misleading with respect to material facts, or which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and which Stern knew or had reasonable ground to believe were false and misleading in violation of §§ 25400 and 25500 of the California Corporate Securities Act.

197.   By virtue of the wrongful conduct of the Stern, Allstate was induced to and did purchase the Bonds.

198.   The prices Allstate paid for the Bonds was affected by Stern's omissions and misrepresentations, resulting in a wrongfully inflated purchase price for the Bonds. The Bonds were not worth the prices that Allstate paid for them.

199.   As a direct and proximate result of the hereinabove alleged violations of §§ 25400 and 25500 of the California Corporate Securities Act, Allstate has suffered damages.

**SIXTH CLAIM FOR RELIEF**

**(Violation of Sections 25401 and 25501 of the California Corporate**

**Securities Act Asserted Against Defendant Stern)**

200.   Allstate repeats the allegations of all preceding paragraphs of the Complaintand incorporates the same by reference.

201.   As an underwriter participating in the initial public distribution of the Bonds, Stern offered to sell the Bonds to the investing public, including Allstate, from the state of California by means of written and/or oral communications which included untrue statements of material fact and omitted to state material facts necessary to make

1   those statements made, in light of the circumstances under which they were made, not
2   misleading in violation of §§ 25401 and 25501 of the California Corporate Securities Act.

3          202.   By virtue of the untrue statements of material fact and omitted material
4   facts made by Stern, Allstate was induced to and did purchase the Bonds.

5          203.   As a direct and proximate result of the hereinabove alleged violations of §§
6   25401 and 25501 of the California Corporate Securities Act, Allstate has suffered
7   damages.

8                          **SEVENTH CLAIM FOR RELIEF**

9   **(Violation of Sections 551.41 and 551.59 of the Wisconsin Uniform Securities Law**
10                          **Against Defendant Baird)**

11

12         204.   Allstate repeats the allegations of all preceding paragraphs of this
13  Complaint and incorporates the same by reference.

14         205.   As an underwriter participating in the initial public distribution of the
15  Bonds, Defendant Baird was a person in connection with the offer, sale, or purchase of a
16  security directly or indirectly in the state of Wisconsin. Baird made statements to Allstate
17  that, at the time and in the light of the circumstances under which the statements were
18  made, were false and misleading with respect to material facts, or which omitted to state
19  material facts necessary in order to make the statement made, in the light of the
20  circumstances under which they were made, not misleading in violation of § 551.41 of
21  the Wisconsin Uniform Securities Law.

22         206.   By virtue of the untrue statements of material fact and omitted material
23  facts made by Baird, Allstate was induced to and did purchase the Bonds.

24         207.   As a direct and proximate result of the hereinabove alleged violation of §
25  551.41 of the Wisconsin Uniform Securities Law, Allstate has suffered damages
26  recoverable under § 551.59 of the Wisconsin Uniform Securities Law.

27         208.   This action is instituted on the basis of conduct which has occurred before
28  January 1, 2009 pursuant to Section 551.703 of Wisconsin Uniform Security Law.

**EIGTH CLAIM FOR RELIEF**

**(Common Law Fraud Asserted Against Global,**

**Hocking, Hocking Associates, PVEC, PVSE, FSG and the Town)**

209.   Allstate repeats the allegations of all preceding paragraphs of this Complaint and incorporates the same by reference.

210.   Global, Hocking, Hocking Associates, PVEC, PVSE, FSG, and the Town made material misrepresentations and omissions of past and present facts as more fully alleged above and knew the misrepresentations were false and misleading.

211.   The misrepresentations and omissions, as alleged above, were made with the intent to induce Allstate to purchase the Bonds.

212.   Allstate was not aware of the omissions and did not know that the representations were false.

213.   Allstate justifiably relied upon the representations contained in the Official Statements and, as a direct and proximate result, has suffered substantial damages.

