**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Allstate Life Insurance Company, | Lead Case No. CV-09-8162-PCT-GMS |
| Plaintiff, | Consolidated with: |
| vs. | Case No. CV-09-8174-PCT-GMS |
| Robert W. Baird & Co., Inc., *et. al.*, | **ORDER** |
| Defendants. | |
| Ronald Covin, *et al.*, | |
| Plaintiffs, | |
| vs. | |
| Robert W. Baird & Co., Inc., *et al.*, | |
| Defendants. | |

Several motions to dismiss are pending before the Court. First, the Defendants in this action move to dismiss the Amended Complaints filed by Allstate Life Insurance Company and the Class Action Plaintiffs (collectively "Plaintiffs"). (*See* Doc. 157–59, 164–65). Defendants then move to dismiss the Counterclaim filed by Counter-Complainant Wells Fargo Bank, N.A. (*See* Doc. 170, 173–74, 177). As set forth below, the Motions to Dismiss are granted in part and denied in part.[1]

---

[1]The parties' requests for oral argument are denied as the Court has determined that oral argument will not aid in its decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

**BACKGROUND**

The instant action arises from the offering and sale of $35 million in revenue bonds (the "Bonds") used to finance the construction of a 5,000 seat event center in the Town of Prescott Valley, Arizona. Beginning in November 2005, Plaintiffs purchased these Bonds pursuant to a set of offering documents, entitled the "Official Statements." The Official Statements, which were allegedly prepared and/or circulated by Defendants, contained, among other things, information and disclosures pertaining to the purchase, redemption, financing, debt servicing, and security of the Bonds. (*See* Doc. 155, Ex. 1). According to Plaintiffs, however, the Official Statements also omitted critical information, allegedly known to Defendants, that rendered portions of the Statements false or misleading.

**I.     The Parties**

Plaintiffs in this action are individuals and business entities that purchased the Bonds pursuant to the Official Statements. Plaintiff Allstate Life Insurance Company ("Allstate") invested $26.4 million and is the Bondholder with the largest single financial interest in the Bonds. The Class Action Plaintiffs include Bondholders, other than Allstate, who invested approximately $9 million into the Bonds. These Plaintiffs are represented by five retirees: Ronald Covin, Bernard Patterson, Allen Patzke, Walter Krause, and Larry Verhulst. Wells Fargo Bank, N.A. (the "Trustee") was appointed as Indenture Trustee for the Bonds in the latter part of 2005. According to the Trustee, it has power to bring claims on the Bondholders' behalf pursuant to its Indenture Agreement with the Bondholders.

Plaintiffs and the Trustee bring claims against multiple defendants, who allegedly failed to disclose material information to purchasers of the Bonds. Defendants Robert W. Baird & Co, Inc. ("Baird"), M.L. Stern & Co., LLC ("Stern"),[2] and Edward D. Jones & Co., L.P. ("Jones") were the Underwriters for the Bonds. Plaintiffs and the Trustee contend that these Defendants are at least partially responsible for the misleading information allegedly

---

[2]In 2008, Southwest Securities, Inc. acquired Stern and became the successor to Stern's interests in this case. For simplicity purposes, however, the Court will refer to the entity as "Stern" throughout this Order.

contained in the Official Statements. Defendants Kutak Rock LLP ("Kutak") and Stinson, Morrison, Heckler LLP ("Stinson") are law firms which allegedly prepared and drafted much of the language contained in the Official Statements. In preparing the Official Statements, Kutak acted as bond counsel and Stinson represented the Underwriters.

The Bonds were issued by the Development Authority of the County of Yavapai (the "Authority"),[3] and the proceeds were loaned to Defendant Prescott Valley Event Center LLC ("PVEC-LLC"). PVEC-LLC is allegedly owned and controlled by Defendants Global Entertainment Corporation ("Global Entertainment") and Prescott Valley Signature Entertainment, LLC ("PVSE"). Global Entertainment is owned and controlled by Defendants Richard Kozuback and W. James Treliving. PVSE is allegedly owned and controlled by Defendant Fain Signature Group, LLC ("FSG"), which is owned by Brad Fain and his family. PVSE and FSG (collectively the "Fain Group") allegedly own a significant amount of commercial real estate in the Prescott Valley area. According to Plaintiffs, Global Entertainment, and the Fain Group also knowingly contributed to the allegedly misleading information contained in the Official Statements.

Sometime before the Bonds were issued, Defendant T.L. Hocking & Associates, which is controlled by Defendant Thomas L. Hocking (collectively the "Hocking Defendants"), and Global Entertainment entered into a partnership to promote and develop small to mid-sized event centers. Pursuant to this arrangement, Global and Hocking approached the Town of Prescott Valley ("Prescott Valley" or the "Town") in 2004 to promote the construction and financing of the Prescott Valley Event Center. After the Town agreed, financing agreements were prepared and signed, the Official Statements were drafted (allegedly with input from each of the Defendants), the Bonds were issued, and the Event Center was constructed. After the Event Center failed to meet financial expectations and projections, as set forth in the Official Statements, Plaintiffs filed this case.

---

[3]The Authority was dismissed from this action without prejudice on March 30, 2010. (*See* Doc. 142; 146).

## II.     The Alleged Fraud

### A.     The Official Statements

The Official Statements provide two sources for paying debt service on the Bonds: (1) the net operating income from the Event Center and (2) certain Transaction Privilege Tax Revenues ("TPT Revenues"), which consist of sales taxes generated by the Event Center, sales taxes created by an "Entertainment District" immediately adjacent to the Event Center, and certain taxes generated in a "Secondary Credit Support Area" located near the Event Center, but beyond the Entertainment District. (Doc. 130 at ¶ 6). Accordingly, the amount of money available for servicing the debt owed on the Bonds, at least in large part, depends on the total number of persons attending events at the Center. (*See* Doc. 155, Ex. 1 at 12). According to the Official Statements, the Event Center was expected to generate 133 events per year with an average attendance of 3,609 people per event. *See id.* In total, the Official Statements projected an "annual . . . paid attendance [of] approximately 480,000." *Id.* Based on these attendance figures, the Official Statements projected that the Event Center's first full year of operation would generate around $5 million in total revenues and just over $4 million for debt servicing on the Bonds. *Id.* at 18. The Amended Complaints allege that because the amount of money available for paying the debt service on the Bonds was expected to be approximately two times the annual amount due to Bondholders, Fitch Ratings ("Fitch"), an independent rating agency, gave the Bonds an investment-grade "A–"rating. (*See* Doc. 188, Ex. 16).

The projections set forth in the Official Statements, however, have not yet materialized, and, according to Plaintiffs, these projections will never materialize. Rather than producing an annual attendance of 480,000, the Event Center has generated attendance closer to 200,000 per year. While the Official Statements projected approximately 133 events with an average attendance of 3,609 per event, the Center has generated approximately 70 events per year with only about 2,857 attendees per event. Where the Official Statements opined that funding available for paying debt service on the Bonds would be approximately two times the annual amount due to Bondholders, the actual amount of net income and TPT

1    Revenue available to pay debt servicing has been substantially less. When it was revealed

2    that the Event Center would not be able to generate the revenue originally projected in the

3    Official Statements, Fitch downgraded the Bonds to junk status.

4            Though the projections in the Official Statements are forward-looking, Plaintiffs

5    contend that they were fraudulent because Defendants knowingly omitted material

6    information that seriously undermined the Event Center's ability to generate the attendance,

7    event, and revenue figures set forth in the estimates contained in the Official Statements.

8    Specifically, Plaintiffs allege that Defendants conducted, or were at least aware of, two

9    internal feasibility studies suggesting that the Prescott Valley area could not be expected to

10   generate the event and attendance statistics set forth in the Official Statements. Plaintiffs first

11   point to a 2001 Feasibility Report prepared by International Coliseums Company ("ICC"),

12   which later became an affiliate of Global Entertainment. The 2001 ICC Report examined the

13   feasibility of a similarly-sized event center in the nearby community of Prescott, Arizona[4]

14   and concluded that an event center in this area could reasonably be expected to generate

15   approximately 78 events per year with an annual attendance of approximately 202,500. (Doc.

16   188, Ex. 2 at 215). Based on these projections, the 2001 Report concluded that an event

17   center in the greater Prescott area could be expected to generate annual revenues of

18   approximately $1,579,675. *Id.* at 218. In drawing these conclusions, the 2001 Report

19   considered factors such as "demographics, disposable income for entertainment, tourism,

20   etc." for the Prescott area. *Id.* at 214.

21           Plaintiffs next allege that Defendants failed to disclose information contained in a

22   February 2005 Feasibility Study conducted by Economics Research Associates ("ERA"). The

23   2005 ERA Report, which was prepared at the request of Global Entertainment, the Town, and

24

25           [4]Prescott, Arizona is approximately twelve miles from Prescott Valley, and the two

26   communities appear to share the same relevant market area for purposes of determining the

27   financial feasibility of an event center. The population base for an event center in either

      Prescott or Prescott Valley includes approximately 95,000 residents, most of whom are

28   located in a fifteen to twenty-mile-radius around either community.

the Fain Group, concluded that an event center in Prescott Valley could be expected to host approximately 103 events during its first year with a total paid attendance of just over 321,000. (Doc. 188, Ex. 5 at 72–73). The Report also concluded that an event center in the Prescott Valley area could be expected to generate approximately $4,577,000 in total gross revenue per year. *Id.* at 6. The Report made these projections after conducting a demographic analysis of 32 arenas in other markets. *See id.* at 72–73. Each of these other markets hosted event centers with minor league sports teams similar to the CHL Hockey and Arena Football 2 Teams that were expected to be anchor tenants in Prescott Valley. *See id.* at 31–32. This demographic analysis determined that the average population in other markets was approximately three times larger than the population in the Prescott Valley area. *Id.* In markets with CHL Hockey Franchises, the average population within a fifteen mile radius of the relevant arena was 4.1 times greater than that of Prescott Valley. *See id.* at 31. Markets with Arena Football 2 Teams had an average population 4.8 times greater than the Town. *See id.* at 32. Given these population disparities, ERA indicated that an event center in the Prescott Valley area could merely be expected to generate "between approximately 97 and 102 annual events." *Id.* at 71. Meanwhile, similarly sized event centers in the substantially larger markets might be expected to generate between approximately 120–140 events. *See id.* at 72.

The following chart summarizes the projections set forth in the ICC Report, the ERA Report and the Official Statements. It also contains the estimated total cost of the project at the time of these projections.

|  | 2001 ICC Report | 2005 ERA Report | 2005 Official Statements |
|---|---|---|---|
| *Number of Events* | 78 | 103 | 133 |
| *Average Attendance* | 2,596 | 3,118 | 3,609 |
| *Annual Attendance* | 202,500 | 321,170 | 480,000 |
| *First Year Revenue* | $1.58 Million | $4.5 Million | $5.84 Million[5] |

[5]The revenue projections in the Official Statements include a pledge by the Town of just over $ 1 million per year should event-based revenues prove insufficient to meet debt

| Projected Costs | $22 Million | $25 Million[6] | $35 Million |

Thus, based on the conclusions and calculations set forth in the 2001 ICC Report and the 2005 ERA Report, Plaintiffs allege that the event and attendance projections in the Official Statements were never realistic and that Defendants knew as much. Plaintiffs further claim that Defendants intentionally and fraudulently increased event and attendance projections to inflate projected revenue and achieve an investment-grade rating.

**B.    Defendants' Other Alleged Omissions**

Aside from Defendants' failure to disclose the content of the 2001 and 2005 Reports, Plaintiffs allege that the Official Statements were misleading because they omitted several other key facts. In their Amended Complaints, Plaintiffs allege that Global Entertainment, the Town, and the Fain Group originally had planned to have ERA conduct a final "examination report" on the projections that were to be revised following the 2005 Report. This examination, had it been conducted, apparently would have been attached to the Official Statements. But, rather than proceed with the final examination report, Global Entertainment and the Fain Group allegedly convinced the Town that the additional evaluation was not necessary. According to Plaintiffs, Defendants failure to disclose the decision to cancel the ERA examination also rendered the Official Statements false or misleading.

Plaintiffs next contend that Defendants failed to disclose the fact that the Town's financial advisor, Stone & Youngberg ("S&Y"), terminated its involvement with the Event Center when the Town decided not to go through with the final ERA examination report. When the Town voiced a desire to disclose that its financial advisor felt that a final feasibility report was necessary and had withdrawn from project, Global Entertainment, the Hocking Defendants, and the Fain Group convinced the Town otherwise. According to Plaintiffs,

servicing obligations.

[6]The 2005 Report does not disclose the anticipated cost of the Event Center. The Town, however, allegedly estimated the cost to be approximately $25 million as late as May 12, 2005, which was three months after the 2005 Report was completed.

Defendants' failure to disclose these facts in the Official Statements rendered them misleading.

Plaintiffs further assert that the Official Statements falsely implied that no feasibility report was prepared. Specifically, Plaintiffs assert that the following language in the Official Statements is false, or at least misleading:

> No feasibility report on [PVEC–LLC] and [the] unaudited projected financial performance of the Project has been prepared and the unaudited projected financial performance of the Project has not been examined by any financial adviser or by any accounting firm in order to verify either the reasonableness of the assumptions used by [PVEC–LLC] and [Global Entertainment], the appropriateness of the preparation and presentation of the unaudited projected financial performance of the Project or the conclusions contained in such unaudited projected financial performance of the Project.

(Doc. 155, Ex. 1 at 22). Plaintiffs assert that this provision is misleading because it implies that a feasibility study was never conducted and because it ignores the 2001 and the 2005 ERA Feasibility Studies. And while Plaintiffs acknowledge that the existence of the 2005 Report was disclosed in a separate portion of the Official Statements, Plaintiffs allege that this disclosure, which mentioned little more than the Report's existence, was insufficient because it was "buried" in an appendix to the Official Statements.

Based on these allegations, Plaintiffs assert that Defendants violated § 10(b) of Securities Exchange Act and Rule 10-b-5 promulgated thereunder. Plaintiffs also claim that Defendants Global Entertainment, Kozuback, Treliving, and the Fain Group violated Section 20(a) of the Exchange Act. Allstate further brings state-law claims against Defendants for securities fraud, common-law fraud, aiding and abetting fraud, and negligent misrepresentation.

/ / /

/ / /

/ / /

/ / /

/ / /

1

### C.       The Trustee's Allegations

2          In its Counterclaim,[7] the Trustee raises factual allegations similar to those asserted in

3   Plaintiffs' Complaints. Unlike Plaintiffs' claims, however, the Trustee does not assert a

4   federal securities claim. Instead, the Trustee alleges that the Town breached the Development

5   Agreement, which apparently requires the Town to deliver TPT Revenues for debt servicing

6   on the Bonds to the Trustee by specified dates. According to the Trustee, the Town has not

7   complied with these requirements. The Trustee also seeks declaratory relief and reformation

8   of the Development Agreement to correct drafting errors allegedly found therein. Finally, the

9   Trustee contends that Defendants violated various state securities laws and that they

10  negligently misrepresented the contents of the Official Statements. In raising these claims,

11  the Trustee also asserts that the Official Statements falsely indicated that debt service on the

12  Bonds would be "secured" by a first lien on the TPT revenues. According to the Trustee, this

13  assertion turned out to be incorrect due to drafting defects in certain Bond documents.

14

### D.       Defendants' Motions to Dismiss

15         As discussed in greater detail below, Defendants have filed numerous motions to

16  dismiss Plaintiffs' Complaints and the Trustee's Counterclaim. Essentially, Defendants assert

17  that Plaintiffs have not pled their federal securities fraud claims with the particularly required

18  by the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil

19  Procedure 9(b). Defendants also contend that their allegedly false statements are not

20  actionable because they are forward-looking statements. Similarly, Defendants contend that

21  Allstate and the Trustee have failed to plead their state-law claims with the requisite

22  particularity. With respect to the Trustee's claims, Defendants jointly contend that the

23  Trustee lacks standing to bring its tort-based claims, and the Town contends that Allstate and

24

25

---

26         [7]The Trustee's Counterclaim was filed in response to the Town's Third-Party
27  Complaint against the Trustee. The Town's Third-Party Complaint, which was dismissed in
    part, is not presently at issue. *See Allstate Life Ins. Co. v. Robert W. Baird & Co.*, 2010 WL
28  2348615 (D. Ariz. June 10, 2010); (Doc. 192).

1   the Trustee have failed to comply with Arizona's notice of claim requirements.[8]

2   **DISCUSSION**

3   Upon review of the parties' 9 separate motions, 538 pages of briefing, duplicative

4   requests for judicial notice—totaling 1217 pages,[9] and 462 footnotes, the Court concludes

5   that Plaintiffs have stated a claim pursuant to §§10(b) and 20(a) against several of the

6   Defendants. Likewise, the majority of the state-law claims asserted by Allstate and the

7   Trustee survive the Motions to Dismiss.

8   **I.   Plaintiffs' Have Stated a Claim Pursuant to § 10(b) of the Securities and Exchange Act Against Certain Defendants.**

9   To establish a valid claim under § 10(b) and Rule 10b-5, Plaintiffs must satisfy five

10  elements: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection

11  with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic

12  loss." *In re Daou Sys. Inc., Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura*

13  *Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). When evaluating motions to dismiss,

14  courts must "accept the plaintiffs' allegations as true and construe them in the light most

15  favorable to plaintiffs[.]" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th

16  Cir. 2009) (quotation omitted). "[D]ismissal is inappropriate unless the plaintiffs' complaint

17  fails to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v.*

18

19      [8]Defendants Global Entertainment and PVEC have not filed separate motions to

20  dismiss, and the Hocking Defendants have not filed a Motion to Dismiss the claims alleged

21  by the Trustee. (*See* Doc. 160–62, 166, 170, 175, 178). Instead, these Defendants have joined the other Defendants' Motions. *Id.* Similarly, as far as the Court can tell, all of the

22  Defendants have joined each other's Motions.

23      [9]The parties have requested consideration of several documents related to the pending

24  claims including the Official Statements, the 2001 and 2005 Feasibility Reports, Fitch's Rating Report and Downgrade, etc. None of the parties dispute the authenticity of these

25  documents, and they do not object to their consideration. Thus, to the extent that the relevant

26  documents are incorporated by reference or are subject to judicial notice, the Court has considered them as appropriate in resolving the pending motions. *Marder v. Lopez*, 450 F.3d

27  445, 448 (9th Cir. 2006) (discussing the parameters of the incorporation by reference doctrine); *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991) (allowing

28  consideration of items that are properly the subject of judicial notice on a motion to dismiss).

1  *Twombly*, 550 U.S. 544, 570 (2007)). Additionally, where a complaint alleges securities

2  fraud, the PSLRA and Federal Rule of Civil Procedure 9(b) require the plaintiff to "'plead

3  with particularity both falsity and scienter.'" *Id.* (quoting *Gompper v. VISX, Inc.*, 298 F.3d

4  893, 895 (9th Cir. 2002)).

