**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: Allstate Life Insurance Company Litigation | No. CV-09-08162-PHX-GMS<br>**ORDER** |

Pending before the Court is Defendant Town of Prescott Valley's (the "Town") Motion for Partial Summary Judgment. (Doc. 578.) For the reasons discussed below, the Town's Motion is denied.[1]

**BACKGROUND**

At issue in this lawsuit is the offering and sale of $35 million in revenue bonds (the "Bonds") used to finance the construction of a 5,000-seat Event Center in the Town of Prescott Valley, Arizona. The facts of the case are set out in greater detail in the Court's earlier Order of November 4, 2010. (Doc. 212.) Plaintiffs in this case are entities and individuals who purchased in the Bond offering in November 2005 (the

---

[1] The Town's request for oral argument is denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

"Bondholders"). They include Allstate Life Insurance Company and a number of individual plaintiffs whose interests are represented by the Indenture Trustee of the Bonds, Wells Fargo.

The Defendants in this case are numerous. They include the underwriters for the bonds, attorneys for the underwriters, and the various entities that received the proceeds for the bonds and built the Event Center. The relevant Defendant for the purposes of this Order is the Town, which agreed to the construction and financing of the Event Center in 2004 and participated in the drafting of the Bond documents.

This suit is based on a number of purported misstatements made by the Defendants. These misstatements were allegedly made in the Preliminary Official Statement and the Official Statement, collectively referred to as the Official Statements ("OS"). The OS provided two sources for paying debt service on the Bonds: (1) the net operating income from the Event Center and (2) Transaction Privilege Tax Revenues ("TPT Revenues"), allegedly pledged by the Town, consisting of sales taxes generated by the Event Center and certain areas near the Event Center. The alleged misstatements pertained to (1) the annual attendance and profitability of the Event Center and (2) the existence of a lien or other security device on the TPT Revenues for the benefit of the Bondholders.

The alleged misstatements regarding the Event Center's attendance and profitability are based on figures in the OS that projected an annual attendance of approximately 480,000. Based on this number, the OS projected that the Event Center would generate approximately $5 million in total revenues in the first year. Plaintiffs allege that Defendants put these figures in the OS despite their knowledge of material information that would undermine the Event Center's ability to generate the projected attendance and revenue. Two reports—the "2001 ICC Report" and the "2005 ERA Report"—were conducted on the feasibility of the Event Center. These reports concluded that the Center would generate substantially less revenue than what was stated in the OS. Plaintiffs allege that the Defendants failed to disclose the existence of these feasibility

reports, and that the OS stated that no feasibility reports had been prepared on its projections at all. Since its opening, the Event Center has in fact failed to recognize profit at the level of the projections set forth in the OS.

The parties agree that in June 2008, Allstate became aware of document defects relating to the security for the Bonds, and that Plaintiffs subsequently attempted to restructure the Bond documents and obtain enhanced security for Bond payments. (Doc. 624 at 2, ¶ 1–2.) At that time, Allstate knew that the Event Center was not producing sufficient net income to cover the Bond payments. (*Id.* at 2, ¶ 3.) In the process of negotiating the restructure of the Bond documents, Plaintiffs sought an independent economic consultant to perform a feasibility study on the Event Center. (*Id.* at 5, ¶ 10.) Economic Research Associates ("ERA"), the firm that prepared the 2005 ERA Report, was proposed to perform the study. (*Id.* at 6, ¶ 11.) ERA thus prepared a draft proposal for a new 2008 feasibility study and circulated it to Wells Fargo and Allstate on October 15, 2008. (*Id.* at 6, ¶ 13–14.) That proposal stated that ERA had previously prepared a feasibility study on the Events Center in 2005. (*Id.* at 6, ¶ 15.) Thus, Allstate was aware of the existence of the 2005 ERA Report by October 15, 2008. (*Id.*)

When Kelly Cruse, an Allstate analyst, reviewed the draft proposal in October 2008, she became concerned that the 2005 ERA Report was not disclosed in the OS. (*Id.* at 8, ¶ 21.) Cruse brought the issue to the attention of Anthony Ceravolo, Allstate's in-house counsel. (*Id.* at 8–9, ¶ 22.) Ceravolo declined to take action on the issue at the time, deciding instead to wait and see the results of the new 2008 feasibility study. (*Id.*)

