1   WO

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7                   FOR THE DISTRICT OF ARIZONA

8

9   In Re: Allstate Life Insurance Company        Lead Case No. CV-09-08162-PCT-GMS
    Litigation
10                                                 Consolidated with:
                                                   No. CV-09-8174-PCT-GMS
11
                                                   **ORDER**
12

13

14

15

16         Pending before the Court are Defendants' Joint Motion for Summary Judgment

17   Dismissing the Claims of Non-Party Bondholders (Doc. 644) and the Underwriters'

18   Motion to Exclude the Report and Testimony of Robert M. Smith (Doc. 774). For the

19   reasons discussed below, the Motion for Summary Judgment is granted in part and denied

20   in part, and the Motion to Exclude is denied without prejudice.

21                              **BACKGROUND**

22         This suit involves the offering and sale of $35 million in revenue bonds (the

23   "Bonds") used to finance the construction of a 5,000-seat Event Center in the Town of

24   Prescott Valley, Arizona. The claims subject to this Motion are those of a number of

25   individual Bondholders whose interests are represented by the Indenture Trustee of the

26   Bonds, Wells Fargo. The Defendants in this case are numerous. They include the

27   underwriters for the Bonds, attorneys for the underwriters, and the various entities that

28

received the proceeds for the Bonds and built the Event Center.[1]

The suit is based on a number of purported misstatements made by the Defendants. These misstatements allegedly were made in the Preliminary Official Statement and the Official Statement, collectively referred to as the Official Statements ("OS"). The OS provided two sources for paying debt service on the Bonds: (1) the net operating income from the Event Center and (2) Transaction Privilege Tax Revenues ("TPT Revenues"), allegedly pledged by the Town, consisting of sales taxes generated by the Event Center and certain areas near the Event Center. The alleged misstatements pertained to (1) the annual attendance and profitability of the Event Center and (2) the existence of a lien or other security device on the TPT Revenues for the benefit of the Bondholders. Wells Fargo claims that the above misstatements caused Fitch, a bond rating agency, to issue the Bonds an investment grade rating of "A-." It asserts that the Bondholders directly or indirectly relied on either the misrepresentations or the investment grade rating in making the decision to purchase the Bonds. The Event Center has failed to realize net operating revenues in the amounts projected by the OS, and while the Town has made TPT Revenue payments, Plaintiffs allege that it reserves the right to stop making those payments at any time.

Wells Fargo, on behalf of the Individual Bondholders, asserts claims of negligent misrepresentation and violation of the Arizona Securities Act ("ASA") against Defendants.[2] (Doc. 466 at 107–09.) However, throughout the course of litigation, Wells Fargo was less than timely in response to Defendants' discovery requests. It was not until early 2012, in light of a deadline that the Court set on June 15, 2012, that Wells Fargo sent out questionnaires to Bondholders requesting information on how to contact them and how they acquired the Bonds. (Doc. 572 at 3.) In light of the late production of such

---

[1] For a more detailed summary of the facts of this case, see the Court's previous Order on November 3, 2010. (Doc. 212.)

[2] Wells Fargo's other claims were dismissed in the Court's previous Order. (Doc. 212 at 52–54.)

information, the Court placed restrictions on Wells Fargo's ability to introduce certain evidence into the litigation. As such, Wells Fargo is prohibited from offering any testimony from the fifty-three Bondholders who never returned questionnaires. (*Id.* at 9.) It is also prohibited from offering any testimony relating to causation or damages from twenty-seven Bondholders who responded "No," "Do Not Recall," or left blank the answers to questions asking if they relied on the OS or their brokers in purchasing the bonds. (*Id.*) Wells Fargo is further limited to calling only the nine employees it expressly named in its June 15 disclosure and it cannot offer any documents or exhibits supporting claims on behalf of bondholders it did not expressly name prior to the June 15 deadline. (*Id.*) Finally, the Court barred Wells Fargo from bringing suit on behalf of any Bondholders not named by the June 15 deadline. (*Id.* at 5–6.)

Defendants now bring this Motion for Summary Judgment, arguing that Wells Fargo has not summoned sufficient evidence to support a finding in favor of the Bondholders on either claim. Defendants also move to exclude the testimony of Wells Fargo's expert Robert M. Smith, on whose report Wells Fargo relies in making its argument against summary judgment. Defendants set forth three arguments in bringing their Motion for Summary Judgment. First, they assert generally that the claims of Bondholders who cannot demonstrate "essential elements" must be dismissed, including the claims of the fifty-three and twenty-seven Bondholders who were precluded or partially precluded from testifying, as well as the claims of Bondholders who purchased in the secondary market. Second, they argue that, for a number of reasons, Wells Fargo is unable to establish the element of transaction causation for the ASA claims. Finally, they argue that Wells Fargo is unable to establish individualized reliance for each Bondholder on their negligent misrepresentation claims.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Substantive law determines which facts are material. *Anderson*, 477 U.S. at 248. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also* LRCiv. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237

F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

## II.    Analysis

### A.    Bondholders Unable to Establish "Essential Elements" of Claims

#### 1.    Bondholders Who Did Not Return Questionnaires

Fifty-three of the Bondholders never returned the form questionnaires sent out by Wells Fargo. In its October 11 Order of last year, this Court precluded Wells Fargo from offering any testimony by those Bondholders. (Doc. 572 at 9.)

Defendants first assert that they are entitled to summary judgment on the claims of these fifty-three Bondholders because Wells Fargo is unable to muster admissible evidence that these Bondholders still own their Bonds. The Indenture of Trust permits Wells Fargo to bring claims only on behalf of current Bondholders. (Doc. 646-3 at 43–44.) Defendants assert that Wells Fargo's BondCom Report, a list of Bondholders, is insufficient to create a material issue of fact as to ownership because it is hearsay and because it is otherwise unreliable. (Doc. 644 at 5–6.)

In its Response, Wells Fargo pointed to the fact that the Underwriter Defendants themselves keep records of the current Bondholders and produced lists of them during discovery. (*See* Doc. 659-25, 29, 31–35.) The names the 53 Bondholders appear on the lists produced by the Underwriters and RBC during discovery.[3] (*Id.*) The fact that the

---

[3] The Bondholders that appeared on lists supplied by the Underwriters and RBC are James C. & Christine B. Akers, Linda L. & William R. Beinke, Walter D. Bethoon & Addie M. Novaria–Bethoon, Keith & Barbara Bitzinger, C-2 Construction, Captive Investors, Mario J. Cirio, Sally L. Clark, Kenneth Cude, Samuel Dempster, Arlene Dotts, Lennis & Richard Elston, Barry Evans, Bruce W. Ewing, Lucinda M. & Kenneth E. Gerlitz, Betty T. Gleason, Fred Grapel, Marvin Groseth, Henry T. Hudson, Jr., Stephen Korey, Margaret Luebbers, Barbara Lurie, Billy G. Massey, Jeanine Mackintosh, Maxicor, Kathleen E. Milford, Edna F. Mlady, Patricia M. Mosbacher, David Orndoff, William E. & Nettie I. Postlewait, Charlotte & Jack Prescott, Lorraine Quayle, Amin Radparvar, Donald W. & Julia M. Rawn, Florence Reed, Norman Rothenbaum, Gloria Saiers, Daniel & Doris R. Sanchez, Mark Sanchez, Roland & Esther Sanchez, Betty F. Schonthal, Mortan & Susan Shane, Jack C. Silhavy, Kenneth Smith, Jack & Paula Strickstein, Dennis Swapp, Joan L. Titland, Herman R. Van Lier, Frances A. & Terrence L. White, Emerson H. Young, Pablo G. De Leon, Rita Echenique, and Karl Richard Gerlitz and Anita Dabney Jones–Gerlitz (counted as a single Bondholder). Initially, Wells Fargo submitted evidence that only fifty of the Bondholders' names appeared on these lists, but at oral argument on September 4, 2013 asserted that in fact all fifty-three

Underwriters and RBC produced these lists in discovery does not, however, cure this evidence of its hearsay problem. The lists were created by an unidentified out-of-court declarant and are submitted to prove ownership, i.e., the truth of the matter asserted. Wells Fargo simply points to the fact that they exist; it does not lay a foundation for the lists, authenticate them, or show that they fall in any hearsay exception. [4] In light of the fact that Wells Fargo has had years to gather this information, the Court finds that Wells Fargo has failed to set forth any admissible evidence that these 53 Bondholders still hold the Bonds.

Wells Fargo also relies on the fact that all 53 of the Bondholders' names appear on the BondCom Report. (*See* Doc. 659-42.) But the BondCom Report is hearsay, too: the information in the Report was provided by Broadridge Financial Solutions and Bloomberg, out-of-court declarants, and the Report is offered to prove the truth of the Bondholders' ownership of the Bonds. (*See* Doc. 661 (Martinez Decl.) at ¶ 4–5.) Wells Fargo argues that it laid a foundation for the Report by offering the Declaration of Sonia Martinez, the Assistant Vice President of BondCom, which describes the process by which BondCom obtained the information for the Bondholder list. (Doc. 657 at 37.) Nevertheless, laying a foundation for a document does not resolve hearsay issues. Wells Fargo further asserts that the sources on which BondCom relied to obtain the list are "recognized as reliable sources of information about Bond ownership" and routinely used by BondCom in the ordinary course of its business. (*Id.*) To establish the business records exception to the hearsay rule, however, the proponent of evidence must show that the record was (1) made by or from information transmitted by a person with knowledge, (2) kept in the course of a regularly conducted activity of the business, and (3) kept as a regular practice of that activity. Fed. R. Evid. 803(6). Martinez's declaration fails to show

---

Bondholders' names are contained on the lists.