**NINTH CLAIM FOR RELIEF**

**(Aiding and Abetting Common Law Fraud Asserted Against Baird, Stern, Jones, Global, Hocking, Hocking Associates, PVEC, PVSE, FSG, the Town, the Kutak Law Firm, and the Stinson Law Firm)**

214.   Allstate repeats the allegations of all preceding paragraphs of this Complaint and incorporates the same by reference.

215.   One or more of Defendants, Global, Hocking, Hocking Associates, PVEC, PVSE, FSG and the Town as alleged above, knowingly made material misrepresentations and omissions of past and present facts as more fully set forth above and is liable to Allstate as a principal for common law fraud.

216.   Any of Defendants, Global, Hokcing, Hocking Associates, PVEC, PVSE, FSG and the Town that is not liable as a principal for common law fraud and Defendants

1  Baird, Stern, Jones, the Kutak Law Firm and the Stinson Law Firm were aware of the
2  fraud and provided substantial assistance to advance the commission of the fraud.

3      217.   As a direct and proximate result of the hereinabove alleged wrongful acts,
4  Allstate has suffered damages.

5                      **TENTH CLAIM FOR RELIEF**
6      **(Negligent Misrepresentation Asserted Against All Defendants)**

7

8      218.   Allstate repeats the allegations of all preceding paragraphs of this
9  Complaint and incorporates the same by reference.

10     219.   Each of the defendants provided information to Allstate without exercising
11 reasonable care to ensure such information was complete and accurate and not false or
12 misleading, as more fully set forth hereinabove.

13     220.   Each of the Defendants knew or should have reasonably foreseen that the
14 Official Statements and the appendices thereto would be distributed to potential
15 purchasers of the Bonds, knew that such investors would rely on the information
16 provided in the Official Statements when deciding whether or not to purchase the Bonds,
17 had a duty to disclose or cause to be disclosed the material facts set forth above and had a
18 duty to take reasonable action to ensure that the representations made in the Official
19 Statements were complete, accurate and not misleading.

20     221.   Each of the Defendants breached their duty to Allstate by negligently
21 making the above alleged misrepresentations of and failures to disclose material facts.

22     222.   Allstate justifiably relied upon the representations contained in the Official
23 Statements and, as a direct and proximate result, has suffered substantial damages.

24                       **RELIEF REQUESTED**

25

26     Allstate requests that the Court enter judgment in its favor against the Defendants,
27 and each of them, jointly and severally, on each of its Claims for Relief and award
28 Allstate:

A.      Statutory damages or rescission;

B.      In the alternative, out-of-pocket damages;

C.      Prejudgment interest;

D.      Costs;

E.      Attorneys' fees pursuant to pertinent provisions of the applicable state securities acts; and

F.      Any other relief which the Court deems proper.

## DEMAND FOR JURY TRIAL

Allstate hereby demands a jury trial with respect to its Complaint.

1

2   Respectfully submitted,

3   Dated: September 18, 2009      **DAVIS & CERIANI, P.C.**

4

5   By:        s/Michael P. Cillo
            Michael P. Cillo (CO # 14955)
6           Patrick J. Kanouff (CO # 26121)
            Davis & Ceriani, P.C.
7           1350 17th Street, Suite 400
            Denver, CO 80202
8           Telephone:  303.534.9000
            Facsimile:  303.534.4618
9           E-mail:      mcillo@davisandceriani.com
                    pkanouff@davisandceriani.com
10

11  **-and-**

12
    **LAVELLE & LAVELLE, P.L.C.**
13

14

15  By:        s/Matthew K. LaVelle
            Michael J. LaVelle, No. 002296
16          Matthew K. LaVelle, No. 018828
            Camelback Esplanade II Center
17          2525 East Camelback Road, Suite 888
            Phoenix, AZ 85016-4280
18          Telephone:  602.279.2100
            Facsimile:  602.279.2114
19          E-mail:      mjl@lavelle-lavelle.com
                    matt@lavelle-lavelle.com
20

21

22  **ATTORNEYS FOR PLAINTIFFS**

23

24

25

26

27

28