5  In their Amended Complaints, Plaintiffs allege that each of the Defendants, with the

6  exception of Treliving, committed a primary violation of § 10(b). Upon review of these

7  allegations, the Court finds that Plaintiffs have stated a § 10(b) claim against Global

8  Entertainment, Kozuback, the Hocking Defendants, the Fain Group, the Town, and

9  PVEC–LLC. Plaintiffs, however, have not pled scienter with the requisite particularity as to

10  the Underwriters, Kutak, or Stinson.

11      **A.**    **Plaintiffs Have Alleged a Material Misrepresentation or Omission Against Several of the Defendants**.

12  Under the PSLRA, a securities fraud complaint must "'specify each statement alleged

13  to have been misleading, the reason or reasons why the statement is misleading, and, if an

14  allegation regarding the statement or omission is made on information and belief, . . . state

15  with particularity all facts on which that belief is formed.'" *Zucco Partners*, 552 F.3d at

16  990–91 (quoting 15 U.S.C. § 78u-4(b)(1)). Similarly, Federal Rule of Civil Procedure 9(b)

17  requires that "in all averments of fraud or mistake, the circumstances constituting fraud or

18  mistake shall be stated with particularity[.]" Fed. R. Civ. P. 9(b). "Averments of fraud must"

19  further "be accompanied by the who, what, when, where, and how of the misconduct

20  charged." *Kearns v. Ford Motor Co*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v.

21  Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). Thus, to adequately allege that

22  Defendants uttered false or misleading statements, Plaintiffs must first identify specific

23  statements and explain how they are misleading. Plaintiffs then must plead particular facts

24  indicating that *each* of the Defendants made or substantially participated in the making of the

25  allegedly false or misleading statements.

26  / / /

27  / / /

28

### (1)   Plaintiffs Have Adequately Alleged that the Event and Attendance Projections in the Official Statements Were Misleading.

Plaintiffs allege that the Official Statements were false or misleading for three reasons: (1) the Official Statements affirmatively created the false impression that no analysis had been conducted with respect to the feasibility of the Event Center; (2) the Official Statements omitted the decision to forgo ERA's final feasibility analysis and S&Y's withdrawal from the project following that decision; and (3) the Official Statements failed to disclose information from the 2001 and 2005 Feasibility Reports, which indicated that Prescott Valley would be unable to attain the event, attendance, and revenue projections set forth in the Official Statements. Though the first two allegations do not independently support a claim for securities fraud, Plaintiffs have sufficiently pled facts indicating that Defendants' failure to disclose the information from the 2001 and 2005 Reports rendered the Official Statements false or misleading. And while these allegedly misleading projections are forward-looking, the Court rejects Defendants' assertion that those projections are immunized by the "bespeaks caution" doctrine because sufficient allegations exist upon which a fact-finder could conclude that at least some of the Defendants knew that the projections were unreasonable.

### (a)   The Disclosure on Page 22 of the Official Statements Does Not Give Rise to an Actionable Misstatement.

Under § 10(b) and Rule 10b-5, an affirmative statement is actionable only if it is "untrue or misleading." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1005–06 (9th Cir. 2002). Accordingly, a disclosure that is "literally true," may be actionable, if it is somehow "misleading." *Id.* at 1006 (citing *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994)). And while "literally true," statements can give rise to liability under certain circumstances, "Rule 10b-5 . . . prohibit[s] only misleading and untrue statements, not statements that are incomplete." *Id.*

In this case, Plaintiffs allege that the following language, located on page 22 of the Official Statements, is false or misleading:

No feasibility report on [PVEC–LLC] and [the] unaudited

- 12 -

projected financial performance of the Project has been prepared and the unaudited projected financial performance of the Project has not been examined by any financial adviser or by any accounting firm in order to verify either the reasonableness of the assumptions used by [PVEC–LLC] and [Global Entertainment], the appropriateness of the preparation and presentation of the unaudited projected financial performance of the Project or the conclusions contained in such unaudited projected financial performance of the Project.

(Doc. 155, Ex. 1 at 22). Plaintiffs argue that this provision is false or misleading because it indicates that no feasibility report had been conducted, though two prior feasibility studies had been conducted. According to Defendants, this provision is limited to the estimates in the Official Statements, and thus it is not a misstatement at all.

Nonetheless, even if the disclosure on page 22 is a misstatement, it is difficult to conclude how such a misstatement is separate from the allegation that the Official Statements failed to disclose material information from the 2001 and 2005 feasibility reports that calls into questions the Official Statements' estimates and projections. Plaintiffs allege that the misstatement is disguised to direct the reader's attention away from the 2005 feasibility studies and the determination not to conduct a final feasibility study. But, even assuming that is true, the statement itself, at most, implies that no feasibility studies were performed.

Plaintiffs cannot seriously contend that, in purchasing the Bonds, they relied on the *lack* of a feasibility report. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the §10(b) private cause of action"). And, while reliance is generally presumed when the statement in question is issued to the public, especially at the pleading stage, that presumption can be rebutted when it is *clear* that no reasonable investor could have relied on the statement at issue in purchasing the securities. *See Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 569 (7th Cir. 2009) (affirming dismissal where the "inference of reliance" was completely "implausible" based on the facts alleged in the complaint); *cf. In re Infineon Techs. A.G. Sec. Litig.*, 266 F.R.D. 386, 395 (N.D. Cal. 2009) ("A presumption of reliance cannot exist where such a presumption would be unreasonable . . . ."); In this case, it seems absurd to suggest that investors made their decision to buy the

- 13 -

Bonds based on the alleged assertion that no feasibility analysis of the Event Center had been conducted. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'") (quoting *Twombly*, 550 U.S. at 570). This would be akin to a home buyer choosing a specific property *on the basis* that *neither an inspection nor an appraisal* of the property had been conducted. While a purchaser may still select the property or the security for other reasons, no reasonable buyer would base his or her decision on a *lack* of relevant information.

To be sure, and as further discussed in this Order, the omission of data from the 2001 and 2005 Reports was arguably misleading because that data may have cast serious doubt on the projections in the Official Statements. This omission, however, does not give rise to an independent claim based on the disclosure found on page 22 of the Official Statements.[10]

### b. The Failure to Reveal the Decision to Forgo a Final ERA Study and S&Y's Withdrawal Was Not Misleading.

To be actionable under Section 10(b) and Rule 10b-5, an alleged omission must render some affirmative public statement misleading. *See In re Metropolitan Sec. Litig.*, 532 F. Supp.2d 1260, 1290 (E.D. Wash. 2007) (holding that to state cause of action based on an omission, a plaintiff must explain "how [an] alleged omitted fact negates the truth of or renders misleading the statements actually made") (quotation omitted). There is no duty to disclose information simply because it is material. Instead, an omission is actionable only if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006 (citing *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 880 (9th Cir. 1994)); *see Wessel v. Buhler*, 437 F.2d 279, 283 (9th Cir. 1971) (interpreting Rule 10b-5 as prohibiting only "omission[s] occurring as part of an

---

[10]This language, however, may give rise to an inference of scienter given that it may have been crafted to disguise the fact that prior feasibility reports had been conducted. To give rise to an inference of the requisite state of mind, however, Plaintiffs must plead with particularity facts indicating that one or more of the Defendants was responsible for making or creating this statement.

1  affirmative statement").

2      In their Amended Complaints, Plaintiffs contend that the Official Statements were

3  misleading because Global Entertainment, the Town, and the Fain Group had originally

4  planned to have ERA conduct a final feasibility study on the event, attendance, and revenue

5  projections that would ultimately be contained in the Official Statements. This examination,

6  had it been conducted, would also have been attached to the Official Statements. But, rather

7  than proceed with the planned examination, Global Entertainment and the Fain Group

8  allegedly convinced the Town that the additional analysis was not necessary. Following that

9  decision, the Town's financial advisor, S&Y, allegedly terminated its involvement with the

10  Event Center. According to Plaintiffs, S&Y's decision was based on the belief that a final

11  feasibility report was necessary.

12      As the project moved forward, Prescott Valley negotiated and entered the

13  Development Agreement, which set forth the Town's debt servicing obligations. And while

14  the Town apparently wanted to disclose in this Agreement that S&Y withdrew from the

15  project due to the lack of a final feasibility report, the Complaint alleges that Global

16  Entertainment, the Hocking Defendants, and the Fain Group convinced the Town otherwise.

17  In the drafting phases of the Development Agreement, the Town allegedly proposed that the

18  following language be placed in that Agreement:

19          The Town's financial advisors have advised that the Town no
            longer directly participate in the [Event Center] Financing
20          determinations based on the decision by [the Fain Group] and
            [Global Entertainment] not [to] pursue [a final] ERA Feasibility
21          Study.

22  (Doc. 122 at 70). When Global Entertainment, the Hocking Defendants, and the Fain Group

23  rejected this language, the Town proposed that the Development Agreement include a

24  provision indicating that the Town wanted a final study proving feasibility of the Event

25  Center. Ultimately, the final draft of the Development Agreement, without these specific

26  disclosures, was attached as "Appendix A" to the Official Statements.

27      While some of the alleged facts may potentially be material, Plaintiffs fail to

28  demonstrate how these alleged omissions somehow render the affirmative provisions in the

- 15 -

Official Statements false or misleading. For instance, while Plaintiffs assert that Defendants should have disclosed their decision to forgo a final feasibility report, it is unclear how this impacted some affirmative provision in the Official Statements. Defendants do not suggest that the final data in the Official Statements underwent a feasibility analysis; instead, the Official Statements indicate that no final feasibility study was conducted. (Doc. 155, Ex. 1 at 22).

Similarly, to the extent Plaintiffs allege that Defendants should have disclosed their alleged dispute about whether to conduct a final feasability report, Plaintiffs fail to explain how facts relating to this internal dispute make an affirmative portion of the Official Statements false or misleading. *See In re Silicon Image, Inc. Sec. Litig.*, 2007 WL 607804, at *7 (N.D. Cal. Feb. 23, 2007) (dismissing a § 10(b) claim where "plaintiffs fail[ed] to allege how [the] omission" of an internal dispute "created a materially different impression from the one that actually existed"). The Official Statements do not disclaim or deny that a dispute took place, nor do they suggest that the parties unanimously agreed to forgo an additional study. There simply is no per se rule requiring companies to disclose every internal disagreement that occurs in the course of a company's decision-making process.

The allegations of S&Y's withdrawal from the project and the subsequent decision not to disclose S&Y's withdrawal suffer from the same deficiencies. Although S&Y, which served as the Town's financial advisor for a time, apparently withdrew because it wanted ERA to conduct an additional feasability study, it is unclear how Defendants' failure to disclose this fact created an impression that differed from reality. The Official Statements do not state or imply that the Town's financial advisor was monitoring the project or that the advisor supported construction of the Event Center. Similarly, the fact that S&Y wanted a final feasibility report does not mean or suggest that an additional report was actually necessary for the event, attendance, and revenue projections to be reasonable.[11] These alleged

_____

[11]Though none of these alleged omissions appear to have a direct bearing on the accuracy of the Official Statements, the circumstances surrounding these facts may still be

omissions simply do not, in and of themselves, "create[] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006 (citation omitted).

### c. The Alleged Failure to Disclose Information from the 2001 & 2005 Reports States a Claim Under § 10(b).

As a general rule, companies are not required to disclose all of their internal projections. *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991). Instead, where a "firm generates a range of estimates internally or through consultants[,] [i]t may reveal the projection it thinks best while withholding others, so long as the one revealed has a '*reasonable basis*.'" *In re Stac Elects. Sec. Litig.*, 89 F.3d 1399, 1411 (9th Cir. 1996) (emphasis added). On the other hand, companies have a duty to disclose internal forecasts "made with . . . *reasonable certainty*." *Convergent*, 948 F.2d at 516 (emphasis added). For example, in *Provenz v. Miller*, 102 F.3d 1478, 1487–88 (9th Cir. 1996), the Ninth Circuit held that material issues of fact precluded summary judgment where a company executive disregarded reliable internal data predicting a $4,000,000 loss for the quarter and instead predicted quarterly earnings of approximately $624,000. *Id.*; *see also In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1455 (N.D. Cal. 1996) ("[C]ompanies have a duty to disclose internal forecasts made with . . . reasonable certainty . . . as well as financial data and other material information upon which an internal forecast is based.") (internal quotations omitted). Accordingly, allegations of fraud involving expectations, beliefs, or projections are misleading only if "(1) the defendant did not actually believe the statement, (2) there was no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) *cert. denied*, 516 U.S. 810 (2005) (quoting *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir. 1993), *cert. denied*, 513 U.S. 917 (1994)).

---

relevant to Defendants' state of mind. As set forth in the scienter section below, at least some of these allegations may tend to indicate that Defendants knew that the event and attendance projections were unreasonable.

1    Plaintiffs have adequately pled that the Official Statements were false or misleading
2    because those documents allegedly omitted critical information contained in the 2001 and
3    2005 Feasibility Reports. Those Reports tend to indicate that the Prescott Valley area could
4    not be expected to generate the number of events and attendees that were projected in the
5    Official Statements. The 2001 ICC Report, which considered the feasibility of a similarly-
6    sized event center in the Prescott/Prescott Valley area, concluded that an event center would
7    generate approximately 78 events per year with an annual attendance of approximately
8    202,500. (Doc. 188, Ex. 2 at 215). In drawing these conclusions, the 2001 Report considered
9    factors such as "demographics, disposal income for entertainment, tourism, etc." for the
10   Prescott area. *Id.* at 214. The 2005 ERA similarly stated that an event center in Prescott
11   Valley could be expected to host "between approximately 97 and 102 annual events" during
12   its first year with a total paid attendance of just over 321,000. (Doc. 188, Ex. 5 at 72–73).
13   The 2005 Report made these projections after conducting a demographic analysis of 32
14   similarly-sized arenas in other markets. *See id.* at 72–73. These markets had populations
15   more than four times larger than Prescott Valley; yet, the Official Statements projected that
16   the Event Center would generate event and attendance numbers that were significantly higher
17   than the projected data set forth in the prior 2001 and 2005 Feasibility Studies. Indeed, the
18   Official Statements set forth event and attendance figures that were similar to the arenas in
19   markets that were much more heavily populated.

20   Given that the event and attendance range in the 2005 Report was based on
21   objectively verifiable demographic data, a fact-finder could conclude *with reasonable*
22   *certainty* that the Event Center would be unable to generate much more than about 105
23   events and 320,000 attendees in a given year. *See Convergent*, 948 F.2d at 516 (emphasis
24   added). This is especially the case given the data from the more conservative 2001 Feasibility
25   Study. Nonetheless, despite the fact that several of the Defendants specifically commissioned
26   these studies, or were intimately aware of their contents, the Official Statements, perhaps
27   unreasonably, projected a substantially higher annual number of events (133) and attendees
28   (480,000). *See Kaplan*, 49 F.3d at 1375 (holding that a future projection is misleading when

a speaker makes that projection with knowledge that it is unreasonable). Accordingly, as with the executive in *Provenz*, who knowingly disregarded reliable internal data that a loss was forthcoming, at least some of the Defendants may have disregarded the 2001 and 2005 Reports and made event, attendance, and revenue projections (predicated on event and attendance calculations) that were unreasonable in light of the internal data at their disposal. *See* 102 F.3d at 1487–88.

To be sure, the Official Statements do project that the Event Center would generate slightly fewer attendees and events than arenas in some larger markets. Nonetheless, viewing the well-pled allegations in the light most favorable to the Plaintiffs, the projections, though slightly tempered, are still arguably unreasonable. For instance, while the ERA Report indicated that markets with CHL Hockey Franchises averaged approximately 4,187 attendees per event, the average population in these markets was over 408,000. (Doc. 188, Ex. 5 at 31, 41). The Report also indicated that markets with Arena Football 2 Teams, which were located in cities with an average population of 474,279, generated attendance of 5,745 attendees per event. *Id.* at 32, 42. In spite of these statistics, and though the Prescott Valley Area's population is approximately one fourth of that of these other markets, the Official Statements projected that the Event Center would generate over 3,609 people per event, or nearly 86% of the average attendance in other CHL Hockey cities and 63% of the average attendance in Arena Football 2 markets. Given the large disparities in population, Plaintiffs have adequately alleged that these projections were untenable.

Similarly, while at least one city's event center in the 2005 ERA Report held as many as 140 events per year, the Official Statements' projection of 133 events was still potentially unreasonable. In its Report, ERA provided the number of events held at event centers in twelve of the thirty-two markets. According to the Report, these facilities hold between 91 and 140 events per year with an average of 118 events per year. (Doc. 188, Ex. 5 at 72). Nonetheless, while the specific locations of these event centers are not identified by market, the twelve *smallest* markets analyzed by the Report contain an average population of nearly 200,000—or more than two times the population of the Prescott Valley area. *Id.* at 31–32.

1    Yet, in spite of the other markets' substantially larger populations, the Official Statements

2    projected that the Event Center would generate 133 events in its first year of operation. This

3    may have been unreasonable given that Defendants were allegedly aware that markets with

4    at least *twice the population* of Prescott Valley averaged only 118 events per year.

5         The fact that the Official Statements revealed the *existence* of the 2005 ERA Report

6    does not change this analysis. Appendix A in the Official Statements does little more than

7    mention the 2005 Report by name and disclose that the parties had commissioned the Report

8    to "determine[] whether the proposed [event center] could successfully develop event-based

9    revenues from which it would largely be financed and operated." (Doc. 155, Ex. 1 at

10   Appendix A, §§ N–O). The Appendix then summarizes the 2005 Report as indicating "that

11   the [Event Center] would not be self-supporting but could potentially develop sufficient

12   event-based revenues from which it could largely be financed and operated with the

13   assistance" of the Town, the Fain Group, Global Entertainment, and others. While this

14   disclosure is not insignificant, it does not mention the fact that the 2005 Report estimated

15   significantly lower event and attendance figures than did the Official Statements. The

16   disclosure also does not discuss the fact that the event and attendance numbers were almost

17   on par with markets that were four times larger than the Town. Indeed, none of the omitted

18   facts that allegedly rendered portions of the Official Statements misleading are discussed in

19   this disclosure. There also is no mention of the 2001 Report.