Plaintiffs received the new feasibility study from ERA on December 18, 2008. (*Id.* at 14, ¶ 9.) The study set forth materially lower financial projections, including lower event and attendance figures, than those disclosed in the OS. (*Id.*) In January 2009, Allstate hired counsel to investigate whether it had a claim to void its purchase of the Bonds due to material misrepresentations and omissions. (*Id.* at 15, ¶ 10.) In February 2009, as a result of counsel's investigation, Allstate received a copy of the 2005 ERA Report. (*Id.*) It was not until this time that Allstate had actual knowledge of the contents

of the 2005 ERA Report. (*Id.* at 15–16, ¶ 13.) Allstate provided its Notice of Claim to the Town on May 21, 2009. (*Id.* at 16, ¶ 15.)

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see Jesinger*, 24 F.3d at 1130. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose*

- 4 -

*Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also* LRCiv. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

## II.     Notice of Claim Requirement

Under Arizona law, any plaintiff wishing to sue a public entity or employee must file a Notice of Claim with that entity or employee within 180 days after the cause of action accrues. A.R.S. § 12-821.01(A). Claims that are not filed within the 180-day time period are barred. *Id.* Accrual is defined as the time "when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition that caused or contributed to the damage." *Id.* §12-821.01(B).

Arizona courts construe accrual "in accordance with the common law discovery rule, which 'provides that a cause of action accrues when a plaintiff discovers or reasonably should have discovered the injury was caused by the defendant's negligent conduct.'" *Little v. State*, 225 Ariz. 466, 469, 240 P.3d 861, 864 (Ct. App. 2010) (quoting *Stulce v. Salt River Project Agric. Improvement & Power Dist.*, 197 Ariz. 87, 90, 3 P.3d 1007, 1010 (Ct. App. 1999)). "[F]or a cause of action to accrue, 'it is not enough that a plaintiff comprehends a "what"; there must also be reason to connect the "what" to a particular "who" in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault.'" *Thompson v. Pima Cnty.*, 226 Ariz. 42, 45, 243 P.3d 1024, 1027 (Ct. App. 2010) (quoting *Walk v. Ring,* 202 Ariz. 310, 316, 44 P.3d

990, 996 (2002)).

Accrual does not require the plaintiff to "know *all* the facts underlying a cause of action." *Thompson*, 243 P.3d at 1028 (quoting *Doe v. Roe*, 191 Ariz. 313, 323, 955 P.2d 951, 961 (1998)) (emphasis in original). Rather, it requires the plaintiff to have "at least . . . a minimum requisite of knowledge sufficient to identify that a wrong occurred and caused injury." *Id.* (quoting *Doe*, 955 P.2d at 961). The focus is on when the "plaintiff's knowledge, understanding, and acceptance in the aggregate provide[] sufficient facts to constitute a cause of action." *Id.* (quoting *Little*, 240 P.3d at 864). In *Walk v. Ring*, the Arizona Supreme Court explained that the "core question" for accrual is "whether a reasonable person would have been on notice to investigate" the cause of her injuries. 202 Ariz. 310, 316, 44 P.3d 990, 996 (2002). Summary judgment may be granted "only if the failure to go forward and investigate is not reasonably justified." *Id.*

As Plaintiffs stress, the issue of when a cause of action has accrued is "usually and necessarily" a fact issue for the jury. *Thompson*, 243 P.3d at 1028 (citing *Doe*, 955 P.2d at 961). However, Arizona courts have granted summary judgment when the facts are not in dispute and show that the plaintiffs were "aware of the necessary facts underlying their cause of action at that time." *Id.* at 1029, *see also Little*, 240 P.3d at 865.