[4] Wells Fargo initially argued at oral argument that these lists were incorporated into sworn interrogatory responses in discovery, but was unable to cite to any evidence to support, and ultimately conceded that there was no such evidence. (Doc. 945 at 92:13–93:21.)

either the first or the third element. Moreover, it does not demonstrate how the sources on which Bondcom relies, themselves hearsay, are admissible evidence. Nor does her declaration establish that the document falls within the residual hearsay exception, which requires "exceptional circumstances" and particularized guarantees of trustworthiness. *United States v. Bonds*, 608 F.3d 495, 500 (9th Cir. 2010). As such, the BondCom Report is insufficient to overcome Defendants' Motion for Summary Judgment with regard to these three Bondholders. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002).

### 2.    Bondholders Not Named by the June 15 Deadline

Defendants request judgment to be entered against all Bondholders not named by Wells Fargo as of the June 15 deadline. In this Court's October Order, it precluded Wells Fargo from bringing claims on behalf of Bondholders not identified by June 15, 2012. (Doc. 572 at 7.) Thus, judgment is entered against those unidentified and untimely-identified Bondholders, including the Catholic Diocese of Wilmington, Delaware.

Defendants also move for summary judgment for failure to establish "essential elements" on the claims of Bondholders who have no evidence of reliance (Doc. 664 at 7) and Bondholders who purchased in the secondary market after the initial Bond offering (*id.* at 9). These claims are better discussed in the context of the Bondholders' separate claims, as demonstrated below.

### B.    ASA Claims

### 1.    Transaction Causation

A.R.S. § 44-1991 of the ASA creates a cause of action against any person who, in connection with a transaction involving an offer to sell or buy securities:

> (1) Employ[s] any device, scheme or artifice to defraud;
> (2) Make[s] any untrue statement of material fact, or omit[s] to state any material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; [or]
> (3) Engage[s] in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

Wells Fargo seeks to obtain relief against Defendants for violations of all three prongs of § 44-1991. (Doc. 466 at 107.) The ASA further places the burden on the plaintiff to prove that the alleged violation caused the loss for which the plaintiff seeks to recover damages. A.R.S. § 44-2082(E).[5]

The Parties disagree over whether "transaction causation" is an element of a § 44-1991 claim. This Court held in October 2012 that a plaintiff would need to prove transaction causation as an element of an ASA claim. (Doc. 572 at 11.) The Arizona Court of Appeals recently held that causation in securities fraud claims requires both transaction and loss causation. *Grand v. Nacchio*, 214 Ariz. 9, 19, 147 P.3d 763, 773 (Ct. App. 2006) ("*Grand I*").  Wells Fargo argues that this statement in *Grand* is merely dicta and points out that there is no extended "discussion of transaction causation [and] whether it is an element under the ASA." (Doc. 657 at 11.). The bulk of the discussion in *Grand* is, in fact, devoted to the issue of loss causation. However, the fact that the Court of Appeals did not discuss at length its holding that transaction causation is an element of securities fraud claims does not mean that this Court can ignore that holding. "Where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 995 (9th Cir. 2007) (internal quotations omitted).

Wells Fargo nevertheless argues that transaction causation is not required. (Doc. 657 at 9.) It essentially argues that transaction causation is identical to reliance, and reliance is not required under the ASA. In 1981, the Arizona Court of Appeals in fact held that "reliance upon a misrepresentation is not an element of . . . our securities laws." *Rose v. Dobras*, 128 Ariz. 209, 214, 624 P.2d 887, 892 (Ct. App. 1981).[6] Federal courts

---

[5] The Court recognizes that for claims brought under A.R.S. § 44-1991(A)(2), the plaintiff does not bear the burden of proving loss causation; rather, loss causation is an affirmative defense. *Grand*, 214 Ariz. at 24. The Parties here focus only on transaction causation, however, and loss causation is not at issue in this Motion.

[6] Defendants argue that the holding of *Rose* was merely that *reasonable* reliance is

commonly state that the requirement of transaction causation is "equivalent" to the element of reliance. *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 171 (2008) (Stevens, J., dissenting); *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999); *Lopes v. Vieira*, 543 F. Supp. 2d 1149, 1193 (E.D. Cal. 2008). However, transaction causation is also commonly defined as but-for causation, or the requirement that "the violations in question caused the plaintiff to engage in the transaction." *See, e.g.*, *McGonigle v. Combs*, 968 F.2d 810, 820 (9th Cir. 1992); *see also Stoneridge*, 552 U.S. at 171 (Stevens, J., dissenting); *Binder*, 184 F.3d at 1065. Reliance is used "to demonstrate the causal connection between the defendant's wrongdoing and the plaintiff's loss," but the requirement of causation can also be established "without direct proof of reliance." *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir. 1975). Rather, transaction causation "can be inferred from the materiality of the misrepresentation." *Id.*; *Kafton v. Baptist Park Nursing Ctr., Inc.*, 617 F. Supp. 349, 350 (D. Ariz. 1985).

In *Trimble*, the Arizona Court of Appeals held that causation may be established by showing that the misstatement or omission was material. *Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 553, 733 P.2d 1131, 1136 (Ct. App. 1986). Materiality under Arizona law requires "a showing that there was a substantial likelihood, under the circumstances, that the misstated fact or omission would have assumed actual significance in the deliberations of a reasonable buyer." *Jakemer v. Romano*, No. CV-06-2563-PHX-SMM, 2007 WL 704178 at *7 (D. Ariz. Mar. 5, 2007) (citing *Trimble*, 733 P.2d at 1136). *Trimble* thus sets out how transaction causation may be proved without requiring the plaintiff to show reliance.

Federal courts have also used materiality as an indicator for measuring causation.

---

not required for an ASA claim, (Docs. 644 at 16–17; 776 at 11 n.15), but that is not the rule articulated by the Court of Appeals. On the facts of *Rose*, it is true that there was no question that the plaintiff relied on misrepresentations by the defendant; the issue raised by the defendant was only whether that reliance was reasonable. *Id.* Nevertheless, the Court of Appeals stated a rule that was broader than the narrow issues presented in that case: whether reasonable or not, reliance is not an element under the ASA. *Id.* Because of the broadly worded rule, this Court declines to adopt Defendants' limited interpretation of *Rose*.

*See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384–85 (1970) ("Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress . . . ."); *Plaine v. McCabe*, 797 F.2d 713, 721 (9th Cir. 1986) ("[T]he plaintiff succeeds in proving causation once the misstatement or omission has been shown to be 'material.'"); *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir. 1975) ("[C]ausation is adequately established . . . by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance."). Those courts reasoned that when deception artificially inflates the price of a security, "proof of subjective reliance on particular misrepresentations is unnecessary." *Blackie*, 524 F.2d at 906.

Defendants object to this materiality standard for evaluating transaction causation on the ground that federal courts apply the above test only in cases involving fraud on the market. (Doc. 776 at 4–5.) Defendants are correct that the federal cases which applied the above standard involve misleading omissions in the presence of a duty to disclose (*Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128, 153–54 (1972)) or securities sold on the open market (*Blackie*, 524 F.2d at 906), neither of which is the case here. However, the fact that federal courts have limited the causation–materiality test under federal law does not mean that the ASA should be similarly limited. Here, Arizona courts have expressly deviated from the federal scheme in ruling that reliance is not an element of an ASA cause of action. *Compare Rose*, 128 Ariz. at 214 ("[R]eliance upon a misrepresentation is not an element of [the ASA].") *with Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) ("[R]eliance is an element of a Rule 10b-5 cause of action.").[7] To limit the causation–materiality test for ASA claims in the same way as federal claims while keeping with the Arizona courts' pronouncement that reliance is not an element would mean that some ASA claims do not require a showing of causation at all, a result that contradicts the ASA. *See* A.R.S. § 44-2082(E) (requiring the plaintiff to show causation).

---

[7] Federal courts deviate from the requirement of reliance only when an exception, like the ones set out in *Affiliated Ute* and *Blackie* applies.

1   Thus, a showing of materiality is necessary to establish the element of causation in Wells
2   Fargo's ASA claims.

3           Materiality is a question of fact for the jury. *Siracusano v. Matrixx Initiatives, Inc.*,
4   585 F.3d 1167, 1178 (9th Cir. 2009), *aff'd*, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (U.S.
5   2011). An issue of materiality can be resolved as a matter of law only when "omissions
6   are so obviously important to an investor that reasonable minds cannot differ on the
7   question of materiality." *Id.* (internal quotations omitted) (citing *TSC Indus., Inc. v.*
8   *Northway, Inc.*, 426 U.S. 438, 450 (1976)). In defining materiality, the Arizona Court of
9   Appeals has held that plaintiffs need not prove that the statement or omission was
10  material to "this particular buyer" but rather that it "would have assumed actual
11  significance in the deliberations of a *reasonable* buyer." *Aaron v. Fromkin*, 196 Ariz.
12  224, 227, 994 P.2d 1039, 1042 (Ct. App. 2000) (emphasis added).