20        Next, to the extent that Defendants contend that the 2001 and 2005 Reports contained

21   "soft," rather than "hard," information, this is not a basis for dismissal at this point. As other

22   courts have explained, "Hard information is typically historical information or other

23   information that is objectively verifiable." *In re Sofamor Danek Group, Inc.*, 123 F.3d 394,

24   401 (6th Cir.1997). Soft information, on the other hand, "includes predictions and matters

25   of opinion." *Id.* Accordingly, such soft information is generally not actionable unless "it is

26   virtually as certain as hard information." *See City of Monroe Emps. Ret. Sys. v. Bridgestone

27   Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (quotation omitted). The demographic information

28   in the 2005 Report, which compared the size of the Town to those markets with similarly-

sized event centers, appears to be objectively verifiable hard information that arguably should have been disclosed. That hard data indicated that the Town and its surrounding area had a substantially lower population base than cities with similar event centers and sports franchises. Further, to the extent that the specific event, attendance, and revenue projections in the 2001 and 2005 Reports arguably constitute "soft information," the conclusions made in those reports, i.e. that the area around Prescott would generate fewer event and attendance totals than substantially larger markets, appear to be virtually as objectively verifiable as hard information. In fact, the 2005 ERA Report itself specifically provides that "[e]very reasonable effort has been made to ensure that the data contained in this study reflect the most accurate and timely information possible, and they are believed to be reliable." (Doc. 188, Ex. 5 at 2). Regardless, even if the event and attendance projections were "soft data," this does not mean as a matter of law that the failure to disclose that information was not materially misleading. *See United States v. Smith*, 155 F.3d 1051, 1065 (9th Cir. 1998) ("[B]oth the Supreme Court's landmark decision in *Basic* and preexisting Ninth Circuit authority confirm that so-called "soft" information can, under the proper circumstances, be "material" within the meaning of Rule 10b-5."). Accordingly, since the Official Statements project that the Event Center would generate event and attendance figures that are almost on par with those of much larger cities, Defendants' failure to disclose the demographic data, as well as the conclusions therefrom, may have made the Official Statements misleading.

The Court also rejects Defendants' assertion that, as a matter of law, the demographic information of other communities was not the type of "firm specific" information required to be disclosed. Although the demographic information of other communities does not specifically pertain to Prescott Valley, the compilation of that information, which was the basis for the event and attendance projections in the 2005 Report, was the type of "firm specific" information Defendants may have had a duty to disclose, at least to the extent it undercut Defendants' affirmative statements. *See Cirrus Logic*, 946 F. Supp. at 1455 (noting that "companies have a duty to disclose . . . financial data and other material information upon which" a reasonably certain "internal forecast is based") (internal quotations omitted).

1    As discussed above, the conclusion that the Event Center would not be able to generate the

2    event and attendance data of larger markets was arguably made with reasonable certainty.

3    Because the Official Statements deviate from that conclusion, Defendants may have created

4    an impression of a state of affairs that was materially different from the one that actually

5    existed.

6            The Underwriters' allusions to the *revenue* projections in the 2005 ERA Report do not

7    alter the Court's ruling that the projections in the Official Statements may be actionable.

8    Though the Underwriters are correct that the Official Statements estimated *less* net revenue

9    from the operations of the Center itself than the 2005 ERA Study projected, Plaintiffs' §

10   10(b) claim does not rely on ERA's revenue projections. Instead, Plaintiffs allege that the

11   Official Statements were misleading because these documents ignored ERA's event and

12   attendance statistics, which were based on the demographic data of the Town. And while

13   Plaintiffs do assert that the revenue projections in the Official Statements were unreasonable,

14   they make this assertion on the basis that the allegedly untenable event and attendance data

15   did not figure only into the net revenue for the operation of the Event Center alone, but also

16   into area sales taxes—which were to be used to pay debt servicing on the Bonds. In other

17   words, if the event and attendance projections were artificially inflated, those increased

18   projections would have a commensurate effect on revenue. Regardless, the fact that the 2005

19   Feasibility Report projected nearly the same amount of revenue as the Official Statements

20   does not mean as a matter of law that the failure to disclose the event, attendance, and

21   demographic information from that Report could not have been misleading.

22           Likewise, to the extent that Defendants contend that the inflated event and attendance

23   projections did not result in a significant addition to the Event Center's projected net income,

24   the Underwriters' contention appears to ignore Plaintiffs' allegation that the event and

25   attendance figures also impacted the amount of revenue from the Entertainment District.

26   Regardless, even if the additional event only added approximately $160,000 in gross revenue,

27   as Defendants assert, this amount may still have been instrumental in allowing the Event

28

1   Center to obtain an investment-grade rating.[12]

2          **(d)    Bespeaks Caution Doctrine Is Not an Absolute Bar to
                    Liability on the Basis of Forward-Looking Statements.**

3          Under the bespeaks caution doctrine, forward-looking statements are not actionable

4   if they are accompanied by sufficient cautionary language that warns of specific risks that

5   may prevent a projection, estimate, or expectation from materializing. *See Livid Holdings,*

6   *Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005). The doctrine,

7   however, is not a complete bar to liability. As the District Court for the District of Columbia

8   recently explained, "[N]o degree of cautionary language will inoculate statements that the

9   defendants knew were simply not true when made." *See Freeland v. Iridium World*

10  *Comm'ns, Ltd.*, 545 F. Supp.2d 59, 71–72 (D. D.C. 2008) (citing *Va. Bankshares, Inc. v.*

11  *Sandberg*, 501 U.S. 1083, 1097 (1991)). In other words, the bespeaks caution doctrine does

12  not immunize forward-looking statements, even if accompanied by cautionary language,

13  when a defendant asserts forward-looking statements with knowledge or awareness of their

14  falsity. *See, e.g.*, *Provenz v. Miller*, 102 F.3d 1478, 1493–94 (9th Cir. 1996) (holding that the

15  bespeaks caution doctrine did not immunize a corporate executive from liability when the

16  executive made financial projections while aware of information that rendered those

17  projections unreasonable); *FSP Stallion 1 v. Luce*, 2009 WL 1219683 (D. Nev. Mar. 1, 2009)

18  (rejecting defendants' reliance on the bespeaks caution doctrine where plaintiffs alleged

19  specific facts indicating that defendants knowingly made future financial projections that

20  were unreasonable); *In re World Access, Inc. Sec. Litig.*, 119 F. Supp.2d 1348, 1358 (N.D.

---

23  [12]The Court does note, however, that the omission of the comparative data from the
24  2001 and 2005 ERA Reports does not appear to render the historical population section of
    the Official Statements misleading. Plaintiffs argument that this section was misleading fails
25  to recognize that "a violation of the federal securities law" generally "cannot be premised
    upon a company's disclosure of accurate historical data." *Sofamor*, 123 F.3d at 401 n. 3
26  (citing *Convergent*, 948 F.2d at 512–13). To be sure, this comparative data may have
    rendered the projections in the Official Statements misleading, but that does not mean the
27  comparative data somehow made the accurate historical population data that was disclosed
28  false or misleading.

1    Ga. 2000) (holding that the "bespeaks caution" doctrine is inapplicable when defendants "are

2    aware . . . of . . . facts rendering their" forward-looking "statements untrue when made").

3         Defendants' reliance on the "bespeaks caution doctrine," at least at this point in the

4    proceeding, is without merit. Although the Official Statements contain cautionary language

5    and a list of potential risk factors, Plaintiffs have adequately alleged that at least some of the

6    Defendants made event and attendance projections that they knew were unreasonable.

7    According to Plaintiffs' Amended Complaints, at least some of Defendants appear to have

8    been aware of prior feasibility reports, which contained a thorough analysis of other markets

9    with event centers. A reasonable jury could determine from these reports that the population

10   of Prescott Valley was insufficient to generate more than about 105 events and 320,000

11   attendees per year. Yet, despite their awareness of the relevant facts, at least some of the

12   Defendants, without further justification, allegedly inflated the number of events and

13   attendance figures in a manner that would qualify the Bonds for an investment-grade rating.

14   The Court, therefore, finds that Plaintiffs have adequately alleged that the projections in the

15   Official Statements were made with knowledge that those statements were unreasonable.

16        The Court also rejects the Fain Group's attempt to invoke the PSLRA's statutory safe

17   harbor for forward-looking statements. *See* 15 U.S.C. 78u-5(c). Under this safe harbor, "a

18   forward-looking statement" that "is identified as such and accompanied by meaningful

19   cautionary statements. . . is not actionable[,]" even if the plaintiff makes a strong "showing

20   of scienter." *In re Cutera Sec. Litig.*, ___ F.3d ___, 2010 WL 2595281, at *6 (9th Cir. 2010).

21   But while the safe harbor protects certain forward-looking statements, it is inapplicable to

22   statements uttered by speakers that are not subject to the Exchange Act of 1934's registration

23   and reporting requirements. *See* 15 U.S.C. § 78u-5(a). Instead, the safe harbor is available

24   only when statements are made by:

25              (1) an issuer that, at the time that the statement is made, is
                subject to the reporting requirements of section 78m(a) of this
26              title or section 78*o*(d) of this title;

27              (2) a person acting on behalf of such issuer;

28              (3) an outside reviewer retained by such issuer making a

1  statement on behalf of such issuer; or

2  (4) an underwriter, with respect to information provided by such
3  issuer or information derived from information provided by such
   issuer.

4  *Id.* Thus, before an issuer will be eligible for the safe harbor, that issuer generally must have

5  properly filed a registration statement with the SEC and must be in compliance with any

6  applicable reporting requirements. *See* 15 U.S.C. §§ 78*l*, 78m(a), 78*o*(d).

7      The Bonds in the instant case were issued by the Industrial Development Authority

8  of the County of Yavapai (the "Authority"). (Doc. 155, Ex. 1 at 1). The Authority, at least

9  on the record presently before the Court, does not appear to have been subject to the

10  reporting requirements of the Exchange Act. *See* 15 U.S.C. §§ 78*l*, 78m(a), 78*o*(d). Instead,

11  the Official Statements explicitly state that the Bonds have not been registered with the SEC.

12  (Doc. 155, Ex. 1 at i). Accordingly, it appears that Defendants' allegedly false statements,

13  though forward-looking, do not fall under the PSLRA's statutory safe harbor.

14          **(2)    Plaintiffs Have Adequately Alleged that Each of the Defendants
                    Made or Contributed to the Misleading Statements.**

15      Although the Official Statements were allegedly false or misleading statements due

16  to the failure to disclose content from the 2001 and 2005 Feasibility Reports, Defendants can

17  be held accountable only for those statements to the extent each had a duty to disclose. *See*

18  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988) ("Silence, absent a duty to disclose

19  is not misleading under Rule 10b-5."). "'When an allegation of fraud [under § 10(b)] is based

20  on nondisclosure, there can be no fraud absent a duty to speak.'" *Cent. Bank of Denver, N.A.*

21  *v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994) (quoting *Chiarella v.*

22  *United States*, 445 U.S. 222, 232 (1980)).

23      A defendant generally has a duty to disclose when it utters or signs a statement that

24  is misleading due to a material omission. *See Howard v. Everex Sys.*, 228 F.3d 1057, 1061

25  (9th Cir. 2000). Where a party does not actually utter or sign the statement at issue, that party

26  may still be held responsible under § 10(b) if it "substantially participated" in the preparation,

27  "creation, drafting, editing, or making" of the materially false or misleading statement. *In re*

28

*Homestore.com Sec. Litig.*, 347 F. Supp.2d 790, 800 (C.D. Cal. 2004); *see Howard*, 228 F.3d at 1061 n. 5 ("[S]ubstantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements.") (citing *In re Software Toolworks Sec. Litig.*, 50 F.3d 615, 628 n. 3 (9th Cir. 1994)). On the other hand, a defendant who does not make or otherwise substantially participate in the creation of the false or misleading statement, but who nonetheless knows of its falsity, owes "no duty of disclosure . . . absent a fiduciary or agency relationship, prior dealings, or circumstances such that [the plaintiff] has placed trust and confidence" in that defendant. *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) (quotation omitted). In considering whether such a relationship or circumstances exist, courts consider five non-exclusive factors: "(1) the relationship of the defendant to the plaintiff; (2) the defendant's access to information as compared to the plaintiff's access; (3) the benefit that the defendant derives from the relationship with the plaintiff; (4) the defendant's awareness of plaintiff's reliance; and (5) the defendant's activity in initiating the securities transaction in question." *Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646, 653–54 (9th Cir. 1988) *cert. denied*, 493 U.S. 1002 (1989); *see Paracor*, 96 F.3d at 1157; *Goel v. Jain*, 259 F. Supp.2d 1128, 1137 (W.D. Wash. 2003). Plaintiffs have effectively alleged facts indicating that Defendants had a duty to disclose the information that allegedly rendered the Official Statements false or misleading—at least to the extent they knew that the projections were false or misleading.

> **(a)**   **Global Entertainment, Kozuback, the Hocking Defendants, and the Fain Group**

On their face, the Official Statements explicitly attribute most of the allegedly misleading event, attendance, and revenue projections to Global Entertainment, Kozuback, the Hocking Defendants, and the Fain Group. According to the Official Statements, Global Entertainment, allegedly through Kozuback, provided the projections regarding the anticipated number of events and attendees; Global Entertainment and Kozuback also provided the Estimated Project Net Operating Income, which appears to have incorporated

the same event and attendance projections. (Doc. 155, Ex. 1 at 12–14). The Official Statements provide that T.L. Hocking & Associates, allegedly through Thomas L. Hocking, made the projections pertaining to the Estimated Pledged Revenues and Debt Service Coverage. *Id.* at 18. These projections were allegedly unreasonable because they too were based, at least in part, on the event and attendance numbers. *Id.* at 12–14. Likewise, the Official Statements specifically provide that FSG, allegedly in concert with PVSE and Brad Fain, provided the projections in Table 2 of the Official Statements. Table 2, which was also prepared with the help of the Town, included Actual and Projected Sales Taxes for the Entertainment District that was located adjacent to the Event Center. *Id.* at 16–18. These tax calculations appear to have been directly related to the number of visitors to the Entertainment District, which depended in large part, on attendance and the quantity of events. *See SEC v. Fraser*, 2010 U.S. Dist. LEXIS 7038, at *15, (D. Ariz. Jan 28, 2010) (finding that a defendant had "substantially participated in the 'creation, drafting, editing, or making' of false statements[,]" when that defendant knowingly "incorporated" false data into a "company's financial statements").

Because it appears that each of these Defendants either made or substantially participated in the "creation, drafting, editing, or making" of the statements at issue, *see Homestore.com*, 347 F. Supp.2d at 800, they had a responsibility to disclose information, to the extent they were aware of it, that tended to seriously undermine the affirmative impressions created by their contributions to the Official Statements. *See In re ZZZZ Best Sec. Litig.*, 864 F. Supp. 960, 971 (C.D. Cal. 1994) (observing that if a defendant is found "to have sufficiently participated in the preparation of . . . misstatements or omissions such that they are attributed to [defendant], then [defendant] will likewise be found to have a duty to disclose or correct these previously released misrepresentations").

### (b)    The Town

The preface to the Official Statements specifically identifies the Town as one of the primary sources of the information contained in those documents. (Doc. 155, Ex. 1 at i) ("The information set forth herein has been obtained from the Borrower, the Town,

Underwriters, and other sources believed to be reliable[.]"). The Official Statements further indicate that the Town "certifi[ed] that the information [it] supplied does not contain any untrue statement of a material fact or *omit* to state a material fact required to be stated herein or necessary to make the statements *herein* . . . not misleading." *Id.* (emphasis added). Reading this provision in the light most favorable Plaintiffs, the Town attested to two things: (1) that its own contributions to the Official Statements were not misleading, and (2) that it did not omit any fact that was necessary to prevent other provisions in the Official Statements—i.e. "the statements *herein*"—from misleading investors. By making this assertion, the Town may have placed its "imprimatur" on *each* of the statements contained in the Official Statements. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996) (holding that a defendant places its "imprimatur, express or implied" on "unreasonably disclosed third-party forecasts," when it "adopt[s]" or "sufficiently entangle[s] [it]self with the . . . forecasts") (internal quotations omitted).

Of the allegedly false or misleading content in the Official Statements, Plaintiffs allege that the Town provided the Actual and Projected Sales Taxes for the Entertainment District contained in Table 2. (Doc. 155, Ex. 1 at 16). According to Plaintiffs, these tax projections were dependant on the event and attendance projections that were allegedly unreasonable. On its face, Table 2 specifically identifies the Town's Management Services Department as one of its primary sources. *Id.* And while Table 2 also indicates that the "Projected Sales Taxes within the Entertainment District [were] based on estimates of current and future development projections provided by [the Fain Group]" the caption to the Table 2 implies that the Town made substantial contributions to these allegedly misleading projections. *See id.* Viewing these facts in the light most favorable to Plaintiffs, they have adequately alleged that the Town participated in the creation of these allegedly unreasonable projections and that the Town had a duty disclose facts that tended to undermine those projections.

/ / /

/ / /

1

### (c)   PVEC–LLC

2      Each of the allegedly misleading statements at issue in this case can also be attributed

3  to PVEC–LLC. The preface to the Official Statements specifically identifies PVEC as one

4  of the primary contributors to the information therein. (Doc. 155, Ex. 1 at i). PVEC–LLC

5  also signed the Official Statements. By doing so, it attested that the content therein was

6  accurate to the best of its knowledge. *See Howard*, 228 F.3d 1057 (noting that when a

7  defendant "signs a document . . . , that signature is rendered meaningless unless [the

8  defendant] believes that the statements in the document are true") (citation omitted). Thus,

9  to the extent that PVEC knew of facts undermining the Official Statements, it had a duty to

10  disclose those facts.

11

### (d)   The Underwriters

12      The Official Statements explicitly state that much of information therein was provided

13  by the Underwriters, identified as Baird, Jones, and Stern. (Doc. 155, Ex. 1 at i). The Official

14  Statements then contain a provision promising that the Underwriters, much like the Town,

15  would certify, at closing, "that the information [they] supplied does not contain any untrue

16  statement of a material fact or omit to state a material fact required to be stated herein or

17  necessary to make the statements herein . . . not misleading." *Id.* Thus, much like the Town,

18  the Underwriters, specifically attested that, to the best of their knowledge and belief, the

19  Official Statements were not false or misleading.

20      Furthermore, even if the Underwriters did not provide the specific projections alleged

21  to be misleading, Plaintiffs have alleged facts indicating the Underwriters' unique role in

22  financing the Event Center required them to disclose known facts that were necessary to

23  make the Official Statements not misleading. *See Roberts*, 857 F.2d at 653–54 (considering

24  five factors in determining whether a defendant has a duty to disclose: the parties'

25  relationship, their relative access to the material information, benefits derived by the

26  defendant, reliance by the plaintiff, and the defendant's conduct in initiating the transaction).

27  First, the Underwriters entered into a relationship with Plaintiffs because they first purchased

28  the Bonds before reselling them to Plaintiffs. *See id.* Next, given their role in this transaction,

the Underwriters had substantially more access to the material that allegedly undermined the financial projections in the Official Statements. *See id.* The Underwriters allegedly received a significant benefit from this transaction because they earned substantial profits through the sale of the Bonds to Plaintiffs. *See id.* Because the Official Statements prominently featured Baird, Jones, and Stern and identified their role in procuring financing, it is plausible that the Underwriters knew that purchasers of the Bonds would rely on the Underwriters' representations, at least in part, in choosing to invest in the Bonds. Finally, the Underwriters played a significant role in initiating the Bond offering because they underwrote the transaction and sold the Bonds to investors, either directly or through their brokers. Indeed, given the role of underwriters generally, Baird, Jones, and Stern "had a duty to make an investigation that would provide [them] with "a reasonable basis for a belief that the key representations in the statements provided to investors" were not misleading. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 858 (9th Cir. 2001). To the extent that the Underwriters knew or should have known of facts tending to undermine the Official Statements, they had a duty to disclose those facts.