The Town asserts that Allstate's claim for securities fraud accrued on October 15, 2008, when it became aware of the existence of the 2005 ERA Report. (Doc. 578 at 2.) It points to evidence that in October 2008, when Allstate received ERA's draft proposal for the new 2008 study, Cruse realized that a 2005 report existed and became concerned that it was not disclosed in the OS. (Doc. 580-6 at 266:14–268:3.) It further points to evidence that Cruse brought this issue to Ceravolo's attention, and that Ceravolo's response was to wait and see the results of the new 2008 study to "see what happens." (Doc. 580-8 at 289:7–20, 301:1–7.) Specifically, Ceravolo told Cruse that "[Allstate] would investigate it after [they] got the 2008 report." (*Id.* at 301:17–304:8.) Thus, the Town has presented evidence that while Allstate was aware of a nondisclosure issue in October 2008, it chose to postpone its investigation.

The Town also set forth evidence that Allstate already knew, by June 2008, that the Event Center was not producing sufficient net income to cover the Bond payments and that Fitch had downgraded their rating of the Bonds from A- to B. (Doc. 580-5 at AL004007.) In addition, it presented evidence that Allstate was contemplating litigation against the Town, among other parties, as early as July 2008. (Doc. 580-7 at AL044169, AL044171–44172.) Thus, the Town has submitted sufficient evidence to show that by October 15, 2008, Allstate was aware that it suffered harm and had notice of a potential disclosure issue with regard to the 2005 ERA Report. In addition, as discussed in greater detail below, Allstate possessed and extensively reviewed documents that stated that the Town had a prominent role in commissioning the 2005 ERA Report. (Doc. 625-19 at KUTAK000479, ¶¶ N–O.)

Allstate argues that it "did not learn the 'what' and the 'who' of its claims until February 2009 at the earliest." (Doc. 623 at 5.) It claims that it had no indication that it may have been defrauded until it received the new 2008 study, which showed that the Event Center could not generate the kind of revenue projected in the OS. However, as discussed above, by the time it received that study, it was already aware that the Event Center was failing to generate adequate revenue to cover debt service payments and that there may be a disclosure issue with regard to a previously conducted feasibility study. Allstate did not set forth any evidence contradicting these facts.

Allstate further contends that it could not have known the "who" of its claims until it actually received the 2005 ERA Report in February 2009. (*Id.* at 1–2, 6.) It points to a document containing errata attached to some responses it submitted to interrogatories during discovery. (Doc. 624 at 16, ¶ 14.) That document states that Allstate did not determine that "Defendants had acted in a deceptive fashion [until] it reviewed the 2005 ERA Report . . . in February 2009." (Doc. 625-1 at 6.) However, it also states that Allstate "became suspicious about the quality and character of Defendants' disclosure on October 8, 2009." (*Id.* at 5.) In addition, as the Town points out in its Reply, a document called the Development Agreement set forth that the Town paid for one-third of the 2005

- 7 -

ERA Report and that the Report was originally submitted to the Town Council. (Doc. 634 at 8 (quoting Doc. 625-19 at KUTAK000479, ¶¶ N–O).) The Development Agreement was referenced repeatedly in drafts of the Settlement Agreement that Plaintiffs were circulating between August and October 2008. (*See* Docs. 625-2, 625-4–10.) Thus, Allstate's evidence shows that, as early as 2008, it had possession of, and was extensively reviewing, a document stating that the Town was one of the main actors behind the 2005 ERA Report.

However, as Allstate demonstrates, and the Town does not dispute, Allstate did not actually know the contents of the 2005 ERA Report until it received a copy of it in February 2009. (Doc. 625-1 at Errata 5–6.) Thus, Allstate argues, it had no knowledge or reason to know of the connection between the Town's nondisclosure and Allstate's injury until it saw the inconsistency between the 2005 ERA Report and the projections in the OS. Allstate asserts that its "first indication that it may have been defrauded happened when it received the 2008 ERA Report." (Doc. 623.) In fact, Allstate's first indication that it may have been defrauded happened when Cruse alerted Ceravolo to a possible nondisclosure issue. However, as stated above, accrual requires the plaintiff to "discover or reasonably should have discovered that the injury *was caused by the defendant's conduct.*" *Long v. City of Glendale*, 208 Ariz. 319, 325, 93 P.3d 519, 525 (Ct. App. 2004) (internal quotations omitted) (emphasis added). Allstate's knowledge of the possible nondisclosure issue and of the Town's participation in commissioning the 2005 Report does not establish as a matter of law that its injury (the shortage of revenues to cover bond repayments and Fitch's downgrading of the Bonds) was caused by the Town's conduct (its omission of the 2005 ERA Report from the OS) because such knowledge alone does not establish that Allstate knew that the previous report provided inconsistent information.