13          Here, Defendants apparently concede that the alleged misrepresentations could be
14  material. Instead, they argue, for example, that Wells Fargo must summon evidence that
15  the misrepresentations in question caused each individual Bondholder to purchase their
16  Bonds, (Doc. 644 at 26), or that Wells Fargo did not show that the Bonds would have
17  failed to garner an investment grade rating, even if the alleged misrepresentations had
18  been disclosed.

19          As discussed above, however, Arizona law requires only that a misrepresentation
20  be material to a reasonable buyer to establish causation. It does not require a showing that
21  the "misstatement was actually significant to a particular buyer." *Trimble*, 152 Ariz. at
22  553; *see also Facciola v. Greenberg Traurig LLP*, 281 F.R.D. 363, 372 (D. Ariz. 2012).
23  The issue thus is not whether each individual Bondholder was personally persuaded to
24  purchase by the alleged misstatements in the OS, but whether those misstatements would
25  have made a difference in the decision of a reasonable purchaser. [8] Wells Fargo further

26  _____

27          [8] For example, the Court has prohibited the Trustee from introducing "any
    testimony relating to damages or causation from the twenty-seven bondholders who
28  failed to provide meaningful responses [to the questionnaires] as it related to their reasons
    for their purchase of the Bonds." While the inability of those individual bondholders to

relies on the possibility that Fitch would have issued the Bonds at the same or a lower rating, though still a rating considered "investment grade," even after disclosure of the alleged misrepresentations. (Doc. 644 at 18–22.) However, again, the relevant factor for determining transaction causation is the materiality of the alleged misstatement. *Trimble*, 152 Ariz. at 553. Speculation over whether Fitch would have issued a different rating if it had known of the alleged misrepresentations is not relevant to whether those misrepresentations "would have assumed actual significance in the deliberations of a reasonable buyer." *See Jakemer*, 2007 WL 704178 at *7.

The issue of materiality is reserved for the jury. Defendants have thus failed to show a lack of a genuine issue of material fact on summary judgment. Defendants' Motion for Summary Judgment on the element of transaction causation is therefore denied.[9]

## 2.    Aftermarket Purchasers

The ASA allows a cause of action to be brought only against persons who "made, participated in or induced the unlawful sale or purchase" of securities in violation of A.R.S. § 44-1991. A.R.S. § 44-2003(A). Thus, liability extends only to persons who have "more than some collateral involvement in a securities transaction" and to misstatements that have more than "merely . . . the effect of influencing a buyer to make a sale." *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 22, 945 P.2d 317, 333 (Ct. App. 1996). The actions of making, participating, or inducing an unlawful sale are not necessarily coterminous. *Grand v. Nacchio*, 225 Ariz. 171, 175, 236 P.3d 398, 402 (2010) ("*Grand III*"). Though the terms may overlap, "participation and inducement are commonly understood to involve separate factors." *Id.* Participation is "to take part in

---

introduce such testimony or evidence may preclude them from showing loss causation, it does not, for the above reasons, necessarily preclude them from establishing transactional causation.

[9] Defendants' argument for summary judgment on the ASA claims of the 27 Bondholders precluded from testifying on causation or damages is also denied, as their failure or inability to demonstrate individualized reliance is not fatal to the ASA claim, which requires only a showing of materiality.

something . . . [usually] in common with others [or] to have a part or share in something." *Standard Chartered*, 190 Ariz. at 21. Conversely, inducement is defined as moving or leading, prevailing upon, persuading, inspiring, or bringing about by influence or stimulation. *Id.* As demonstrated below by the facts of the *Grand* decisions, participation and inducement do not always cover the same conduct.

Defendants point to seventeen Bondholders who purchased Bonds outside the initial Offering from non-party brokers, as well as fifteen Bondholders who purchased after the initial Offering from Defendants Edward Jones, Baird, and M.L. Stern. (Doc. 644 at 9.) Defendants assert that summary judgment should be granted on all thirty-two of these claims pursuant to the holding in *Grand v. Nacchio*, 222 Ariz. 498, 217 P.3d 1203 (Ct. App. 2009) ("*Grand II*") which they assert forecloses secondary market purchasers from bringing ASA claims. (Doc. 644 at 10.)

In *Grand II*, the plaintiff chose to forego an ASA claim under a "make or induce" theory and instead pursued its cause of action solely on the theory that the defendants participated in the unlawful sale of securities. 222 Ariz. at 500. The plaintiff was an aftermarket purchaser of securities and alleged that the defendants "participated in" the unlawful sale of securities by sending the plaintiff emails containing misstatements, misleading public investors, and controlling the flow of information to the market. *Id.* at 1205, 1206. The plaintiff further alleged that the defendants provided it with a referral to a broker. *Id.* at 1207. However, the Court of Appeals upheld the trial court's determination that these allegations were not sufficient to support a claim that the defendants "participated in" the plaintiff's aftermarket purchase. *Id.* at 1206. Thus, *Grand II* did not completely foreclose the possibility of a secondary market purchaser bringing an ASA claim; it merely held that facts like those described above are insufficient to sustain a claim on the participation theory. In affirming, the Arizona Supreme Court expressly noted that the facts would support an ASA claim under an inducement theory, but this theory was not available to the plaintiff due to the plaintiff's own election of claims in filing suit. *Grand III*, 225 Ariz. at 176. Defendants do not dispute that fifteen of

the secondary market purchasers bought the Bonds through the Defendant Underwriters, which is sufficient evidence to create a triable issue of fact that those Defendants "made" the sales under the ASA. Their Motion for Summary Judgment is therefore denied as to these fifteen Bondholders' claims.

Defendants nevertheless contend that they are entitled to summary judgment on the claims of the seventeen aftermarket Bondholders who did not purchase from Defendants.[10] They assert that there is no evidence that any Defendant had any contact with these seventeen Bondholders, much less that they made, participated in, or induced the unlawful sales to those Bondholders. (Doc. 775 at 13.)

Wells Fargo does not argue that any Defendant made the sale to these seventeen Bondholders. However, it points to evidence that Defendants placed misleading information in the OS and that Fitch reviewed the OS as a "key document" in determining the bond rating. (Doc. 666-7 at 164:5–165:14.) Wells Fargo further points to evidence that eight of the seventeen Bondholders supplied testimony in the form of questionnaire responses or declarations showing that they indirectly relied on the OS and the Fitch Rating through their brokers. For example, Bondholders Carolyn Buckner, Dagmar Montgomery, and Lavina Lovitt declared that they relied on their brokers' recommendations in deciding to purchase the Bonds, and that they would not have purchased them if they had known that they were not a safe and secure investment. (Doc. 550-2 at 26, 98, 118.) Vicki Porter and Frank and Anna Marie Hemmen declared that they relied on their brokers and would not have purchased the Bonds if they were not investment grade. (*Id.* at 91, 145.) The remaining Bondholders simply filled out questionnaires in which they checked "yes" in response to the question of whether they

---

[10] These seventeen Bondholders are Larry Verhulst, Marvin Bruning, Carolyn Buckner, Carole Conover, Allen Dotson, Elene Fortman, Maryann Inman, Roger Johnson, Suzanne Johnson (beneficiary of original Bond purchaser), Mark Merrill, Dagmar Montgomery, Vicki Porter, Neil & Gayle Potter, Amanda Ross, Frank & Anna Hemmen, Lavina Lovitt, and Twila Smith. (Doc. 646-3 at ¶¶ 192–205, 241–43.)

relied on their brokers' recommendation in deciding to purchase the Bonds.[11] (Doc. 550-1 at 81, 327.) According to Wells Fargo, this evidence of reliance is sufficient to create an issue of material fact as to whether Defendants participated in or induced the sales to these Bondholders. Nevertheless, there is no evidence as to the basis on which the broker's made their recommendations to the bondholders to purchase the bonds.

The information supplied by these Bondholders shows that Defendants' level of involvement was less than the activity of the defendants in *Grand II* (sending emails, recommending brokers, etc.). 217 P.3d at 1206–07. Thus, Wells Fargo has failed to show that Defendants' involvement in the allegedly unlawful sales of securities to these secondary market Bondholders arose to the level of participation.

Nor can the evidence that Defendants supplied information which was used to formulate a rating which was then relied upon by two of the Bondholders support a finding that Defendants induced the sale to the aftermarket Bondholders. As discussed above, inducement is defined as persuading or influencing the decision to purchase. *Standard Chartered*, 190 Ariz. at 21. The Arizona Court of Appeals has found inducement where the defendant placed ads for the securities and showed misleading financial statements to potential purchasers. *Strom v. Black*, 22 Ariz. App. 102, 104, 523 P.2d 1339, 1341 (Ct. App. 1974). Similarly, the Arizona Supreme Court described the actions taken by the defendants in *Grand II* of directly contacting and providing information to the plaintiffs as "classic inducement." 225 Ariz. at 176. By contrast, the misleading statements in this case were placed in the OS, which was not given to aftermarket purchasers. There is no evidence that Defendants had any contact with the aftermarket purchasers. Defendants did not take any affirmative steps to persuade or influence the purchases of the seventeen aftermarket purchasers who did not purchase their Bonds from Defendants. The placement of misleading statements in the OS does not

---

[11] One of the Bondholders set forth by Wells Fargo inherited the Bonds from her mother and checked that she did not recall whether her mother relied on a broker's recommendation or received any materials in connection with the Bond purchase. (Doc. 550-1 at 155–57.)

come close to the actions of other defendants who have been found to induce unlawful sales of securities in the cases described above. The evidence raised by Wells Fargo is not sufficient for a reasonable fact-finder to determine that any Defendant induced the aftermarket purchases by these seventeen Bondholders. Thus, Defendants' Motion for Summary Judgment is granted as to the ASA claims of these Bondholders.