### (e)   Kutak & Stinson

Plaintiffs have pled facts indicating that Kutak and Stinson may also be responsible for the alleged omissions—at least to the extent these law firms knowingly failed to disclose facts that tended to undermine the affirmative impressions created by the Official Statements. In preparing the Official Statements, Kutak, as bond counsel, represented the Issuer and Stinson represented the Underwriters. Thus, they had a fiduciary duty to the Authority and to Baird, Stern, and Jones, not to the Bondholders. *See Cent. Bank*, 511 U.S. at 174 (holding that a § 10(b) claim premised on an omission cannot lie absent a duty to speak). The lack of a fiduciary duty to Plaintiffs, however, does not end the inquiry.

Even though Plaintiffs were not the law firms' clients, Kutak and Stinson cannot escape liability if, during the course of their work on the Official Statements, they knowingly or recklessly omitted facts that rendered these offering documents false or misleading. Under the Ninth Circuit's substantial participation test, Kutak and Stinson, as the primary drafters

of the language in the Official Statements, had a duty to exercise reasonable care and to disclose relevant facts that undermined the statements that they actually drafted or otherwise prepared. *See Homestore.com*, 347 F. Supp.2d at 800 (holding that the "creation, drafting, editing, or making" of the statements at issue can give rise to liability under § 10(b)). This is so because when Kutak and Stinson chose to speak, they knew investors might rely on the statements made. The law firms' duty, however, must also be considered in light of the services they were retained to perform. Because Kutak and Stinson were not hired to opine on the feasibility of the Event Center, they cannot have been held to a duty to investigate or determine whether the financial projections were realistic unless these firms otherwise became involved in the making, preparing, or drafting of those projections. *See N.Y. City Emps.' Ret. Sys. v. Berry*, 616 F. Supp.2d 987, 994 (N.D. Cal. 2009) (holding that substantial participation requires particular "facts relating to" each "[d]efendant's specific role in the preparation of each of the allegedly misleading statements"). Similarly, to the extent the law firms actually learned that the projections were grossly inflated during the course of their engagement and work on the Official Statements, Kutak and Stinson had a duty to disclose as much given their prominent role in the project. Here, Plaintiffs have alleged facts indicating that Kutak and Stinson played a substantial role in drafting, preparing, and reviewing the allegedly misleading statements. To the extent this is true, Kutak and Stinson assumed a duty to disclose facts tending to undermine the statements therein.[13]

## B.   Scienter

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter. 15

---

[13]As discussed in the next section, Plaintiffs' § 10(b) claims fail against the Underwriters, Kutak, and Stinson because Plaintiffs have failed to adequately plead scienter with the requisite particularly. Nonetheless, the Court has devoted some attention to whether Plaintiffs have alleged facts indicating that these parties had a duty to disclose because that duty is not only relevant to an analysis of § 10(b), but also to whether Allstate and the Trustee have stated claims pursuant to state laws that do not require scienter to be pled with particularity.

1    U.S.C. § 78u-4(b)(2); *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976). The

2    required state of mind is either that the defendant acted intentionally or with "deliberate

3    recklessness." *Daou Sys.*, 411 F.3d at 1014–15. In a securities claim under § 10(b),

4    "recklessness only satisfies scienter" when it "reflects some degree of intentional or

5    conscious misconduct." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999);

6    *see also DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002)

7    (holding that in order to allege a strong inference of deliberate recklessness, a plaintiff must

8    state "facts that come closer to demonstrating intent, as opposed to mere motive and

9    opportunity") (citations omitted). Significantly, "where the challenged act is a forward

10   looking statement," a plaintiff must set forth facts showing that the defendant "'actually

11   kn[ew] that the statement [was] false or misleading.'" *In re Apollo Group, Inc. Sec. Litig.*,

12   395 F. Supp.2d 906, 908 (D. Ariz. 2005) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th

13   Cir. 2001)).

14          To survive a motion to dismiss, the inference of scienter must be "cogent and at least

15   as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*

16   *v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The inference of scienter,

17   however, "need not be irrefutable, *i.e.*, of the 'smoking gun' genre or even the 'most

18   plausible of competing inferences.'" *Id.* (citations omitted). In determining the cogency of

19   the allegations at the motion to dismiss stage, federal courts are required to consider whether

20   "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

21   whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323

22   In other words, courts may not rely "exclusively on a segmented analysis of scienter." *Zucco*

23   *Partners*, 552 F.3d at 991. Instead, courts must "consider the totality of the circumstances[.]"

24   *Id.* at 992 (citing *South Ferry LP, No. 2 v. Kililnger*, 542 F.3d 776, 784 (9th Cir. 2008)).

25   Thus, in addressing the question of scienter, federal district courts must "conduct a dual

26   inquiry." *Id.* First courts must "determine whether any of the plaintiff's allegations, standing

27   alone, are sufficient to create a strong inference of scienter; second, if no individual

28   allegations are sufficient," courts must then "conduct a 'holistic' review of the same

allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

Upon review of the allegations against the Defendants, both individually and holistically, the Court finds that Plaintiffs have adequately alleged that some, but not all, of the Defendants knowingly omitted facts that made the official statements false or misleading.

> **(1)    Global Entertainment, Kozuback, the Hocking Defendants, the Fain Group, and the Town**

Plaintiffs have adequately alleged that Global Entertainment, Kozuback, the Hocking Defendants, the Fain Group, and the Town knew that the event, attendance, and revenue projections in the Official Statements were false or misleading. Two recent district court cases from within the Ninth Circuit are helpful in determining whether Plaintiffs have alleged a compelling inference of scienter as to these Defendants. First, in *Apollo Group, Inc.*, 395 F. Supp.2d at 921–22, another Division of this District held that allegations of scienter were sufficient where investors pled facts indicating that defendants "knew of [a] negative internal report which undermined the defendants' affirmative statements, yet "failed to disclose the report" or its contents. Likewise, in *FSP Stallion 1 v. Luce*, 2009 WL 1219683, at *5 (D. Nev. May 1, 2009), the District of Nevada held that a group of investors adequately raised allegations of scienter where a group of corporate defendants sold securities pertaining to a Las Vegas golf club. In selling the securities, the defendants made financial projections that were allegedly unreasonable based on the defendants' "knowledge and experience" of operating the club and based on undisclosed reports, with which Defendants were familiar, that indicated that the future projected performance was unreasonable. *Id.*

Much like the defendants in *Apollo Group* and *FSP Stallion 1*, Global Entertainment, Kozuback, the Hocking Defendants, the Fain Group, and the Town allegedly knew that the Official Statements were misleading based on their intimate knowledge and familiarity with the 2001 and 2005 Feasibility Reports, which undermined the information in the Official Statements. In their Amended Complaints, Plaintiffs set forth specific facts indicating that Global Entertainment, Kozuback, the Hocking Defendants, the Fain Group, and the Town

- 33 -

1   each received and reviewed the 2001 Report. (Doc. 122 at ¶ 39). That Report concluded that

2   an event center in the Prescott Valley area could be expected to generate approximately 78

3   events with an average attendance of 2,596 per event. Similarly, each of these Defendants

4   either commissioned, participated in, or were intricately aware of the 2005 Report, which

5   concluded that the Event Center could be expected to generate only about 103 events and an

6   average attendance of 3,118. Both Reports indicated that the number of events and

7   attendance figures were based on the small population base in Prescott Valley.

8        Yet, despite knowledge of these Reports, their conclusions, and the demographic data

9   contained therein, Global Entertainment, Kozuback, the Hocking Defendants, the Fain

10  Group, and the Town projected that the Event Center would generate 133 events and

11  approximately 3,609 attendees during its first year of operation. In other words, these

12  Defendants projected a number of events that was 71% greater than the 2001 Report and 29%

13  greater than the 2005 Report. Annual attendance was increased by 137% over the 2001

14  Report and 49.5% over the 2005 Report. Moreover, the Official Statements projected average

15  attendance to be 39% greater than the 2001 Report and 16% more than the 2005 Report.

16  These event numbers and attendance were then allegedly incorporated into the Official

17  Statements' revenue and tax projections, which appear to have been provided by the Hocking

18  Defendants, the Fain Group, and the Town.

19       The substantial divergence from the data set forth in the 2001 and 2005 Reports

20  supplies evidence that Global Entertainment, Kozuback, the Hocking Defendants, the Fain

21  Group, and the Town intentionally inflated the event, attendance, and revenue numbers to

22  obtain an investment-grade rating on the Bonds—which required the annual revenue for debt

23  servicing to be two times the amount due. Based on these disparities, as well as these

24  Defendants' other conduct, Plaintiffs have pled facts giving rise to a cogent inference that

25  the event and attendance projections set forth in the Official Statements were not premised

26  on a reasonable analysis of Prescott Valley's population. Indeed, the inference of scienter is

27  bolstered by the allegation that these Defendants canceled their arrangement with ERA to

28  conduct a final feasibility analysis of any revised projections. That decision was allegedly

made shortly after these Defendants learned that the costs to construct the Event Center had increased by approximately ten million dollars. Based on the timing of the decision to forgo the study and S&Y's subsequent withdrawal due to that decision, it can reasonably be inferred for purposes of assessing scienter that Global Entertainment, Kozuback, and the Hocking Defendants recognized that a feasibility analysis would reveal that their revised projections were unreasonable.

The inference of scienter is further supported by Plaintiffs' allegations that Global Entertainment's own contractors and employees notified the Company of the unrealistic expectations set forth in the Official statements. According to Plaintiffs, Richard Flocco and Tom Sadler were hired by Global Entertainment to manage ticketing and to generate events for the Event Center. Just a few months before the Bonds were issued, both Flocco and Sadler allegedly informed Global Entertainment and Kozuback that the population base in Prescott Valley was not sufficient to support a 5,000 seat event center. Flocco and Sadler also indicated to Global's senior management that, based on their experience in the industry, the projected number of events and attendees were not realistic. (Doc. 122 at ¶¶ 102–06). In response, Kozuback allegedly told senior staff members at Global Entertainment to "make the numbers work" and "make it happen." *Id.* at ¶ 105. According to Plaintiffs, Global Entertainment required these specific event projections so that the revenue projections in the Official Statements, which were based on attendance, would appear to satisfy the two times debt servicing ratio that was necessary to obtain an investment-grade rating.

The Town contends that it acted in good faith, but this does not negate the inference of scienter in this case. Although the Town apparently agreed "to add a sales tax pledge" from the Secondary Credit Support Area in excess of $1 million annually, the pledge does not necessarily mean that the Town believed in the accuracy or adequacy of the estimates in the Official Statements. The Town was obliged to make these additional payments only if other TPT Revenue was insufficient to pay debt service. (*See* Doc. 155, Ex. 1 at 16). Thus, while the Town assumed some risk in the case of a shortfall, the assumption of such a risk simply shows that the Town was prepared to supplement insufficient revenue generation

1  from the Event Center. It does not establish the lack of knowledge by the Town that event,

2  attendance, and revenue estimates were overstated. Viewing the facts in the light most

3  favorable to the Plaintiffs, there is sufficient evidence that the Town and others knew that

4  event revenues would be insufficient for debt servicing.

5      Likewise, to the extent that the Fain Group argues that Plaintiffs fail to plead scienter

6  as to any individuals with the Fain Group, this argument ignores several of the allegations

7  contained in Plaintiffs' Amended Complaints. To raise an inference of scienter as to a

8  corporate defendant, a complaint generally must plead scienter as to the individual executives

9  or directors of the corporate entity. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736,

10  743, 745 (9th Cir. 2009). Alternatively, a plaintiff can raise a compelling inference of

11  corporate scienter where the complaint sets forth facts indicating that the company's "named

12  officers" are "directly responsible for . . . day-to-day operations" and that the subject-matter

13  of the alleged misleading statement is, "by its nature, the type of transaction of which it

14  would be hard to believe senior officials were unaware." *Id.* The Amended Complaints in this

15  case meet either standard. According to Plaintiffs, Brad Fain, who was one of FSG's four

16  members, received the 2001 and 2005 Reports and reviewed the content therein. He also

17  allegedly participated in the decision to cancel the final feasibility study and knew of the

18  S&Y's withdrawal from the project. Likewise, given the Fain Group's prominent role in

19  obtaining the Event Center's financing and the Fain Group's decision to commission the

20  2005 Report before cancelling a final analysis, it seems "hard to believe" that senior officials,

21  who allegedly managed the day-to-day operations of this relatively small, family-owned

22  company, were unaware of the alleged misrepresentations. *See id.* (citing *Berson v. Applied

23  Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (holding that the subject-matter of the

24  alleged omissions was "prominent enough" that it would be absurd to suggest" that top

25  management was unaware of them")). Given these allegations, which are plausible in light

26  of the Official Statements, the Court finds that Plaintiffs have pled a cogent inference that

27  the Fain Group acted with scienter.

28          **(2)    PVEC–LLC**

1    PVEC–LLC does not challenge Plaintiffs' allegation, at least at this stage in the

2    proceedings, that it acted with the requisite degree of scienter. And while PVEC–LLC joins

3    the other Defendants' Motions, none of those filings contend that PVEC–LLC lacked

4    scienter. Regardless, inasmuch as PVEC–LLC signed the Official Statements under the

5    alleged direction and control of Global Entertainment and the Fain Group, against both of

6    which scienter is adequately alleged, Plaintiffs have sufficiently plead that PVEC–LLC,

7    through these owners and officers, acted with the requisite degree of scienter necessary to

8    state a claim for securities fraud.

9                        **(3)    The Underwriters**

10    Plaintiffs have not pled facts giving rise to a cogent inference of scienter as to the

11    Underwriters. To adequately plead facts creating a strong inference of scienter as to an

12    underwriter, a complaint must do more than assert "vague generalizations that would be

13    applicable to every underwriter of securities." *In re Stratosphere Corp. Sec. Litig.*, 1 F.

14    Supp.2d 1096, 1122 (D. Nev. 1998). In other words, a plaintiff must do more than assert that

15    the underwriter had a "close connection" with the corporate wrongdoer or that the

16    underwriter had access to non-disclosed material information. *See id.*; *Marks v. Sciences*,

17    2000 WL 33115589, at *2 (C.D. Cal. Feb. 28, 2000) (finding allegations to be insufficient

18    where plaintiffs merely alleged facts indicating that the underwriters had "intimate access"

19    to internal documents and information and were in "constant contact" with executive

20    officers). As the Southern District of New York has explained in this context:

21            Plaintiffs allege over and over again that, under ordinary
               underwriting procedures, [the underwriters] should have been
22            able to—or, in fact, did—learn during the course of their due
               diligence in connection with the [the offering document at issue]
23            of all the alleged negative facts outlined [in the complaint].

24            At base, these allegations claim that if [the underwriters] had
               properly done their jobs as underwriters and performed due
25            diligence adequately, they would have uncovered the truth . . .
               . These allegations constitute negligence at best, and these types
26            of allegations against an underwriter have always been
               insufficient to establish scienter under the federal securities
27            laws.

28    *In re WRT Energy Sec. Litig.*, 1999 WL 178749, at *10 (S.D. N.Y. Mar. 31, 1999) (citations

1   omitted). Hence, as with any other § 10(b) defendant, a complaint must set forth particular

2   facts demonstrating that the underwriter defendant knowingly, or with deliberate

3   recklessness, made misleading statements. *See, e.g.*, *DSAM*, 288 F.3d at 388 (finding

4   allegations that an underwriter acted with scienter to be insufficient where plaintiffs did not

5   "plead[] in great detail, facts that constitute strong circumstantial evidence of deliberately

6   reckless or conscious misconduct") (quoting omitted).

7         According to Plaintiffs, the Underwriters "either reviewed the records and reviewed

8   the 2001 Feasibility Report and the 2005 Preliminary Report. . . . or knowingly and

9   intentionally failed to conduct any such due diligence inquiry." (Doc. 122 at ¶¶ 152–153).

10  These allegations, however, appear to amount to allegations that these Defendants failed to

11  "properly do[] their jobs as underwriters." *See WRT Energy*, 1999 WL 178749, at * 10. The

12  fact that the Official Statements referred to the 2005 ERA Report does indicate that the

13  Underwriters knew that Report *existed*, but it does not mean that the Underwriters actually

14  reviewed the Report and its contents. The allegation that Underwriters *must* have reviewed

15  the Report or recklessly ignored it do not suffice. Those allegations amount merely to an

16  accusation that the Underwriters failed to perform their duties as underwriters. *See id.* Unlike

17  Global Entertainment, the Town and the Fain Group, the Underwriters did not commission

18  the 2005 Report and there are no well-pled facts indicating that the Underwriters were

19  somehow involved in the preparation of that Report.

20        Likewise, though Plaintiffs allege that the Underwriters were apprised of certain red

21  flags and failed to investigate them, this does not demonstrate knowledge that the Official

22  Statements were false or misleading. Given that the alleged omissions all pertain to whether

23  certain forward-looking statements were misleading, Plaintiffs must demonstrate that the

24  Underwriters knew or were reckless with respect to the falsity of those statements. And,

25  while Plaintiffs allege that certain executives and directors employed by the Underwriters

26  knew that the event, attendance, and revenue projections were inflated, Plaintiffs do not

27  provide anything other than conclusory allegations to support this theory. The Amended

28  Complaints provide no details explaining how these individuals knew of the alleged fraud,

when they were apprised of these red flags, or what they did in response. Noticeably absent is any allegation that the Underwriters were aware of the 2001 Report, which arguably casts more doubt on the projections in the Official Statements than the 2005 Report. To be sure, Plaintiffs have alleged facts indicating that Underwriters *should* have conducted a more thorough investigation and *should* have become more familiar with the facts before releasing the Official Statements. But these allegations suggest negligence, not knowledge or deliberate indifference.

Similarly, Plaintiffs' reliance on *Software Toolworks* as a basis for scienter is misplaced. *Software Toolworks* does not allow investors to show scienter simply because a defendant "substantially participated" or was "intricately involved" in a statement's preparation, creation, or drafting. *See* 50 F.3d at 628 n. 3. The relevant question for scienter is not solely whether the defendant made or participated in making an allegedly false statement, but also whether he or she acted with the requisite state of mind. *See Silicon Graphics*, 183 F.3d at 977. Otherwise, securities claimants could circumvent the PSLRA's scienter requirement and state a securities claim regardless of the defendant's knowledge or deliberate recklessness simply by alleging that the defendant participated in the drafting of the misstatement. Furthermore, even if *Software Toolworks* could be read to imply that substantial participation gives rise to an inference of scienter, as Plaintiffs suggest, that decision was decided before Congress passed the PSLRA, which explicitly requires securities plaintiffs to plead a scienter with particularity. *See* 15 U.S.C. § 78u-4(b)(2). Because Plaintiffs have failed to plead their allegations of scienter against the Underwriters with sufficient particularity, their § 10(b) claim as to these Defendants is dismissed.