The Town argues that Allstate's knowledge of the possible nondisclosure issue in October 2008 was sufficient to trigger Allstate's duty to investigate, thus causing the notice of claim statute to begin running. It points to Allstate's awareness of its injury, the

existence of the 2005 ERA Report, and the Town's involvement in the commission of the 2005 Report. (Doc. 634 at 5–7.) The Town emphasizes that Allstate admits that it "first became suspicious" about the adequacy of the Town's disclosure in October 2008. (*Id.* at 6.) However, as stated above, the duty to investigate is not triggered until there is a "reason to connect the 'what' to a particular 'who.'" *Thompson*, 243 P.3d at 1027. Suspicion alone does not necessarily give rise to a duty to investigate. The Town also focuses on the fact that Allstate did not begin its investigation until after December 2008. (*Id.* at 7.) Though accrual is not tolled for the time it takes for a plaintiff to get the results of the investigation, the plaintiff must have enough knowledge to trigger the duty of investigation for the time of investigation to count against it. Here, Allstate arguably did not discover the connection between the "what" and the "who" until it received and reviewed the contents of the 2005 ERA Report in February 2009. The Town has failed to establish a lack of genuine issue of material fact that Allstate had sufficient information to know or reasonably have known of the causation between the potential nondisclosure issue and Allstate's losses prior to February 2009.

The Town's argument that Allstate's knowledge was sufficient to give rise to a duty to investigate as a matter of law relies primarily on *Thompson*, a case that also turned on whether the plaintiffs knew or reasonably should have known of facts to support the element of causation in their negligence case. 243 P.3d at 1027. There, the Arizona Court of Appeals granted summary judgment to defendants, though it acknowledged that accrual is "'usually and necessarily' a question of fact for the jury." *Id.* at 1028. In that case, however, each plaintiff testified at their deposition that they suspected that potholes had caused the accident within a few days of the accident. *Id.* Thus, the court found "no genuine issue of material fact as to whether the [plaintiffs] had 'reasonable notice to investigate whether the injury [wa]s attributable to [the defendant's] negligence.'" *Id.* at 1029.

Here, though there is evidence that Allstate was suspicious of the quality of the Town's disclosure, there is nothing to indicate that Allstate was aware of the link

- 9 -

between the potential disclosure issue and its losses. There is no evidence as clear as the deposition testimony in *Thompson* that Allstate had enough information to support the element of causation on its claims against the Town.

The Town also relies on *Little*, another case on which the Arizona Court of Appeals granted summary judgment on the issue of accrual. 240 P.3d at 865. In that case, however, the plaintiff filed a complaint against the defendant doctor with the Arizona Medical Board prior to filing suit against the doctor for malpractice. The complaint with the Board "not only initiated an investigation into [the doctor's] treatment of [plaintiff's daughter] but expressly identified the actors and events that caused or contributed to her damage." *Id.* at 864 (internal quotations omitted). Here, again, there is no evidence that Allstate had knowledge linking the Town's nondisclosure conduct to the insufficient income to cover Bonds repayments and Fitch's downgrading of its rating for the Bonds. Based on the uncontroverted evidence that Allstate did not receive a copy of the 2005 Report until February 2009, a reasonable fact-finder could determine that Allstate's cause of action did not accrue until that time.

Thus, there is a material issue of fact as to whether Allstate had sufficient knowledge of the facts to link the Town's nondisclosure to its injury, causing it to know or have reason to know of the element of causation in its claims against the Town. The evidence is sufficient for a reasonable jury to find that because Allstate did not see the contents of the 2005 ERA Report until February 2009, its cause of action did not accrue until that time, which would bring its notice of claim to the Town on May 18, 2009 in compliance with A.R.S. § 12-821.01(A).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**IT IS THEREFORE ORDERED** that Defendant Town of Prescott Valley's Motion for Partial Summary Judgment (Doc. 578) is **DENIED**.

Dated this 3rd day of June, 2013.

*A. Murray Snow*
/G. Murray Snow
United States District Judge