As stated above, the parties agree that at least fifteen of the Bondholders purchased their Bonds from the secondary market directly from the Underwriters.[12] (Docs. 644 at 9; 657 at 23.) Defendants do not appear to contest that the Underwriters "made" the sale to these Bondholders under the ASA. Rather, they contend that they are entitled to summary judgment on the claims of these Bondholders as well because these secondary market sales were not made pursuant to the OS. (Doc. 775 at 14.) Defendants assert the lack of evidence that any of these fifteen Bondholders were provided with copies of the OS means that Wells Fargo cannot show that reliance or transaction causation for any of them. (*Id.*) As discussed above, however, reliance is not an element of an ASA claim and transaction causation requires only a showing of materiality. The ASA does not require evidence that any particular Bondholder relied on or was caused to purchase by a misstatement, and the issue of materiality is reserved for the jury. Thus, the lack of evidence pointed out by Defendants is not fatal to Wells Fargo's ASA claims on behalf of these Bondholders.

Nevertheless, Defendants argue that the limited scope of the OS and the Bond Offerings prevents any secondary market purchasers from relying on misstatements therein to bring an ASA claim. (Doc. 644 at 11.) They point to the MSRB disclosure rule in effect at the time of the offering, which required delivery of the OS only to

---

[12] These fifteen Bondholders are Esther Bedford, Marilyn Diebold, Robert Dravecky, Faith Hammack, Willie and Georgia Knopff, Frederick and Patricia Mariacher, Richard John Strohmayer, Wendy Tanata, Larry and Deloris Tolliver, Keith and Barbara Birzinger, Essex Regional Retirement System, Norman Rothenbaum, Betty Schonthal, Morton and Susan Shane, and Rita Echenique. Rita Echenique's claim is barred because, as discussed above, Wells Fargo has failed to provide any non-hearsay evidence of her current ownership of the Bonds.

Bondholders who purchased during the "new issue disclosure period," and the fact that the OS's cover page stated that it was "not intended for use in connection with any subsequent sale, reoffering or remarketing of the Bonds." (*Id.* at 12–13.)

However, Defendants do not cite to any case law holding that a rule with limited disclosure requirements means that liability is limited to only the parties for which disclosure is required. In the federal scheme, liability is so limited only when the cause of action expressly states that the security was sold pursuant to the disclosure document, requiring the plaintiff to plead and prove that it purchased as part of the initial offering. *See* 15 U.S.C. § 77l; *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010). Those circumstances are not present in an ASA claim, which requires only that a defendant make any untrue statement or omit any material fact in connection with a securities transaction. A.R.S. § 44-1991. Nor does the statement on the cover page preclude secondary market purchasers from recovering; the mere statement that the OS is "not intended for use" by subsequent purchasers does not indicate that Defendants have thoroughly disclaimed liability for any misstatements in the document.

## B.  Negligent Misrepresentation

Arizona defines the tort of negligent misrepresentation in accordance with the Restatement (Second) of Torts § 552. *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987). Under Arizona law, negligent misrepresentation occurs when a person "fails to exercise reasonable care and competence in obtaining or communicating information and thereby, in the course of his business or employment, provides false information for the guidance of others." *PLM Tax Certificate Program 1191–92, L.P. v. Schweikert,* 216 Ariz. 47, 50, 162 P.3d 1267, 1270 (Ct. App. 2007). The recipients of the information must incur damages due to their justifiable reliance on the false information. *Id.* A claim for negligent misrepresentation cannot be based on future promises; it must be premised on statements about past or present facts. *McAlister v. Citibank (Ariz.), a Subsidiary of Citicorp*, 171 Ariz. 207, 215, 829 P.2d 1253, 1261 (Ct. App. 1992).

Liability for negligent misrepresentation is limited to loss suffered "by the person or one of a limited group of persons for whose benefit and guidance" the information is supplied. Restatement (Second) of Torts § 552 (1997). The defendant must have intended for the information to influence the plaintiff or known that the plaintiff would be influenced by the information. *Id.* In addition, the plaintiff must have actually relied on the information, and the misstatement must have caused the plaintiff's injury. *Id.* "However, direct communication of the information to the person acting in reliance upon it is not necessary." *Id.* § 552 cmt. g.

In an earlier Order, this Court dismissed all negligent misrepresentation claims except for those relating to the "misleading impression that Bondholders would have a 'first lien' upon certain TPT revenues that were pledged for debt servicing." (Doc. 212 at 70.) The Court found the other claims to be based on promises of future conduct, and thus incapable of supporting a negligent misrepresentation claim. (*Id.* at 72.)

Defendants primarily argue that they are entitled to summary judgment on the negligent misrepresentation claims because Wells Fargo is unable to prove the element of individualized reliance. (Doc. 644 at 30.) They also assert that summary judgment should be granted for the same reasons that they put forth for summary judgment on the ASA claims—namely, that Wells Fargo is unable to establish causation for each of the individual Bondholders. (*Id.* at 34.)

### 1.    Standard for Reliance

As discussed above, an essential element of the claim of negligent misrepresentation is justifiable reliance. The parties dispute the level of reliance that is required to overcome summary judgment on this element. Defendants argue that Wells Fargo is required (and has failed) to show "individual proof of direct reliance on a representation or omission." (Doc. 664 at 32.) Conversely, Wells Fargo argues that indirect reliance is sufficient. (Doc. 657 at 13.)

Wells Fargo is correct that "direct communication of the information to the person acting in reliance upon it is not necessary." Restatement (Second) of Torts § 552 cmt. g.

However, Wells Fargo further argues that establishing reliance requires only a showing that "the Defendants intended or had reason to expect that the fraudulently-procured rating would be communicated to the purchasers or their brokers."[13] (Doc. 657 at 16–17.) In doing so, it conflates two separate elements of the cause of action. Section 552 of the Restatement, which sets out the claim for negligent misrepresentation, requires both that the defendant "[intend] the information to influence or [know] that the recipient so intends" and that the plaintiff justifiably rely on the information, resulting in injury. There is nothing in the Restatement or Arizona law that suggests a showing of the first element (intent to influence a particular person or group of people) suffices to establish the second element of reliance.

None of the cases discussed by Wells Fargo demonstrate otherwise. They cite to a number of cases interpreting ASA claims and 10b-5 claims, but those are distinguishable. As discussed above, reliance is not an element of an ASA claim. The 10b-5 cases rely on the fraud-on-the-market theory, which does not apply to Arizona common law claims. *Hoexter v. Simmons*, 140 F.R.D. 416, 424 (D. Ariz. 1991).

Wells Fargo also relies on a number of cases interpreting the Restatement. The sections of the Restatement discussed in its Response do not, however, relate to the claim of negligent misrepresentation. Wells Fargo relies heavily on the sections describing causes of action other than negligent misrepresentation in setting forth its theory of indirect reliance. (*See* Doc. 657 at 15–16 (citing Restatement (Second) of Torts §§ 533 ("Representation Made to a Third Person"), 534 ("Representation to More Than One Person")).) These sections all discuss types of fraudulent misrepresentation, see Restatement (Second) of Torts § 533 cmt. b, which the Restatement expressly distinguishes from negligent misrepresentation. *Id.* § 552 cmt. a. ("The liability stated in

---

[13] Wells Fargo does state conclusorily that "each of the Bondholders purchased the Bonds 'in reliance upon the erroneous [Fitch] rating so procured," but do not cite to their Counter Statement of Facts or any part of the record in doing so. (Doc. 657 at 16.) Thus, the Court need not take this statement into account in deciding the summary judgment motion.

this Section [for negligent misrepresentation] is . . . more restricted than that for fraudulent misrepresentation stated in § 531."). Moreover, while these sections discuss the concept of holding a defendant liable for statements that it intended to reach the plaintiff or the group of persons of which the plaintiff is a part, they do not equate that element to the element of reliance. Wells Fargo must summon evidence to show *both* Defendants' intent that the misrepresentations reach the Bondholders and the Bondholders' reliance on those misrepresentations; proof of the first does not establish the second.

Thus, though Wells Fargo need not show that Defendants directly communicated the misstatements in the OS to the Bondholders, it does need to show that the Bondholders relied on the misstatements and that those misstatements caused the Bondholders' harm. *W. Technologies, Inc. v. Sverdrup & Parcel, Inc.*, 154 Ariz. 1, 3–4, 739 P.2d 1318, 1320–21 (Ct. App. 1986). It cannot rely solely on evidence that Defendants provided misinformation that they intended to reach the Bondholders.