### (4)    Kutak, & Stinson

Plaintiffs also fail to plead adequate facts giving rise to a cogent inference that Kutak and Stinson acted with the requisite degree of scienter. To the extent that Kutak and Stinson even participated in making the allegedly misleading projections, there are insufficient facts pled to infer that these Defendants knew that the projections were false.

According to Plaintiffs, Kutak and Stinson must have known the event and attendance

projections were inflated because Kutak received an email and letter regarding S&Y's withdrawal, which included a reference to the decision by Global Entertainment Group, Fain Signature Group, and the Town to forgo a final feasibility study. Nonetheless, this does not create a cogent inference of scienter because this letter, at most indicates that Kutak *should* have looked into the matter further. Failure to perform a legal duty, however, does not, without more, give rise to a claim under § 10(b). Kutak's alleged failure to do more may be negligent, but that is not enough. The breach of a duty must be intentional or deliberately reckless. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir. 1990) (en banc) (defining the "recklessness" that constitutes the scienter necessary for a violation of securities law as conduct "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care").

Moreover, the notion that Kutak should have made further inquiry into the feasibility of the Event Center is tenuous at best given that the law firms were not retained to opine on the feasibility of the project, but to provide legal expertise and assistance in crafting the language contained in the Official Statements. There is nothing in the Amended Complaints suggesting that the law firms were retained to investigate the event, attendance, or revenue projections in the Official Statements or that they went beyond the scope of their representation and did so anyway. With respect to Stinson, a strong inference of scienter is also lacking. Unlike Kutak, Stinson was not even copied on the email containing the S&Y letter. Instead, Plaintiffs allege in conclusory fashion that Kutak must have shared the letter with Stinson. Without more detail, such speculation is insufficient to satisfy the heightened pleading requirements of the PSLRA.

Given that Plaintiffs' claim is based on allegations that Defendants knew their forward-looking projections were unreasonable, Plaintiffs must plead detailed facts giving rise to a strong inference that this is the case. With respect to Kutak and Stinson, there are no well pled facts indicating that anyone at these law firms ever received a copy of the 2001 or 2005 Report, that they reviewed those reports, and appreciated their contents. The law firms did not commission these Reports, and unlike several of the other Defendants, there are

1    no well-pled facts indicating that the law firms were somehow involved in the preparation

2    of those Reports. Accordingly, Plaintiffs' § 10(b) claim is dismissed as to Kutak and Stinson.

3            **C.    Plaintiffs Have Pled Loss Causation and Damages**.

4            According to the United States Supreme Court, loss causation is the "causal

5    connection between the [defendant's] material misrepresentation and the [plaintiff's] loss."

6    *Dura*, 544 U.S. at 342 (citation omitted). To plead loss causation, a compliant must "'provide

7    a defendant with notice of what the relevant economic loss might be or of what the causal

8    connection might be between that loss and the misrepresentation.'" *Metzler Inv. GMBH v.*

9    *Corinthian Coll., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (quoting *Dura*, 544 U.S. at 347)

10    (brackets omitted)). The complaint must also set forth allegations that "if assumed true, are

11    sufficient to provide [the defendant] with some indication that" the security's drop in value

12    "was causally related to" the alleged misstatement or omission. *Daou Sys.*, 411 F.3d at 1026.

13    Additionally, a plaintiff must allege that the value of the security "fell significantly after the

14    truth became known." *Metzler*, 540 F.3d at 1062. As other courts have explained, allegations

15    of loss causation must demonstrate "'that the subject of the fraudulent statement or omission

16    was the cause of the actual loss suffered,' i.e., that the misstatement or omission concealed

17    something from the market that, when disclosed, negatively affected the value of the

18    security." *Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d Cir. 2005) (quoting *Suez Equity*

19    *Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

20            Plaintiffs have adequately alleged loss causation in this case. According to Plaintiffs'

21    Amended Complaints, the value of the Bonds were inflated because Defendants concealed

22    or omitted facts which demonstrated that the event, attendance, and revenue projections were

23    unreasonable. Accordingly, the truth was revealed when Fitch downgraded the Bonds due

24    to "serious concerns regarding the sufficiency of pledged revenues to meet debt service

25    requirements over the near term," i.e. when it became clear that projected revenues, based

26    on the number of events and attendees, would not be realized. (*See* Doc. 188, Ex. 17).

27    Plaintiffs further allege that the Bonds decreased in value as a result of the Fitch downgrade

28    and the revelation that the Official Statements' attendance and revenue projections were not

realistic. Plaintiffs, therefore, were allegedly damaged because they purchased securities at the inflated prices.

Defendants' arguments to the contrary read the loss causation requirement too narrowly. According to Defendants, the Amended Complaints fail to set forth facts demonstrating loss causation because the 2001 and 2005 Reports, which allegedly demonstrate Defendants' knowledge that the Official Statements were misleading, were not revealed until *after* the Bonds decreased in value. This argument, however, ignores that the loss causation requirement does not necessarily depend on when investors discover that a defendant acted in bad faith. Instead, the truth becomes known for purposes of loss causation when it is discovered that statements were incorrect. Under Defendants' theory, a company could knowingly make false statements about business expectations, later reveal that expectations were not realistic, not reveal that company acted knowingly, wait for the stock price to drop, and then avoid liability because it was not immediately revealed that the company made false or misleading statements with awareness of the falsity.

To the extent that Defendants assert that any decline in value was solely the result of Fitch's downgrade of the investment-grade rating, rather than the revelation that certain expectations were inflated, this argument ignores the fact that the downgrade itself was at least partially the result of the Bonds' failure to meet those expectations—which were the very expectations that Defendants allegedly knew were artificially inflated and unreasonable. And while Defendants assert that Fitch cited poor economic conditions as one reason for the Event Center's inability to generate sufficient revenue, a misrepresentation or omission does not have to be the "*sole* reason for the investment's decline in value." *See Daou Sys.*, 411 F.3d at 1025. Because the Amended Complaints set forth facts demonstrating that Defendants knowingly made misleading event, attendance, and revenue projections, Plaintiffs have adequately alleged that Defendants' fraud was a "substantial cause" of the Bonds' decline in value.

/ / /

/ / /

1
2

**II.     Plaintiffs' Have Stated a Claim Pursuant to § 20(a) of the Securities and Exchange Act Against Certain Defendants.**

3
4
5

Plaintiffs next allege that Global Entertainment, Kozuback, Treliving, and the Fain Group are "control persons" subject to § 20(a) liability under the Exchange Act. *See* U.S.C. § 78t(a). Section 20(a) of the Exchange Act provides for joint and several liability of persons who control primary violators of the securities laws:

6
7
8
9
10

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

11
12
13
14
15
16
17

*Id.* As the Ninth Circuit has further explained, "In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) 'a primary violation of federal securities law' and (2) 'that the defendant exercised actual power or control over the primary violator.'" *No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (quoting *Howard*, 228 F.3d at 1065). After a plaintiff sets forth a prima facie case, the burden shifts to the defendant to show that it acted in good faith—i.e. that it lacked scienter or did not directly or indirectly induce the misconduct. *Id.*

18
19
20
21
22
23
24
25
26

Control in this context is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (emphasis added). A control person is, therefore, generally a parent corporation, the employer of the primary violator, or a director or officer of the primary violator corporation. *See* Edward Brodski & M. Patricia Adamski, *Law of Corporate Officers and Directors: Rights, Duties and Liabilities* § 16:3 (2006). According to the Ninth Circuit, the "traditional indicia of control" include "having a prior lending relationship, owning stock in the target company, or having a seat on the board." *Am. W. Holding Corp.*, 320 F.3d at 945–46 (citation omitted).

27
28

Under the Ninth Circuit's test for control, Plaintiffs have sufficiently alleged that Global Entertainment, Kozuback, Treliving, and the Fain Group exercised control over a

1   primary violator of the security laws. As previously discussed, Plaintiffs have adequately

2   stated a § 10(b) claim against PVEC–LLC. Accordingly, Plaintiffs' § 20(a) claim turns on

3   whether Plaintiffs have pled facts indicating that Global Entertainment, Kozuback, Treliving,

4   the Fain Group exercised actual power or control over PVEC–LLC, the alleged primary

5   violator. According to the Amended Complaints, Kozuback and Treliving are alleged to own

6   and directly control Global Entertainment, which owned a 50% share in PVEC—LLC.

7   Likewise, FSG is alleged to wholly own and control PVSE, which was the other 50% owner

8   and operator of PVEC–LLC. According to Plaintiffs, Global Entertainment (under the control

9   of Kozuback and Treliving) and PVSE (under the control of FSG) explicitly directed

10  PVEC–LLC to sign the Official Statements. Thus, because "control person liability" can be

11  based "on allegations of substantial stock ownership and common principals[,]" *see Kalin*

12  *v. Xanboo, Inc.*, 526 F. Supp.2d 392, 405 (S.D. N.Y. 2007), the Court holds that Plaintiffs

13  have adequately alleged a prima facie case for control person liability under Section 20(a).

14  **III.    Allstate and the Trustee Have Adequately Pled State-Law Claims Against Each
            Defendant.**

15
16          In addition to Plaintiffs' federal securities claims, Allstate and the Trustee allege

17  several state law claims. Allstate brings claims against Defendants for violations of state-

18  securities laws, common-law fraud, aiding and abetting fraud, and negligent

19  misrepresentation. Similarly, the Trustee, on behalf of Bondholders other than Allstate,

20  asserts claims for violations of Arizona security laws, negligent misrepresentation, breach

21  of contract, and a claim for declaratory relief and reformation.[14] Defendants move to dismiss

22  these claims on several bases: (1) Defendants assert that the Trustee lacks standing to bring

23  tort-based claims on the behalf of Bondholders; (2) the Town asserts that neither Allstate nor

24  the Trustee has complied with Arizona's notice of claim provisions; (3) Defendants argue

25  that the state securities claims, common-law fraud claim, aiding and abetting claim, and the

26  _____

27          [14]Not each of these claims is alleged as to every Defendant. To avoid confusion, the
    Court will address whether a particular claim is alleged against all or some of the Defendants

28  in discussing the particulars of each claim.

negligent misrepresentation claim each fail as a matter of law. Upon review of Defendants'
motions, the Court finds that Allstate and the Trustee have adequately pled their state-law
claims, except as otherwise noted below.

**A.     The Trustee Has Authority to Bring Tort-Based Claims on Behalf of
        Bondholders.**

The Court rejects Defendants' contention that the Trustee has standing to bring only
contract claims, as opposed to tort-based claims, on behalf of Bondholders. Generally, an
indenture trustee, such as Wells Fargo, has standing to bring claims on behalf of bondholders
only if the agreement creating the indenture trust grants the trustee the power to do so.
Accordingly, the issue of an indenture trustee's standing to bring claims on behalf of bond
or debenture holders turns on the specific indenture language of each case. *See, e.g.*, *Class
Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1280 (9th Cir. 1992) (holding that the relevant
indenture agreement allowed the trustee to "bring tort and fraud claims on behalf of the
bondholders"); *In re Was. Pub. Power Supply Sys. Sec. Litig.*, 623 F. Supp. 1466, 1483
(W.D. Wash. 1985) (concluding that the plain language of the "Bond Resolution"
empowered a trustee to bring both securities fraud and tort claims).

In the instant action, the plain language of the Indenture of Trust permits the Trustee
to pursue tort-based claims on behalf of the Bondholders. In three separate sections, the
Indenture expressly grants the Trustee power to enforce "all rights" and "any other remedies"
of the Bondholders, without limitation:

> **Section 10.4 Legal Proceeding by Trustee.** If any Event of
> Default with respect to the Bonds has occurred and is
> continuing, the Trustee, in its discretion may, and upon the
> written request of the Holders of not less than a majority of the
> aggregate principal amount of the Outstanding Bonds and
> receipt of indemnity to its satisfaction shall, in its own name: (a)
> by mandamus, or other suit, action or proceeding at law or in
> equity, enforce *all rights* of the Holders of the Bonds . . . .

(Doc. 173, Ex. 1 at 43). The Indenture of Trust later provides in § 10.9 that "no remedy
contained in this Indenture is intended to be exclusive of any other remedy or remedies, and
each remedy is in addition to *every other remedy* given hereunder or now or hereafter
existing at *law or in equity* or *by statute*." *Id.* at 44 (emphasis added). Similarly, § 10.13 adds

1  that "[i]t is the purpose of this Article to provide such remedies to the Trustee and
2  Bondholders as may be lawfully granted under . . .applicable laws of the State." *Id.* at 46.

3  　　　Under Arizona law, "[t]he controlling rule of contract interpretation requires that the
4  ordinary meaning of language be given to words where circumstances do not show a
5  different meaning is applicable." *Chandler Med. Bldg. Partners v. Chandler Dental Group*,
6  175 Ariz. 273, 277, 855 P.2d 787, 791 (Ct. App. 1993) (citation omitted). The ordinary
7  meaning of "enforce all rights without limitation" indicates that the Trustee is entitled to
8  enforce those rights that arise in contract *and* tort. Similarly, the language, "every other
9  remedy . . . existing at law or in equity or by statute, does not limit itself to contract remedies.
10  Instead, it includes remedies that arise in contract and tort.

11  　　　The plain language of the Indenture of Trust is very similar to that addressed in *City*
12  *of Seattle*, 955 F.2d at 1280. There, the Ninth Circuit determined that the following indenture
13  language granted the trustee power to bring both tort and contract claims:

14  　　　　　If an Event of Default shall happen and shall not have been
　　　　　waived or remedied, then and in every such case the Bond Fund
15  　　　　　Trustee . . . shall be entitled and empowered to proceed
　　　　　forthwith to institute such suits, actions and proceedings at law
16  　　　　　or in equity for the collection of all sums due in connection with
　　　　　the Bonds and to protect and enforce its rights and the rights of
17  　　　　　holders of the Bonds under the Resolution . . . in the
　　　　　enforcement of any other legal or equitable right as the Bond
18  　　　　　Fund Trustee, being advised by counsel, shall deem most
　　　　　effectual to enforce any of its rights or the rights of the holders
19  　　　　　of the Bonds.

20  *Id.* at 1280. This language parallels the Indenture of Trust in this case. Both contain
21  provisions indicating that the trustee's rights are triggered by an event of default, both
22  provide discretion and power to the trustee to bring actions in law or equity, and both permit
23  the trustee to enforce all rights of bondholders arising under the relevant provision. *See id.*;
24  (Doc. 173, Ex. 1 at 44–45).

25  　　　The language in the Indenture simply does not limit the Trustee's powers to bringing
26  contract claims. To support their argument to the contrary, Defendants assert that the "only
27  examples" of the Trustee's authority provided in § 10.4(a) pertain to contract rights—i.e.,
28  "the right to require the Issuer to carry out any agreements." (Doc. 173, Ex. 1 at 44). This

1   argument, however, ignores the qualifier immediately preceding these examples: "*without*
2   *limitation*." *Id.* (emphasis added). This qualifier, especially in light of the broad language of
3   the Indenture, indicates that the Trustee's power is not limited to contract actions.

4       The Court also rejects Defendants' attempt to limit the Trustee's power based on the
5   Indenture's use of the terms "rights" and "remedies." (Doc. 173 at 7–8). As Defendants point
6   out, § 10.4(e) of the Indenture grants the Trustee power to exercise "all rights and remedies"
7   qualified by the phrase, "*provided for by any other document or instrument securing such*
8   *Bonds.*" (Doc. 173, Ex. 1 at 44). Meanwhile, other provisions of the Indenture, such as §
9   10.4(a) grant the Trustee authority to "enforce all rights" of the holders with no mention of
10  remedies. *Id.* But while Defendants correctly cite the language of the Indenture, it is unclear
11  how the Indenture's use of the term "rights," rather than "rights and remedies," in § 10.4(a)
12  mandates the conclusion that the Indenture permits the Trustee to bring only contract claims.
13  Indeed, the notion that "remedies" somehow denotes something broader than the term
14  "rights" in this context is without support. *See Black's Law Dictionary* 1407, 1437 (9th ed.
15  2009) (defining "remedy" as "the means of enforcing a right" and defining "legal rights" as
16  something that is "remediable").

17      Defendants further contend that the Trustee's authority under the Indenture is limited
18  to contract claims because the language of Indenture applies to Bondholders rather than
19  purchasers of Bonds. This argument, however, misses the mark. While some bondholders
20  apparently purchased Bonds on a secondary market after the fraud was revealed and may not
21  have a securities claim, *see In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1490 (9th Cir.
22  1985), this does not prevent the Trustee from asserting claims on behalf of Bondholders that
23  do have a viable claim. The Indenture in this case grants the Trustee discretion to "enforce
24  all rights" of the Bondholders. (Doc. 173, Ex. 1 at 44). Those Bondholders who are not
25  original purchasers simply do not have as many rights as the Bondholders who are. In *City*
26  *of Seattle*, the Ninth Circuit noted this possibility and simply observed that those bondholders
27  that purchased their bonds during a certain time period had a claim for securities fraud while
28  those who purchased bonds outside the specific window did not have any claim. *See* 955 F.2d

at 1274 n. 2. Thus, to the extent that certain Bondholders do not have viable claims for fraud, this does not preclude the Trustee from asserting tort-based claims on behalf of the remaining Bondholders.

That the Trustee's rights are only triggered by an event of default does not alter this interpretation of the Indenture of Trust. Under the Indenture, default is defined, among other things, as instances where payments on the Bonds are not made or are late. (Doc. 173, Ex. 1 at 43). This, however, does not limit the Trustee's rights to curing default. For example in *United Bank of Ariz. v. Sun Mesa Corp.*, 119 F.R.D. 430, 431 (D. Ariz. 1988), another Division of this Court held that the Trustee lacked standing to bring securities fraud claims on behalf of bondholders because the indenture at issue limited the trustee to curing default. In so holding, the court noted that "[s]tanding was absent because the relevant agreements only provided the Bank with standing *to cure default* on the underlying loan. Since the fraud claims could have been asserted regardless of breach, the claims were not a remedy for default." *Id.* Other cases, relied on by Defendants, apply the same approach. *See e.g.*, *Regions Bank v. Blount Parrish & Co.*, 2001 WL 726989, at *5 (N.D. Ill. June 27, 2001) (holding that though "[p]laintiff [was] given the power under the [i]ndenture to pursue 'any available remedy,' . . . that language *refers* only to actions designed to 'collect the principal of, premium, if any, or interest on the Bonds' or to enforce the performance of any provision of the bonds or the [i]ndenture") (emphasis added). The Indenture of Trust in this case contains no such limiting language, but empowers the Trustee to "enforce all rights" and pursue "every remedy." (Doc. 173, Ex 1 at 44–45). Indeed, *City of Seattle* contained triggering language very similar to that at issue here, and the Ninth Circuit found that such language did not limit the trustee's power to claims arising in contract. *See* 955 F.2d at 1280 ("If an Event of Default shall happen and shall not have been waived or remedied . . . the Trustee . . . shall be entitled . . . to proceed forthwith to institute such suits, actions and proceedings at law or in equity . . . .").