### 2.    Evidence of Causation and Reliance

It is undisputed that at least some of the Bondholders never obtained or saw the OS prior to purchasing the Bonds. (*See, e.g.*, Doc. 646-1 at 84, 86, 88, 92 (Bondholder questionnaires answering "no" to the question whether they received a copy of the OS or POS prior to purchase).) Thus, because those Bondholders never personally read the misleading statements in the OS, Wells Fargo must prove indirect reliance. Wells Fargo's theory is that the Bondholders indirectly relied on the Fitch Rating, which was the result of Fitch's reliance on misinformation in the POS. (Doc. 657 at 3.) In addition, Wells Fargo contends that the Bondholders relied on the Underwriters, who in turn relied on the Fitch Rating and misinformation in the OS and/or POS. (*Id.*) Defendants argue that Wells Fargo's claims rely on a long chain of causation and reliance that is broken by lack of evidence at multiple points. For the reasons that follow, Plaintiff has demonstrated sufficient evidence to raise an issue of fact as to whether Fitch's rating was dependent on the OS. Nevertheless, as to those Bondholders who indicated only that they relied on the

statements of their brokers in purchasing the Bonds, the Trustee has failed to create a material issue of fact as to whether the brokers who sold the Bonds to the Bondholders relied on the misstatements in the OS in making their recommendations.

### a.    Link Between Fitch Rating and Misstatements in OS

Defendants cite to the fact that Jose Hernandez, the primary analyst evaluating the Bonds for Fitch, never definitively stated that the misrepresentations regarding a lien on the TPT Revenues would have foreclosed the possibility of an investment grade rating. They point to the lack of evidence from Hernandez, or any other witness, that not only would Fitch have declined to issue an A- rating, but would also have declined to issue any of the other four ratings qualified as "investment grade" had it known of the alleged misstatement regarding the TPT Revenues. Defendants cite *Harrison v. Proctor & Gamble*, a case from the Northern District of Texas, in which the court granted summary judgment on a claim of legal malpractice because the plaintiffs were unable to show that a term that their attorneys failed to include in a contract would have been accepted by the other party to the contract, even if the attorneys had brought it up. No. CIV.A.7:06-CV-121-OE, 2009 WL 304573 at *8 (N.D. Tex. Feb. 9, 2009) *aff'd sub nom. Harrison v. Taft, Stettinius & Hollister, L.L.P.*, 381 F. App'x 432 (5th Cir. 2010). They argue that the logic of *Harrison* applies here, and that they should be granted summary judgment because Wells Fargo is unable to show that Fitch would have issued a non-investment grade rating if it had known of the alleged issues with the TPT Revenues.

However, the facts of *Harrison* are distinguishable from the case at hand. Texas law specifically requires that, in malpractice cases "involving business transactions or contractual negotiations . . . a plaintiff must show that a negotiated term or provision would have been accepted by the other party to the negotiation." *Id.* at *5. Thus, *Harrison* is distinguishable on multiple fronts: this is not a legal malpractice case and it does not involve terms or provisions omitted from negotiations. Additionally, Defendants have pointed to no express legal standard like the one under Texas law for omitted terms or provisions that would apply to a rating agency's reliance on a misstatement in a

prospectus. Further, Texas law generally requires expert testimony to prove causation in legal malpractice cases, and in *Harrison* the plaintiffs' expert "affirmatively disclaimed any opinion as to causation." *Id.* at *8. Thus, the plaintiffs there failed to create a material issue of fact on summary judgment.

Here, conversely, Wells Fargo has submitted evidence that Fitch relied on statements in the OS, and that its subsequent rating was caused, at least in part, by those misstatements. Hernandez testified the POS was a "key document for Fitch to review" prior to issuing a bond rating. (Doc. 646-16 at 165:9–14.) He further testified that the support from the Town of Prescott Valley was "the key credit factor for Fitch" in rating the Bonds. (*Id.* at 172:16–19; 173:16–24; 174:1–9.) Hernandez agreed that it would be "unusual" for the Town of Prescott Valley to refuse to read any of the documents that Hernandez reviewed in evaluating the Bonds, though he apparently did not know that the Town was doing this at the time of his analysis in 2005. (*Id.* at 176:6–12.) He further testified that it would have been a "concern for [him] and Fitch" if he had been aware that the Town disagreed with the statement that it was pledging a junior lien on the TPT Revenues for debt servicing on the Bonds. (*Id.* at 179:5–21.) He also agreed that if anything impeded the ability of Wells Fargo to obtain TPT Revenues from the Town, that issue would have required a "satisfactory resolution" before the rating committee issued its decision. (*Id.* at 221:12–21.)

Defendants point to the fact that Hernandez stopped short of testifying that such a concern would have prevented Fitch from issuing an investment grade rating; instead, he noted that the rating was a decision made by a committee of which he was not a part. (*Id.* at 112:1–7; 180:15–18.) However, the causation requirement for negligent misrepresentation is not as stringent as Defendants assert. Negligent misrepresentation is "governed by the principles of the law of negligence." *Van Buren v. Pima Cmty. Coll. Dist. Bd.*, 113 Ariz. 85, 87, 546 P.2d 821, 823 (1976). Under Arizona negligence law, the plaintiff is not required to establish that the defendant's breach definitively caused the injury, but rather that the act of "negligence increased the risk of injury." *Ritchie v.*

*Krasner*, 221 Ariz. 288, 297, 211 P.3d 1272, 1281 (Ct. App. 2009). "The step from increased risk to [the probability of] causation is one for the jury to make." *Id.* Causation may be established even if the defendant's "conducted contributed 'only a little' to plaintiff's injuries." *Ontiveros v. Borak*, 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983) (citing *Markiewicz v. Salt River Valley Water Users' Assoc.*, 118 Ariz. 329, 338 n.6, 576 P.2d 517, 526 n.6 (App. 1978)).

Here, Wells Fargo has identified evidence that Fitch relied on the OS as part of its decision-making process in issuing a rating for the Bonds. The OS, a "key document for Fitch to review," contained omissions regarding the functionality of a lien on the TPT Revenues, and there is at least some evidence that Fitch would not have issued a rating at all until the issues with the lien were resolved. A genuine issue of material fact exists as to whether the omissions in the OS caused the Fitch rating. Thus, a jury could find that the omissions regarding the TPT Revenues increased the risk that Fitch would issue an investment-grade rating for the Bonds, thus contributing to the Bondholders' decision to purchase the Bonds, and ultimately playing some part in the Bondholders' injury of losing money on the Bonds. In addition, a jury could infer from Hernandez's testimony that Fitch relied on the alleged misstatement in reaching the A- rating. Defendants' Motion for Summary Judgment is thus denied for this prong of the causation analysis.

Wells Fargo also submitted the report of its expert witness, Robert Smith, to support its argument that the Fitch Rating would not have been issued if the true facts had been disclosed. (Doc. 657 at 26; *see also* Doc. 663.) Defendants, in turn, have filed a Motion in Limine to preclude Smith's report, arguing that Smith is not qualified to opine on the matter and that his opinion is speculative. (Doc. 774.) However, because Defendants have failed to meet their summary judgment burden, the Court need not reach the question of whether Smith's testimony is admissible to create a genuine issue of material fact. Defendants' Motion in Limine is denied without prejudice.

        **b.**    **Bondholders' Statements That They Would Not Have Purchased Bonds if Not for Investment Grade Rating**

Defendants further argue that Wells Fargo is unable to show that the Bondholders actually relied on the Fitch Rating in deciding to purchase the Bonds. They assert that Wells Fargo's evidence from Bondholders that they would not have bought the Bonds if they had not been investment grade is inadmissible. (Doc. 644 at 23.) Defendants are presumably referring to the declarations by some of the Bondholders gathered by Wells Fargo after the June 15 deadline set by this Court.[14] (Doc 550-2.) The majority of those declarations contain statements asserting that the Bondholder in question would not have bought the Bonds if he or she had known they were "junk bonds." (*See generally id.*)

Defendants point to cases in which courts refused to allow "[v]ague, self-serving speculative testimony concerning what a party would have done under different circumstances." *See Bridgen v. Scott*, 456 F. Supp. 1048, 1063 (S.D. Tex. 1978); *Williams v. Sec. Nat'l Bank of Sioux City, Iowa*, 358 F. Supp. 2d 782, 814 (N.D. Iowa 2005). Many of the cases cited by Defendants occur in the products liability context, in which courts precluded plaintiffs from testifying what they would have done if defendants had not violated a standard of care. (*See* Doc. 23 n.30.) Those courts reasoned that a party's testimony about what he or she might have done in other, hypothetical circumstances was speculative and not rationally based on the party's perception, and thus impermissible under Federal Rule of Evidence 701. *See Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993).