Contrary to Defendants' averment, allowing the Trustee to bring tort claims on behalf bondholders will not lead to absurd results. Defendants point to § 10.7 of the Indenture to

1   support this argument. That Section provides:

2   **Section 10.7 Limitations on Actions by Bondholders.** No
3   Bondholder shall have any right to pursue any remedy hereunder
    unless (a) the Trustee shall have been given written notice of an
    Event of Default, (b) the Holders of at least a majority of the
4   aggregate principal amount of the Outstanding Bonds shall have
5   requested the Trustee, in writing, to exercise the powers
    hereinabove granted or to pursue such remedy in its or their
    name or names, (c) the Trustee shall have been offered
6   indemnity satisfactory to it against costs, expenses and
7   liabilities, and (d) the Trustee shall have failed to comply with
    such request within a reasonable time.

8   (Doc. 173, Ex. 1 at 44). Defendants contend that the remedies in this Section cannot be read

9   to include tort-based claims; otherwise, Allstate and the Class Action Plaintiffs would be

10  without standing to bring fraud-based claims in the event that no default had been declared.

11  According to Defendants, this would create the anomaly where a massive fraud could have

12  occurred, Bondholders are fully aware of it, but no one could sue on that claim because no

13  actual default had occurred. Nonetheless, while this scenario might present some difficulties,

14  Defendants' argument relies on a misunderstanding of the terms of the Indenture. Under §

15  10.7, any limitations on actions by Bondholders applies only to "remedies *hereunder*,"—i.e.

16  those remedies that fall within the Indenture of Trust. The Indenture makes clear that rights

17  and remedies vest in the Trustee only if a notice of default has been declared. There is

18  nothing stripping Bondholders of their rights to bring claims in the event that no default has

19  been declared. Hence, if no default had been declared, Bondholders still could have pursued

20  their fraud-based claims.

21      Defendants do correctly point out that the Bondholders' right to bring claims in the

22  event of a default is subject to certain conditions: the Trustee is to be provided with written

23  notice of default, the Bondholders must request the Trustee to take action and offer to

24  indemnify the Trustee, and the Trustee must fail to comply with the request to file a claim.

25  (Doc. 173, Ex. 1 at 44). There is no indication at this point, however, that these conditions

26  remain unsatisfied.

27      Next, though the Trustee elected to bring its claim on behalf of only certain

28  Bondholders, i.e. Bondholders other than Allstate, Defendants point to nothing in the

1   Indenture of Trust that precludes the Trustee from doing so. Given that the Indenture of Trust

2   provides the Trustee with discretion in bringing its claims, such discretion could reasonably

3   be interpreted to permit the Trustee to bring claims on behalf of some Bondholders, while

4   allowing other Bondholders, such as Allstate, to pursue claims in their own name.

5       Section 10.11 of the Indenture further does not limit the Trustee's authority to

6   contract-based rights or remedies. That Section pertains to the application "of moneys

7   received by the Trustee . . . in connection with any proceedings brought" under the Indenture

8   of Trust. (Doc. 173, Ex. 1 at 45). Under § 10.11, the Trustee is required to distribute the

9   proceeds of any successful claims first to the Trustee's fees and costs, then to interests

10  payments, and then to bond redemptions. *See id.* According to Defendants, this may be

11  problematic, especially where the Trustee has permitted Allstate to bring separate claims,

12  because the Trustee would be required to apply any proceeds obtained on behalf of some

13  Bondholders to the interest payments owed to all Bondholders—including Allstate. While

14  this result could *ultimately* prove to be inequitable, it hardly inevitable nor is it a basis for

15  dismissal at the pleading stage.

16      **B.    Issues of Fact Preclude Judgment on the Town's Notice of Claim and**
        **Statute of Limitations Defenses—At Least With Respect to the Parties'**
17      **Fraud-Based Claims.**

18      Arizona's notice of claim statute provides that all persons having a claim against a

19  public entity or public employee must provide notice of that claim within 180 days after the

20  cause of action accrues. Ariz. Rev. Stat. § 12-821.01(A). Similarly, Arizona law imposes a

21  one-year statute of limitations on claims against the state or municipality from the time those

22  claims accrue. Ariz. Rev. Stat. § 12-821. A cause of action accrues for purposes of the notice

23  of claim provision and the statute of limitations when "the damaged party realizes he or she

24  has been damaged and knows or reasonably should know the cause, source, act, event,

25  instrumentality or condition which caused or contributed to the damage." *Id.* at § 12-

26  821.01(B). Generally, strict compliance with the notice of claim provision and the statute of

27  limitations is required. *See Falcon ex. rel. Sandoval v. Maricopa County*, 213 Ariz. 525, 527,

28  144 P.3d 1254, 1256 (2006) ("Actual notice and substantial compliance do not excuse failure

to comply with the statutory requirements."). Nonetheless, because a notice of claim and the statute of limitations are procedural requirements, they are both "subject to waiver, estoppel, and equitable tolling." *Pritchard v. State*, 163 Ariz. 427, 432, 788 P.2d 1178, 1183 (1990).

Under Arizona law, a proper notice of claim "contain[s] facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed." *Id.* at § 12-821.01(A). The notice shall also "contain a specific amount for which the claim can be settled and the facts supporting that amount." *Id.* Compliance with the notice of claim statute further requires that the notice be "file[d] . . . with the person or persons authorized to accept service for the public entity or public employee." *Id.* If the claimant fails to timely file a proper notice of claim, the action is barred. *See* Ariz. Rev. Stat. § 12-821.01(A). *Id.*

The Town's notice of claim and statute of limitations defenses presents three distinct issues: (1) whether the fraud-based claims asserted by Allstate and the Trustee are barred; (2) whether the Trustee complied with §§ 12-821 and 12-821.01 in raising its breach of contract claim; (3) whether the Trustee may bring its claim for reformation and declaratory judgment. The Court will address each in turn.

### (1) Issues of Fact Exist With Respect to the Parties' Fraud-Based Claims.

Though the Town contends that neither Allstate nor the Trustee has complied with Arizona's notice of claim statute and the applicable statute of limitations as those provisions relate to the parties' fraud-based claims, issues of fact, pertaining to when Plaintiffs knew or reasonably should have known the "cause, source, act, event, instrumentality or condition which caused or contributed to the damage," preclude dismissal at this time. *See* Ariz. Rev. Stat. § 12-821.01(B). According to Allstate and the Trustee, they did not learn of their securities and fraud-based claims until July 2009 when the Town provided them with the 2005 Report, which contained the event and attendance projections that were substantially less than those in the Official Statements. Thus, while the Town contends that Allstate and the Trustee discovered or should have discovered the cause of its damages when Fitch lowered its rating on the Bonds, the parties' pleadings set forth facts indicating that they did

1   not discover the alleged fraud underlying the devaluation until the 2005 Feasibility Study

2   was revealed. *See Aaron v. Fromkin*, 196 Ariz. 224, 228, 994 P.2d 1039, 1043 (Ct. App.

3   2000) (holding that "discovery of the fraudulent practice on which liability is based," rather

4   than the discovery of damages, commences the running of the limitations period for securities

5   fraud). Along the same lines, it is also unclear at this juncture whether a reasonable

6   investigation would have uncovered the alleged fraud any earlier. Accordingly, the Town's

7   motion to dismiss is denied to the extent it asserts that Allstate and the Trustee failed to

8   comply with the notice of claim provisions and the applicable statute of limitations.

9                    **(2)    The Trustee's Breach of Contract Claim is Dismissed.**

10          The Trustee has failed to comply with §§ 12-821 and 12-821.01(A) in bringing its

11   breach of contract claim. The parties agree that Trustee's contract claim accrued on October

12   2, 2007, when the Town allegedly failed to make a timely debt servicing payment in

13   accordance with the Development Agreement. The Trustee, however did not file a proper

14   notice of claim until September 25, 2009—more than two years after the Town's debt-

15   servicing default. Though the Trustee contends that it sent an invoice for debt servicing and

16   other documents to the Town prior to this date, it is clear that none of these qualifies as a

17   notice of claim as they were either sent *before* any claim could have accrued, were sent to

18   the wrong government officials, and did not otherwise comply with the provisions of the

19   Notice of Claim Statute. *See* Ariz. Rev. Stat. at § 12-821.01(A). And while the Town

20   apparently engaged in "good-faith settlement negotiations" with the Trustee after the 180-day

21   notice period, this is insufficient to demonstrate express or implied waiver of the Town's

22   rights. *See Jones v. Cochise County*, 218 Ariz. 372, 379–80, 187 P.3d 97, 104–05 (Ct. App.

23   2008) ("[W]aiver may be found when a governmental entity has taken substantial action to

24   litigate the merits of the claim that would not have been necessary had the entity promptly

25   raised the defense."). Mere settlement negotiations, conducted in good faith, without some

26   further investigation into the claim or some offer to settle the claim are insufficient to find

27   that the Town took "substantial action to litigate the merits of the claim" or that it acted in

28   a manner "inconsistent with an intent to assert the right." *See id.* (quotation marks omitted).

To the extent the Trustee asserts that the Town expressly waived its rights, the Trustee fails to identify any facts indicative of express waiver. The Trustee points to language in the Development Agreement that provides: "[n]o delay in exercising any right or remedy shall constitute a waiver thereof." (Doc. 155, Ex. 1 at Appendix A § 15.2). This provision, however, addresses only the parties' "rights or remedies" that exist under the Development Agreement—not the statutory notice of claim statute at issue. More importantly, this language states that a party's "delay in exercising" a right or remedy will not "constitute a waiver" of that right. Here, the Trustee's claim is barred, not because the Trustee "waived" its claims, but because the Trustee has failed to comply with the statutory requirement that it file a timely notice of claim before asserting its claims against the Town.

Similarly, to the extent the Trustee argues that estoppel bars the Town's notice of claim defense, the Trustee fails to set forth facts establishing the elements of estoppel. Under Arizona law, estoppel requires: (1) affirmative acts inconsistent with a claim afterwards relied upon; (2) action by a party relying on such conduct; and (3) injury to the party resulting from repudiation of such conduct. *Lincoln Hosp. & Health Corp. v. Maricopa County*, 208 Ariz. 532, 537, 96 P.3d 530, 535 (Ct. App. 2004). According to the Trustee, the Town should be estopped from asserting its notice of claim defense as to the contract claim because the Town engaged in good-faith settlement negotiations with the Trustee for approximately two years following the breach. The Trustee, however, fails to explain how the decision to engage in negotiations somehow constitutes an affirmative action inconsistent with a claim afterwards relied upon. Instead, the facts alleged merely indicate that the Town engaged in these negotiations at the Trustee's request. There is nothing indicating that Town somehow induced these negotiations or made some threat or promise that hindered the Trustee from complying with the notice of claim and the one-year statute of limitations. *See Nolde v. Frankie*, 192 Ariz. 276, 280–81, 964 P.2d 477, 481–82 (Ariz. 1998) (to invoke estoppel, "plaintiff must identify specific promises, threats or inducements by the defendant"). Based on these facts, the Trustee has failed to comply with Arizona's notice of claim requirements and the statute of limitations in bringing its breach of contract claim.

**(c)     The Trustee's Claims for Reformation and Declaratory Judgment are Barred by § 12-821.**

Arizona courts have held that the notice of claim provisions set forth in § 12-821.01(A) generally do not apply to declaratory judgment or reformation actions. *See Martineau v. Maricopa County*, 207 Ariz. 332, 336, 86 P.3d 912, 916 (Ariz. Ct. App. 2004). But while compliance with the notice of claim provisions may not have been necessary to assert these types of claims, Arizona's one-year statute of limitations for claims against municipalities still begins to run from the time that the claim accrued. Ariz. Rev. Stat. § 12-821. Here, there is no dispute that the Trustee's declaratory judgment and reformation claims accrued as of June 23, 2008, when the Town responded to the Trustee's demand letter regarding failure to timely pay the October 2007 disbursement. The Trustee, however, did not bring is claim until September 2009. And while the Trustee contends that the Town waived or should be estopped from asserting it limitations defense, those arguments fail for the same reasons discussed with respect to the Trustee's breach of contract claim.[15]

**C.     Allstate and the Trustee Have Stated Claims for Violations of Arizona's Securities Laws.**

Allstate and the Trustee each allege that Defendants violated the Arizona Securities Act. Specifically, Allstate alleges violations of Arizona Revised Statute §§ 44-1991(A)(1)–(3), 44-1998, and 44-1999. The Trustee raises its claim under § 44-1991)(A)(2). The Court finds that Allstate and the Trustee have stated a claim under these provisions except as otherwise discussed bellow.

**(1)     Allstate and the Trustee Have Stated Claims Pursuant to Section 44-1991(A).**

Allstate and the Trustee have both stated claims for violations of § 44-1991(A) of the

---

[15]The Trustee also asserts its declaratory judgment and reformation claims against Global Entertainment and the Fain Group. Since these entities do not appear to be parties to the documents that the Trustee seeks to reform, however, it is unclear how the Trustee can pursue these claims in the absence of any such claim against the Town. Nonetheless, to the extent the Trustee believes that these claims can go forward without the Town, the Trustee may attempt to explain its basis for continuing to assert this claim against Global Entertainment and the Fain Group.

Arizona Securities Act. That Section makes it unlawful to engage in or employ fraudulent or deceitful practices in the purchase or sale of securities. Specifically, § 44-1991(A) provides:

> It is a fraudulent practice and unlawful for a person, in connection with a transaction . . . involving an offer to sell or buy securities, or a sale or purchase of securities . . . , to do any of the following:
>
> 1.   Employ any device, scheme or artifice to defraud.
>
> 2.   Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
>
> 3.   Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

Ariz. Rev. Stat. § 44-1991(A); *see Albers v. Edelson Tech. Partners, L.P.*, 201 Ariz. 47, 51, 31 P.3d 821, 825 (Ct. App. 2001). As a preliminary matter, any action arising under § 1991(A) must set forth facts indicating that each defendant either made, participated in, or induced the security transaction at issue. *See* Ariz. Rev. Stat. § 440-2001(A). Claimants seeking recovery under § 1991(A) must also meet certain pleading requirements as set forth in Ariz. Rev. Stat. § 44-2082. This requires a plaintiff to allege with particularity an actionable scheme, misstatement, or omission. *See id.* at § 44-2082(A). To the extent a defendant's state of mind is an element of the offense, which it is under § 1991(A)(1), a complaint must plead scienter with particularity. *See id.* at § 44-2082(B).

> ### (a)   Allstate and the Trustee Have Alleged Facts Indicating that Each Defendant Either Made, Participated in, or Induced the Security Transactions at Issue.

Section 44-2001(A)(1) of the Arizona Securities Act permits a purchaser injured by a violation of §§ 44-1991(A)(1), (2), or (3) to bring a private cause of action for rescission or damages. *See* 44-2001(A). The private right of action, however, may only be brought against those "who made, participated in or induced the unlawful sale or purchase." *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 18, 945 P.2d 317, 329 (Ct. App. 1996) (citing Ariz. Rev. Stat. § 44-2003). Of the Defendants, only Kutak and Stinson argue that

1    they did not play an actionable role in the sale of the Bonds. Allstate and the Trustee,

2    however, have alleged facts indicating that the law firms "participated in" the sale of the

3    Bonds.

4           In the context of § 2003A, to "participate in . . . means 'to take part in something' or

5    'have a part or share in something.'" *Grand v. Nacchio*, 222 Ariz. 498, 500–01, 217 P.3d

6    1203, 1205–06 (Ct. App. 2009) (quoting *Standard Chartered*, 190 Ariz. at 21, 945 P.2d at

7    332). This requires something more than "activities" that are merely "tangentially related to

8    and concurrent with [an] ongoing sale." *See Standard Chartered*, 190 Ariz. at 21, 217 P.3d

9    at 332. For instance, in *Standard Chartered*, the court determined that an accounting firm did

10   not participate in the sale of securities by a bank, even though the firm prepared a negligent

11   audit on which investors claimed to have relied, because the accounting firm performed the

12   audit in its normal course of professional duties as the bank's auditor. *Id.* The court,

13   therefore, found that the accounting firm did not "participate in" any sale because the

14   accounting firm's "function—to issue audit opinions about [the bank's] financial status—did

15   not differ from the function it would have performed had no merger or sale been in process."

16   *Id.*

17          Allstate and the Trustee have set forth facts indicating that Kutak and Stinson "took

18   part in" the sale of the securities at issue. According to the relevant pleadings, these law firms

19   were retained to prepare relevant documents that were necessary to procure financing for the

20   Event Center. Thus, unlike the auditor in *Standard Chartered*, who would have conducted

21   an audit irrespective of the securities transaction, the law firms were hired for work that was

22   not merely "tangentially" related to the sale of a security or that otherwise would have

23   performed if no sale had been in progress. *See id.* Here, Kutak and Stinson were retained for

24   *the sole purpose of* preparing, drafting, and reviewing documents that were *primarily*

25   designed to solicit purchasers for the Bonds. Given these allegations, Allstate and the Trustee

26   have adequately pled facts indicating that Kutak and Stinson "participated in" the sale of the

27   Bonds at issue.

28   / / /

1

2          **(b)        Allstate and the Trustee Have Alleged an Actionable Fraud.**

3          To properly state a violation under any of the provisions of § 1991(A), a complaint

4    must identify "each alleged untrue statement or material omission and the reason or reasons

5    why the statement or omission is misleading or the omission is material." Ariz. Rev. Stat. §

6    44-2082(A); *see* Fed. R. Civ. P. 9(b) (requiring complainants to state with particularity the

7    circumstances constituting fraud or mistake). Similarly, a complaint must set forth facts

8    suggesting that each Defendant made the misrepresentations at issue, or at least had a duty

9    to disclose the facts necessary to make the statement made, in light of the circumstances, not

10   misleading. *See Dunahay v. Struzik*, 96 Ariz. 246, 249, 393 P.2d 930, 933 (1964) ("While

11   Fraud may be committed by the failure to speak, a duty to speak must be imposed."); *see also*

12   *Cent. Bank of Denver*, 511 U.S. at 174 (1994) ("When an allegation of fraud . . . is based on

13   nondisclosure, there can be no fraud absent a duty to speak.") (quotation omitted).

14         For the same reasons as set forth in Plaintiffs' federal securities claims, Allstate and

15   the Trustee have adequately alleged that the Official Statements were false or misleading due

16   to the omission of data from two prior feasibility reports that strongly undermined the event,

17   attendance, and revenue projections in the Official Statements. These statements were

18   allegedly false or misleading because Global Entertainment, the Fain Group, the Town, and

19   others are alleged to have inflated event, attendance, and revenue projections to obtain an

20   investment-grade rating for the Bonds.