However, that case law is inapposite to the facts of this case, where the Bondholders' statements regarding junk bonds were made in the context of their

---

[14] Nine of these declarations are made by Bondholders from whom the Court has prohibited testimony relating to reliance or causation. (Doc. 572 at 9.) Thus, the declarations of these Bondholders are not admissible and will not be considered on this Motion for Summary Judgment. The Bondholders whose declarations will not be considered are Lisa Audlin (Doc. 550-2 at 10–12), Ronald Chehy (Doc. 646-2 at 42–43), Emil DePiero (Doc. 55-2 at 71–72), Brian Donovan (*id.* at 73–75), Kester Haugh (*id.* at 89–91), Lavina Lovitt (*id.* at 97–09), Bernard Patton (*id.* at 136–37), Neil Potter (*id.* at 146–47), and Harold Smith (*id.* at 162–64). In addition, one of the declarations is made on behalf of the Catholic Diocese of Wilmington, Delaware, whose claim the Court has barred. (Doc. 572 at 7.) That declaration will not be considered on this Motion to Dismiss, either. (Doc. 550-2 at 46–48.)

assertions regarding their general investing strategy. The Bondholders declared that they avoided high-risk, speculative bonds; only invested in securities that were safe and secure; only bought bonds with good ratings; considered themselves conservative investors; and wanted to preserve principal. (*See, e.g.*, Doc. 550-2 at 15 ("My investment goals in 2005 were to invest conservatively to prepare and be available for retirement."); 29 ("We make only safe and secure investments . . . . We require the bonds we purchase to have a good rating."); 35 ("I . . . require any bonds I purchase to have at least an A-rating."); 70 ("I was a conservative investor who preferred safe and secure investments, not high-risk ones."); 103 ("I tend to avoid high risk investments."); 114 ("I do not care about high yields. I want safe bonds."); 116 ("My broker knows that I'm a conservative investor and don't make risky investments."); 125 ("I do not believe that I have ever bought a junk bond. . . . I wanted a steady source of income for my retirement and did not want to risk principal."); 132 ("I am a conservative investor . . . . All of my bonds are investment grade.").) Thus, when the Bondholders declared that they would not have bought the Bonds if they had known that they were junk bonds or they were not investment grade, they were not basing their assertions on a hypothetical situation but rather on their own behavior based on known preferences and habits. Such testimony is not vague and speculative; it is based on the personal knowledge and experience of the Bondholders.

*Bridgen*, the primary case on which Defendants rely, involved different facts from the ones at issue here. The plaintiffs in that case testified that they would not have invested if they had known that "the property was sold twice on the same day." *Bridgen*, 456 F. Supp. at 1063. The Southern District of Texas found this testimony "completely meaningless" because the plaintiffs were sophisticated and were familiar with the transaction's setup, including that its structure would result in "enormous tax advantages" because of its "highly leveraged nature." *Id.* at 1064. Based in these facts, it determined that the plaintiffs' testimony was totally inconsistent with the "material economic realities" manifested in the record. *Id.* at 1065. It therefore found no genuine issue of

material fact and granted summary judgment for defendants.

Wells Fargo argues that a genuine issue of material fact is created by "the undisputed evidence that the investment grade rating was a key factor in the decision to sell the Bonds and in marketing them." (Doc. 657 at 31.) It cannot, however, rely on a general statement that this factor was key to the decision to create a genuine issue of material fact as to reliance by each of the individual Bondholders. Wells Fargo's Statement of Facts reveals only 43 Bondholders whose declarations create a genuine issue of material fact that they relied on the Fitch Rating—these Bondholders stated that they would not have invested in the Bonds if they had not been investment grade, if they had not been rated above a B, or if they hadn't been "so highly rated."[15] Such statements are sufficient to create a genuine issue of material fact that these Bondholders relied on the Fitch Rating, which as discussed above may have been the result of reliance on alleged misstatements in the OS.

Conversely, many of the Bondholders' declarations state only that they relied on their broker (or their brokers' judgments of the Bonds safety or rating), that they would not have invested if the Bonds were not "safe and secure," or that they would not have purchased the Bonds if they had known that they were "junk bonds." These declarations

---

[15] The 43 Bondholders are Mary Abbey (Doc. 550-2 at 3), Roberta Alcorn (*id.* at 6), Gary and Sharon Armstrong (*id.* at 8), Joseph and Linda Beane (*id.* at 20), Carl Becvar (*id.* at 18), Maurice Campbell (*id.* at 32), S. Kathryn Carnahan (*id.* at 35), Marilyn Colley (Doc. 550-2 at 41), Larry Roger Cunningham (*id.* at 67), Stephen Dorr (*id.* at 77), Robert Dravecky (*id.* at 83), Eric R. Erlbaum (*id.* at 86), Joseph F. Gleissner (*id.* at 88), Faith M. Hammock (Doc. 646-2 at 101), Frank & Anna Marie Hemmen (*id.* at 92), Maryann Inman (*id.* at 94), Jerry Jackson (doesn't appear on Doc. 532-2) (Doc. 646-2 at 112), John E. James (*id.* at 115), Elmo & Deanna Jones (*id.* at 117), Basil J. Komas (Doc. 550-2 at 96), John MacFadden (*id.* at 100–01), Bruce Mackintosh (*id.* at 103), Fred Mariacher (*id.* at 105), Charles Marshall (*id.* at 107), Dagmar Montgomery (*id.* at 118), Edith Marie Moser (*id.* at 122), Jean Pansch (*id.* at 130), Larry Parr (*id.* at 132), Edward Patillo (*id.* at 134), Carl B. Peterson (*id.* at 141), Dale Petty (*id.* at 143), Vicki Porter (*id.* at 145), Charles Robeda (*id.* at 149), Cecilia Robertson (*id.* at 151), Betty Schmidt (Doc. 646-2 at 184–85), Michael Schuster (Doc. 550-2 at 158), James L. Self (Doc. 646-2 at 190), William & Lisa Sims (Doc. 550-2 at 161), Emily Gladys Smith (Doc. 646-2 at 195), Wendy Tanata (*id.* at 171), Deloris Tolliver (*id.* at 175), Sam Wasserman (*id.* at 178), and Lloyd Wiles (*id.* at 180). Ronald Chehy, Emil DePiero, Kester Haugh, Bernard Patton, and Harold J. Smith submitted affidavits but are precluded from testifying on causation and damages per the Court's earlier Order. (Doc. 572 at 9 n.7.)

do not indicate that the Bondholders behind them relied specifically on the Fitch Rating in deciding to purchase the Bonds. Wells Fargo cannot assert general reliance on the Fitch Rating to demonstrate individualized, indirect reliance for these remaining Bondholders. It argues instead that those Bondholders relied on their brokers, who they claim relied on either the Fitch Rating or the alleged misstatements in the OS.

### c.       Lack of Individual Broker Testimony

Defendants assert that Wells Fargo has not presented sufficient evidence to establish that the brokers who sold the Bonds to individual Bondholders relied on either the OS or the Fitch rating, thus breaking the chain of causation and reliance on alleged misstatements in the OS. They point out that this Court barred Wells Fargo from offering testimony by the individual brokers in its previous Order on October 11, 2012. (Doc. 572 at 10.) They assert that, as a matter of law, Wells Fargo cannot establish that the brokers who sold the Bonds relied on either the OS or the Fitch Rating without their testimony.[16] (Doc. 644 at 26.) They claim that the lack of the individual brokers' testimonies breaks a crucial link in the chain of reliance from the misstatements in the OS to the Bondholders' purchases.

As discussed earlier, the Restatement does not require the misrepresentation to be made directly to the ultimate recipient of the information. Rather, the misrepresentation need only be made to a person whom the maker knows will supply or intends to supply the information to the ultimate recipient. Restatement (Second) of Torts § 552. "[D]irect communication of the information to the person acting in reliance upon it is not necessary." *Id.* cmt. g. "It is enough that the maker of the representation intends it to reach and influence . . .  a group or class of persons." *Id.* cmt. h.

In addition, however, the Restatement requires that "the *party injured* must have relied on the information the defendant supplied." *W. Technologies, Inc. v. Sverdrup &*

---

[16] Defendants argue this in asserting that Wells Fargo has failed to establish transaction causation, but carry all arguments made in the transaction causation context to their argument that Wells Fargo failed to establish indirect reliance on their negligent misrepresentation claim. (Doc. 644 at 34.)

*Parcel, Inc.*, 154 Ariz. 1, 3, 739 P.2d 1318, 1320 (Ct. App. 1986) (emphasis in original). The Restatement also requires that the above reliance caused the injuries suffered by the plaintiff. *Id.* at 1320–21. Thus, in order to show that the Bondholders relied on the misstatements and that the misstatements caused their injury, Wells Fargo must show both that the brokers relied on the misstatements in the OS and the Bondholders based their purchase of the Bonds on their brokers' reliance on those misstatements.[17]

Here, Wells Fargo has submitted evidence that Defendants made misstatements in the OS regarding the TPT Revenues. (*See* Doc. 583-2 (Preliminary Official Statement) at KUTAK00435, 442, 448, 450, 451, 453–54 (describing the TPT Revenues and the alleged "first lien" on them).) The purpose of an OS in a municipal securities offering is "to enhance the quality and timeliness of disclosure to investors" and underwriters for such offerings are required to "obtain and distribute to their customers the issuers' official statements for the offerings." Securities Act Release No. 7049, File No. S7-4-94 (March 9, 1994). The fact that Defendants placed information regarding the TPT Revenues in the OS is sufficient for a finder of fact to find that the Defendants intended that information to reach the purchasers of the Bonds.