21         Allstate and the Trustee have also alleged that each of the Defendants participated in

22   and contributed to the alleged fraud or misstatement. As discussed in the Court's analysis of

23   Plaintiffs' § 10(b) claims, Global Entertainment, Kozuback, the Hocking Defendants, the

24   Fain Group, the Town, and PVEC–LLC each assumed a duty to disclose given their role in

25   creating, drafting, and adopting the projections set forth in the Official Statements. The same

26   can be said of Treliving, who does not move to dismiss the claims against him on this basis,

27   and who, as a director of Global Entertainment, allegedly participated in the scheme to inflate

28   event and attendance revenues. With respect to the Underwriters, they too had a duty, given

1    their role in the project, to disclose facts that were necessary to prevent the Official

2    Statements from being false or misleading.

3        Kutak and Stinson had a duty to ensure that the statements they made, or substantially

4    participated in making, were not false or misleading. Thus, to the extent they substantially

5    participated in drafting the allegedly misleading event and attendance projections, these

6    Defendants had a duty to disclose facts that tended to undermine those projections. In

7    addition, Allstate and the Trustee raise allegations, which are not pled with respect to

8    Plaintiffs' federal securities claims, indicating that Kutak and Stinson may be responsible for

9    a misstatement that is unrelated to the allegedly misleading projections. In its Counterclaim,

10   the Trustee contends that Kutak and Stinson drafted a provision in the Official Statements

11   that creates the misleading impression that Bondholders would have a "first lien" upon

12   certain revenues that were pledged for debt servicing. (Doc. 155, Ex. 1 at 8). Any security

13   interest created by the lien, however, was allegedly illusory due to defects in the

14   Development Agreement, the Trust Indenture, the Loan Agreement, and other associated

15   documents, which also were allegedly drafted by Kutak and Stinson. According to the

16   Trustee, the Official Statements negligently failed to disclose defects in these documents.

17   These defects, in turn, have permitted the Town to withhold debt service payments from

18   Bondholders, which effectively nullified any security interest created by the lien. The defects

19   allegedly came to fruition in October 2007 when the Town, citing to the relevant offering

20   documents, refused to deliver payments for debt servicing to the Trustee. Viewing these

21   allegations in the light most favorable to the Trustee and Allstate, they have sufficiently

22   alleged facts indicating that Kutak and Stinson negligently created the false impression that

23   the Bonds would be secured by the revenues that had been pledged for debt servicing.[16]

24

25

26        [16]Allstate and the Trustee do not assert that Kutak and Stinson, or any other Defendant
     for that matter, acted intentionally or recklessly in failing to disclose the defects that have
27   allegedly rendered the security lien illusory. Accordingly, these allegations pertain only to
28   those claims that do not require a showing of scienter.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(c)    Allstate's § 1991(A)(1) Claim Adequately Pled Scienter, Except as to the Underwriters and the Law Firms.**

For claims arising under § 1991(A)(1), a claimant must allege the requisite state of mind with particularity. Specifically, "[i]n any private action arising under § 44-1991" requiring "proof that the defendant acted with a particular state of mind . . . , the complaint shall state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Ariz. Rev. Stat. § 44-2082(B). Scienter, however, is only an element § 1991(A)(1) claims. It is not a required element of claims raised pursuant to § 1991(A)(2) and § 1991(A)(3). *See e.g.*, *Orthologic Corp. v. Columbia/HCA Healthcare Corp.*, 2002 WL 1331735, at *5 (D. Ariz. Jan 7, 2002) (holding that "proof of scienter is required to succeed on a claim under § 1991(A)(1), but not under § 1991(A)(2) or § 1991(A)(3)") (citing *State v. Gunnison,* 127 Ariz. 110, 113, 618 P.2d 604, 607 (1980)). Thus, while a claimant must plead his or her § 1991(A)(1) claim "with particularity" and is required to allege " facts giving rise to a strong inference that the defendant acted with the required state of mind," this heightened pleading requirement does not apply to claims raised pursuant to §§ 1991(A)(2) and (3). *See* Ariz. Rev. Stat. § 44-2082(B).

Only Allstate alleges a claim pursuant to § 1991(A)(1). With respect to that claim, Allstate has alleged scienter with sufficient particularity against Global Entertainment, Kozuback, the Hocking Defendants, the Fain Group, the Town, and PVEC–LLC for the same reasons set forth in the Court's discussion of Plaintiffs' federal securities claims. And while the Court's prior analysis does not address Treliving's role, he does not dispute or challenge that he acted with the requisite degree of scienter. Accordingly, Allstate has adequately set forth facts demonstrating scienter as to each of these Defendants.

Allegations of scienter against the Underwriters, Kutak, and Stinson have not been pled with sufficient particularity. Again, for the same reasons as discussed with respect to Plaintiffs' federal securities claims, there are not sufficient facts to create an inference that these Defendants knew the event, attendance, and revenue projections were inflated. And while there are facts suggesting negligence, a negligent state of mind is insufficient to give

1  rise to liability under § 1991(A)(1).

2          **(d)     Allstate and the Trustee Have Alleged Violations of § 1991(A).**

3

4          Upon review of the requisite pleading standards for § 1991A(1)–(3), Allstate has

5  alleged a violation pursuant to § 1991A(1) against each defendant with the exception of the

6  Underwriters, Kutak, and Stinson. The § 1991(A)(1) claims against these Defendants fail for

7  lack of scienter. With respect to § 1991(A)(2), where scienter is not a necessary element of

8  the offense, Allstate and the Trustee have both stated a claim against each of the Defendants

9  for violations of that provision. Likewise, to the extent Allstate seeks relief pursuant to

10  §1991(A)(3), it has adequately alleged that each defendant participated in a securities

11  transaction that operated to defraud investors.

12          Defendants' challenges to the claims raised pursuant to § 1991(A) are without merit.

13  As set forth in the Court's analysis of § 10(b), Allstate and the Trustee have adequately

14  alleged that the misleading statements at issue caused the Bonds' decrease in value. *See*

15  *Grand v. Nacchio*, 214 Ariz. 9, 19, 147 P.3d 763, 773 (Ct. App. 2006) (applying a similar test

16  for loss causation as applied by the United States Supreme Court in *Dura*, 544 U.S. at 344).

17  To the extent Defendants contend that the allegedly false statements are immunized by the

18  bespeaks caution doctrine,"no degree of cautionary language will inoculate statements that

19  the defendants knew were simply not true when made." *See Freeland*, 545 F. Supp.2d at

20  71–72 (citing *Va. Bankshares*, 501 U.S. at 1097). Given that Allstate and the Trustee have

21  alleged facts indicating that at least some of the Defendants knew that the event, attendance,

22  and revenue projections in the Official Statements were misleading, application of the

23  bespeaks caution doctrine at this juncture would be premature.

24          **(2)     Allstate's Section 44-1998 Claim Fails.**

25          Allstate has not stated a claim for liability pursuant to Arizona Revised Statute § 44-

26  1998 against any of the Defendants. Section 1998 imposes liability upon "any person who

27  offers or sells a security by means of a prospectus or oral communication that includes an

28  untrue statement of a material fact or omits to state a material fact necessary in order to make

1    the statements, in light of the circumstances under which they were made, not misleading."

2    Ariz. Rev. Stat. § 44-1998(A).

3         Section 1998, on its face, however, indicates that it does not apply to certain securities

4    that qualify under § 44-1843(A)(1) as being "issued or guaranteed by the United States, by

5    any state, . . . or any political subdivision of such state[.]" *See* Ariz. Rev. Stat. § 44-

6    1843(A)(1). Hence, § 44-1843(A)(1) provides a broad exemption from § 1998(A) liability

7    for securities issued by states and political subdivisions or instrumentalities thereof. To be

8    sure, it appears that § 44-1843(A)(1) contains an exception to the exemption—i.e. a provision

9    that could reinstate liability for industrial development bonds issued by political subdivisions

10   that meet certain criteria. Plaintiffs, however, do not offer any argument as to why *that*

11   exception, which is found in § 44-1843.01(A), would operate to reinstate § 1998 liability in

12   this case. Defendants have moved to dismiss on the basis that the securities at issue are

13   exempt from § 1998 because they qualify under § 44-1843(A)(1) as being issued by a

14   political subdivision of the state of Arizona. Plaintiffs do not contest this. Thus, Plaintiffs

15   offer no reason or argument in response to Defendants' Motion.

16        Instead, Plaintiffs argue that SEC Rule 131 applies to reinstate liability because the

17   Bonds are a "separate security" within the meaning of the SEC Rule. Plaintiffs fail, however,

18   to explain how or why SEC Rule 131 is applicable to the state law claim set forth under §

19   1998. Nothing in § 1998 references the SEC Rule, and Plaintiffs do not cite or refer to any

20   analogous Arizona provision that would apply to reinstate liability. Plaintiffs appear to

21   proceed as if their claim were asserted pursuant to § 12(2) of the Securities Act, which it is

22   not. It is true that in some respects, courts have looked to § 12(2) of the Securities Act to

23   interpret Arizona Revised Statute § 44-1998 to the extent they are similar. *See Orthologic*,

24   2002 WL 1331735, at *7 (relying on § 1998's federal counterpart in defining the term

25   "prospectus"). A comparison of § 12(2) and § 44-1998, and especially the exceptions to those

26   provisions that fall under § 3(2) of the Securities Act and § 44-1843(A)(1) of the Arizona

27   Securities Act, indicate that in this context the statutes contemplate somewhat different

28   exceptions or exemptions from liability. The exceptions simply do not appear to be

completely analogous. Without some more definitive basis for applying SEC 131, this federal regulation, written specifically pursuant to § 12(2) and § 3(2) of the Securities Act, is not persuasive here. Accordingly, Plaintiffs' § 1998 claim is dismissed.

### (3)    Allstate Has Stated a Claim Pursuant to Section 44-1999.

Allstate has stated a claim against Global Entertainment, Kozuback, Treliving, and the Fain Group for control person liability pursuant to Arizona Revised Statute § 44-1999(B). That Section provides,

> Every person who, directly or indirectly, controls any person liable for a violation of § 44-1991 . . . is liable jointly and severally with and to the same extent as the controlled person to any person to whom the controlled person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act underlying the action.

Ariz. Rev. Stat. § 44-1999(B). In other words, § 1999 imposes liability on anyone that, through stock ownership, agency or otherwise, controls a person that is liable as a principal for violation of § 1991.

Because Allstate has alleged a primary violation against PVEC—LCC, and given Allstate's allegations of ownership and control over that entity by Global Entertainment, Kozuback, Treliving, and the Fain Group, Allstate has adequately stated a claim against these Defendants.

### D.    Allstate Has Stated Claims for Violations of Other States' Securities Laws.

### (1)    Allstate Has Alleged a Violation of the Illinois Securities Law.

According to Allstate, each of the Defendants committed violations of the Illinois Securities Law of 1953. *See* 815 Ill. Comp. Stat. §§ 5/12, 5/13. Specifically, Allstate contends that Defendants violated §§ 12 and 13 of the statute, which are largely patterned after § 17(a)(2) and (3) of the Securities Act of 1933. *See Anvil Inv. Ltd. P'ship v. Thornhill Condos. Ltd.*, 407 N.E.2d 645, 651 (Ill. Ct. App. 1980). Section 12 provides, in pertinent part:

> It shall be a violation of the provisions of this Act for any person:
>
> F.    To engage in any transaction, practice or course of

business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

G.   To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

H.   To sign or circulate any statement, prospectus, or other paper or document required by any provision of this Act or pertaining to any security knowing or having reasonable grounds to know any material representation therein contained to be false or untrue.

I.   To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

815 Ill. Comp. Stat. § 5/12. Section 13 of the statute further provides that liability may be imposed on "the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom the sale was made, and each underwriter, dealer, or salesperson who shall have participated or aided in any way in making such sale[.]" *Id.* at § 5/13.

In raising a securities claim under these provisions, a claimant must plead an actionable misstatement with particularity under Rule 9(b). Where allegations concern an omission, the complaint must also plead facts indicating a duty to disclose. The claimant, however, need not plead, nor even prove for that matter, scienter to state a claim for violations of §§ 12(F) and 12(G). *Foster v. Alex*, 572 N.E.2d 1242, 1245 (Ill. Ct. App. 1991) (holding that "scienter need not be pled nor proved in a civil case brought under sections 12(F) and 12(G) of the Illinois Securities Act"); *see Schwitters v. Tomlinson*, 1996 WL 54240, at *3 (N.D. Ill. Feb. 9, 1996) ("[S]cienter is not an essential element to an action under the Illinois Blue Sky laws."). *But see People v. Whitlow*, 433 N.E.2d 629, 634 (Ill. 1982) (holding that scienter is an essential element of a claim alleged under § 12(I) of the Illinois Security Law).

In the instant case, Allstate has adequately stated a claim pursuant to the Illinois Securities Law against each of the Defendants except Kutak and Stinson. First, for the same

reasons that Plaintiffs have stated a federal § 10(b) claim against Global Entertainment, Kozuback, the Hocking Defendants, the Fain Group, the Town, and PVEC–LLC, Allstate has also stated a claim pursuant to §§ 12 and 13 of Illinois's blue sky laws. Likewise, Allstate has sufficiently alleged that Treliving, through his alleged conduct with Global Entertainment and through his control of PVEC–LLC, engaged in a transaction or course of business in connection with the sale of a security that tended to work a fraud or deceit upon Allstate. *See* 815 Ill. Comp. Stat. § 5/12. Allstate has also alleged a violation as to the Underwriters. As discussed above, Baird, Stern, and Jones, given their role as underwriters, had a duty to disclose material facts tending to undermine affirmative provisions in the Official Statements. Thus, because that scienter is not an element of a cause of action under at least some of the provisions issue, Plaintiffs have adequately alleged that the Underwriters engaged in a practice that perpetrated a fraud on investors, including Allstate. Each of these Defendants also appear to fall within the ambit of § 13 of the statute because they are allegedly either issuers, controlling persons, underwriters, or dealers. *See id.* at § 5/13.

Allstate, however, has not stated a claim as to Kutak and Stinson for violations of Illinois's blue sky provisions. As set forth in § 13, only issuers, controlling persons, underwriters, dealers or other persons *by or on behalf of whom* the fraudulent sales are made are subject to liability under the Illinois law. 815 Ill. Comp. Stat. § 5/13. Illinois courts have interpreted this language narrowly and held that lawyers who participate in the preparation of an offering memorandum are not subject to liability. *See, e.g.*, *Excalibur Oil, Inc. v. Sullivan*, 616 F. Supp. 458, 466 (N.D. Ill. 1985) (explaining that the only persons who can be held liable under the Act are those "who regularly play central and specialized roles in securities transactions"). For instance, in *Boltz v. Flagship Partners Ltd. P'ship*, 1990 WL 106571, at *4 (N.D. Ill. 1990), the Northern District of Illinois held that the language of § 13 "does not indicate that a law firm providing legal services is also the party by whom the securities are sold." The court further observed, that even if the law firm had "prepar[ed], review[ed], and approv[ed] the offering memorandum at issue, it could not be held liable for fraud under §§ 12 and 13. *Id.* Accordingly, given that Kutak and Stinson are merely alleged

to have participated in the in the preparation, review, and approval of the Official Statements, Allstate's claim for violations of the Illinois Securities Law as to Kutak and Stinson are dismissed. Allstate, has not pled facts indicating that Kutak and Stinson were controlling persons in this case.

> **(2)** **Allstate Has Stated a Claim against Stern for Violations of the California Securities Act**.

Allstate also alleges that Defendant Stern, one of the Underwriters, violated §§ 25400 and 25500 of the California Corporations Code. Section 25400 "makes it unlawful for any person 'selling or offering for sale . . . [a] security, to make, for the purpose of inducing the purchase . . . of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading . . . and which he [or she] knew . . . was so false or misleading.'" *Cal. Amplifier, Inc. v. RLI Ins. Co.*, 94 Cal.App.4th 102, 109 (Ct. App. 2001) (quoting Cal. Corp. Code § 25400)). To bring a cause of action under this provision, a private claimant must further satisfy § 25500, which provides that a person who "willfully participates in any act or transaction in volition of § 25400 shall be liable to any person who purchases . . . a security at a price which was affected by such act or transaction." Cal. Corp. Code § 25500.

To meet the "willful participation" requirement, a plaintiff must "satisfy a high level of scienter." *See Cal. Amplifier*, 94 Cal.App.4th at 112. This means that the plaintiff must demonstrate that the defendant acted with "an intent to defraud through a knowingly false statement." *Id.* Accordingly, "[o]nly persons who willfully, not merely recklessly, violate section 25400, . . . can be liable for damages." *Id.* But while the elements of a claim under §§ 25400 and 25500 are relatively straightforward, the pleading requirements for "willful participation" are not. *See Reiger v. Altris Software, Inc.*, 1999 WL 540893, at *10 (S.D. Cal. April 30, 1999) (noting that an "interesting question arises as to whether Section 25500 claims are subject to a heightened pleading standard for fraudulent intent" but then leaving that question for another day). In the absence of any definitive guidance on this question, the Court will hold Allstate to the pleading requirements Federal Rule of Civil Procedure 9(b),

which requires misstatements to be pled with particularity, but which permits knowledge or intent to be pled generally. Fed. R. Civ. P. 9(b); *see Twombly*, 550 U.S. at 570 (requiring claimants to plead facts that "state a claim for relief that is plausible on its face"); *Iqbal*, 129 S. Ct. at 1949 (requiring claimants to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged); *Glenfed*, 42 F.3d at 1546–47 (observing that where no heightened pleading standard is required, a plaintiff need not plead fraudulent intent with particularity).

Under these requirements, Allstate has adequately alleged a violation of §§ 25400 and 25500. According to Allstate, Stern willfully participated in the conveyance of misleading information to investors through its involvement in investigating, drafting, and reviewing the data set forth in the Official Statements. Given that role, Stern had a duty to disclose any known information necessary to prevent the Official Statements from being false or misleading. *See Howard*, 228 F.3d at 1061 (holding that a defendant can be held liable when it knowingly participates in the creation of a false or misleading statement). Allstate has further alleged that Stern knowingly or wilfully participated in the alleged fraud. According to Allstate, Stern knew of the existence of documents that undermined portions of the Official Statements and was aware of the need for the Bonds to obtain an investment-grade rating. As previously discussed in this Order, such allegations are insufficient to plead scienter with particularly; nonetheless, to the extent particularity is not required under California law, Allstate has stated a claim.