Wells Fargo also claims that it has evidence that all the brokers involved in this case used a standardized sales pitch in selling the Bonds to the Bondholders. (Doc. 657 at 32.) "[A] showing that . . . sales presentations were uniformly patterned on a known model provides certitude that material misrepresentations were a causative factor in each plaintiffs' decision." *Am. Continental*, 140 F.R.D. at 430. The evidence to which Wells Fargo cites, however, does not support the existence of a standardized sales pitch. At most, the evidence suggests that some of the Defendant Underwriters and non-party sellers of Bonds forwarded information from the OS or the Fitch Rating to their retail sales force. (*See, e.g.*, Docs. 666-11 at 32:23–25 (Kimes sent wire communication to the

---

[17] Wells Fargo need not show that the brokers relied on the misstatements for those Bondholders who claim that they directly relied on the misstatements in the OS without relying on their brokers.

sales force at Edward Jones mentioning the Fitch Rating and TPT Revenues); 666-3 at 16:8–13, 91:2–13 (Forsberg sent emails with information on Fitch Rating, TPT Revenues, and OS to sales representatives at Lawson); 66-8 at 22:24–24:10 (Howell at Baird forwarded the OS and Fitch Report to the retail sales force); Doc. 332-27 (email from Benickes at ML Stern to all personnel setting out detailed information about the Bonds).) However, none of this evidence demonstrates the existence of a uniform or standardized sales pitch that the individual brokers were required to use in selling the Bonds to the Bondholders. The evidence shows that employees in the higher levels of each of the Underwriters' and sellers' offices sent the individual brokers information regarding the Bonds, including information on the Fitch Rating and the content of the OS, but there is no evidence that the individual brokers considered that information or even viewed it before deciding to sell the Bonds to the individual Bondholders. Thus, there is no evidence that any Bondholder who claims to have relied on their broker in deciding to purchase the Bonds, without relying separately on the OS or the Fitch Rating, relied, even indirectly, on misstatements regarding the TPT Revenues in the OS.

Consequently, the chain of reliance linking the misstatements in the OS to the Bondholders' purchases of the Bonds is broken for those Bondholders who claim to have relied solely on their brokers in making the purchase.[18] Because there is no evidence that

---

[18] 86 Bondholders checked that they relied on their brokers and not on the OS in making their purchases of the Bonds. (Doc. 532-2 at 6–8.) As discussed above, however, some of those Bondholders submitted declarations that create a genuine issue of material fact as to whether they relied on the Fitch Rating. The remaining Bondholders are: Francis J. Allbritton, Bonnie Kane Barenholtz, Vernon & Janet Bloom, Merle Buck, Carolyn Buckner, Louis John & Joyce Buytendorp, Lee & Helen Capuchio, Thomas & Loretta Coder, Helen M. Corlett, Eva J. Dayhuff, Marilyn R. Diebold, Edna M. Doole, Susan Dorr, Allen Dotson, Bill & DeEtte Douglas, Sam L. Farmer, Elene Fortman, Kristi L. Galindo-Dyson, Lester & Jody Gaskill, Robert R. Griebnow, Zelda J. Hawk, Curtis & Adeana Henrickson, David A. Hester, Iron Workers Local Union Nos. 40, 361, 417 Pension Fund, Lois A. Irwin, Billie Sue Jackson, Roger H. Johnson, Thomas Jungwirth, Arlie & Barbara Kyzer, Larry D. Lauderback, John F. L'Ecuyer, Fred Lenz, Marlynrae Mathews, Robert L. Matthiessen, Rudolph & Marsha Mayers, Lucy Mayorga, Patricia Mecey, Mark A. Merrill, Minnesota Masonic Charities Funds, Linda A. Monteblanco, Edwin & Marjorie Olson, Marilyn & Deborah Orndoff, Leonard & Linda Peters, Kathy Philips, Wilmetta A. Roth, Betty & Robert Schmidt, Martha H. Schroyer, Kennon H. Shank, Lawrence L. Siems, Paulina J. Smith, Twila Smith, Louis J. Stamey, Richard Strohmayer Charles & Karen Struthers, Logan Tivitt, Samuel R. Wasserson, Melvin &

the individual brokers relied on either misstatements in the OS or the Fitch Rating (which arguably was premised in part on the same misstatements) in selling Bonds to Bondholders, there is no evidence that the Bondholders relied on that information in purchasing the Bonds, either. Wells Fargo does not set forth any evidence that any of these Bondholders relied, directly or indirectly, on misstatements in the OS independently of their reliance on their brokers.[19]

### 3. Bondholders Who Gave Incorrect Reasons for Purchasing Bonds

Defendants assert that they are entitled to summary judgment on the claims of several Bondholders who declared that they bought the Bonds for reasons that were not applicable to the Bonds. They point to the affidavits of six Bondholders who variously stated that they bought the Bonds because they were "AAA rated," "insured," or "tax free." (Doc. 645 at ¶ 21.) The Bonds were not AAA-rated or insured, though they were exempt from state taxes.

Five of these six Bondholders stated in their affidavits that they relied in some way on the Bonds' rating in deciding to purchase the Bonds. (Doc. 646-2 at 101 ¶ 3 (Faith Hammock), 105 ¶ 4 (Frank & Anna Marie Hemmen), 110 ¶ 4 (Maryann Inman), 131 ¶ 5 (Charles Marshall), 205 ¶ 4 (Wendy Tanata).) Thus, the fact that they also relied on other mistaken beliefs on the Bonds is immaterial. The fact that they relied on the Fitch Rating, which in turn was the result of reliance on alleged misstatements in the OS, is sufficient to create a genuine issue of material fact as to their reliance. The sixth Bondholder, Kester Haugh, also declared that he relied on the Fitch Rating (*id.* at 103 ¶ 4), but his testimony on causation and damages was precluded by the Court's earlier Order, and thus he cannot demonstrate reliance. (Doc. 572 at 9 n.7.) Defendants' Motion for Summary

---

Sandra Weber, Brenda Wellenreiter, and Wisconsin Laborers Health Fund C/O Voyageur Asset Management.

[19] Defendants' specific argument for summary judgment on the claims of the 27 Bondholders who are precluded from testifying on causation and damages is granted for the same reason. Because these Bondholders are unable to establish reliance, they are missing a crucial element of the negligent misrepresentation claim.

1  Judgment on the five Bondholders' claims is therefore denied, but granted as to the

2  negligent misrepresentation claims of Kester Haugh.

3  **4.      Bondholders Who State They Relied on the OS**

4      Defendants contend that they are entitled to summary judgment on the claims of

5  twenty-seven Bondholders who checked either that they relied on the OS or that they

6  received the OS before purchasing the Bonds.[20] They argue that the checkmarks are mere

7  legal conclusions that cannot create a genuine issue of material fact on summary

8  judgment. (Doc. 644 at 27–29.) They fault Wells Fargo for failing to produce any

9  evidence that any of these Bondholders actually read the OS. (*Id.* at 28.) Thus, they

10 argue, Wells Fargo has failed to produce evidence that these twenty-seven Bondholders

11 actually relied on any misstatements in the OS, and Defendants are entitled to summary

12 judgment on those negligent misrepresentation claims.

13     However, Defendants' characterization is incorrect. Though reliance is an

14 essential element of the claim of negligent misrepresentation and thus has legal

15 significance, a Bondholder's declaration that he or she relied on the OS does not become

16 a legal conclusion because of that significance. Rather, it is a mixed question of law and

17 fact. "When the application of a rule of law depends on the resolution of disputed

18 historical facts, . . . it becomes a mixed question of law and fact." William W. Schwarzer,

19 Alan Hirsch, & David J. Barrans, *The Analysis and Decision of Summary Judgment*

20 *Motions: A Monograph on Rule 56 of the Federal Rules of Civil Procedure*, 139 F.R.D.

21 441, 456 (1992). Defendants dispute the historical fact of whether these particular

22 Bondholders in fact relied on misstatements in the OS by questioning whether they even

23 read the OS. "Such disputed facts normally preclude summary judgment." *Id.* That the

24

25 [20] Sixteen of the Bondholders checked that they relied on the OS: John Barron, Marvin Bruning, Maurice Campbell, Karen Cotterell, Larry Cunningham, Ernestine Hins,

26 William & Glenda Hins, Willaim Kramer, Bernard Lampo, Peggy Moore, Ruby Norris, Judith Padrta, Darlene Rowe, Larry & Deloris Tolliver, Lloyd Wiles, and Gary Willgues.

27 Eleven checked that they received the OS before purchasing the Bonds: Emil & Theresa DePiero, Robert Dravecky, Sam Farmer, Maryann Inman, Lois Irwin, Willie & Georgia

28 Knopff, Pauline Lovato, Marlynrae Mathews, Dale Petty, Michael & Denise Schuster, and Rosella Wiessman.

fact of reliance is "essential to a claim" does not mean that it is a legal conclusion that cannot raise a genuine issue of material fact. Instead, these "ultimate facts are ordinarily the province of the jury." *Carrasco v. City of Vallejo*, No. CIV.S001968 WBS JFM, 2001 WL 34098655 at *2 (E.D. Cal. Sept. 6, 2001). Thus, the Court rejects Defendants' characterization of these Bondholders' checkmarks on form questionnaires as legal conclusions that cannot overcome a motion for summary judgment. Defendants' objections to the checkmarks go to the weight and credibility of the evidence, and such objections are not appropriate for resolution at the summary judgment stage. *Harris*, 183 F.3d at 1051.