### (3)   The Trustee Has Not Adequately Plead Violations of Twenty-Eight Other States' Securities Laws.

In its Counterclaim, the Trustee also alleges that Defendants violated the securities laws of some twenty-eight states. (Doc. 130 at ¶ 211). This vague allegation, however, does not adequately identify or explain which specific laws Defendants are alleged to have violated. Such an approach does not satisfy the pleading requirements of Federal Rule of Civil Procedure 8(a), let alone Rule 9(b) or any other heightened pleading requirements that may apply to such claims. Accordingly, to the extent the Trustee attempts to raise securities

1    claims based on these other states' laws, these claims are dismissed.

2         **E.    Allstate Has Stated a Claim for Common Law Fraud.**

3         Allstate brings its claim for common law fraud against Global Entertainment, the

4    Hocking Defendants, the Fain Group, the Town, and PVEC–LLC. Upon review of the

5    allegations in its Amended Complaint, Allstate has sufficiently stated a claim against each

6    of these Defendants. To prove common law fraud in Arizona, a plaintiff must satisfy nine

7    elements:

8             (1) a representation, (2) its falsity, (3) its materiality, (4) the
              speaker's knowledge of its falsity or ignorance of its truth, (5)
9             the speaker's intent that the information should be acted upon by
              the hearer and in a manner reasonably contemplated, (6) the
10            hearer's ignorance of the information's falsity, (7) the hearer's
              reliance on its truth, (8) the hearer's right to rely thereon, and (9)
11            the hearer's consequent and proximate injury.

12   *Taeger v. Catholic Family and Cmty. Servs.*, 196 Ariz. 285, 294, 995 P.2d 721, 730 (Ct. App.

13   1999) (citation omitted). To adequately plead a claim for fraud, a party must "state with

14   particularity the circumstances constituting fraud of mistake" in accordance with Rule 9(b).

15   *See Kearns*, 567 F.3d at 1125 ("'[W]hile a federal court will examine state law to determine

16   whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule

17   9(b) requirement that the circumstances of the fraud must be stated with particularity is a

18   federally imposed rule.'"). In addition, claims for fraud generally cannot lie where the

19   allegedly false or misleading representation pertains to future prospects or performance. *See*

20   *Dawson v. Withycombe*, 216 Ariz. 84, 96, 163 P.3d 1034, 1046 (Ct. App. 2007). Nonetheless,

21   forward-looking statements are actionable when the Defendants make the statements with

22   actual knowledge that projections, promises, or expectations will not be met. *See id.* (quoting

23   *Law v. Sidney*, 47 Ariz. 1, 4–5, 53 P.2d 64, 66–67 (1936)).

24        Allstate's allegations meet each of these elements as to Global Entertainment, the

25   Hocking Defendants, the Fain Group, the Town, and PVEC–LLC. As discussed throughout

26   this Order, the parties have adequately alleged that the event, attendance, and revenue

27   projections in the Official Statements were unreasonable, and therefore misleading, when

28   these Defendants made these statements.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.      Allstate Has Stated a Claim Against All Defendants for Aiding and Abetting the Commission of Fraud.**

Allstate next alleges that each of the Defendants is liable pursuant to an aiding and abetting theory. To state a claim for aiding and abetting fraud under Arizona law, a plaintiff must plead three elements: (1) the commission of fraud by the primary tortfeasor causing injury to the plaintiff; (2) the defendant's knowledge of the fraud; and (3) the defendant's substantial assistance or encouragement of the primary tortfeasor in accomplishing the fraud. *See Wells Fargo Bank, N.A. v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 485, 38 P.3d 12, 23 (2002). For liability to attach, however, a plaintiff need not show "the existence of . . . a pre-existing duty of care[;]" instead, "aiding and abetting liability is based on proof" of scienter—i.e. that the defendants knew that "the conduct they [were] aiding and abetting [was] a tort." *Id.* (citations omitted). At the pleading stage of a claim for aiding and abetting the commission of fraud, a misrepresentation of fact must be set forth with particularity, as required by Rule 9(b). *See Kearns*, 567 F.3d at 1125 (noting that 9(b)'s pleading requirements apply to state law claims brought in federal court). The other elements, including scienter, however, must simply satisfy the pleading requirements set forth in *Twombly* and *Iqbal*. *See Twombly*, 550 U.S. at 570 (requiring claimants to plead facts that "state a claim for relief that is plausible on its face"); *Iqbal*, 129 S. Ct. at 1949 (requiring claimants to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *see also* Fed. R. Civ. P. 9(b) (explaining that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

Allstate has adequately pled facts giving rise to a plausible claim of aiding and abetting liability as to each of the Defendants. As discussed throughout this Order, Allstate has set forth facts indicating that several of the Defendants committed securities fraud. Similarly, because Allstate need not plead scienter with particularity to state a claim for aiding and abetting liability, the allegations in Allstate's Amended Compliant are sufficient to satisfy the second and third elements of the claim. Accordingly, the Court finds that

1   Allstate has stated a claim for aiding and abetting liability against all Defendants.

2       **G.    Allstate and the Trustee Have Stated Claims for Negligent Misrepresentation, But Only to the Extent that Those Claims Pertain to**
3       **Past or Present Statements of Fact.**

4           Under Arizona law, a defendant is liable for negligent misrepresentation when he or

5   she negligently provides false information to another in the course of his business or

6   employment and the other party, justifiably relying on this false information, incurs damages.

7   *PLM Tax Certificate Program 1991-92, L.P. v. Schweikert*, 216 Ariz. 47, 50, 162 P.3d 1267,

8   1270 (Ct. App. 2007). Where a defendant discloses some facts, but negligently omits others,

9   that defendant is liable if its disclosures create a misleading or false impression. *Hill v. Jones*,

10  151 Ariz. 81, 84–85, 725 P.2d 1115, 1118–19 (Ct. App.1986). A claim for negligent

11  misrepresentation, however, cannot "be premised upon a promise of future conduct."

12  *McAlister v. Citibank*, 171 Ariz. 207, 215 829 P.2d 1253, 1261 (Ct. App. 1992). Instead, a

13  claim for negligent misrepresentation must be based on statements about past or present facts.

14  *Shacknai v. Mathieson*, 2009 WL 4673767, at *4 (D. Ariz. Dec. 3, 2009) (citing *McAlister*,

15  171 Ariz. at 215, 829 P.2d at 1261). To the extent that the relevant pleading raise allegations

16  pertaining to negligent omission of facts necessary to make a past or present assertion not

17  misleading, Allstate and the Trustee have stated a claim for negligent misrepresentation.

18  Where the alleged omission pertains to future events, promises, or projections, the negligent

19  misrepresentation claims fail.

20              **(1)     Allegations Pertaining to Past or Present Facts**

21          To the extent that the pleadings allege that Kutak and Stinson, and perhaps the other

22  Defendants, negligently failed to disclose certain defects in Bond-related documents, Allstate

23  and the Trustee have stated a claim for negligent misrepresentation. According to Allstate

24  and the Trustee, Kutak and Stinson drafted a provision in the Official Statements that creates

25  the misleading impression that Bondholders would have a "first lien" upon certain TPT

26  Revenues that were pledged for debt servicing. (Doc. 155, Ex. 1 at 8). This statement,

27  however, is alleged to be misleading because certain drafting defects have essentially

28  prevented the Bondholders from exercising any lien.

1    Significantly, the allegedly misleading assertion that the Bonds were secured by a lien

2    on certain revenue is statement of present fact—which may be actionable under Arizona law.

3    While the Bonds had not yet been issued when this statement was made, all of the relevant

4    documents creating the alleged defects were in existence. Accordingly, at the time

5    Defendants issued the statement, it had allegedly been established to a legal certainty that the

6    defects at issue would render the lien basically worthless.

7    **(2)    Allegations Pertaining to Future Projections**

8    To the extent the alleged omissions are alleged to have rendered a forward-looking

9    statement false or misleading, Allstate and the Trustee do not state a claim for negligent

10   misrepresentation. The issue here is whether a claim for negligent misrepresentation can lie

11   where an omission of present or past facts is alleged to have made a statement pertaining to

12   future events false or misleading. Although there does not appear to be any Arizona authority

13   directly on point, other jurisdictions have split in deciding this issue. First, in a 1996

14   decision, the New York Court of Appeals found future financial projections to be actionable

15   where a company executive explicitly told investors that his projections were reasonable,

16   even though in calculating the projections, the executive failed to take into account a new

17   state utility rate structure. *Kimmell v. Schaefer*, 675 N.E.2d 450, 455 (N.Y. 1996). Because

18   the new utility rate completely undermined the feasibility of the projections, the court found

19   the executive liable for negligent misrepresentation. *Id.*

20   A more recent decision from the Second Circuit Court of Appeals, however, reached

21   the opposite conclusion. *See Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8 (2d

22   Cir. 2000). In *Hydro Investors*, the appellate court rejected a claim for negligent

23   misrepresentation against an energy company that made certain energy output projections but

24   failed to disclose present facts indicating that the proposed site for a hydroelectric power

25   plant was not viable. *See id.* at 20. In rejecting the claim for negligent misrepresentation, the

26   court held, "[T]he alleged misrepresentation must be factual in nature and not promissory *or*

27   *relating to* future events that might never come to fruition." *Id.* at 20–21 (emphasis added).

28   The Second Circuit then proceeded to severely criticize the decision in *Kimmell,* 675

1    N.E.2d at 455, noting key distentions and deficiencies. *See Hydro Investors*, 227 F.3d at 21

2    n. 1. According to the *Hydro Investors* court, the projections in *Kimmell* were actionable only

3    because they "were calculated based on known and existing utility rates that [were] applied

4    incorrectly"—i.e. the failure to use the existing rate structure was akin to a misstatement of

5    a present fact. *Id.* Similarly, *Kimmell* was unique in that the projections at issue were based

6    on an existing facility and on past results, which were misleading since the new rate structure

7    did not relate to the past results. *Id.* Third, the *Kimmell* court did not actually address whether

8    future projections were actionable, but merely assumed that they were based on the

9    procedural posture of the case and the issues addressed on appeal. *Id.* Finally, the Second

10   Circuit noted that, "although the Appellate Division in *Kimmell* [implicitly] found that future

11   prediction/projections could qualify as the basis for a negligent misrepresentation claim . .

12   . , that finding is contrary to the great weight of authority. *Id.*

13        The Court agrees with the Second Circuit's analysis. The inquiry does not depend on

14   whether the omission itself relates to a past or present fact. Instead, the relevant inquiry is

15   whether the failure to disclose renders an existing statement of fact false or misleading. *Cf.*

16   *Metropolitan*, 532 F. Supp.2d at 1290 (holding that a cause of action based on an omission

17   requires the plaintiff to show "how [an] alleged omitted fact negates the truth of or renders

18   misleading the statements actually made"). If this were not the case, almost any unfulfilled

19   promise of future conduct would give rise to a claim for misrepresentation. A plaintiff could

20   state a claim by identifying some adverse condition existing when the projection or promise

21   was made that, in hind-sight, ultimately proves to undermine that projection. This would

22   obliterate Arizona's rule that future statements cannot serve as the basis of a negligent

23   misrepresentation claim. *See McAlister*, 171 Ariz. at 215, 829 P.2d at 1261 (holding that

24   promises of future conduct are not actionable as negligent misrepresentations). This is so,

25   even where the projection or promise of future conduct turns out to have been unreasonable.

26   *See Dozier v. Maispace*, 2007 WL 518622, at *7 (N.D. Cal Feb. 13, 2007) ("Making a

27   promise with an honest but *unreasonable intent to perform* cannot be construed as a

28   misrepresentation concerning past or existing material facts, and therefore does not constitute

1  a basis for a negligent misrepresentation claim. There is no tort of negligent false promise.")

2  (emphasis added).

3     Accordingly, though Allstate and the Trustee contend that Defendants omitted past

4  and present facts from the 2001 and 2005 Reports, this does not give rise to a claim for

5  negligent misrepresentation. Allstate and the Trustee cannot escape the fact that an omission

6  is only actionable to the extent it negates the truth of or renders misleading the statements

7  actually made. Here, the information omitted from the 2001 and 2005 Reports is alleged to

8  have been misleading because it undercut or negated the truth of future event, attendance,

9  and revenue projections in the Official Statements. And while Allstate and the Trustee further

10 contend that the Official Statements were misleading because they failed to disclose the

11 decision to forgo a final feasibility report and S&Y's subsequent withdrawal, Allstate and

12 the Trustee fail to explain how these omissions rendered some past or present statement of

13 fact false or misleading.

14    As set forth in this Order, projections can serve as a basis for a claim of fraud when

15 a defendant *knowingly* makes unreasonable statements of future performance. Hence, the

16 parties have stated a claim for fraud on that basis. Nonetheless, because future promises and

17 projections are not actionable under a negligent misrepresentation theory, the Court dismisses

18 Allstate's and the Trustee's claims to the extent their claims that are based on that theory.

19 **IV.    Plaintiffs and the Trustee Are Afforded Leave to Amend.**

20    As the Ninth Circuit has routinely held, "Dismissal without leave to amend is

21 improper unless it is clear, upon de novo review, that the complaint could not be saved by

22 any amendment." *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061

23 (9th Cir. 2004). It is not clear at this juncture that amendment would be unable to save those

24 portions of Plaintiffs' and the Trustee's claims that have been dismissed. Accordingly, unless

25 otherwise noted, dismissal of the parties' claims is with leave to amend.

26                                 **CONCLUSION**

27    Upon consideration of the parties' filings, **IT IS THEREFORE ORDERED** that

28 Defendants' Motions to Dismiss (Docs. 157-59, 164-65, 170, 173-74, 177) are **GRANTED**

**IN PART** and **DENIED IN PART** as set forth in this Order:

(1)     Plaintiffs have raised a Section 10(b) claim against Global Entertainment, Richard Kozuback, T.L. Hocking and Associates, Thomas L. Hocking, the Town of Prescott Valley, Fain Signature Group, Prescott Valley Signature Entertainment, LLC, and Prescott Valley Event Center, LLC. Accordingly, to the extent these Defendants move to dismiss Plaintiffs' Section 10(b) claims, those Motions are **DENIED**.

(2)     Plaintiffs have not stated a Section 10(b) claim against Robert W. Baird & Co, Inc., M.L. Stern & Co., LLC, Edward D. Jones & Co., L.P., Kutak Rock LLP, or Stinson Morrison Heckler LLP. Plaintiffs' Section 10(b) claims against those Defendants, therefore, are **DISMISSED** with **LEAVE TO AMEND**.

(3)     Plaintiffs have adequately raised a Section 20(a) claim against Global Entertainment, Richard Kozuback, W. James Treliving, Fain Signature Group, and Prescott Valley Signature Entertainment, LLC. Defendants' Motions to dismiss these claims are **DENIED**.

(4)     Wells Fargo Bank, N.A. Has Standing to Pursue Claims on Behalf of the Bondholders in this case. To the extent Defendants attempt to dismiss the Trustee's Counterclaim on the basis of standing, those Motions are **DENIED**.

(5)     Issues of fact preclude a finding at this time with respect to the Town of Prescott Valley's notice of claim and statute of limitations defenses as they pertain to the fraud-based claims alleged against the Town. Prescott Valley's Motion to Dismiss the fraud-based claims, therefore, is **DENIED**.

(6)     The Trustee's Claims for Breach of Contract, Reformation, and Declaratory Judgment against the Town are barred by Arizona's notice of claim provision and the applicable statute of limitations. To the extent that the Town's Motion seeks dismissal of these claims, that Motion is **GRANTED**. These claims, insofar as they pertain to the Town, are **DISMISSED** with **PREJUDICE**.

(7)     Allstate has adequately stated a claim pursuant to Arizona Revised Statute § 44-1991(A)(1) against each Defendant with the exception of Robert W. Baird & Co, Inc.,

M.L. Stern & Co., LLC, Edward D. Jones & Co., L.P., Kutak Rock LLP, and Stinson Morrison Heckler LLP. Allstate's § 1991(A)(1) claim against Baird, Stern, Jones, Kutak, and Stinson, therefore, is **DISMISSED** with **LEAVE TO AMEND**.

(8)   Allstate and the Trustee have both stated a claim pursuant to Arizona Revised Statute Section 44-1991(A)(2) against each Defendant. Allstate has stated a claim pursuant to Arizona Revised Statute Section 44-1991(A)(3) against each Defendant. Defendants' Motions to Dismiss these claims, therefore, are **DENIED**.

(9)   Allstate has not stated a claim pursuant to Arizona Revised Statute Section 44-1998 against any Defendant. That claim, therefore, is **DISMISSED** with **LEAVE TO AMEND**.

(10)   Allstate has stated a claim pursuant to Arizona Revised Statute Section 44-1999(A)(1) against Global Entertainment, Richard Kozuback, W. James Treliving, Fain Signature Group and Prescott Valley Signature Entertainment, LLC. To the extent these Defendants move to dismiss this claim, their Motions are **DENIED**.

(11)   Allstate has stated a claim pursuant to Sections 12 & 13 of the Illinois Securities Law against each of the Defendants with the exception of Kutak Rock LLP and Stinson Morrison Heckler LLP. Accordingly, Plaintiffs' Sections 12 and 13 claims against Kutak and Stinson are **DISMISSED** with **LEAVE TO AMEND.**

(12)   Allstate has stated a claim against M.L. Stern & Co., LLC for violations of Sections 25400 and 25500 of the California Corporations Code. To the extent Stern moves to dismiss this claim, that Motion is **DENIED**.

(13)   To the extent the Trustee alleges violations of some twenty-eight states' securities laws, those claims are **DISMISSED** with **LEAVE TO AMEND**.

(14)   Allstate has stated a claim for common-law fraud against Global Entertainment, T.L. Hocking and Associates, Thomas L. Hocking, the Town of Prescott Valley, Fain Signature Group, Prescott Valley Signature Entertainment, LLC, and Prescott Valley Event Center, LLC. These Defendants' Motions to Dismiss those claims, therefore, are **DENIED**.

(15)   Allstate has stated a claim for aiding and abetting fraud against each Defendant.

Accordingly, Defendants' Motions to Dismiss this claim are **DENIED**.

(16)    Allstate and the Trustee have stated a negligent misrepresentation claim against each of the Defendants. That claim, however, lies only to the extent it is based on allegations that Defendants' alleged omissions rendered a present or past statement of fact false or misleading. Accordingly, Defendants' Motions to Dismiss these claims are **GRANTED IN PART** and **DENIED IN PART**. To the extent that the parties' negligent misrepresentation claims pertain to future statements, promises, events, or projections, those claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that to the extent Allstate, the Class Action Plaintiffs, and/or the Trustee seek to amend the defects in their pleadings, they shall have until **December 3, 2010** to do so.

**IT IS FURTHER ORDERED** that due to the complexity of this case and the length of the parties' pleadings, if the parties seek to amend by submitting a Second Amended Complaint or an Amended Counterclaim, the parties shall: (1) provide the Court and all Defendants a redline indicating all changes from the prior pleading and amended pleading; and (2) provide the Court and all Defendants a conversion table indicating which paragraphs have been renumbered in the newly amended pleading.

DATED this 3rd day of November, 2010.

G. Murray Snow
United States District Judge