Defendants nevertheless argue that in order to succeed on summary judgment, Wells Fargo must show that each Bondholder relied on "a particular representation or omission that is alleged to be false or misleading." (Doc. 644 at 30.) Defendants argue that Wells Fargo has failed to establish the element of reliance because it lacks evidence that the Bondholders specifically relied on the misstatements in the OS regarding the alleged lien on TPT Revenues. (*Id.* at 31–32.) However, Wells Fargo has provided evidence that at least sixteen of these Bondholders relied on the OS generally in making their purchases. A reasonable finder of fact may infer from that evidence that these Bondholders relied on the statements within the OS regarding TPT Revenues. Defendants' Motion for Summary Judgment on this ground is thus denied.

As for the eleven Bondholders who merely received the OS, however, a checkmark indicating receipt does not create a triable issue of fact as to whether they relied on the OS in making their purchase. Of the eleven, three—Emil & Theresa DePiero, Pauline Lovato, and Rosella Weissman—are precluded from testifying on causation and damages, and thus cannot demonstrate reliance. (*See* Doc. 572 at 9 n.7.) Another four of them submitted declarations stating that they would not have invested in the Bonds if they had not been investment-grade.[21] This is sufficient to create a triable

---

[21] The four investors are Robert Dravecky (Doc. 646-2 at 93–95), Maryann Inman (*id.* at 109–110), Dale Petty (*id.* at 168–69), and Michael and Denise Schuster (*id.* at 186–

issue of fact as to whether they relied on the Fitch Rating, thus completing a chain of reliance sufficient to withstand summary judgment. The remaining four did not submit any affidavit; nor does Wells Fargo point to any evidence showing that they relied, directly or indirectly, on the misstatements in the OS.[22] Defendants' Motion for Summary Judgment is thus granted as to their claims.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** as to the claims of the 53 Bondholders who failed to return questionnaires, namely James C. & Christine B. Akers, Linda L. & William R. Beinke, Walter D. Bethoon & Addie M. Novaria–Bethoon, Keith & Barbara Bitzinger, C-2 Construction, Captive Investors, Mario J. Cirio, Sally L. Clark, Kenneth Cude, Pablo G. De Leon, Samuel Dempster, Arlene Dotts, Rita Echenique, Lennis & Richard Elston, Barry Evans, Bruce W. Ewing, Karl Richard Gerlitz & Anita Dabney Jones–Gerlitz, Lucinda M. & Kenneth E. Gerlitz, Betty T. Gleason, Fred Grapel, Marvin Groseth, Henry T. Hudson, Jr., Stephen Korey, Margaret Luebbers, Barbara Lurie, Billy G. Massey, Jeanine Mackintosh, Maxicor, Kathleen E. Milford, Edna F. Mlady, Patricia M. Mosbacher, David Ornoff, William E. & Nettie I. Postlewait, Charlotte & Jack Prescott, Lorraine Quayle, Amin Radparvar, Donald W. & Julia M. Rawn, Florence Reed, Norman Rothenbaum, Gloria Saiers, Daniel & Doris R. Sanchez, Mark Sanchez, Roland & Esther Sanchez, Betty F. Schonthal, Mortan & Susan Shane, Jack C. Silhavy, Kenneth Smith, Jack & Paula Strickstein, Dennis Swapp, Joan L. Titland, Herman R. Van Lier, Frances A. & Terrence L. White, and Emerson H. Young.

**IT IS FURTHER ORDERED** that Wells Fargo is prohibited from bringing claims on behalf of any Bondholders not identified by the June 15, 2012 deadline, including the Catholic Diocese of Wilmington, Delaware.

---

88).

    [22] The remaining four are Sam Farmer, Lois Irwin, Willie & Georgia Knopff, and Marlyanne Mathews.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on the ASA claims is **GRANTED** as to the secondary market purchasers who did not purchase their Bonds from Defendants, namely Larry Verhulst, Marvin Bruning, Carolyn Buckner, Carole Conover, Allen Dotson, Elene Fortman, Maryann Inman, Roger Johnson, Suzanne Johnson (beneficiary of original Bond purchaser), Mark Merrill, Dagmar Montgomery, Vicki Porter, Neil & Gayle Potter, Amanda Ross, Frank & Anna Hemmen, Lavina Lovitt, and Twila Smith. However, Defendant's Motion for Summary Judgment is **DENIED** as to the ASA claims of all other Bondholders.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on the negligent misrepresentation claims is **DENIED** as to those Bondholders who claimed to have relied on the Fitch Rating or the OS, namely Mary Abbey, Roberta Alcorn, Gary and Sharon Armstrong, Joseph and Linda Beane, Carl Becvar, Maurice Campbell, S. Kathryn Carnahan, Marilyn Colley, Larry Roger Cunningham, Stephen Dorr, Robert Dravecky, Eric R. Erlbaum, Joseph F. Gleissner, Faith M. Hammock, Frank & Anna Marie Hemmen, Maryann Inman, Jerry Jackson, John E. James, Elmo & Deanna Jones, Basil J. Komas, John MacFadden, Bruce Mackintosh, Fred Mariacher, Charles Marshall, Dagmar Montgomery, Edith Marie Moser, Jean Pansch, Larry Parr, Edward Patillo, Carl B. Peterson, Dale Petty, Vicki Porter, Charles Robeda, Cecilia Robertson, Betty Schmidt, Michael and Denise Schuster, James L. Self, William & Lisa Sims, Emily Gladys Smith, Wendy Tanata, Larry & Deloris Tolliver, Sam Wasserman, Lloyd Wiles, John Barron, Marvin Bruning, Karen Cotterell, Ernestine Hins, William & Glenda Hins, Willaim Kramer, Bernard Lampo, Peggy Moore, Ruby Norris, Judith Padrta, Darlene Rowe, and Gary Willgues.  However, Defendants' Motion for Summary Judgment on the negligent misrepresentation claims is **GRANTED** as to those Bondholders who relied only on their brokers or only received the OS without any indication that they relied on it, namely Francis J. Allbritton, Bonnie Kane Barenholtz, Vernon & Janet Bloom, Merle Buck, Louis John & Joyce Buytendorp, Lee & Helen Capuchio, Thomas & Loretta Coder, Helen M. Corlett, Eva J. Dayhuff, Edna M. Doole, Susan Dorr, Bill & DeEtte

Douglas, Sam L. Farmer, Elene Fortman, Kristi L. Galindo-Dyson, Lester & Jody Gaskill, Robert R. Griebnow, Zelda J. Hawk, Curtis & Adeana Henrickson, David A. Hester, Iron Workers Local Union Nos. 40, 361, 417 Pension Fund, Lois A. Irwin, Billie Sue Jackson, Roger H. Johnson, Thomas Jungwirth, Arlie & Barbara Kyzer, Larry D. Lauderback, John F. L'Ecuyer, Fred Lenz, Marlynrae Mathews, Robert L. Matthiessen, Rudolph & Marsha Mayers, Lucy Mayorga, Patricia Mecey, Mark A. Merrill, Minnesota Masonic Charities Funds, Linda A. Monteblanco, Edwin & Marjorie Olson, Marilyn & Deborah Orndoff, Leonard & Linda Peters, Kathy Philips, Wilmetta A. Roth, Betty & Robert Schmidt, Martha H. Schroyer, Kennon H. Shank, Lawrence L. Siems, Paulina J. Smith, Louis J. Stamey, Charles & Karen Struthers, Logan Tivitt, Samuel R. Wasserson, Melvin & Sandra Weber, Brenda Wellenreiter, Wisconsin Laborers Health Fund C/O Voyageur Asset Management, and Willie & Georgia Knopff. It is also **GRANTED** as to the negligent misrepresentation claims of the Bondholders who are precluded from testifying on causation and damages, namely Therese Anthony, Lisa M. Audlin, Beverly Bledsoe, Ronald T. Chehy, Emil & Theresa DePiero, Brian C. Donovan, Alvin Curtis Earls, Essex Regional Retirement System, Kester D. & Ann Haugh, Wendy A. Laude, Pauline Lovato, New Jersey Statewide Building Laborers Pension Fund, Operating Engineers Local #49 Health and Welfare, Bernard A. Patton, Neil R. & Gayle S. Potter, Production Sheet Metal Workers' Local 10 Retirement Plan, Laurence V. Rosa, Lenore M. Sesner, Harold J. Smith, Byron & Dorothy A. Snyder, State Bank & Trust, United Food and Commercial Workers Union Local #789 & St. Paul Food Employees Health Care Fund, Vance & Bobbie G. Vaupel, Rosella Weissman, Ed C. Winthrop, Esther Bedford, Suzanne G. Johnson, and Lavina J. Lovitt.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 640) is **GRANTED IN PART** and **DENIED IN PART**.

/ / /

/ / /

1    **IT IS FURTHER ORDERED** that Defendants' Motion in Limine (Doc. 774) is

2  **DENIED WITHOUT PREJUDICE**.

3    Dated this 13th day of September, 2013.

G. Murray Snow
United States District Judge