WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| In Re: Allstate Life Insurance Company Litigation | Lead Case No. CV-09-08162-PCT-GMS<br><br>Consolidated with:<br>No. CV-09-8174-PCT-GMS<br><br>**ORDER** |
|---|---|

Pending before the Court are twelve motions. Defendants have filed multiple Motions for Summary Judgments on Plaintiffs' claims against them. (Docs. 681, 704, 712, 717, 718, 751, 783.)[1] Plaintiff Allstate has also filed a Motion for Determination as a Matter of Law. (Doc. 706.) Finally, Defendants have filed multiple Motions in Limine to exclude reports and testimony by several of Plaintiffs' witnesses. (Docs. 679, 709, 713, 774.) For the reasons set out below, Defendants' Motions for Summary Judgment are granted in part and denied in part. Allstate's Motion for Determination as a Matter of Law is also granted in part and denied in part. Defendants' Motion in Limine to Exclude the Testimony and Report of William Rhoda is denied; the remainder of their Motions in Limine are denied as moot and without prejudice.

---

[1] Document 783 is the unredacted version of Document 751, Kutak Rock's Motion for Summary Judgment, and the two will be considered as a single Motion in this Order.

**BACKGROUND**

As discussed in previous Orders, this lawsuit stems from the offer and sale of $35 million in revenue Bonds used to finance the construction of a 5,000-seat Event Center in the Town of Prescott Valley. The Bonds were sold pursuant to a Preliminary Official Statement ("POS") and Official Statement, together referred to as the Official Statements ("OS"). These documents, circulated to some of the Plaintiffs who purchased the Bonds, contained information and disclosures pertaining to the purchase, redemption, financing, debt servicing, and security of the Bonds. The multiple parties involved in this litigation have been described in detail in previous Orders. (*See, e.g.*, Doc. 212 at 2–3.) Plaintiffs allege that the OS contained misrepresentations and omissions which led to a decrease in the value of their Bonds. The misrepresentations and omissions involve primarily two allegations: (1) inflated projections regarding the Event Center's future performance, and (2) misleading statements regarding the existence of a security interest on the Event Center's net operating income ("NOI") and other funds pledged to ensure debt service payments on the Bonds. The specifics of the alleged misrepresentations and omissions are set out in the Court's earlier Order of November 2010. (Doc. 212 at 4–9.) Only a brief summary of the Bonds' history and structure is set out here to supplement the information covered in previous Orders.

The idea of building an Event Center in the Town of Prescott Valley was proposed to the Town by private developers—Global and Fain Signature Group ("FSG")—in 2004. The Town agreed with those parties to obtain a feasibility study on the proposed center from Economic Research Associates ("ERA") (also known as SFCERA). A previous feasibility study, prepared in 2001, regarding the feasibility of an event center in the neighboring town of Prescott (the "2001 Report"), was in the possession of some parties. After the final version of the ERA study (the "2005 Report") was issued in February 2005, the Town approved of the project at a Town Council meeting. Subsequently, Global, FSG, and the Town executed a Development Agreement in May 2005 in which the Town promised to provide support for the Event Center in the form of a percentage of

sales taxes ("TPT Revenues") collected from the Event Center, a neighboring Entertainment District, and Secondary Credit Support Area ("SCSA"). After entering into the Development Agreement, the Town withdrew from the process of financing the Event Center.

The Defendant parties still involved in the financing determined that the Event Center would be funded by the sale of municipal Bonds issued by the Yavapai Industrial Development Authority (the "Issuer"). The Issuer hired Kutak Rock as bond counsel to draft certain of the documents associated with the Bond offering. The Issuer was to issue the Bonds as a conduit, meaning that it was not issuing the Bonds for its own use, but rather as a vehicle for the Borrower, Prescott Valley Entertainment Center ("PVEC"). Thus, the Issuer loaned the proceeds from the sale of the Bonds to PVEC as set out in the Loan Agreement. PVEC signed a Promissory Note to pay the $35,000,000 back to the Issuer, presumably with the income generated by the Event Center. The Issuer then granted a lien to Wells Fargo, the Bondholders' Trustee, over all Pledged Revenues, including the Event Center's net operating income and the Town's pledge of TPT Revenues in the event of a shortfall. The Issuer also endorsed the Promissory Note over to the Trustee. The Trustee was charged with using the funds it received to make debt service payments to the Bondholders.

Defendants subsequently drafted a POS for the sale of the Bonds which contained projections for the Event Center's operating results, including projections for attendance and number of events. The POS also set out actual and projected sales taxes for how much the Town could gather in TPT Revenues. The POS further stated that a lien existed on the Event Center's net operating income and the pledged TPT Revenues in favor of the Bondholders. Defendants asked Fitch Ratings to issue a rating for the Bonds. Fitch reviewed the POS and the underlying Bond Documents and issued a rating of A-. The Bonds were issued in November 2005 pursuant to a final version of the OS.

/ / /

/ / /

**DISCUSSION**

**I.    Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); see also L.R.Civ. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[ ] forth the specific facts, which the opposing party asserts,

including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party.").

## II.     Federal Securities Claims

The Plaintiffs assert Rule 10b-5 claims against PVEC (the Borrower), Global (part-owner of PVEC), Kozuback (CEO of Global), Hocking (Global's financial advisor), PVSE (part-owner of PVEC), FSG (owner of PVSE) and Stern (the original underwriter of the Bonds). The elements of a 10b-5 private cause of action are: (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). They also assert Rule 20(a) control person claims against Global, Kozuback, FSG, and PVSE based on the above Defendants' primary Rule 10b-5 violation.

### A.     Loss Causation and Damages

Loss causation requires the plaintiff to show that the misrepresentations or omissions caused the plaintiff's harm. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). Such loss causation is established "if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). The plaintiff need not show that the misrepresentation or fraudulent act "was the *sole* reason for the investment's decline in value," only that it was "one substantial cause." *In re Daou*, 411 F.3d at 1025 (internal quotations omitted) (emphasis in original). Typically, a plaintiff makes this showing by demonstrating that the value of the security declined after the true facts behind the misrepresentation or fraudulent practice become generally known. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 344 (2005).

FSG and PVSE move for summary judgment on the ground that Plaintiffs have failed to submit any evidence of diminution in Bond value after any truth became known

to the market.[2] (Doc. 681 at 10–11.) Plaintiffs argue that they should not have to demonstrate a disclosure followed by market decline because the Bonds were not an efficiently traded security. (Doc. 886-1 at 43–44.) They assert without citation that there were only 75 trades of the Bonds in the first six years that they were outstanding and the differences between debt and equity. (*Id.* at 44.) They argue that because of the thin market for the Bonds, there is no "immediate cause and effect relationship between the disclosure of news concerning the security and the price at which the security trades." (*Id.*) Thus, they assert that they should not have to meet the *Dura Pharmaceuticals* market reaction showing to demonstrate loss causation. Instead, they urge the Court to apply the traditional proximate cause standard, which requires only a showing that their loss was "either a direct result or a reasonably probable consequence" of Defendants' actions or omissions. (*Id.* at 45 (quoting 3 Fed. Jury Prac. & Instr. §120:60 (6th ed.).)

However, the only Ninth Circuit case that has provided for a departure from the *Dura Pharmaceuticals* market reaction test was in the case of a privately held company. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053. Plaintiffs do not and cannot argue that the Bonds are securities in a privately held company. Plaintiffs admitted at oral argument that the Bonds were sold in the open market in the initial offering. And, indeed, the fact that the bonds were given a Fitch rating, demonstrates that they were considered sufficiently subject to market trading to receive such a rating. Plaintiffs have made no argument that the dates and prices at which the Bonds were subsequently sold were unavailable to them. They make only a bare assertion that the price at which the Bonds traded would not be indicative of their actual value. However, they have not provided any evidence of that value. Even in *Spot Runner*, which was a decision at the motion to dismiss stage, the plaintiffs alleged that their shares immediately became worthless after fraudulent activity was revealed. There, despite

---

[2] FSG and PVSE are joined by every 10b-5 Defendant except PVEC: the Underwriters (for Stern) (Doc. 750), Global and Kozuback (Doc. 756), and the Hocking Defendants (Doc. 768).

allowing a departure from the market reaction test, the Ninth Circuit still required the plaintiffs to show "that the revelation of the truth is directly related to the economic loss alleged." *Id.* Thus, even if the Court were to adopt the laxer test for closely held securities, which admittedly provides a stronger case for security prices not matching market forces, two elements would still be required: revelation of the truth and economic loss. Plaintiffs have failed to set forth evidence of either of these.[3]

Plaintiffs rely on the report of their expert, Richard Carlson. (Doc. 886-2 at ¶¶ 558-580.) Carlson focused his analysis on Prescott Valley's economy from 2004 to 2008 and income limits on Prescott Valley's population that would have prevented the OS's sales and tax projections from materializing. (Doc. 809-248, Ex. 1 at 3–7.) Nowhere does Carlson study the effect of the market learning of the misrepresentations and omissions in the OS. Nor do any of Carlson's calculations demonstrate economic loss. His estimate of rescissory damages simply subtracts the amount of all payments actually made to Allstate from the amount Allstate originally paid for the Bonds, then adds the applicable interest rate. (*Id.* at 8.) His calculation for out-of-pocket damages is based on "the difference between what was paid for the bonds and what the bonds would have been worth with full disclosure." (*Id.*) However, this methodology relies only on actual performance of the bond obligations, and no knowledge of any alleged misrepresentation on the open market. Even assuming that this methodology somehow shows that the Bondholders purchased the Bonds at an inflated price due to the misrepresentations, this is precisely what the Supreme Court held to be inadequate for loss causation in *Dura Pharmaceuticals*. 544 U.S. at 342–43.

The Plaintiffs have set forth no persuasive argument that the market here, even if inefficient, was less than objective or not contemporaneous with events. Their

---

[3] It is undisputed that after the Bonds were issued, Fitch downgraded them twice, once from A- to B and then from B to D, as discussed in greater detail below. Though this evidence, particularly the evidence of the first downgrade, might be relevant to whether the market became aware of misstatements that resulted in a potential decrease in market value, Plaintiffs do not raise it in opposition to Defendants' Motions for Summary Judgment. Instead, they raise only the report of their expert.

explanation is solely that the market reaction test should not apply because the Bonds were not efficiently traded. The Ninth Circuit has held that an inefficient market is not the measure by which the market reaction test rises or falls. *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010). In addition, even assuming that *Miller* allows leeway to adopt a different causation standard in appropriate circumstances, Plaintiffs have given the Court no cause to do so here. This is especially true in light of the fact that Plaintiffs have failed to set forth any evidence of market revelation or economic loss, which the Ninth Circuit required even in its most relaxed version of the loss causation requirement. Plaintiffs have failed to create a genuine issue of material fact as to the issue of loss causation. The Court therefore grants summary judgment on Plaintiffs' 10(b) claims against all Defendants except PVEC, who did not join FSG and PVSE's argument on loss causation.

## B.    Control Person Liability

Section 20(a) provides for a control person to be held liable if a plaintiff is able to prove (1) a primary violation of federal securities laws and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Here, a primary violation claim survives only against PVEC. Plaintiffs claim that Global, Kozuback, FSG, and PVSE had control over PVEC. This "two-pronged test . . . should be construed liberally and flexibly." *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 814 F.2d 1564, 1575 (9th Cir. 1990) (en banc).

"Control" is defined in the Code of Federal Regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. The determination of a defendant's control over the primary violator "is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to

control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (citing *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396–97 (9th Cir. 1993)) (internal quotations omitted). "Traditional indicia of control" include "having a prior lending relationship, owning stock in the target company, or having a seat on the board." *Am. W. Holding Corp.*, 320 F.3d at 645 (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996)).

The plaintiff need not prove that the defendant had scienter or that he "culpably participated" in the primary violation to establish control. *Paracor*, 96 F.3d at 1161. However, once the plaintiff makes a prima facie case of control, the "defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." *Howard*, 228 F.3d at 1057. The defendant bears the burden of proving the good faith defense. *Hollinger*, 914 F.2d at 1575.

### 1.    Element of Control

FSG and PVSE contend that Plaintiffs cannot show that they are control persons under § 20(a). Plaintiffs' control person claims against PVSE are based on PVSE's control of PVEC, while their claims against FSG are based on FSG's control of both FSG and PVEC. PVSE claims that, though it was a member of PVEC, it did not "manage" it, and thus held no control over PVEC. (Doc. 681 at 15.) PVSE cites generally to PVEC's Operating Agreement without particular reference to either a page or section number. (Doc. 686 at ¶ 3.) The Operating Agreement does not support PVSE's argument. Instead, it states that "[e]ach of the Members shall have a voice in the management and conduct of the Company business." (Doc. 686-B (Operating Agreement of PVEC) at § 3.1.) Though the Operating Agreement apparently designated Global as PVEC's "manager" (*id.* at § 2.27), it nevertheless provided that each member, regardless of manager status, had some say over PVEC's management. PVSE's argument that it had no control over PVEC therefore fails.

FSG similarly contends that it had no control over any primary violator, and also cites generally to an Operating Agreement—this time to PVSE's Operating Agreement—

for support. (Docs. 681 at 13–14; 686 at ¶ 10.) As was the case above, the Operating Agreement does not support FSG's argument that it had neither direct nor indirect control over PVSE. Though the Operating Agreement granted a designated manager full and exclusive control over PVSE's management, it reserved certain rights and powers to the Members. (Doc. 686-C (Operating Agreement of PVSE) at § 4.1.) Moreover, the Members had the power to convene a meeting by requesting it from the Manager. (*Id.* at § 7.11.) To satisfy the element of control, "the evidence need only show that the person targeted as a controlling person had the legal power, either individually or as part of a control group, to control the activities of the primary violator." *E. Vanguard*, 79 P.3d at 99. FSG's reference to the OA does not show that it completely lacked any legal power, either individually or as part of a group, to control PVSE; indeed, the OA tends to show that FSG had at least some power to exercise influence over the management of PVSE. Plaintiffs also point to evidence that FSG owned 99% of PVSE, further evidence that FSG had power or influence over PVSE. (Doc. 809-219 (Brad Fain Dep.) at 18:7–20.) A jury could infer from this evidence that FSG had control over PVSE, and thus indirectly control over PVEC.

The remainder of FSG and PVSE's arguments and evidence are dedicated to showing that neither entity participated in the financing of the Bonds or the drafting of the OS. (*See* Doc. 686 at ¶¶ 46–57, 81, 92–98.) This evidence is irrelevant to § 44-199(B), which imposes presumptive liability on any person with direct or indirect control, without regard for whether that person actually participated in the underlying securities violation. *Paracor*, 96 F.3d at 1161. FSG and PVSE's Motion on the ground that they were not controlling entities under § 20(a) is therefore denied.

## 2.    Good Faith Defense

As stated above, a defendant is entitled to a good faith defense if it can show no scienter and an effective lack of participation. 15 U.S.C. § 78t(a). FSG and PVSE both contend that they are entitled to the good faith defense. They submit evidence that neither entity was never asked to and in fact did not review any statements contained in the OS

and that it never evaluated the reasonableness of any attendance or revenue projections. (Doc. 681 at 15.) Brad Fain (also known as Shawn Fain), whom FSG and PVSE acknowledge acted on behalf of both entities, testified that he had "no role in the financing" and thus would not have read the OS to check it for accuracy or completeness. (Doc. 686-D (Shawn B. Fain Dep.) at 142:13–143:13.) Bill Fain (also known as Norman Fain) similarly testified that he never read or commented on any draft of the OS. (Doc. 686-G (Norman W. Fain Dep.) at 92:10–22.) In response, Plaintiffs simply cite to this Court's earlier Order, in which it applied the Ninth Circuit's decision in *Kersh* to impose a duty to supervise on Defendant Treliving. (Doc. 655 at 8.) However, the five-factor test set out in *Kersh* requires analysis of highly factual issues like the controlling person's financial gain from the controlled person and the relationship between the controlling person and the plaintiff. *Kersh v. General Council of Assemblies of God,*, 804 F.2d 546, 550 (9th Cir. 1986), *overruled on other grounds by Hollinger v, Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990). Plaintiffs' reference to this Court's earlier Order does nothing to set out evidence showing a genuine issue of fact on those questions. Thus, FSG and PVSE's evidence of lack of scienter and participation in the primary violation (the viability of which is already precarious due to Plaintiffs' failure to show loss causation) is unrebutted. FSG and PVSE's Motion is granted on Plaintiffs' § 20(a) control person claim.

Kozuback and Global also assert that they are entitled to summary judgment on the basis of their good faith and lack of effective participation. (Doc. 717 at 14–15.) Kozuback cites to his lack of financial expertise and consequent inability to evaluate the accuracy of projections in the OS as evidence of his lack of scienter. (Doc. 719-A (Kozuback Dep.) at 106:12–23 (testifying that the feasibility of the Event Center was "way beyond" him).) Kozuback testified that he relied on the expertise of others, like Global's CFO Craig Johnson or financial advisor Tom Hocking, to ensure the accuracy and completeness of the statements in the OS. (*Id.* at 80:5–21, 121:–22, 228:10–229:1.)

He also testified that he likely looked at the POS when it was sent, but did not review it in any "degree of detail whatsoever." (*Id.* at 318:22–320:20.)

Kozuback has failed to show that he is entitled to the good faith defense. Though his testimony regarding his lack of financial expertise may be evidence of his lack of scienter, he conceded at his deposition that he read the POS. His assertion that he did not review it in detail would not prevent a jury from finding that he failed to show "effective lack of participation" in the violation. The same is therefore true, if not moreso, for Global. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1259 (S.D. Cal. 2010) ("A corporate defendant's scienter is necessarily derived from its employees."). Kozuback's testimony establishes that he relied to some extent on the expertise of a fellow Global employee, CFO Craig Johnson. That expertise would also be imputed to Global. The Court notes that the existence of a primary 10(b) violation is cast in serious doubt due to the Plaintiffs' inability to make a showing on the element of loss causation. Nevertheless, because Defendant PVEC failed to join in the loss causation argument, the Court cannot find on these Motions for Summary Judgment that the 10(b) claim is foreclosed against PVEC. Kozuback and Global's Motion for Summary Judgment on the ground that they are entitled to a good faith defense is therefore denied.

## III.   Arizona Securities Act Claims

### A.   A.R.S. § 44-1991

Section 44-1991 of the Arizona Securities Act ("ASA") creates a cause of action against any person who, in connection with a transaction involving an offer to sell or buy securities:

> (1) Employ[s] any device, scheme or artifice to defraud;
> (2) Make[s] any untrue statement of material fact, or omit[s] to state any material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; [or]
> (3) Engage[s] in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

Plaintiffs assert claims pursuant to § 44-1991 against each Defendant. (Doc. 886-1 at 59.) A.R.S. § 44-2003 permits suit to be brought against "any person . . . who made, participated in or induced the unlawful sale or purchase."

### 1.  Participated In or Induced

The Town asserts that it is entitled to summary judgment on Plaintiffs' 44-1991(A) claims because it did not make, participate in, or induce the sale of the Bonds. (Doc. 712 at 5–6.) Plaintiffs do not dispute the Town's contention that it did not make the sale, so this Court need only address the "participate in" and "induce" prongs. (*See* Doc. 886-1 at 72.)

Though there is some overlap between the terms participation and inducement, they "are commonly understood to involve separate factors." *Grand v. Nacchio*, 225 Ariz. 171, 175, 236 P.3d 398, 402 (2010). Participation requires taking part in something, usually in common with others. *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 21, 945 P.2d 317, 332 (Ct. App. 1996). Inducement, on the other hand, connotes an active role, and requires engaging in purposeful persuasive effort. *Id.* at 333. On both prongs, § 44-2003 "does not stretch to collateral actors, 'remote from the transaction, who neither financially participate, nor promote or solicit the transaction, but merely provide information that contributes to a buyer or seller's decision to close the deal.'" *Red River Res., Inc. v. Mariner Sys., Inc.*, No. CV 11-02589-PHX-FJM, 2012 WL 2507517 at *11 (D. Ariz. June 29, 2012) (quoting *Standard Chartered*, 945 P.2d at 333).

In *Grand*, the Arizona Supreme Court held that the defendants did not "participate" in a sale of stock to the plaintiffs because there was no allegation "that the defendants played any role in the transactions between [the plaintiffs] and the sellers," even though defendants unquestionably persuaded the plaintiffs to purchase the stock. *Grand*, 236 P.3d at 403. The court distinguished between the facts before it and *Strom*, a case in which participation was found, where "the defendants not only persuaded the plaintiffs to buy stock, but then also drafted the sales agreement, received funds from the plaintiffs, and took a commission from the sales." *Id.* It further noted that a substantial

financial benefit from the stock purchase, standing alone, was not sufficient to constitute participation in the sales. *Id.*

Conversely, the Arizona Supreme Court found that the defendants' alleged actions of directly encouraging the plaintiffs to buy stock from others constituted "classic inducement." [4] *Id.* The defendants' actions of sending the plaintiffs reassuring but misleading information about the stock, referring the plaintiffs to a broker, and actively and publicly promoting the company provide a good example of what actions rise to the level of inducement. Similarly, in *Strom*, the defendants were found to have induced a sale when they posted a newspaper advertisement containing misleading statements on the securities, met with the plaintiffs and provided them with information, and omitted material information while explaining growth projections. *Strom v. Black*, 22 Ariz. App. 102, 104, 523 P.2d 1339, 1341 (1974). In *Standard Chartered*, the Arizona Court of Appeals cautioned that "inducement" should not be read "particularly expansively" and that liability should not extend to "any outsider to a securities transaction . . . who provided information that foreseeably contributed to, and thereby *influenced*, a buyer or seller's decision to engage in the transaction." *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 21, 945 P.2d 317, 332 (Ct. App. 1996) (emphasis in original). Rather, to "induce" required a more active role. *Id.* The Court of Appeals cited, for example, the dictionary definitions "[to offer] for consideration persuasive advantages or gains that bring about a desired decision" or "[to win] over by an appeal, entreaty, or expostulation addressed as much to feelings as to reason." *Id.* (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1154 (1969)).

The Town argues that it did not participate in or induce the sale of the Bonds because it played no role in financing the Event Center (i.e., structuring and selling the Bonds), preparing or reviewing the OS, or dealing with any Bond purchaser. It points to extensive testimony from its managers and employees that it did not participate in the

---

[4] Because the plaintiffs did not seek recovery on the ground of inducement, however, their complaint was dismissed.

financing process of creating and selling the Bonds. (*See* Docs. 721-2 (Tarkowski Dep.) at 94:14–24 (Town Manager testifying that he understood there was a group in charge of financing, but that the Town had no involvement in it), 108:9–109:5 (testifying that the Town stopped reviewing pro forma projections for the Event Center because it wasn't involved in financing); 721-5 (Legler Dep.) at 145:17–25 (Town attorney testifying that while he drafted the Development Agreement, he understood that financing would be handled by other parties); Doc. 721-23 (Kauppi Dep.) at 52:5–24 (Town's management services director testifying that he was told that the Town wasn't involved in financing, so no one reviewed documents involved in the financing).)

It also sets forth testimony that it did not participate in the preparation of the OS. (Doc. 721-2 at 268:15–269:1, 271:3–5 (Tarkowski testifying that he is "absolutely positive" and "adamant" that he never read any drafts of the POS because "it was not our deal"), Doc. 721-5 at 62:1–15, 260:22–261:10, 266:17–25, 167:17–268:8 (Legler testifying that he did not read drafts of the POS, Indenture, or other documents involved with Bond issue); Doc. 721-23 at 52:5–24, 112:24–113:18 (Kauppi testifying that he stopped reviewing documents related to the POS because it was not the Town's deal, even though his usual practice was to review the POS for how revenue would be used); Doc. 721-24 (email from Tarkowski and Legler to multiple parties stating that though they appreciated being kept aware, they would not be reviewing Bond documents for content).) It notes that while the OS attributes some statements to the Town, in fact the Town only provided historical tax information and did not actually prepare the projections on future sales taxes. (Doc. 721-23 at 81:8–11 (Kauppi testifying that the Town had no involvement in the tax projections); Doc. 721-6 (Hocking Dep.) at 52:8–15 (Hocking testifying that he learned early on that the Town was not in charge of issuing the Bonds), 515:14–519:1 (testifying that Hocking obtained historical growth information from the Town and arrived at the 3% growth rate on his own, though he ran it by the Town, who agreed that it was reasonable).) The Town also argues that while it provided a Closing Certificate, that Certificate only went to the validity of the Development

Agreement, and did not guarantee the accuracy of the OS. (*See* Doc. 721-38 ("Closing Certificate of the Town of Prescott Valley, Arizona").)

The Town further points to evidence that it did not receive the proceeds from the sale of the Bonds and that it received no money from the project or the Bonds at all (Doc. 719 (Kauppi Decl.) at ¶ 6), that it had no dealings with Allstate and thus played no part in the sale to Allstate (Doc. 715 (Tarkowski Decl.) at ¶ 8), and that the Town didn't sell any of the Bonds and no Bonds were sold on the Town's behalf (*id.* at ¶ 9).

In Response, Plaintiffs argue that the Town induced the sale of the Bonds by pledging TPT Revenues. (Doc. 886-1 at 72.) The Town admits that it pledged TPT Revenues, but disputes that this is sufficient to constitute participation or inducement. Plaintiffs also assert that the Town had a conversation with Fitch that convinced Fitch there were no defects in the security for the Bonds, leading to Fitch's A- rating. This characterization is not supported by the evidence, however. Plaintiffs' evidence is that Hernandez, the Fitch analyst on the Bond issue, had a telephone conversation with Bill Kauppi about the Town's commitments to the transaction. (Doc. 809-236 (Hernandez Dep.) at 68:13–25.) Ultimately, a key factor of the Fitch Rating was the Town's "substantial support." (Doc. 809-119 (Fitch Press Release).) These two pieces of evidence do not combine to support an inference that "Fitch was actively misled by the Town," as claimed by Plaintiffs. (Doc. 886-1 at 73.) No one contests that the Town did, in fact, pledge in the Development Agreement to pay certain amounts of TPT Revenues in support of the Event Center. Plaintiffs point to Hernandez's testimony after the fact that he would have been concerned and Fitch would have required a resolution if Fitch had known that the Town was refusing to read financing documents or that the Town disagreed with the statement that the Bondholders had a junior lien over the TPT Revenues. (Doc. 809-236 at 175:18–176:12, 179:13–180:18.) Though this shows that Fitch was not thoroughly informed of the Town's role (or lack thereof) in the financing, it does not show that the Town deliberately concealed this information from Fitch. Nor does it raise an issue of fact as to whether what the Town did or did not tell Fitch, as

opposed to what Fitch assumed based on what it understood from the Town, could have induced any Plaintiff to purchase the Bonds.

Plaintiffs further argue that the Town removed the "cap" on its pledge of TPT Revenues from the SCSA to "help convince Fitch to provide the A- rating." (Doc. 886-1 at 73.) The proffered evidence, however, is only an email from Hocking, Global's financial advisor, informing Dube of M.L. Stern that the Town had removed the cap and that Hocking would be speaking to Fitch about the Rating soon. (Doc. 809-118.) Plaintiffs further accuse the Town of failing to inform Fitch that the SCSA tax pledge was defective. (Doc. 886-1 at 73.) However, the evidence to which they cite shows only that as of 2009, the Town believed the Development Agreement did not provide adequate detail about the timing of TPT Revenue payments from the Entertainment District and SCSA. (Doc. 809-95.) It does not show that the Town knew of this defect at the time of the Fitch Rating, or that the Town intentionally concealed this defect from Fitch.

To the extent that the above evidence is admissible, it alone is insufficient, absent some additional admissible evidence, to create a material issue of fact that the Town, no matter how indirectly, encouraged the purchase of the bonds in such a manner as to amount to "participation" or "inducement." The Town was undeniably involved in the structure of the financing package to the extent that it agreed to provide certain assurances of financial performance that inured to the benefit of the bondholders. But the fact that the Town was involved in the overall structure of the financing package itself does not raise any issues of fact as to whether the Town "induced" any of the Plaintiffs to purchase the bonds. When the statute refers to "any person . . . who made, participated in or induced the unlawful sale or purchase," it does not include those persons who were involved in the structure of the financial transaction, but played no role in its marketing.

The Town's pledge of TPT Revenues is insufficient to support a genuine issue of material fact as to whether the Town participated in the sale. The pledge of TPT Revenues may have been critical to the procurement of an investment-grade Fitch Rating, but again obtaining the rating cannot fairly be construed as a "sale or purchase." Indeed,

when the Town entered into the Development Agreement pledging the TPT Revenues, the parties had not yet decided to finance the Event Center by the placement of private bonds. (Doc. 921-2 at 169:15–170:4.) The relevant documents for the Bond offering, which would ultimately lead to the sale or purchase of the Bonds, had not yet been drafted. (Doc. 921-20 (Batenhorst Dep.) at 95:11–18.) To impose liability on the Town for its pledge at this preliminary point in time, after which it withdrew from the Bond financing process entirely, would be to sweep "collateral parties . . . remotely connected to the securities transaction" under the reach of the ASA.[5] *Orthologic Corp. v. Columbia/HCA Healthcare Corp.*, No. CIV 01-0006-PHX-SRB, 2002 WL 1331735 at *4 (D. Ariz. Jan. 7, 2002). The statute does not contemplate such a result. *Id.*

Nor does the evidence of the Town's role in procuring the Fitch Rating or its pledge of the TPT Revenues create a genuine issue of material fact as to whether the Town induced the sale of the Bonds to Plaintiffs. Though some buyers may have relied on the Fitch Rating in making their purchase of the Bonds, the Town's limited activity in the procurement of the Fitch Rating is too far attenuated from the purchase transaction to constitute "participation" *in the sale or purchase* as required under § 44-2003. The Fitch Rating is not "the unlawful sale or purchase." There is no evidence that the Town had any part in the sales between the Underwriters and the Bondholders, that the Town received any financial benefit, or that the Town obtained a commission on the sale.[6] As was the case in *Grand*, there is no evidence that the Town "played any role in the transactions between [the plaintiffs] and the sellers" here.

---

[5] Plaintiffs also make the illogical argument that the Town's withdrawal from the Bond financing process was itself "participation" in the sale or purchase of the Bonds. Plaintiffs support this argument by setting forth factual statements without citation to either their Counterstatement of Facts or the record. The Court rejects, as a matter of law, the argument that, pursuant to these facts, the Town's *withdrawal* from the process constituted participation.

[6] Plaintiffs assert, without citation, that "[t]he Town's financial benefit from the sale of the Bonds was not nearly so attenuated." (Doc. 886-1 at 74.) Plaintiffs' mere assertion is insufficient to create a genuine issue of material fact and fails to overcome the Town's showing that it received no proceeds whatsoever from the sale of the Bonds.

Further, the TPT Revenues, pledged before even the structure of the Bonds was finalized, cannot be characterized as active "inducement" by the Town to persuade the Plaintiffs to purchase.[7] The Town had no direct contact with the Plaintiffs to encourage them to buy the Bonds by touting the pledge, and the pledge by itself is not comparable to the advertisements and promotions put forth by past defendants found liable for "inducing" pursuant to § 44-2003. The Town's conduct with regard to the Fitch Rating falls far below the conduct found to have constituted inducement by Arizona courts in other cases—the Town did not communicate with Plaintiffs, send any message encouraging Plaintiffs to purchase, or advertise the Bonds in any way.

Plaintiffs also argue that the Town's demand that it be removed from the joint continuing disclosure obligation with PVEC constituted "direct participation in the financing process that resulted in the sale of the Bonds." (Doc. 886-1 at 73.) As stated above, however, the financing process does not constitute an "unlawful sale or purchase" of a security, so Plaintiffs' assertion, even if true, would not create a genuine issue of fact as to the Town's participation. Moreover, though Plaintiffs submit an email in which the Town's outside counsel request that the Town's joint disclosure obligation be split from the Borrower's, (Doc. 809-130), they fail to demonstrate how this action constitutes participation in either the financing process or the sale or purchase of the Bonds. The Continuing Disclosure Agreement is a document pursuant to SEC Rule 15c2-12, which requires parties to provide certain annual financial information to the Municipal Securities Regulating Board. 17 C.F.R. 140.15c2-12(5)(i). It has no connection to either the financing of the Event Center or the sale of the Bonds to Plaintiffs.

Plaintiffs make a host of other assertions ("[T]he Town was involved in the primary market sale of the Bonds," "the Town's deficient tax pledge is a critical part of what makes the Bond documents false and misleading," "[t]he Town also directly participated in the events that resulted in the concealment of the demographic facts in the

---

[7] Moreover, the TPT Revenues were pledged to the Borrower, PVEC, and only later assigned by the Borrower to the Trustee for the benefit of the Bondholders.

2005 ERA Report," "[t]he Town was also aware that its decision to make certification of a revenue deficiency a requirement in . . . the Development Agreement implicated the Town's Budget Requirements . . . and was aware that the initial plan was to address that during the financing phase") that they claim support their argument that the Town participated in and induced the sale of the Bonds. These assertions are not supported by citations to either Plaintiffs' Counterstatement of Facts ("CSOF") or the record and thus cannot create genuine issues of material fact as to the Town's participation or inducement in the sales.[8] The Court grants the Town's Motion for Summary Judgment on Plaintiffs' § 44-1991 claims.

The Hocking Defendants also assert that they are entitled to summary judgment because they did not make, participate in, or induce the sale as required by § 44-2003. (Doc. 718 at 10.) However, they neither cite to the record nor demonstrate Plaintiffs' lack of evidence in doing so. They simply assert that they do not meet the requirements for liability under the statute. Even when the party moving for summary judgment does not bear the burden of proof at trial, it must discharge its initial summary judgment by pointing out the absence of evidence to support the opposing party's case. *Celotex*, 477 U.S. at 325. The Hocking Defendants fail to do this here. Their Motion for Summary Judgment on this ground is therefore denied.

/ / /

/ / /

---

[8] Despite the Court's previous warning to the Plaintiffs, they continue to engage in expansive assertions without bothering to provide support from the record for them. (Doc. 894 at 9 n.3.)  In some cases, when Plaintiffs do provide a citation to the record, the citation does not support the assertion for which it is cited. (*See, e.g.*, Doc. 886-2 at ¶ 303 (Counterstatement of Facts asserting that the Town refused to deposit Town Escrow proceeds into an account controlled by the Trustee and citing to Exhibit 87, which is only a copy of the Indenture of Trust and has no relevance to what the Town did with the Escrow proceeds).) Such unsupported assertions are not apparently true on their face, and in the absence of such assurances are insufficient to defeat summary judgment.  In ruling on the parties' various motions, the Court will only consider cited materials that support the proposition for which they are cited. Fed. R. Civ. P. 56(c)(3). It is especially true in a case so litigated as this one that the parties cannot expect the Court to hunt like a pig for truffles buried in briefs. *Christian Legal Soc. Chapter of Univ. of California v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010).

## 2.    Section 44-1991(A)(1) and (A)(3)

Subsection (A)(1) of 44-1991 prohibits a person from using any device, scheme, or artifice to defraud in connection with a sale or purchase of securities. Subsection (A)(3) prohibits engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit. Plaintiffs assert claims against PVEC, Global and Kozuback, FSG and PVSE, the Town, the Hocking Defendants, and Stern for violations of Subsection (A)(1). Because Plaintiffs do not make any separate argument for Subsection (A)(3) (*see* Doc. 886-1 at 96), the Court discusses the two prongs of liability together in this section.

A recent decision from the District of Arizona held that liability under § 44-1991(A)(1) and (3) could not be premised solely on assertions of misstatements and omissions. *Red River Res., Inc. v. Mariner Sys., Inc.*, No. CV 11-02589-PHX-FJM, 2012 WL 2507517 at *10 (D. Ariz. June 29, 2012). To do so would "conflate the three subsections," and "[a] statute should be construed so that the effect is given to all its provisions, so that no part will be inoperative or superfluous." *Id.* (citing *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). In so holding, the *Red River* Court relied on federal courts' interpretations of Rule 10b-5(a) and (c), which are nearly identical to the language of § 44-1991(A)(1) and (3). *Compare* § 44-1991(A)(1), (3) *to* 17 C.F.R. § 240.10b-5(a), (c). The Ninth Circuit, for example, has held that "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) *cert. denied*, 132 S. Ct. 2713, 183 L. Ed. 2d 68 (U.S. 2012). In *Red River*, Judge Martone reasoned that "[m]anipulative conduct must be distinct from omissions and misrepresentations under state law as well in order to give meaning to every provision of § 44-1991(A)." 2012 WL 2507517 at *10. The Underwriters assert that they are entitled to summary judgment because Plaintiffs fail to summon any

evidence of manipulative conduct distinct from omissions and misrepresentations.[9] (Doc. 704 at 32 n.30.)

Plaintiffs argue that Judge Martone was incorrect to apply the federal interpretation of Rule 10b-5 to § 44-1991(A) because "the ASA is a remedial statute imposing a broader sweep than the federal securities laws." (Doc. 886-1 at 84.) Though in some respects, the ASA is broader than the federal securities laws,[10] it should be interpreted "by following settled federal securities law unless there is a good reason to depart from that authority." *Sell v. Gama*, 231 Ariz. 323, 295 P.3d 421, 425 (2013). Plaintiffs have provided no good reason to depart from federal authority here, and the near-identical language of the two statutes is strong support for applying existing federal precedent on Rule 10b-5 to § 44-1991(A). *See* 1996 Ariz. Sess. Laws, ch. 197, § 11(C) (2nd Reg. Sess.) ("It is the intent of the legislature that in construing the [ASA], the courts may use as a guide the interpretations given by the . . . federal or other courts in construing substantially similar provisions in the federal securities laws of the United States.").

Plaintiffs cite to *Facciola v. Greenberg Traurig, LLP* for support of their position, asserting that there, we found that Subsections (A)(1) and (A)(3) did apply to omissions and misrepresentations. (Doc. 886-1 at 84.) There, Judge Murguia rejected the defendants' argument that Subsections (A)(1) and (A)(3) does not apply to misleading disclosures or omissions. 781 F. Supp. 2d 913, 922 (D. Ariz. 2011). In so holding, however, she cited to a case that involved "a sophisticated scheme to defraud purchasers through improper accounting practices, financial statements . . . and the use of stock dividends, which were omissions of fact." *Id.* (citing *Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 553, 733 P.2d 1131, 1136 (App. 1986)). Under federal law interpreting

---

[9] The Underwriters are joined in their argument by PVEC (Doc. 758), the Town (Doc. 763), the Hocking Defendants (Doc. 768), and Global and Kozuback (Doc. 899).

[10] *See, e.g.*, *Rose v. Dobras*, 128 Ariz. 209, 214, 624 P.2d 887, 892 (Ct. App. 1981) (holding that reliance is not an element of the ASA); *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) holding that reliance is an element of a Rule 10b-5 cause of action).

Rule 10b-5, "scheme liability does not preclude, outright, claims based upon a scheme to misrepresent or omit material facts." *S.E.C. v. Goldstone*, CIV 12-0257 JB/LFG, 2013 WL 3456875 at *128 (D.N.M. July 8, 2013) (compiling cases). A scheme or device used to perpetuate a misrepresentation or omission may still be the basis of liability under 10b-5(a) or (c), so long as there exists conduct beyond the basic misrepresentation or omission. Thus, *Facciola* does not stand for the proposition that Subsections (A)(1) and (A)(3) apply indiscriminately to omissions and misrepresentations, but rather that those subsections may still apply if there is a scheme or artifice in addition to an omission or misrepresentation. It does not support Plaintiffs' position that we should interpret those subsections more broadly than their counterparts in the federal framework of securities regulation.

Thus, as the Underwriters point out (Doc. 704 at 32 n.30), Plaintiffs' claims pursuant to (A)(1) and (A)(3) may succeed only if they have evidence of manipulative conduct separate from or in addition to mere misrepresentations or omissions. *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009) ("[M]anipulative conduct typically constitutes 'a scheme . . . to defraud' in violation of Rule 10b–5(a) or a 'course of business which operates . . . as a fraud or deceit upon any person' in violation of Rule 10b–5(c)."). Manipulation, according to the Supreme Court, "is virtually a term of art when used in connection with securities markets," generally referring to "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id.* at 938–39 (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)). The Underwriters argue that, because Plaintiffs only assert omissions and misrepresentations, they can only bring ASA claims pursuant to § 44-1991(A)(2). (Doc. 704 at 32 n.30.)

Plaintiffs devote more than two pages of their Response setting forth facts that they claim would show "fraudulent conduct beyond the misrepresentations and omissions in the OS" (Doc. 886-1 at 84), but fail to support *any* of these factual assertions with citations to their CSOF or the record. (*Id.* at 84–87.) Bare assertions are insufficient to

create a genuine issue of material fact, so the Court will not consider these unsupported statements in deciding the motions for summary judgment. (*See* note 8, *supra*.) However, the Court will examine the few statements supported by citations in this section of Plaintiffs' brief to determine whether they create a genuine issue as to the existence of a device, scheme, or artifice to defraud (Subsection (A)(1)) or any transaction, practice, or course of business that would operate as a fraud or deceit (Subsection (A)(3)).[11]

According to Plaintiffs, Kutak and Stinson participated in a scheme to defraud by splitting the original Joint Continuing Disclosure Agreement into two separate Continuing Disclosure Agreements ("CDAs") for the Borrower and the Town, individually. (Doc. 886-1 at 82.) However, as discussed in this Court's previous Order, the two new CDAs appear to bind the Borrower and Town to the same obligations as the first Joint CDA. (Doc. 894 at 8.) Moreover, the CDAs involve disclosures to the Municipal Securities Regulating Board, not to Plaintiffs. At most, Plaintiffs' evidence that Kutak and Stinson split the CDAs amounts to a failure to disclose in the final OS that the CDAs were split. (*Id.* at 8–9.) It does not demonstrate manipulation beyond any omission or misrepresentation. This evidence is insufficient to show a genuine issue as to whether Kutak and Stinson were involved in a device, scheme, or artifice to defraud. Nor does it constitute a transaction, practice, or course of business that operated as a fraud or deceit.

Plaintiffs also assert that Stern's Dube knew of the 2005 ERA Report and recognized that its demographic facts were important and should be disclosed, but failed to bring it to the attention of Stern management or discuss it with any other parties involved in the financing. (Doc. 886-1 at 82.) They further claim that Dube was aware of certain facts like the stressed financial condition of the Event Center construction and inconsistencies in the POS regarding parking lot payments, but that he did nothing. (*Id.* at

---

[11] Many of Plaintiffs' assertions pertain to the Town, which, as discussed above, is not liable under A.R.S. § 44-1991 because it did not make, participate in, or induce the sale of the Bonds to Plaintiffs.

83.) This evidence demonstrates, at most, an omission by Dube, which is insufficient to support liability under either Subsection (A)(1) or (A)(3).

Plaintiffs set forth no specific facts or evidence regarding Global, Kozuback, FSG, or PVSE, instead stating simply that those parties "direct and indirectly participated in a device scheme or artifice [sic] to defraud with respect to concealment of the 2005 ERA Report." (*Id.*) Plaintiffs' reasoning that these four parties' arguments should "fail for the reasons set forth above and in the CSOF"[12] does nothing to create a genuine issue of material fact. Plaintiffs have failed to summon evidence to support a finding of manipulation beyond mere misrepresentation or omission. Summary judgment is therefore granted on their claims pursuant to ASA § 44-1991(A)(1) and (A)(3) against Stern and those Defendants who joined the Underwriters' argument on this issue.

### 3.       Section 44-1991(A)(2)

Subsection (A)(2) requires only a misstatement or omission of a material fact. *Aaron v. Fromkin*, 196 Ariz. 224, 227, 994 P.2d 1039, 1042 (Ct. App. 2000). It does not require that the statement or omission was material to the particular buyer, just that it would have assumed actual significance in the deliberations of a reasonable buyer. *Id.* Nor does it require the speaker to know the falsity of the statements; in other words, it does not require scienter. *Id.* It only imposes an affirmative duty not to mislead. *Id.* "Plaintiffs' burden of proof requires only that they demonstrate that the statements were material and misleading." *Id.* Section 44-1992(B), however, permits a defendant to prove a lack of loss causation as an affirmative defense to any claims brought under Subsection (A)(2). *Grand v. Nacchio*, 214 Ariz. 9, 25, 147 P.3d 763, 779 (Ct. App. 2006) ("*Grand II*").

---

[12] These "reasons" span a total of 233 pages—83 pages above the statement and 150 pages of the CSOF. Plaintiffs fail to cite even to a section of their pleadings or specify an argument in their Response that would indicate where, exactly, their "reasons" could be found. This is simply not a sufficient basis on which to defeat a motion for summary judgment on this issue.

Plaintiffs' misrepresentation claims are premised on two theories: (1) Defendants made material misstatements in setting out attendance and revenue projections in the OS, as well as material omissions in failing to disclose the existence of feasibility studies, and (2) Defendants misrepresented or omitted alleged defects in the Bond Documents that should have created a lien or somehow secured the TPT Revenues for debt service for the benefit of the Bondholders. Defendants assert that both of these theories fail, as the OS was accurate on both accounts.

### a.    Actionable Projections

"Information that inherently involves some subjective analysis or extrapolation, such as projections, estimates, opinions, motives, or intentions is 'soft information' which is generally not required to be disclosed." *Caruthers v. Underhill*, 230 Ariz. 513, 524, 287 P.3d 807, 818 (Ct. App. 2012), *review denied* (Mar. 19, 2013); *see also In re Convergent Tech Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991). Under the federal securities scheme, projections or statements of belief may be actionable if any of the following are true: (1) the projection is not genuinely believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending to seriously undermine the accuracy of the statement. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). However, Plaintiffs assert that the federal securities scheme is inapplicable to their (A)(2) claims because the implied federal private right of action requires scienter, while claims pursuant to Subsection (A)(2) of the state securities law only require negligence.[13] (Doc. 886-1 at 89 n.35.)

---

[13] In fact, some Arizona cases suggest that not even negligence is required. *See Aaron*, 994 P.2d at 1042 ("The statute . . . imposes only an affirmative duty not to mislead . . . Therefore, Plaintiffs' burden of proof requires only that they demonstrate that the statements were material and misleading."); *Trimble*, 733 P.2d 1131, 1136 ("[D]efendants have an affirmative duty not to mislead potential investors . . . This requirement . . . places a heavy burden upon the offeror not to mislead potential investors in any way."). Nevertheless, the Supreme Court case upon which the Supreme Court of Arizona relied in finding that scienter is not an element of Subsection (A)(2) imposed a negligence requirement on Subsection (A)(2)'s federal counterpart. *State v. Gunnison*, 127 Ariz. 110, 113, 618 P.2d 604, 607 (1980) (holding that scienter is not an element of Subsection (A)(2) and citing *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 696 (1980)); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 823 F.2d 1349, 1351–52 (9th Cir.

The different state-of-mind requirements between § 44-1991(A)(2) and Rule 10b-5 does justify a departure from federal securities law on this issue. The *In re Apple* standard's focus on the speaker's genuineness of belief and on its subjective awareness of undisclosed, undermining facts is incompatible with the Arizona courts' pronouncements that scienter is not required for claims pursuant to § 44-1991(A)(2). However, the second prong of *In re Apple*, finding a projection to be actionable if there is no reasonable basis for the belief, dovetails with the negligence-based standard of Subsection (A)(2). Indeed, at least one Arizona court has found that projections were actionable under the ASA where there was no "evidence suggesting that they had any factual basis." *Purvis v. Arizona Corp. Comm'n*, No. 1 CA-CV 10-0311, 2011 WL 662842 at *5 (Ariz. Ct. App. Feb. 24, 2011) (finding a violation where owner erroneously predicted that stock in corporation would become publicly traded within 18 months and the stock would increase three to four times in value). Thus, projections under Subsection (A)(2) are actionable if there is no rational basis for believing in them. Of course, because negligence is a lower threshold than knowledge or reckless disregard as required by the federal scheme, evidence that Defendants did not genuinely believe their statements or that Defendants were aware of undisclosed facts that would seriously undermine their statements is still sufficient to create a genuine issue as to the reasonableness of their belief in the projection.

No reasonable basis exists for a speaker to believe the truth of a prediction if the source of the prediction is "*unrealistic*, and not merely uncertain." *Cloutier v. Adobe Sys., Inc.*, 5 F.3d 535 (9th Cir. 1993) (emphasis in original). Evidence of a thorough and trustworthy process of obtaining forecasts is sufficient to show a rational basis. *See In re*

---

1987) ("In *Aaron*, 446 U.S. at 695–97 . . . the Supreme Court held that negligence—and not scienter—suffices to support a SEC injunction action under sections 17(a)(2) and (a)(3)."); *see also S.E.C. v. Tambone*, 550 F.3d 106, 123 (1st Cir. 2008) *reh'g en banc granted, opinion withdrawn*, 573 F.3d 54 (1st Cir. 2009) and *opinion reinstated in part on reh'g*, 597 F.3d 436 (1st Cir. 2010). Because Plaintiffs argue for a negligence standard, and because they have submitted sufficient to create a genuine issue of material fact under either standard, the Court will proceed on the assumption that negligence is required to show a violation of Subsection (A)(2).

*Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010). Projections based on historical growth patterns also have a rational basis. *Cloutier v. Adobe Sys., Inc.*, 5 F.3d 535, *3 (9th Cir. 1993). The Underwriters set forth extensive evidence showing how the projections in the OS were reached.

Daniel De Mos, an employee of Global, gathered information on the Event Center's revenue potential, including information on the area's population, growth patterns, and sales tax revenue generation. (Doc. 702-10 (De Mos Dep.) at 29:19–25.) He also conducted due diligence on what events fit a certain area, the cost of living in that area, and what people in that area expected to pay for events. (*Id.* at 35:5–15.) He worked with other individuals in putting together the information to reach the projections: Wayne Davis provided information on contractually obligated income, advertising, and types of sales (*id.* at 27:19–28:5), Dan Vaillant provided information on construction costs (*id.* at 84:4–14), and James Treliving provided information on hockey teams (*id.* at 33:16–25). Kozuback reviewed all of De Mos's information and made the final determination as to its reasonableness. (*Id.* at 33:2–15, 73:24–74:7.) De Mos's information was also reviewed by Craig Johnson, Global's CFO, before being passed onto Hocking, Global's financial advisor. (Doc. 702-20 (Johnson Dep.) at 37:3–10.) Johnson participated in multiple meetings where the various teams in charge of collecting certain information would present their findings and explain why they were reasonable. (*Id.* at 116:6–10.)

The Underwriters also set forth evidence on how the projections for sales taxes were calculated. The evidence shows that Hocking generally tended to underestimate the potential for sales tax generation in comparison to historical growth. (Doc. 702-19 (Hocking Dep.) at 119:5–19 (Hocking explaining that though the historical growth rate for sales tax in the entertainment district was anywhere from 20.4% to 37.43%, Hocking used a much more conservative 3% to estimate sales tax growth), 517:16–519:1 (Hocking explaining that while the historical growth in the Secondary Credit Support Area was anywhere from 12.7% to 40%, Hocking again used a conservative figure of 3%).) The use of historical growth patterns to reach projections, particularly when the projections

1    are lower than the level predicted by strictly following the growth pattern, establishes a

2    rational basis for believing those projections to be reasonable. *Cloutier*, 5 F.3d at *3.

3           In Response, Plaintiffs rely on the report and testimony of their expert witness,

4    William Rhoda of CSL International, which they claim demonstrates that the projections

5    in the OS have no rational basis. (Doc. 886-1 at 27.) The Underwriters, in turn, have filed

6    a Motion in Limine to exclude Rhoda's report and testimony. (Doc. 679.)

7                    **i.       Admissibility of Plaintiffs' Expert Rhoda**

8           The admissibility of expert testimony is governed by Rule 702 of the Federal

9    Rules of Evidence, which permits "scientific, technical, or other specialized knowledge"

10   by a qualified expert if it will "assist the trier of fact to understand the evidence or to

11   determine a fact in issue." Expert testimony must be relevant and reliable to be admitted.

12   *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). In *Daubert*, the

13   Supreme Court suggested four factors to consider in evaluating admissibility: 1) whether

14   a theory or technique can be tested; 2) whether it has been subjected to peer review and

15   publication; 3) the known or potential error rate of the theory or technique; and 4)

16   whether the theory or technique enjoys general acceptance within the relevant scientific

17   community. *Id.* at 592–94. However, these factors are neither exhaustive nor applicable

18   to every case. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). Rather, the

19   trial court has broad discretion to decide "*how* to test an expert's reliability." *Id.*

20          The Underwriters do not challenge the relevancy of Rhoda's report; rather, they

21   focus their efforts on the reliability of Rhoda's method. This is appropriate, as "the test

22   under *Daubert* is not the correctness of the expert's conclusions but the soundness of his

23   methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Criteria for

24   reliability of methodology include "testability, publication in peer reviewed literature,

25   and general acceptance, but the inquiry is a flexible one." *Id.* Other criteria may include

26   how often the methodology produces erroneous results and whether the testimony is

27   based on "legitimate, preexisting research unrelated to the litigation." *In re Apollo Grp.*

28   *Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 961 (D. Ariz. 2007) (internal citation omitted).

However, simply "[o]ffering the expert's qualifications, conclusions, and an assurance of reliability is insufficient."

Rhoda's report consists of three sections. (*See generally* Doc. 809-19.) In the first section, Rhoda (for CSL International) compared the event days and attendance projections set forth in the 2001 ICC Report, the 2005 ERA Report, and the OS. (*Id.* at 4.) Rhoda concluded that the projections in the OS were significantly higher than those in the ERA Report, which, in turn, were significantly higher than those in the ICC Report. (*Id.* at 7.) Rhoda also compared the OS projections to projections for two other cities that had Global Entertainment facilities in 2005. (*Id.* at 6.) He found that the net income projected in the OS was significantly higher than those projected for the other two cities, despite the fact that those two cities had "superior market demographics" in terms of population, buying power, and age. (*Id.* at 7.)

The second section consisted of Rhoda comparing the projections in the OS to the projections in feasibility studies of eight "similar arena/events center development projects completed by CSL in the early to mid-2000's." (*Id.* at 8.) Rhoda performed a "penetration analysis" by taking the population of the area within a 25-mile radius of the event center and dividing it by the projected annual event days and annual attendance to reach ratios for "population per event" and "population per attendee." (*Id.* at 10.) Rhoda also took the Effective Buying Income ("EBI") for each area and performed the same analysis to reach "EBI per event" and "EBI per attendee" ratios. (*Id.*) Rhoda averaged those ratios and applied the average ratio to the population within 25 miles of Prescott Valley to determine that the projections for Prescott Valley's annual event days and annual attendance should have been significantly lower than those set forth in the OS. (*Id.* at 12.) Rhoda also compared the projected net operating income ("NOI") in the OS to the projected NOI for the other areas and found that the OS's projected NOI of $1.8 million was more than five times the highest projected NOI of $335,000 out of the eight studies in the sample. (*Id.* at 14.) Finally, Rhoda compared the population and EBI of each area to their NOI estimates. He found that the ratios for Prescott Valley's population and EBI

as compared to the OS's projected NOI were significantly higher than the average ratios for the other eight areas. (*Id.* at 15–16.)

The third part of the CSL Report compares the projections in the OS to actual operating results for several small to mid-sized arenas throughout the country. (*Id.* at 17.) Again performing the penetration analysis, Rhoda took the actual event and attendance levels of each of the arenas in his sample and calculated the ratio of population and EBI within 25 miles of each event. (*Id.*) He found that, when he applied the average ratio to Prescott Valley's population and EBI, he arrived at event and attendance levels that were much lower than the projections in the OS. (*Id.* at 18.) Rhoda then performed a penetration analysis comparing the actual revenue and NOI levels of the arenas in his sample to their respective populations and EBIs. (*Id.* at 19.) He applied the average ratio he gleaned from that analysis to the population and EBI of Prescott Valley and again found that the revenue and NOI figures were lower than those projected in the OS. (*Id.* at 20.)

The Underwriters set forth a number of criticisms of Rhoda's report. They point out that Rhoda's methodology was not scientifically supported or peer-reviewed. (Doc. 678-4 (Rhoda Dep.) at 35:22–36:7.) They submit the declaration of their own expert, Jeffrey Dubin, who explains that Rhoda's penetration analysis is also known as a "ratio estimator" in statistical terms, and that it is valid only when there is a relationship between the variables (i.e., attendance and events versus population and income). (Doc. 678-1 at ¶ 27.) Dubin declared that there was no evidence of any correlation between the variables in Rhoda's penetration analyses. (*Id.*) Dubin also took the average ratios derived from Rhoda's penetration analyses and applied them to the arenas and event centers used in Rhoda's sample and found that those ratios did not accurately predict attendance. (*Id.* at ¶ 19.) The Underwriters highlight more flaws in Rhoda's report, including that it confuses the dependent and independent factors, that the samples he used were not comparable to the Prescott Valley Event Center, that his sampling method was

unreliable, that his methodology results in a high rate of error, and more. (Doc. 679 at 11–13.)

The Underwriters point out that Rhoda's methodology is supported by no objective studies or evidence other than Rhoda's own bare assertion that his research was supported by "extensive industry experience." (Doc. 799-2 at ¶ B-5.) Plaintiffs spend the majority of their Response brief arguing weaknesses in the expert declaration proffered by the Underwriters instead of attempting to meet their burden of proving Rhoda's reliability.[14] Nevertheless, the Court does not find that Rhoda's methodology is so unsound that it has no reliable foundation. The majority of the Underwriters' complaints, including that Rhoda's ratio estimator technique is unsound because of the lack of correlation between variables, goes to the weight of the evidence, and "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. Moreover, some of the Underwriters' criticisms pertain to factors that do not apply in every case, like the lack of peer review or scientific studies. Because Rhoda's analysis is commercial rather than scientific, those factors are not good indicators of the reliability of his methodology.

Although Plaintiffs were unable to muster any external objective evidence supporting Rhoda's methodology other than his own assurances, Rhoda's report thoroughly explains the calculations he used to obtain his comparisons, and the explanations are not so illogical as to warrant exclusion. In addition, there is no dispute that Rhoda possesses extensive experience in sports industry consultation and conducting feasibility studies. (Doc. 799-1 at 1–2.) Further, the Court gives some weight to Plaintiffs' argument that Rhoda's calculations were not made for the purpose of showing

---

[14] Plaintiffs' Response is also rife with assertions that are not supported by their citations. (*See, e.g.*, Doc. 798 at 13 (assertion that Rhoda's analysis did not rely solely on population and income citing to Doc. 798-2 at B-1, where Rhoda states only that "utilizing demographic variables such as population and household income levels . . . is a standard practice in the feasibility industry")).

direct correlation but rather to demonstrate how anomalous the projections in the OS were. (*See* Doc. 798 at 10.) Indeed, even with the multiple flaws pointed out by the Underwriters, the data shows that the projections for the Event Center in Prescott Valley were dramatically higher than the projections and actual figures for other locations. Thus, the Underwriters' Motion in Limine to Exclude the Report and Testimony of William Rhoda (Doc. 679) is denied.

### ii.    Rational Basis for Belief in Projections

Plaintiffs argue that "the evidence that the projections in the OS were published without disclosing the material demographic facts in the 2005 Report is undisputed or the radically different projections in the 2001 Report, all of it undermined the projections in the OS [sic]." (Doc. 886-1 at 27–28.)

The Underwriters argue that Plaintiffs have no evidence that they were even aware of the 2001 Report. They point to the deposition of Samir Dube, the primary investment banker from Stern who worked on the Bond Offering, in which he states that he was not aware of the 2001 feasibility study. (Doc. 688-4 (Dube Dep.) at 115:9–11 (Dube testifying that he was not aware of any feasibility study prepared for the town of Prescott, which the 2001 Report was).) Indeed, Plaintiffs' Response consists of a bare assertion that all Defendants knew of the 2001 Report, without elaboration or citation. The lack of evidence that the Underwriters even knew about the existence of the 2001 Report prevents Plaintiffs from using it as evidence undermining the reasonableness of the Underwriters' belief in the OS projections.

The Underwriters acknowledge that they were aware of the 2005 Report, but contend that it did not contain any information that contradicted the projections in the OS, and thus could not affect the reasonableness of their belief in those projections. First, they address Plaintiffs' complaint that the OS assumed more yearly events than the final 2005 Report. The 2005 ERA Report noted the possibility that the Event Center could generate revenue from non-ticketed events such as meetings and banquets, but chose not to consider them in generating its analysis. (Doc. 702-7 (Cohen Dep.) at 348:18–349:22.)

The Underwriters assert that the additional 30 events projected in the OS over the original 103 events projected in the final 2005 Report accounted for the non-ticketed events that ERA left out. (Doc. 702-87 (operating pro-forma for the Event Center dated August 25, 2005, predicting 30 events from meeting or convention space events).) They further assert that they only projected such events to generate a total of $5,000 in revenue, an amount that cannot be said to "seriously undermine" the projections in the OS for lack of inclusion in the final 2005 Report. (*Id.* (showing the total predicted revenue from the meeting and convention space events to be $5,000).)

Additionally, the Underwriters point to the fact that Stern's investment banker, Dube, compared the final 2005 Report to the projections in the OS. (Doc. 688-22 (Dube Decl.) at ¶ 16(c)(2).) When he noticed differences, he raised them to Global and/or Tom Hocking, and satisfied himself that any differences were reasonable. (*Id.*) Dube focused particularly on the OS projection for net operating income ("NOI"), as this was part of the revenue pledged to repay Bondholders. (*Id.*) He found that the NOI projection in the OS was lower than the NOI projection in the final Report, and was thus satisfied that the OS projection was reasonable. (*Id.*) Similarly, he found that the combined projections for NOI, Town contribution, arena TPT, and Entertainment TPT for the first three years in the OS were lower than the combined projection in the final ERA Report. (*Id.*) Moreover the differences upon comparison of subsequent years were de minimis. (*Id.*) Thus, Dube was satisfied that the projections in the OS were reasonable.

In Response, Plaintiffs cite to Rhoda's CSL Report, which noted significant differences between the 2005 ERA Report and the OS projections. For example, the OS projected annual attendance of 479,750, a number 49% higher than the ERA's projection of 321,170 in annual attendance. (Doc. 809-19 at 4.) The OS also predicted an increased number of annual event days, 164 to the 2005 Report's 103. (*Id.*) Though the number of event days increased, the OS's projection of expenses were decreased from those predicted in the OS. (*Id.* at 5.) CSL observed that the OS projections "had a lower overall net operating income as compared to the ERA report," but cautioned that this did not

mean "that the offering statement projections were conservative." (*Id.*) The Underwriters' awareness of these figures in the 2005 Report and the substantial difference between them and the figures in the OS are sufficient to allow a reasonable juror to find that the Underwriters could not have reasonably believed the accuracy of the projections in the OS.

The latter two sections of Rhoda's report also raise an issue as to the reasonableness of the projections in the OS generally. Though Plaintiffs do not summon any evidence that the Underwriters were aware of the other feasibility studies and actual operating results for other event arenas around the country, the fact that other regions with higher population and income demographics than Prescott Valley predicted and actualized lower event and attendance numbers than those set out in the OS raises an issue as to whether the OS projections were reasonable. When compared to other feasibility studies, the revenue projections set out in the OS are 2.5 times greater than the demographics of the market would support, as determine by analyzing eight other studies. (Doc. 809-19 at 16.) When compared to actual operating results, the OS revenue projections are approximately 3.8 to 4.3 times greater than the demographics supportable by the market, and the net operating income projections are 9 to 10 times higher. (*Id.* at 22.) These figures raise factual questions as to the reasonableness of the Underwriters' belief that the numbers in the OS were accurate.

Plaintiffs have thus raised a genuine issue of material fact as to whether the 2005 Report undermined the reasonableness of the Underwriters' belief in the projections in the OS. The differences raised by Plaintiffs' expert in the CSL report go beyond the differences accounted for by the Underwriters in moving for summary judgment. Moreover, the Underwriters' knowledge of the 2005 Report serves as a sufficient counterweight to the evidence of their due diligence. Though the Underwriters assert that they are entitled to summary judgment as long as they have "*a* rational basis" for their belief, Plaintiffs' showing of the differing figures in the 2005 Report from the figures in the OS contradicts the Underwriters' claim of a rational belief. Though the Underwriters'

evidence of performing due diligence is uncontroverted, it does not support a conclusive finding that the Underwriters' belief was rational when combined with their simultaneous knowledge of the significantly different numbers in the 2005 Report. A jury could find that the final 2005 Report seriously undermined the projections in the OS due to the differences in annual attendance, annual event days, and Event Center expenses. It could thus find that the existence of the 2005 Report made it impossible for the Underwriters to rationally believe that the OS projections were accurate, in spite of their due diligence. It could also use the comparable information from other feasibility studies and actual operating results of other event centers to find that the Underwriters were unreasonable in finding no issue with the OS projections. Thus, the Underwriters' Motion for Summary Judgment on this ground is denied, and also denied as to the other Defendants who joined the Underwriters' Motion.

### b.    Defects in the Bond Documents

The OS describes the security for the Bonds as follows:

> The principal of, redemption premium, if any, and interest on the Bonds are secured equally and ratably by a first lien upon and pledge of the Pledged Revenues, which include: (a) all Net Operating Income, (b) all TPT Revenues received by the Trustee under the Assignment or the Deposit Only Account Agreement, and (c) all moneys on deposit in the Funds and Accounts established under the Indenture.

(Doc. 809-53 at 8.) Kutak contends this statement accurately describes the security for the Bonds. Thus, it asserts that it cannot be held liable for an omission or misstatement in the OS regarding the Bond Documents because the Bond Documents were not defective. In opposition, Plaintiffs contend that the Bond Documents are defective for a number of reasons, which are discussed individually below.

### i.    Lien on Net Operating Income

Kutak contends that it is entitled to summary judgment because the documents it drafted successfully grant a first lien on net operating income ("NOI") generated by the Event Center to the Trustee on behalf of the Bondholders. (Doc. 783 at 22.) It cites to the

Trust Indenture, in which "the Issuer hereby assigns, transfers, sets over and pledges to the Trustee and grants a lien on all of the right, title and interest of the Issuer in and to the Pledged Revenues . . ." (Doc. 752-36 (Trust Indenture) at 2.) "Pledged Revenues" are subsequently defined as "all Net Operating Income," along with other moneys. (*Id.* at 15.) The Indenture further states that "[t]he Pledged Revenues shall immediately be subject to the lien and pledge of this Indenture without any physical delivery thereof or further act." (*Id.* at § 6.1.) Kutak additionally cites to the Loan Agreement, in which the Borrower agreed to the Issuer's grant of the pledge and lien to the Trustee. (Doc. 752-44 (Loan Agreement) at § 8.8.) The Borrower further agreed to perform all of the Issuer's obligations under the Indenture and promised not to let another other lien or charge encumber the Pledged Revenues. (*Id.* at §§ 8.9, 8.13.) In Response, Plaintiffs argue that the defect was not Kutak's failure to draft a lien on the NOI, but rather its failure to ensure that the Trustee's interest in the NOI was perfected. (Doc. 886-1 at 69.) Without perfection, they argue, the Trustee's interest in the NOI and other revenues cannot accurately be described as a "first" lien but is rather an unsecured security interest.[15] They cite to multiple provisions of Arizona's adoption of the UCC that require particular actions to be taken in order to perfect an interest in specific types of property. For example, a security interest in money may only be perfected by taking possession. A.R.S. § 47-9312(B)(3). Plaintiffs point to § 5.2 of the Loan Agreement, which requires the Borrower to pay available funds to the Trustee "on or before any Interest Payment Date for the Bonds." (Doc. 752-44 at § 5.2; *see also* Doc. 809-254 (Slade Decl.) at ¶ 10(b).) Thus, Plaintiffs argue, the Trustee may not have a perfected security interest in the funds paid by the Borrower until the day a debt service payment is due, giving it insufficient time to make payments to the Bondholders in time. (Doc. 886-1 at 69.) Plaintiffs further

---

[15] "The term, 'first lien,' is a legal term of art meaning a lien which takes priority or precedence over other charges or encumbrances upon the same piece of property and which must be satisfied before such other charges are entitled to participate in the proceeds of the property's sale." *Gibson v. Resolution Trust Corp.*, 51 F.3d 1016, 1026 (11th Cir. 1995) (quoting Black's Law Dictionary (6th ed. 1990)).

cite to other sections of the UCC which would require a control agreement to perfect a security interest in a deposit account or a written assignment of contracts to protect the Trustee in the event that future payment rights were assigned to a third party. (*Id.* at 70–71.)

Kutak points to A.R.S. § 47-9109(D)(14), which defines the scope of Arizona's statutory adoption of the UCC and provides that it does not apply to "[a] transfer, pledge, assignment, grant or similar action by this state, another state or a governmental unit of this state or another state." The Issuer in this case, the Yavapai Industrial Development Authority, is a political subdivision formed as a corporation under A.R.S. § 35-701 *et seq.* Thus, the Industrial Authority and its transactions in connection with the Bonds are exempt from the requirements of Arizona's UCC. (Doc. 922 at 17.) Plaintiffs respond that, because the Borrower was involved and the Borrower is not a public body, the exemption set out in § 47-9109 does not apply. (Doc. 886-1 at 71.) It is true that the Borrower plays a role in the structure of the transaction, in that it is the entity that remits the pledged NOI payments to the Trustee. However, this is because the Issuer, who originally loaned the Bond proceeds to the Borrower and had the right to obtain repayment from the Borrower, granted the Trustee a lien over its interest in and right to repayment. Indeed, in the Loan Agreement between the Borrower and the Issuer, the Borrower expressly consented to the Issuer's pledge and lien to the Trustee. It is uncontested that the Issuer is a governmental unit of the state, and its action of granting the Trustee a lien is perfectly encompassed by the language of § 47-9109(D)(14). Thus, the Borrower's consent in the Loan Agreement is not a transaction that requires perfection under Arizona's UCC provisions. The lien is the transaction that requires perfection, and the grant of the lien took place only between the Issuer and the Trustee. Thus, Plaintiffs' arguments that Kutak failed to ensure the lien on the NOI complied with the perfection requirements of the UCC are unavailing. The Bond Documents are not defective for failing to comply with statutes that do not apply to it.

Plaintiffs cite to a number of cases where courts declined to apply the government exemption in Article 9 because the government was the grantor rather than the debtor in the transaction. (Doc. 886-1 at 71.) However, as pointed out by Kutak, these cases relied on a UCC comment that has since been replaced. *See In re Altek Sys., Inc.*, 14 B.R. 144, 149 (Bankr. N.D. Ill. 1981) (citing to Comment N.5 of the UCC); *In re Brazier Forest Products, Inc.*, 106 Wash. 2d 588, 598 n.2, 724 P.2d 970, 976 n.2 (Wash. 1986) (also citing to Official Comment 5). Moreover, the logic of that comment is expressly rejected by the language of Arizona's government exemption, which states that Article 9 does not apply to transfers, pledges, and similar actions *by this state or governmental unit of this state*. The cases set forth by Plaintiffs are inapposite. Plaintiffs have failed to show that Kutak's drafting of the Bond Documents resulted in a flawed lien over the NOI in favor of the Bondholders. Thus, Plaintiffs have not demonstrated a genuine issue of material fact that the OS was misleading or omitted material information on this ground.[16]

### ii.   Trustee's Ability to Obtain Financial Information

Kutak also asserts that it is entitled to summary judgment on Plaintiffs' claims that Kutak failed to ensure the Trustee would have a method of obtaining information on whether NOI would be sufficient to pay debt service. (Doc. 783 at 24.) Plaintiffs' theory is that the OS provides only two sources of repayment on the Bonds, NOI and TPT Revenues, and that without financial information, "the Trustee has no practical means of knowing whether or not there will be sufficient [NOI] to pay debt service on the Bonds . . . with no lead time for the Trustee to respond to non-payment [of TPT Revenues to make up for the shortfall]." (Doc. 466 at ¶ 258–59.) Thus, Plaintiffs argue, the OS failed to

---

[16] Plaintiffs raised, for the first time at oral argument, the theory that perfection was not required for the Issuer's grant of the lien to the Trustee, but rather the Borrower's promise to repay the Issuer as set out in the Loan Agreement. Plaintiffs argued that the problem was that the Issuer's interest in repayment from the Borrower was not perfected, and thus it could not grant the Trustee a perfected security interest in the Indenture of Trust. Plaintiffs cited no case law for this proposition at oral argument, and the Court is disinclined to entertain theories that were not properly raised in the briefings. *Aloe Vera of Am., Inc. v. United States*, No. CV99-1794PHXJAT, 2002 WL 1484463 at *6 n.7 (D. Ariz. May 10, 2002).

disclose that difficulties may arise in the Trustee's collection of TPT Revenues, leading to possible non-payments of debt service.

Kutak first points to evidence that the Wells Fargo employee in charge of administering its duties as trustee, Nancy Eatros, testified that she didn't need any financial information to perform the tasks necessary for the Trustee to collect funds under the Indenture. (Doc. 752-16 (Eatros Dep.) at 272:14–273:9.) Eatros also testified that, even if she received financial statements, she did not review them. (*Id.*) This greatly undermines the Plaintiffs' contention that the Trustee's inability to gather financial information rendered the Bond Documents defective.

Moreover, Kutak contends that the Bond Documents provided adequate methods for the Trustee to obtain the necessary financial information. The Loan Agreement gives the Issuer and Trustee the right "at all reasonable times" to examine and copy the Borrower's books and records regarding the financial performance of the Event Center. (Doc. 752-44 at § 8.1). It further requires the Borrower to deliver its financial reports to the Issuer and Trustee on an annual basis, as well as whenever requested by the Issuer or Trustee. (*Id.* at § 8.2.) The Borrower is required to deliver the reports "as soon as practicable," and in no event may it exceed 120 days for delivery. (*Id.*) In addition, Global is required to prepare and submit to the Borrower monthly financial reports, as well as a yearly line item budget. (Doc. 752-47 (Management Agreement) at § 8.1.) Kutak argues that, because of the above examination and request provisions, the Trustee is thus able to avail itself of the necessary financial information at any time.

In Response, Plaintiffs submit a Declaration from Wells Fargo's vice president, stating that there was no mechanism in place for the Trustee to receive actual operating results from the Event Center. (Doc. 809-254 (Slade Decl.) at ¶ 10(a).) The Declaration further states that the Trustee is unqualified to examine the Borrower's books to determine the financial results under GAAP, that such a mechanism is not part of the Trustee's duties anyway, and that it would be impractical to require the Trustee to do this. (*Id.* at ¶ 8.) Even if the Court accepts the second assertion from the Declaration to be true,

Slade's first assertion that no mechanism was in place is flatly contradicted by the evidence. As set forth by Kutak above, the Loan Agreement required the Borrower to submit its financial reports on a yearly basis. Plaintiffs contend that the yearly report is insufficient for the Trustee because it is required to make debt service payments twice a year, in April in October. However, the same provision of the Loan Agreement requires the Borrower to disclose financial information *whenever the Trustee requests it*. Thus, there is a mechanism in place for the Trustee to receive actual operating results from the Event Center. To the extent the Slade Declaration asserts otherwise, it is conclusory, self-serving, and unsupported by any evidence in the record, and thus insufficient to create a genuine issue of material fact. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Thornhill Pub. Co. v. General Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### iii.    The Fain Escrow Account

Kutak contends that it is entitled to summary judgment on claims that the Bond Documents were defective for reasons relating to the Fain Escrow Account. (Doc. 783 at 25.) Kutak sets forth evidence that the Fain Escrow Account was included in the definition of "Pledged Revenues" under the Indenture Agreement and thus that the Trustee has adequate access to it. (Doc. 752-36 at §§ 6.2, 6.12(b), 7.1.) In Response, Plaintiffs assert that the problem with the Fain Escrow Account is not whether it was included in the definition of "Pledged Revenues" but rather what party was to hold the Account. It points to the Development Agreement, which required the Town to pay amounts to the Fain Escrow Account, which was to be held in the Town's name. (Doc. 809-24 at § 4.1.4.) The problem arose in the Indenture, the final version of which provided that the Fain Escrow Account would be held by the Trustee. (Doc. 809-87 at § 6.12(c).) Plaintiffs contend that this inconsistency caused the Town to refuse to turn over the Fain Escrow proceeds. (Doc. 809-254 (Slade Decl.) at ¶ 10(c).) Thus, they argue, the OS was misleading in that it omitted these discrepancies which could lead to obstacles collecting the TPT Revenues, which in turn could lead to nonpayment of debt service.

1    Kutak does not apparently contest the existence of this inconsistency, but asserts

2  that its draft of the Indenture maintained the provisions and intent of the Development

3  Agreement regarding the Fain Escrow Account. (Doc. 922 at 19.) It asserts that because

4  the funds in the Account "were always pledged as security for the bonds," the Trustee

5  must hold that Account in trust for the Bondholders. (*Id.*) Kutak's interpretation of who

6  must hold the Fain Escrow Account does not entitle it to summary judgment on this

7  portion of Plaintiffs' (A)(2) claim. The inconsistency between the Development

8  Agreement and the Indenture is apparent on the face of the documents. In addition,

9  Plaintiffs have submitted evidence that this inconsistency caused concrete problems for

10  the Bondholders when the Town refused to turn over the Escrow proceeds. At a

11  minimum, there is a genuine issue of fact as to whether the failure of the OS to disclose

12  this inconsistency and any subsequent problems that arose with payment of the Escrow

13  proceeds constituted a misstatement or omission under § 44-1991(A)(2).

### iv.    Deposit-Only Account Agreement

15    The Deposit-Only Account Agreement ("DOAA") is an agreement by which

16  Comerica Bank opened an Account into which TPT Revenues would be deposited for the

17  Trustee's use. Kutak contends that it is entitled to summary judgment on Plaintiffs'

18  claims that no mechanism addressed Fitch's concern that sales taxes from the Event

19  Center be remitted directly to the Trustee from the Town with no intercept from the

20  Borrower. (Doc. 786 at 26.) Kutak points to testimony from Jose Hernandez, the Fitch

21  analyst in charge of reviewing the Bond offering, who concluded that there were

22  "adequate legal provisions in place" in the Bond Documents. (Doc. 752-40 (Hernandez

23  Dep.) at 143:18–144:12.) He further testified that Fitch determined that there were

24  procedures and agreements in place to effectuate the deposit of the sales taxes. (*Id* at

25  146:7–147:5.) Plaintiffs do not contest this showing in their Response; thus, Kutak's

26  Motion for Summary Judgment on Plaintiffs' (A)(2) claims is granted on this ground.

27    Kutak further argues that it is entitled to summary judgment on Plaintiffs' claim

28  that the TPT Revenues from the Event Center are not required to be deposited in the

Revenue Account. Kutak points to the Indenture, which requires the Trustee to immediately deposit into the Revenue Fund all TPT Revenues pursuant to § 6.12, as well as "any other payments or amounts required or otherwise specified." (Doc. 752-36 at § 6.3.) In addition, the DOAA requires monthly transfers of TPT Revenues from the Event Center to the Trustee for deposit in the Revenue Account. (Doc. 752-30 at 2.) Again, Plaintiffs do not contest Kutak's showing in their Response. Kutak's Motion is therefore also granted on Plaintiffs' (A)(2) claims on this ground.

### v.    The Town's Budgeting Process

A major point of contention for the Plaintiffs is the fact that the Bond Documents failed to provide a mechanism by which the Trustee could ensure that the Town would pay the pledged TPT Revenues while still complying with its annual budgetary requirements. According to the Plaintiffs, the OS is misleading in this regard because it simply states that the Town will pay any deficiencies in debt service with TPT Revenues, without disclosing that the pledge is subject to compliance with the Town's budget requirements and procedure. (Doc. 886-1 at ¶ 282.) In September 2007, when it became apparent that the Trustee would need TPT Revenues to cover the October 2008 debt service payment, the Trustee sent an invoice to the Town for the shortfall. The Town responded that it could not allot those TPT Revenues to the Trustee because it had not budgeted to set aside that money for debt service payments that year. Plaintiffs contend that it was Kutak's responsibility to draft the Bond Documents in a way that would have prevented this from occurring.

The securities laws require disclosure only of information that is not otherwise in the public domain. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004); *Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995); In re *Textainer P'ship Sec. Litig.*, No. C-05-0969 MMC, 2005 WL 3801596 at *6 (N.D. Cal. Dec. 12, 2005). Thus, "[s]ellers of securities need not 'disclose' the statutes at large of the states in which they operate." *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1323 (7th Cir. 1988). Kutak asserts that, as a matter of law, it is not required to disclose

state statutes, and thus it cannot be held liable for its failure to discuss the Arizona state budgetary law in drafting the Bond Documents.

Moreover, Kutak submits evidence that the Trustee's inability to work in tandem with the Town's budgeting process was the result of the Trustee's own shortcomings rather than defects in the Bond Documents. The Trustee's own expert, Jeffrey Powell, admitted at his deposition that under a common-sense understanding of the Bond Documents, the Trustee's invoice on September 20, 2007 for TPT Revenues to cover the debt service payment due on October 1, 2007 was not timely. (Doc. 752-38 (Powell Dep.) at 173:21–174:21 (acknowledging that Wells Fargo was required to transfer any funds necessary to cover a shortfall in the debt service payments 15 days before the payment due date, so the request for funds to cover the shortfall should have, at a minimum, taken place before September 15, 2007).) Kutak also points to multiple points in Eatros's testimony where she admitted that she either did not set ticklers to monitor funds coming in so she could anticipate any need for TPT Revenues to cover a shortfall, or she set ticklers that failed to give her warning in advance of the time that she would need to take action. (Doc. 752-16 (Eatros Dep.) at 212:5–19, 234:11–235:11, 237:12–239:21, 262:11–265:3, 278:20–279:5, 310:21–25.) The Trustee's expert also testified that it was industry practice and Eatros's duty to review the Bond Documents and ensure that there was clarity and consistency regarding timing, dates, and amounts. (Doc. 752-38 at 79:16–80:13.)

Plaintiffs argue, in Response, that they do not assert that Kutak had a duty to disclose Arizona state budgeting laws but rather "to ensure the Town's budgeting process and procedure . . . was disclosed in a manner that would permit the Trustee to make certification . . .  that would actually be enforceable against the Town." (Doc. 886-1 at 88.) Because the Town's budgeting process and procedure are set out in the Arizona state budgeting laws, however, the Court is not persuaded by the distinction.[17] The evidence

---

[17] Plaintiffs make no argument that the Town's budgetary process and procedure are not set out in the Arizona statutes.

does not show that the Bond Documents failed to provide the Trustee with mechanisms to make certifications that would be enforceable on the Town. The Town's budgetary procedures allow for payments of TPT Revenues to be made to cover shortfalls when they are given adequate notice and certification by the Trustee. The Trustee need only comply with the certification requirement, as set out in the Bond Documents, and the Town's budgeting process, as set out in the Arizona Revised Statutes, to successfully request and obtain TPT Revenues. The certification requirement was not "undisclosed," as it was delineated in § 6.12 of the Trust Indenture, which Eatros signed on behalf of the Trustee. The fact that the Bond Documents work is evidenced by the fact that the Town has timely made every single TPT Revenue payment since the first October 2007 incident.[18]

Plaintiffs' claims that the Bond Documents did not create a mechanism that would allow it to obtain the information necessary to timely make a certification on the Town are unfounded. Plaintiffs' arguments boil down to the claim that Kutak should have disclosed Arizona budgetary laws, but this is not the kind of information required to be disclosed under the securities statutory scheme. The fact that the Trustee had trouble collecting the first TPT Revenue payment appears to be the result of the Trustee's own failure to monitor the situation, and Plaintiffs do nothing to rebut the evidentiary showing put forth by Kutak. Thus, summary judgment is granted on Plaintiffs' (A)(2) claims based on Kutak's alleged failure to disclose or implement the Town's budgetary process and procedure.

/ / /

/ / /

---

[18] Plaintiffs assert that the only reason the Town has made payments thus far is because of current litigation. (Doc. 886-1 at 90.) Plaintiffs claim that the Town has "consistently reserved its right to require the Trustee to make certification with audited financial statements for PVEC." (*Id.*) However, as discussed throughout this section, the requirement that the Trustee make certification is neither inconsistent with the Bond Documents nor an unworkable defect. The fact that the Town reserves its right to require this certification is not evidence that the Town will cease making payments once this litigation is over unless there is an absence of such certification.

### vi.   The Trustee's Remedies

Kutak claims that it is entitled to summary judgment on Plaintiffs' claims that the Bond Documents are defective because the Trustee's remedies are available only upon accelerating the Bonds, but the Indenture prohibits the Trustee from acceleration. (Doc. 783 at 33.) Kutak cites to the language of the Indenture, which in fact gives the Trustee broad permission to exercise remedies in the event of a default and does not require acceleration for those remedies to be available. (Doc. 752-44 at § 10.2.) Plaintiffs do not contest this showing in their Response, as a result, Kutak's Motion is granted on this claim.

### vii.   The Lockbox Account

Under the Development Agreement, the Town is required to pay amounts to Fain into a Lockbox Account. (Doc. 809-24 at § 4.1.4.) Kutak asserts that it is entitled to summary judgment on Plaintiffs' claim that Kutak failed to create a Lockbox Account. (Doc. 783 at 32.) Plaintiffs contend that the OS's failure to disclose the absence of a Lockbox Account was an omission concealing "critical defects in the underlying bond documents." (Doc. 464 at ¶ 239.) Kutak asserts that the obligation to create a Lockbox Account was imposed by the Development Agreement, which predated Kutak's involvement in the Bond financing. Kutak cites to the opinion of its expert, Monty Humble, who states that the Development Agreement was negotiated by other sophisticated parties without Kutak's involvement and it was reasonable for Kutak to assume those parties had reviewed the various documents and were satisfied that they could perform their obligations under those agreements. (Doc. 752-11 (Humble Report) at ¶ 77.)

In Response, Plaintiffs point to evidence tending to show that, in fact, it was Kutak's responsibility to ensure that the Development Agreement cohered with the other Bond Documents. For example, Stern's expert, Martha Haines, opined that Stern was entitled to rely on Kutak to ensure that the Bond Documents worked with the Development Agreement. (Doc. 809-55 (Haines Report) at 23.) Similarly, Batenhorst of

Stinson testified that he looked to Kutak and the Borrower to make sure the Bond Documents worked with one another. (Doc. 809-212 (Batenhorst Dep.) at 75:1–9.) Kutak's own expert, Monty Humble, testified at his deposition that Kutak would have wanted to ensure that the Indenture would "work mechanically" with the Development Agreement, though he said Kutak could rely on the other parties to make sure that Kutak got it right. (Doc. 809-232 (Humble Dep.) at 51:4–52:21, 54:20–55:21.) Plaintiffs have thus set forth sufficient evidence to create a genuine issue of material fact that it was Kutak's responsibility to ensure that the Development Agreement worked with the rest of the Bond Documents, including ensuring that a Lockbox Account was created. Kutak's Motion for Summary Judgment on this ground is denied.

### c.      A.R.S. § 44-2001(B) Affirmative Defense

Section 44-2001(B) states that "[a] person against whom an action for a violation of § 44-1991 is brought is not liable . . . if the person sustains the burden of proof that the person did not know and in the exercise of reasonable care could not have known of the untrue statement or misleading omission." The Underwriters assert that they are entitled to this affirmative defense for the Plaintiffs' claims regarding defects in the Bond documents. Kutak asserts that it is entitled to the defense for the claims involving misleading projections and omission of the previous feasibility studies. (Doc. 783 at 37.) The Hocking Defendants also assert that they are entitled to the good faith defense under § 44-2001(B) without specifying which claims. (Doc. 718 at 10.)

The Underwriters set forth evidence that they performed adequate due diligence in connection with the Bond Documents. (Doc. 701 at 33 n.33.) For example, Samir Dube, the primary Stern representative working on the deal, declared that he reviewed all drafts of the POS and OS, the Trust Indenture, and various other documents, including the Development Agreement and Town Council records relating to the Town's approval of its commitments to the deal. (Doc. 688-22 (Dube Decl.) at ¶ 16(d).) He also provided comments on many of the Bond Documents. (*See* Docs. 688-29 (email to Pat Ray of Kutak commenting on consistency of cash flows with pledge); 688-30 (email to Ray

commenting on pledged revenues section of the POS); 688-31 (email to Hocking requesting updated information for investors); 688-50 (email to Hocking containing multiple comments on the POS).) Dube also participated in conference calls with the other parties concerning the transaction, provided comments orally and in writing on the Bond Documents, and actively pursued more information and asked questions on the information contained in the Documents. (Doc. 688-22 at ¶ 17.) Stern also hired separate counsel, Stinson, to review the OS, Trust Indenture, and other Bond Documents. (*Id.*) In addition, two other Stern employees besides Dube reviewed the Bond Docs (Smith and Gresham). (*Id.* at ¶ 16(d).) Gresham testified that he spent several hours reviewing the final POS, and that he read every single page of the document. (*Id.* at 72:9–73:12.)

Baird's representative Drew Kanyer also reviewed the POS to gain an understanding of the general structure of the deal and the basic tenets of the transaction. (Doc. 688-12 (Kanyer Dep.) at 30:8–30:23.) Similarly, Mary Piontek testified on behalf of Edward Jones that Jones' review process would have included a detailed review of the Rating Report and the OS, with a particular focus on the TPT Revenues. (Doc. 688:15 (Piontek Dep.) at 30:4–22.) She further testified that multiple departments would have provided input on the review process. (*Id.*) Joe Riley, an analyst for Jones, also testified that he performed credit due diligence on the Bonds, including reviewing the Rating Report and potentially the POS. (Doc. 688-17 at 56:16–24.) He stated that he remembered reviewing the Fitch Report with an emphasis on the stress testing conducted by Fitch. (*Id.* at 40:14–41:22.) Though he cannot clearly remember whether he read the POS, his typical practice was to read offering circulars or prospectuses with a focus on the financials, in addition to running his own numbers on the debt service coverage. (*Id.* at 58:23–29:20.) Stina Wishman, another representative for Jones, testified that she reviewed the POS and formed a reasonable belief as to its accuracy and completeness. (Doc. 688-20 at 28:4–25.)

In addition, the Underwriters received numerous certifications and opinions of counsel from the other parties involved in the transaction, including the Borrower

(PVEC), the Trustee (Wells Fargo), Bond Counsel (Kutak), the Issuer (Yavapai Industrial Development Authority), and the Town. (Doc. 699-22 at ¶ 20.) Dube declared that the Underwriters relied on all of these and the representations within as to the accuracy of the statements in the OS. (*Id.*) The Underwriters also assert that there is no evidence that any of them were aware of the misrepresentations regarding the defects in the Bond Documents. (Doc. 704 at 33 n.33.)

The Underwriters' evidence is insufficient to establish that they are entitled to the affirmative defense under § 44-2001(B) as a matter of law. Though they set forth evidence that they performed due diligence, they do not explain why their research and review could not reasonably have led them to realize that there were problems with the Bond Documents and thus a misstatement or omission in the OS. Indeed, as discussed above, some of the defects regarding the Bond Documents were apparent from the face of the documents—e.g., the inconsistencies between the Development Agreement and the Trust Indenture. Moreover, it is insufficient for them Underwriters to simply state that there is a lack of evidence that they had knowledge of the defects in the Bond Documents—the statute imposes on the defendant the burden of demonstrating that it did not know of the misrepresentation or omission. The Underwriters have failed to meet their burden under § 44-2001(B).

Kutak contends that it did not know, and could not reasonably have known, of the misstatements or omissions in the OS regarding projections or nondisclosure of demographic facts. It sets forth evidence that Kutak's Patrick Ray never reviewed or even saw pro forma financial statements in connection with the Bond issue. (Doc. 752-5 (Ray Dep.) at 56:4-11.) He testified that he does not recall seeing the revenue projections or participating in discussions about them. (*Id.* at 160:16–171:7.) Ray also testified that Bond counsel was only responsible for ensuring the accuracy and completeness of sections in the OS for which it provided an opinion. (*Id.* at 91:34–92:13.) The opinion of Bond counsel discussed the Loan Agreement and Indenture, authorization of the Bonds, the tax exemption of the Bonds, and other topics, but never touched on the accuracy of

the financial projections. (Doc. 752-18.) Moreover, Ray testified that it was not Bond counsel's job to deal with financial projections, and that in any event neither he nor Kutak had the expertise to analyze the projections' accuracy. (Doc. 752-5 at 94:7–21, 371:11–377:5.) In addition, Kutak provided evidence that it was never aware of the 2001 or 2005 Reports—Kutak's attorney, John DeWulf, declared that when Kutak delivered its file relating to its engagement as Bond counsel, neither report was found in it, and there is no other evidence suggesting that Kutak ever possessed those reports. (Doc. 752-10 (DeWulf Decl.) at ¶¶ 2, 3, 5.)

Kutak has set forth sufficient evidence demonstrating that it did not know that the OS contained misstatements or omissions regarding the projections. Moreover, it has demonstrated that, even in the exercise of reasonable care, it would not have discovered those misstatements or omissions because the analysis of financial projections was outside the scope of its duty as Bond counsel. In Response, Plaintiffs merely state that "Defendants fail to carry this onerous burden [set out in § 44-2001(B)] for the reasons set out throughout this brief and the CSOF." (Doc. 886-1 at 96.) Plaintiffs do not cite to any particular facts to support their assertion. Nor do their arguments regarding § 44-1991 generally tend to show that Kutak knew or in the exercise of reasonable care could have found out about the misstatements or omissions in the OS regarding the projections. Plaintiffs' arguments regarding Kutak on § 44-1991 all pertain to the defects in the Bond Documents. As such, Plaintiffs have failed to overcome Kutak's showing that it is entitled to the affirmative defense set out in § 44-2001(B). Summary judgment is granted on Plaintiffs' claims against Kutak regarding the misstatements or omissions in the OS regarding projections or nondisclosure of demographic facts. Plaintiffs' claims against Kutak based on misstatements or omissions regarding Bond Document defects remain.

### d.    Loss Causation

Subsection (B) of A.R.S. § 44-1991 provides that if a defendant "proves that any portion or all of the amount recoverable under [Subsection (A)(2) of A.R.S. § 44-1991] represents an amount *other than* the depreciation in value of the subject security resulting

from the part of the prospectus or oral communication, with respect to which the liability of the person is asserted, not being true or omitting to state a material fact required to be stated or necessary to make the statement not misleading, then the amount shall not be recoverable." A.R.S. § 44-1991(B) (emphasis added). In other words, if a defendant can prove lack of loss causation for any amount of the decrease in value of the security, that amount is not recoverable. Unlike the federal cause of action, which places the burden of proof for loss causation on the plaintiff, § 44-1991(B) requires the defendant to affirmatively prove that the decrease in the security's value was caused by something other than its misrepresentation or omission.

Plaintiffs argue that, because they are seeking the remedy of rescission, the affirmative defense set out in § 44-1991(B) should not be available for Defendants. (Doc. 886-1 at 95.) They refer the Court to Allstate's Motion for Determination as a Matter of Law (Doc. 706), in which Allstate requests various rulings in connection with its election of the remedy of rescission.

Allstate argues that "[t]he remedial purpose of rescission and the statutory intent of the ASA demonstrate that the defense should not apply to claims for rescission." (Doc. 706 at 7.) It points to the language of Subsection (B), which states that the "amount recoverable" will be reduced by any amount of decrease in value shown not to be the result of a misrepresentation or omission. It argues that because rescission contemplates returning the parties to the position they were in before they entered into the contract, rather than an award of damages, it does not constitute an "amount recoverable" under the meaning of Subsection (B), and thus cannot be subject to the lack of loss causation defense. (*Id.* at 7–8.) However, as Defendants point out, the Arizona Court of Appeals expressly found in *Grand v. Nacchio* that the language "amount recoverable" in Subsection (B) does not refer exclusively to damages, noting that the "difference in language shows the legislature's intent to distinguish between a claim for damages and a claim for rescission." 214 Ariz. 9, 24, 147 P.3d 763, 778 (Ct. App. 2006). As observed by the Court of Appeals in *Grand*, if the legislature intended for the subsection to apply only

to damages, it would have used that term. *See, e.g.*, A.R.S. § 44-2082 (requiring the plaintiff to prove that the defendant caused "the loss for which the plaintiff seeks to recover *damages*"—but excepting § 44-1991(B) from its reach) (emphasis added). Thus, the "amount recoverable" language does not apply only to damages; it also applies to actions for rescission or rescissory damages. Allstate's claims that loss causation and rescission are inherently contradictory notwithstanding, the Court rejects Allstate's argument that the affirmative defense set out in Subsection (B) does not apply to Allstate's claims if it seeks rescission.

To attempt to establish their affirmative defense of lack of loss causation, Defendants rely on the lack of evidence that it caused Fitch's downgrades of its Bond rating  because, as discussed above in Section II.A, Plaintiffs failed to submit any evidence of their economic loss due to the events underlying this litigation. Fitch downgraded the Bonds twice—once in May 2008 from A- to B, and once in October 2009 from B to D. Defendants assert that neither downgrade was caused by their actions.

According to Fitch, the May 2008 downgrade was caused by three factors: (1) the Trustee's report of a payment default in October 2007, (2) declining TPT Revenues, and (3) the Event Center's inability to generate NOI. (Doc. 752-10, Ex. G.) Kutak first points out the fact that the Trustee's report of default was a false alarm. Though the Town indeed failed to make a TPT Revenue payment in time to make up for the shortfall in the October 2007 debt service payment, this occurrence did not actually constitute a "default" under the terms of the Bond Documents. (Docs. 752-10, Ex. G (Fitch press release stating that the first reason for its downgrade was Wells Fargo's report of a default); 752-16 (Eatros Dep.) at 257:16–258:19 (Eatros testifying that, in fact, the draw on the funds in October 2007 was not a default either under the Indenture or "any other document [she's] aware of"), 752-39 (Slade Dep.) at 116:7–117:12 (Slade testifying that the use of the debt service reserve fund on October 2007 was not an event of default).) Thus, the first reason for Fitch's May 2008 downgrade was not caused by Defendants but rather by the Trustee's false report of a default event.

Kutak, FSG, and PVSE all contend that second and third reasons for the May 2008 downgrade, namely, declining TPT Revenues and inability to generate NOI, were caused not by misstatements or omissions in the OS but rather "the deepest and longest recession since the Great Depression." (Doc. 783 at 40.) They cite to the report of Defendants' expert Elliott Pollack, who researched the real estate market and economic conditions in Arizona from 2004 to 2010, focusing in particular on the conditions in Yavapai County and the Town of Prescott Valley. (Doc. 703-92 (Pollack Report) at 1.) Pollack concluded that "the extent of job losses, decline in construction activity and loss of revenue experienced by Yavapai County and Prescott Valley is unprecedented." (*Id.* at 14.) He further opined that "the depth of the recession and impact on local counties and communities in Arizona was far beyond what any observers anticipated." (*Id.*)

In Response, Plaintiffs again rely on the report of their expert, Richard Carlson. (Doc. 886-2 at ¶¶ 558–580.) Carlson examined the Prescott Valley economy from 2004 to 2008 and found that its employment, retail sales, personal income, and population grew over that time period. (Doc. 809-248, Ex. 1 at 3–6.) He concluded that Prescott Valley did not suffer a recession during the years at issue, and thus that the underperformance of the Event Center was not due to a lagging economy. (*Id.* at 8.) Carlson also conducted an analysis on the reasonableness of the projections in the OS, looking at regional incomes and the percentage that would have had to be spent to reach the revenue projections set forth in the OS. (*Id.* at 7.) He concluded that the failure of the Event Center to perform up to the projections set out in the OS was due to undisclosed limitations on the personal income and spending patterns of the population of Prescott Valley. (*Id.* at 6–7.) Plaintiffs have thus set forth evidence rebutting Defendants' evidence that the first Fitch downgrade was caused by the recession rather than misrepresentations or omissions in the OS. Carlson's report creates a genuine issue of material fact as to whether the May 2008 downgrade, attributed to lack of NOI and declining TPT Revenues, was caused by risks concealed or misstated in the OS rather than by Prescott Valley's economic downturn. Defendants FSG, PVSE, and Kutak's

Motions for Summary Judgment are denied on their affirmative defense argument to the extent it pertains to loss correlating to the first Fitch downgrade.

Fain and PVSE also demonstrate that, at the time of the draw on the debt service reserve fund and subsequent downgrade of the Fitch Rating, Allstate did not consider the Bonds to be "other than temporarily impaired." (Doc. 686-X (Zinkula Dep.) at 54:11–18, 56:1–14 (Allstate monitoring analyst testifying that that as of 2008, the watchlist committee determined that "[g]iven the project is fully complete and operating and the continued growth of new taxing sources as well as the continued work with the trustee to replenish the reserve fund, the bonds are not other than temporarily impaired").) One Allstate analyst testified that prior to March 2009, Allstate made a determination that it was probable that Allstate would receive all principal and interest on the Bonds. (Doc. 686-Y (Edwards Dep.) at 134:2–8.) However, this evidence does not show that there was no issue of material fact as to whether the Bonds declined in value. Even a temporary impairment can cause the market value of a security to drop, and Allstate's determination that it would eventually be able to recover the principal and interest on the Bonds does not mean that the Bonds' market value remained stable throughout the events underlying this litigation.

With regard to the second Fitch downgrade, however, Defendants set forth uncontradicted evidence that it was caused by Allstate's actions rather than Defendants'. They cite to a Fitch press release dated October 23, 2009, stating that it was downgrading the Bonds from a 'B' rating to a 'D' due to the failure to make a payment of principal and/or interest pursuant to the contractual terms of the Bonds. (Doc. 686-V.) The press release noted that, although there were sufficient funds to make the payment, Wells Fargo missed the payment because Allstate directed it to maintain the funds for use in pursuing legal action relating to the 2005 offering. (*Id.*) Plaintiffs made no effort to rebut this showing. Thus, FSG, PVSE, and Kutak have successfully demonstrated that any loss in Bond value due to the second Fitch downgrade was not caused by their misstatements or omissions, satisfying the requirements for the affirmative defense pursuant to § 44-

1991(B).[19] Plaintiffs are thus barred from recovering any portion of their loss correlating to the second Fitch downgrade.

<strong>e.      Transaction Causation</strong>

Kutak and the Underwriters assert that they are entitled to summary judgment on Plaintiffs' ASA claims because they failed to show transaction causation.[20] (Docs. 704 at 41; 783 at 36.) Their argument regarding transaction causation relies entirely on whether Allstate and the Covin Plaintiffs relied on the OS in purchasing the Bonds. However, as discussed in the Court's other Order filed contemporaneously with this one, individual reliance is not an element of the ASA. *See Rose v. Dobras*, 128 Ariz. 209, 214, 624 P.2d 887, 892 (Ct. App. 1981). Instead, transaction causation may be proved by showing the objective materiality of the misstatement or omission. (*See* Doc. ___ at 7–12.) Defendants do not contend that the misstatements or omissions were not material. Thus, its Motion for Summary Judgment on this ground is denied.

<strong>C.      Control Person Liability</strong>

A.R.S. § 44-1999(B) attaches vicarious or secondary liability to "controlling persons" to the same extent as persons liable for a primary violations of § 44-1991. It "imposes presumptive liability for '[e]very person who, directly or indirectly controls any person liable for a violation of §§ 44-1991 or 44-1992.'" *Facciola v. Greenberg Traurig, LLP*, 781 F. Supp. 2d 913, 923 (D. Ariz. 2011) (quoting A.R.S. § 44-1999(B)). The controlling person need not have actually participated in the specific action upon which the securities violation is based. *Id.* "Like other portions of the Arizona Securities Act, this section should be 'liberally construed to effect its remedial purpose of protecting the public interest.'" *Id.* (quoting *E. Vanguard Forex Ltd. v. Arizona Corp. Comm'n*, 206 Ariz. 399, 411, 79 P.3d 86, 97 (Ct. App. 2003)).

---

[19] As with the loss causation element for 10b-5, each Defendant except PVEC joins FSG and PVSE's Motion for Summary Judgment on this ground. (*See* Docs. 763 (the Town's Joinder); 765 (Kutak's Joinder).)

[20] Hocking also joins this argument. (Doc. 718 at 10–11.)

However, A.R.S. § 44-1999 also provides a defense to a controlling person who "acted in good faith and did not directly or indirectly induce the act underlying the action." Thus, the defense is not available to a controlling person who induces a fraud while possessing a good-faith belief that he or she was not perpetrating a fraud. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1434 (9th Cir. 1995). Conversely, "mere nonparticipation in the actual fraudulent act is insufficient to establish good faith." *E. Vanguard*, 79 P.3d at 100. If this were not the case, "controlling persons could avoid liability by disregarding their duty to monitor the activities of the controlled person." *Id.* The burden of proof for the good faith defense falls on the controlling person. *Id.*

### 1.    Control Person Status

Plaintiffs assert control person claims against PVSE, FSG, Global, and Kozuback. FSG and PVSE contend that Plaintiffs cannot show that they are control persons under § 44-1999(B) on the same grounds that they assert they are not control persons under the federal securities scheme, as discussed above in Section II.B.1, *supra*. For the reasons set out above, FSG and PVSE's argument on this ground fails. Under state law as well as securities law, presumptive liability is imposed on any person with direct or indirect control, without regard for whether that person actually participated in the underlying securities violation. Thus, FSG and PVSE's Motion for Summary Judgment on the ground that they are not control persons under § 44-1999(B) is denied.

### 2.    Good Faith Defense

As stated above, an affirmative defense is available to a defendant control person if it establishes that it "acted in good faith and did not directly or indirectly induce the act underlying the action." A.R.S. § 44-1991(B). Arizona's standard for the good faith defense sets a higher bar than the federal securities scheme. It is insufficient to show only that the control person lacked scienter and that there is no evidence that it actively participated in any wrongful conduct. *E. Vanguard*. 79 P.3d at 100. Instead, the control person must establish that it "exercised due care by taking reasonable steps to maintain

1    and enforce a reasonable and proper system of supervision and internal controls." *Id.* at

2    101 (internal quotations omitted).

3            FSG and PVSE set forth the same evidence that they submitted for their good faith

4    defense under Section 20(a) of the federal Securities Exchange Act. Here, however, it is

5    insufficient to establish that they are entitled to the defense. Their evidence shows only

6    that they did not participate in the financing or the drafting of the OS, butthe Arizona

7    Court of Appeals has expressly stated that showing a lack of evidence of active

8    participation does not meet the burden for obtaining the good faith defense under A.R.S.

9    § 44-1991(B). *E. Vanguard*. 79 P.3d at 100.  FSG and PVSE have failed to demonstrate

10   that they "exercised due care" as required by *Eastern Vanguard*, and thus their Motion on

11   that ground is denied.

12           Kozuback and Global also rely on the evidence they submitted above to argue that

13   they are entitled to summary judgment on the basis of their good faith and lack of

14   effective participation. (Doc. 717 at 14–15.) As above, their evidence fails to show that

15   they did not participate in the primary violation. They further assert that Global had an

16   "ongoing system of appropriate supervision and internal controls." (Doc. 717 at 15.)

17   However, none of their evidence supports the existence of a "system" at Global—rather,

18   the evidence indicates only that Kozuback believed he reviewed all the reports prepared

19   by Global employees and Hocking. (Doc. 719-A at 113:3–114:13.) A CEO's assurances

20   that he reviews the work done by his employees and outside advisors do not amount to "a

21   reasonable and proper system of supervision and internal controls." *E. Vanguard*, 79 P.3d

22   at 101. In *Eastern Vanguard*, the Court of Appeals rejected a two-month training

23   program that was not designed with the effort to ensure that traders were adequately

24   trained to comply with securities laws. *Id.* Here, there is no training program, nor any

25   testimony from Kozuback that he or anyone at Global operated any system with the goal

26   of ensuring compliance with the securities laws. Kozuback and Global have thus failed to

27   establish that they are entitled to the good faith defense under § 44-1991(B).

28

**IV.   Common Law Claims**

    **A.   Negligent Misrepresentation**

Arizona defines the tort of negligent misrepresentation in accordance with the Restatement (Second) of Torts § 552. *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987). Under Arizona law, negligent misrepresentation occurs when a person "fails to exercise reasonable care and competence in obtaining or communicating information and thereby, in the course of his business or employment, provides false information for the guidance of others in their business transactions, causing the recipients of the information to incur damages because they justifiably relied on the false information." *PLM Tax Certificate Program 1191–92, L.P. v. Schweikert,* 216 Ariz. 47, 50, 162 P.3d 1267, 1270 (Ct. App. 2007).

Plaintiffs assert negligent misrepresentation claims against all Defendants. The only basis on which Plaintiffs may pursue these claims is based on misstatements on the OS regarding the enforceability of the lien on TPT Revenues. (*See* Doc. 212 at 69 (granting motion to dismiss on negligent misrepresentation claims based on projections).)

    **1.   Existence of a Misstatement**

The Underwriters claim that, for the reasons set out in their briefing on Plaintiffs' 10(b) and ASA claims, there is no actionable misstatement underlying the negligent misrepresentation claims. However, as discussed above in Section III.A.3.b, the OS did contain misstatements regarding the enforceability of the lien as it pertains to inconsistencies between the Development Agreement and other Bond Documents, and the Underwriters failed to show that they would not have, in the exercise of reasonable care, discovered these defects. The Underwriters' Motion for Summary Judgment on this ground is therefore denied.

/ / /

/ / /

/ / /

### 2.      Reliance

The Underwriters, FSG and PVSE, and the Hocking Defendants assert that Plaintiffs' negligent misrepresentation claims must be dismissed because of the lack of any evidence of reliance.[21] (Docs. 681 at 17; 704 at 14–15, 34; 718 at 14.)

According to the Underwriters, Michael Kobs was the portfolio manager at Allstate who decided to buy the Bonds. (Doc. 702-23 (Kobs Dep.) at 159:7–9.) Kobs does not remember reading the OS (*id.* at 158:16–20, 159:3–6), meeting with the analyst Kelly Cruse (*id.* at 158:21–24), or reading Cruse's write-up of the Bonds at the time (*id.* at 159:22–160:6). In fact, Kobs does not recall ever seeing Cruse's write-up until the day before his deposition. (*Id.*) Though Kobs is "very confident" that he would not have purchased the Bonds without first talking to Cruse (*id.* at 137:3–5), he can't remember anything Cruse said to him (*id.* at 159:16–20) or have a general memory of the conversation with her (*id.* at 136:18–20). Furthermore, he doesn't remember why he bought the Bonds, other than that they met the client's investment objectives. (*Id.* at 161:1–6.) Cruse testified that Kobs asked her to look at the Prescott Valley credit (Doc. 702-9 (Cruse Dep.) at 70:2–10) and that she was the only person at Allstate who read the POS before the purchase (*id.* at 401:19–22). She stated that she didn't give Kobs her report, but that she made it available for him to read on Allstate's system. (*Id.* at 154:18–21.) She remembers talking to Kobs and telling him that she thought the Fitch A- rating was too high, but does not remember the other details of the conversation. (*Id.* at 152:7–153:3, 154:10–12.)

In Response, Plaintiffs assert that they are entitled to a presumption of reliance because there are omissions by entities with a duty to disclose in this case. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (holding that in federal securities claims, a plaintiff may use a presumption of reliance when there is an omission of material fact by one with a duty to disclose). Plaintiffs do not explain why the federal

---

[21] Kozuback and Global (Doc. 75720) and PVEC (Doc. 758) also join the Underwriters' Motion for Summary Judgment on the negligent misrepresentation claim.

presumption of reliance ought to carry over to the Arizona common law claim of negligent misrepresentation. Moreover, Plaintiffs base their securities claims on both misstatements and omissions. The presumption of reliance "should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999). Plaintiffs have not attempted to make such a showing, and the Court's review of Plaintiffs' pleadings shows that Plaintiffs claims contain substantial allegations of both misstatements and omissions. Plaintiffs are thus not entitled to a presumption of reliance.

Nevertheless, Plaintiffs point to the content of Cruse's write-up and her post-deposition declaration. The write-up, prepared in response to a request by Kobs, recommends the Bonds for purchase (Doc. 809-177 at AL006581) and notes the sources of debt service payment, including the project's NOI and the Town's pledged TPT Revenues (*id.* at AL006582). Cruse's discussion notes the projected annual attendance of 480,000 and the 133 projected annual events. (*Id.* at AL006583.) Cruse also declared that she relied on the NOI, which she knew was dependent on projected events and attendance, in evaluating the Bonds. (Doc. 809-253 (Cruse Decl.) at ¶ 5.) She also determined that the pledged TPT Revenues were "necessary to make the deal work." (*Id.* at ¶ 6.) Finally, she declared that it was her practice to discuss her write-up with the portfolio manager when recommending a purchase. (*Id.* at ¶ 3.) Plaintiffs also point to Kobs' affidavit, in which he declared that he "always spoke to the analyst before making the purchase decision" and that he "would have had no basis upon which to make the trade" if he had not spoken with Cruse. (Doc. 809-252 (Kobs Decl.) at ¶ 3.) He further stated that it was his practice to rely on the analyst's recommendation in making any investment decision. (*Id.* at ¶ 4.)

The Underwriters argue that Allstate has failed "to produce any evidence that Kobs relied on a claimed misrepresentation in investing in the Bonds," (Doc. 914 at 21), but they are incorrect. The evidence shows that Cruse reviewed the OS and took note of misleading statements, including the statements regarding the lien over the Event

Center's NOI and the pledged TPT Revenues. Cruse discussed these observations in her write-up, which she declares she discussed with Kobs prior to the purchase. Kobs further declared it was his practice to rely on the discussion with the analyst in making a purchase. This is sufficient to create a genuine issue of material fact as to whether Kobs relied on the alleged misstatements in the OS in deciding to purchase the Bonds.

The Underwriters further assert that there is no evidence that the Covin Plaintiffs relied on the OS in making their purchases. They point to the fact that four out of the five Covin Plaintiffs testified that they never read the OS. (*See* Doc. 702-8 (Covin Dep.) at 78:3–8 (Covin testifying that he never read a prospectus or official statement regarding the Bonds)); 702-31 (Patzke Dep.) at 86:15–18, 87:25–88:3 (Patzke testifying that he never saw a prospectus or offering statement for the Bonds, and that his decision to purchase the Bonds "was not based in any way on [his] review of the offering statement)); 702-26 (Krause Dep.) at 63:25–64:11 (Krause testifying that he did not see any documents of any type regarding his decision to invest in the Bonds, and that he had never heard of the official statement of the Bonds); 702-38 (Verhulst Dep.) at 111:25–112:5 (Verhulst testifying that he didn't think he had read the OS or even received it).) Patterson was the only Plaintiff that testified that he had read the OS (Doc. 702-30 (Patterson Dep.) at 42:14–21), but in a separate declaration he stated that he relied entirely on the Bonds' investment-grade A- rating in deciding to purchase them. (Doc. 333 (Patterson Aff.).) The Covin Plaintiffs' Complaint also states that Patterson purchased the Bonds in reliance on his broker and the Fitch rating, making no reference to the OS. (Doc. 465 at 7.)

Plaintiffs, in turn, point to the declarations of each of the Covin Plaintiffs,[22] in which they declare that they relied on their brokers and/or the Fitch Rating in deciding to

---

[22] Here, the Covin Plaintiffs refer to the five named Plaintiffs in this case who initially sought to bring a class action (Covin, Patzke, Krause, Verhulst, and Patterson); they do not refer to the individual Bondholders whose claims are being pursued by Wells Fargo on their behalf. Those claims are discussed in the Order filed concurrently with this one.

purchase the Bonds. (*See* Doc. 333 (Patterson affidavit declaring that he relied entirely on the Bonds' investment-grade A- rating); 334 (Krause affidavit declaring that he relied on the recommendation of his broker and the Bonds' "safe, investment-grade A-" rating); 335 (Covin affidavit declaring that he purchased the Bonds based on his broker's recommendation and the Bonds' A- rated security rating); 336 (Verhulst affidavit declaring that he purchased the Bonds in reliance on his broker's recommendation that the Bonds were safe a safe, investment-grade A- rated security); 337 (Patzke affidavit declaring that he relied on his broker's recommendation that the Bonds represented a safe, investment-grade A- rated security).) Plaintiffs direct the Court to the reasoning for reliance and transaction causation set out in Wells Fargo's Response (Doc. 657) to the Defendant's Motion for Summary Judgment on Individual Bondholders (Doc. 644). As set out in the Order for that Motion for Summary Judgment, evidence of reliance on the Fitch Rating is sufficient to create a genuine issue of material fact as to reliance on the alleged misstatements, as there is some evidence that Fitch relied on the misstatements in giving the Bonds their A- rating. (Doc. ___ at 19–25.) However, mere reliance on a broker is insufficient to create an issue of material fact on reliance, because there is no evidence that individual brokers relied on either misstatements in the OS or the Fitch Rating. (*Id.*) Here, the Plaintiffs have submitted evidence that though the Covin Plaintiffs may have relied on their brokers, they also relied specifically on the A- rating of the Bonds, whether or not conveyed to them by their brokers. This is sufficient to create a genuine issue of material fact as to whether they relied on the misstatements in the OS. The Defendants' Motions for Summary Judgment on the Covin Plaintiffs' negligent misrepresentation claims is therefore denied.

### 3.   Statute of Limitations

The Town asserts that Plaintiffs' negligent misrepresentation claims are time-barred.[23] Under A.R.S. § 12-821.01, a plaintiff wishing to sue a public entity must file a

---

[23] Kutak also asserted a statute of limitations defense to Plaintiffs' ASA claims, but conceded at oral argument that it no longer wished to pursue it as a ground for

Notice of Claim with that entity within 180 days after the cause of action accrues. Accrual is defined as the time "when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition that caused or contributed to the damage." A.R.S. § 12-821.01(B).

The Town asserts that Allstate has already conceded that its claims based on defects in the Bond Documents accrued by October 2008, which was more than 180 days before Allstate filed its notice of claim. (Doc. 712 at 14–15.) The Town points to statements in Allstate's Response to the Town's earlier Motion for Partial Summary Judgment in which Allstate acknowledged the Town's evidence that it was aware of potential litigation "relat[ing] only to the claims arising out of the security for the Bonds (i.e., the defective pledge and lien." (Doc. 623 at 2.) However, despite the Town's claims, Allstate does not *admit* that in its Response that it already knew or reasonably should have known of its claims based on defects in the security for the Bonds by October 2008. Allstate described the Town's evidence relating to that claim as "unequivocal." (*Id.* at 1.) Though Allstate states that the Town's evidence "relates to" or "arises out of" the fact that "Allstate learned there were specific problems with disclosure regarding the security for the Bonds and the defective Bond documents in June 2005," this does not amount to a concession that Allstate's Notice of Claim was not timely. As discussed in this Court's earlier order denying the Town's Motion for Partial Summary Judgment, notice merely of the fact of injury is insufficient for accrual. A plaintiff must also have sufficient knowledge of who caused the injury. (Doc. 892 at 8.) The Town does not set forth any evidence that showing that Allstate had this knowledge. Its Motion for Summary Judgment on this ground is therefore denied.

---

summary judgment. (Doc. 945 at 108:6–12.) Thus, Kutak's Motion for Summary Judgment on this ground, to the extent it has not been withdrawn, is denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.    Loss Causation

A plaintiff in a negligent misrepresentation claim must prove loss causation and out-of-pocket damages. *Standard Chartered*, 945 P.2d at 324, 343. Kutak contends that it is entitled to summary judgment on Plaintiffs' negligent misrepresentation because Plaintiffs have failed to submit any evidence linking their loss to those misstatements in the OS regarding defects in the lien or security for the Bonds.[24] The only expert that testified on causation, Plaintiffs' Richard Carlson, linked the value of the Bonds only to the projections regarding NOI and TPT Revenues. (Doc. 809-248, Ex. 1 (Carlson Report) at 7.) Nothing in Carlson's report addressed the presence of defects in the Bond Documents that allegedly caused the Bonds to decline in value. (*See id.*)

In Plaintiffs' Response addressing causation on their negligent misrepresentation claims, they only quote case law, and do not attempt to set out or discuss any facts that would rebut Kutak's showing. (Doc. 886-1 at 128–29.) Nor do the other sections of Plaintiffs' brief in which they discuss loss causation address the failure to link any decrease in Bond value to defects in the Bond Documents instead of misleading misrepresentations. (*See, e.g.*, *id.* at 43, 94.) Though Carlson's Report did set out a calculation for measuring out-of-pocket damages, it did not relate those damages to the misrepresentations relating to the security for the Bonds; rather, it linked Plaintiffs' loss to risks of population and income that were concealed by misstatements and omissions regarding the projections in the OS. (Doc. 809-248, Ex. 1 at 8.) Summary judgment is therefore granted for lack of loss causation on Plaintiffs' negligent misrepresentation claims against Kutak and the Hocking Defendants.

### B.    Common Law Fraud

The nine elements of common law fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by and in the manner reasonably contemplated; (6)

---

[24] Kutak's argument on this ground is joined by the Hocking Defendants. (Doc. 768.)

the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. *Nielson v. Flashberg*, 101 Ariz. 335, 338–389, 419 P.2d 514, 517–18 (1966); *Peery v. Hansen*, 120 Ariz. 266, 269, 585 P.2d 574, 577 (Ct. App. 1978). Plaintiffs assert claims of common law fraud against Global, Hocking, FSG, PVSE, the Town, and PVEC.

### 1.    Representation

Under Arizona law, there are three distinct classes of fraud: misrepresentation, concealment, and nondisclosure. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 496 n.11, 38 P.3d 12, 34 n.22 (2002). A "misrepresentation" is defined as "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." Restatement (Second) of Torts § 525 cmt. b. Whereas nondisclosure requires a legal duty to disclose to be actionable, concealment involves "acts taken to conceal, mislead or otherwise deceive, even in the absence of a fiduciary duty, or other legal duty to disclose." *Id.* at 21. The Town asserts that it is entitled to summary judgment because it did not make any affirmative misrepresentations toward Allstate, it did not actively conceal any information from Allstate, and it owed Allstate no duty to disclose.

The Town asserts that there is no evidence that it made any of the statements in the OS. (Doc. 712 at 12.) The only information it provided for the OS was historical tax revenues. (Docs. 721-2 (Tarkowski Dep.) at 212:10–19 (Tarkowski testifying that Kauppi worked with developers but only to provide historical information); 721-23 (Kauppi Dep.) at 59:8–17 (Kauppi testifying that he only spoke with Cohen once or twice to provide "historical TPT numbers"), 80:23–21:11 (testifying that he does not remember discussing anything with Hocking besides historical tax collection information and that he had no involvement in projecting future sales taxes); 721-6 (Hocking Dep.) at 511:15–613:17 (Hocking testifying that he got the actual sales tax information from the Town); *see also* Doc. 464 ¶ 129 (Amended Complaint alleging that the Town provided actual tax information and FSG and Brad Fain provided projected tax information.) Plaintiffs make

no argument that this historical tax information was misleading. (Doc. 507 at 10–11.) Thus, the Town argues that it cannot be held liable because it did not make any misrepresentation to Allstate.

The Town further asserts that there is no evidence that it actively concealed any information from Allstate. (Doc. 712 at 13.) It argues that in fact, it provided some of the information Allstate alleges was concealed. It points to evidence that the ERA feasibility study was presented at a public Town Council meeting and posted on the Town's website. (Doc. 721-12 (Cohen Dep.) at 436:16–437:14, 438:1–19.) Furthermore, it is undisputed that the Development Agreement, which references the ERA study and the Town's commitments to the Bond issue, was attached as an appendix to the OS.

Finally, the Town argues that it had no duty to disclose any facts to Allstate. (Doc. 712 at 13.) It points to evidence that it never had any contact with Allstate. (Doc. 715 (Tarkowski Decl.) at ¶ 8 (Tarkowski declaring that the Town had no dealings or communications with Allstate and that it did not encourage, solicit, or persuade Allstate to purchase the Bonds). It further cites to an array of agreements to which it was a party, but in which Allstate was not involved. (*See, e.g.*, Docs. 721-11 (Development Agreement); 721-14 (Amendment to Development Agreement); 721-36 (Deposit-Only Account Agreement).) It further points to the trade tickets for Allstate's purchase of the Bonds, which shows that the Town was not a party to the transaction. (Docs. 721-43–45.) The Town thus argues that it had no legal or equitable obligation to Allstate and that it did not speak to Allstate about either the projections or Bond security terms in the OS.

In Response, Plaintiffs simply contend that "the facts support a finding of misleading representations, fraudulent concealment, and nondisclosure." (Doc. 886-1 at 109.) Plaintiffs are incorrect. Even overlooking their failure to set forth facts supporting their argument as required to rebut a prima facie showing on summary judgment, Plaintiffs' supported facts set out throughout their Response do not support such a finding. First of all, nowhere in their Response do Plaintiffs show that the Town had a

duty to disclose any information to Plaintiffs.[25] Second, though Plaintiffs set forth some facts (many not backed up by any citations to the CSOF or the record) regarding the Town's role in the transaction in their discussion of their ASA claims, those facts do not create a genuine issue of material fact that the Town either made an affirmative misrepresentation or that it actively concealed information from Plaintiffs. Plaintiffs assert that the Town "actively misled" Fitch with regard to the Town's commitment with respect to the pledge and lien of the TPT Revenues, but their assertion is not cited, and as discussed above, the evidence does not support this interpretation of the facts. Finally, none of Plaintiffs' assertions, either supported or not, contradict the Town's showing that it provided only historical, non-misleading information to be placed in the OS, and otherwise made no affirmative representations to Allstate. The Town's Motion for Summary Judgment on Allstate's common law fraud claims is thus granted.[26]

FSG and PVSE also contend that they did not make any material misrepresentation in the OS. (Doc. 681 at 16.) Their argument is identical to their argument under their 10(b) claim that they did not "make" a statement under the framework of *Janus*, which limited liability to "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). FSG and PVSE do not explain why this restrictive standard under the federal securities scheme ought to also be applied to Plaintiffs' common law fraud claims. Moreover, their evidence that they did not "make" the misleading statements fails, at least with regard to FSG. The OS expressly attributes certain projections to FSG. Specifically, Footnote 2 to Table 2 of the OS states that the figures for Projected Sales Taxes were "based on estimates of current development and future development projections provided by the

---

[25] The only section of Plaintiffs' Response that addresses the duty to disclose is in connection with their Rule 10b-5 claims, which they did not assert against the Town. (*See* Doc. 886-1 at 20.)

[26] The Town did not seek summary judgment on the common law fraud claims asserted by the other Plaintiffs, if any, so the Court does not address them.

Fain Signature Group." (Doc. 686-A (OS) at 16.) FSG does not dispute that this is the language in Footnote 2, but argues is not the type of specific 'quotation' of allegedly misleading language that constitutes 'attribution.'" (Doc. 686 at 9.) This argument is based on the *Janus* standard, however, and the Plaintiff provides no reason to impose an interpretation of an implied cause of action stemming from a federal statute on a state common law claim. The OS states that FSG contributed to a misleading projection in the OS. A reasonable juror could find that this is "conduct that amounts to an assertion not in accordance with the truth."

Conversely, PVSE argues that there is no evidence that it made any of the misleading statements in the OS. It was a Global representative who signed the OS, and unlike FSG, there are no statements in the OS expressly attributed, directly or indirectly, to PVSE. Plaintiffs respond by pointing to evidence that PVSE had the power to prevent the Global representative from signing the OS. (Doc. 809-218 (Johnson Dep.) at 46:2–47:3 (Johnson testifying that he understood that he had to obtain PVSE's authorization to sign the OS in November 2005).) This is not a claim of control person liability, however—merely exercising power over a person or entity that made a misleading statement is not "conduct that amounts to an assertion not in accordance with the truth." Thus, PVSE's Motion for Summary Judgment is granted on the ground that it did not make any affirmative misrepresentation. It did not argue that it did not actively conceal information or that it did not owe Plaintiffs a duty to disclose, so to the extent Plaintiffs pursue common law fraud claims on those grounds against PVSE, those claims remain.

Global also asserts that the OS contained no material misrepresentations, but fails to cite to any evidence to this effect. (Doc. 717 at 16.) Global's Motion on this ground is therefore denied.

### 2.      Knowledge of Falsity

"To maintain a claim for fraudulent misrepresentation, the claimant must demonstrate the speaker's knowledge of the falsity of the statement." *Dawson v. Withycombe*, 216 Ariz. 84, 97, 163 P.3d 1034, 1047 (Ct. App. 2007). The Hocking

Defendants contend that they are entitled to summary judgment because they had no knowledge that the statements in the OS were false. (Doc. 718 at 12.) FSG and PVSE assert that there is no evidence that they "made a statement regarding a 'future event' with the 'present intent not to perform.'" (Doc. 681 at 16.) The Court presumes that FSG and PVSE are arguing that they did not make forward-looking statements with actual knowledge that the projections would not be met, because that is what is at issue at this lawsuit, rather than promises of future conduct. (*See* Doc. 212 at 67.)

Hocking submitted an affidavit declaring that he believed all his projections were reasonable and that he had no intent to defraud, that he acted in good faith. (Doc. 702-41 at ¶¶ 5–6.) He testified at his deposition that he never thought that the Event Center would not be successful or that the Bonds would default. (Doc. 702-19 at 34:17–35:3.) He believed that everything he reviewed was reasonable. (*Id.* at 393:17–19.) He never formed a belief that the TPT Revenue projections were unreasonable, and he described his projections as "very reasonable" and "very conservative." (*Id.* at 120:7–121:3, 123:2–19.) Hocking's testimony and affidavit attesting to his good faith are sufficient to meet the initial burden as to lack of knowledge on summary judgment.

In Response, Plaintiffs point to an email sent by Hocking to Cohen, the ERA analyst, telling Cohen that the Town wanted to see that "the project would pay for itself without the sales tax making an annual contribution to cover debt service" and therefore that the 2005 ERA "report needs to show the assumptions necessary to break even." (Doc. 809-45.) This tends to show that Hocking wanted to maintain the Town's support and was willing to manipulate data to do so. Plaintiffs also point to another email Hocking sent Cohen, noting "major differences" between ERA's numbers and Global's numbers. (Doc. 809-42.) Drawing all reasonable inferences in favor of Plaintiffs raises an issue of fact as to whether Hocking intended and prevailed on ERA to make the Event Center's feasibility look better than initially projected in the draft Report so that the Town would be assured it would not have to pay over TPT Revenues to service the Bonds. A reasonable finder of fact could determine from this evidence that Hocking was

aware of and possibly responsible for manipulations in the 2005 Report, which led to misstatements in the OS (whose projections he partially drafted) with regard to projections.

FSG and PVSE assert that there is no evidence showing that they had knowledge of the falsity of the statements in the OS. As discussed above, both Bill and Brad Fain testified that they never read or commented on any draft of the OS. (Docs. 686-D (Brad Fain Dep.) at 142:13–143:13; 686-G (Bill Fain Dep.) at 92:10–22.) In Response, Plaintiffs point to the fact that Brad Fain received and "skimmed" the draft 2005 Report. (Doc. 809-219 (Brad Fain Dep.) at 201:22–202:23.) It further points to evidence that the 2001 ICC Report was found in FSG's possession. (Doc. 809-15 at FSG003930.) Even if this evidence is sufficient to find that FSG and PVSE had knowledge of both the 2001 and 2005 draft reports, Plaintiffs do not present facts from which it could be inferred that Fain or PVSE compared those reports to the final 2005 Report or the final OS to determine inconsistencies or falsehoods. They only make unsupported assertions of fact in their Response that fail to create a genuine issue of material fact. (*See, e.g.*, Doc. 886-1 at 35 (stating that "Global and the Fains took active steps to conceal the existence of the 2005 ERA Report" and that "Global and the Fains were sufficiently conversant with the drafts of the POS to see that disclosure of the demographic facts was not being made").) They also cite to portions of the CSOF that contain statements that, if true, might create a genuine issue of material fact on this claim, (*see, e.g.*, Doc. 886-2 at ¶¶ 122, 129 (stating that the Fains were "not happy" with the draft 2005 Report and that they participated in making changes in it to double the expected NOI)), but again fail to cite to any portion of the record to support these statements. Plaintiffs do not even present evidence that Fain or PVSE had access to the final 2005 Report or the final OS.[27] The Court therefore grants

---

[27] Plaintiffs also make an argument that FSG and PVSE should be liable because they were aware of a draft of the POS that misstated the amount that the Fains would be reimbursed for parking expenses. However, the statements, if true, show only that the Fains' attorney noticed that the amount for parking expenses in the draft POS was too low and negotiated a higher number. (Doc. 886-2 at ¶¶ 431–38.) The CSOF states that "[n]o one corrected the POS and OS to reflect [the increased reimbursement]," but it does

summary judgment on Plaintiffs' common law fraud claims against FSG and PVSE for lack of actual knowledge.

### 3. Reliance

The Global Defendants, FSG, and PVSE contend that they are entitled to summary judgment on Plaintiffs' common law fraud claims because there is no evidence that Plaintiffs relied on the misstatements in the OS. Both Motions rely on the argument set out by the Underwriters that there is no reliance because Kobs did not read the OS. (Docs. 681 at 17; 717 at 16.) However, as discussed above, Plaintiffs have set forth enough evidence through the testimony and declarations of Kobs and Cruse to create a genuine issue of material fact that Allstate did rely on the misstatements in the OS to purchase the Bonds. Thus, Defendants' Motions for Summary Judgment on this ground are denied.

### C. Aiding and Abetting Common Law Fraud

Under Arizona law, the elements of aiding and abetting fraud are: (1) a primary violation, (2) defendant's knowledge of or duty of inquiry regarding the primary violation, and (3) the defendant's substantial assistance or encouragement of the primary actor's violation. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons*, 201 Ariz. 474, 485, 38 P.3d 12, 23 (2002). Liability does not depend on whether or not the defendant owes a duty of care—rather, it is based on whether the defendant *knew* that the conduct it was aiding and abetting was a tort. *Id.* However, "[a] showing of actual and complete knowledge of the tort is not uniformly necessary," and proof of knowledge can be circumstantial. *Id.* at 23, 26. For example, "if a method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability." *Id.* at 27. To establish the element of substantial assistance, the plaintiff must demonstrate that the defendant's conduct was "a substantial factor in causing the plaintiff's harm." *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794

---

not show that the Fains knew of this discrepancy or that it was their responsibility to update the POS or final OS. (*Id.* at ¶ 438.)

F. Supp. 1424, 1434–35 (D. Ariz. 1992). Plaintiffs assert that each Defendant aided and abetted the commission of common law fraud. (Doc. 886-1 at 116.)

### 1.     Substantial Assistance

The Town admits that it provided tax commitments in the Development Agreement that "were important to the developer," but disputes that this is sufficient to constitute substantial assistance to the primary violation. (Doc. 712 at 14.) Plaintiffs respond that the Town provided substantial assistance by reviewing drafts of the POS and knowing that the demographic facts in the Report would not be disclosed. (Doc. 886-1 at 124.) They further assert that the Town "took steps to minimize the importance of the 2005 ERA study knowing that it would likely result in the demographic facts not being disclosed in the OS." (*Id.*) However, as discussed above, the evidence shows only that the Town agreed to provide support in the form of pledged TPT Revenues and subsequently withdrew from the financing process. *See* Section III.A.1, *supra*. None of Plaintiffs' evidence shows that the Town was aware that demographic facts in the Report would not be disclosed. Nor does any of Plaintiffs' evidence show that the Town took steps to minimize the results of the 2005 ERA study; as discussed above, the Town publicly presented the 2005 study at a Town Council meeting and posted it on the Town website. (Doc. 721-12 (Cohen Dep.) at 436:16–437:14, 438:1–19.)

Plaintiffs also claim that the Town provided substantial assistance "by convincing Fitch its understanding of the Town's pledge and lien was consistent with the Town's understanding, resulting in the investment grade rating without which the Bonds could not have been issued." (Doc. 886-1 at 125.) Again, as discussed above, the evidence does not support this assertion. *See* Section III.A.1, *supra* (evidence only shows that the Town had a phone conversation with Fitch, not that the Town actively persuaded Fitch or concealed any information from Fitch in that conversation).

Finally, Plaintiffs assert that the Town's substantial assistance came in the form of the credit enhancements it provided the Bond issue by making the pledge of TPT Revenues. (Doc. 886-1 at 125.) The Town does not dispute that it did so. However, this

pledge does not constitute substantial assistance *of the primary actor's violation*. Though substantial assistance requires only action that is "more than 'a little aid.'" *Wells Fargo*, 38 P.3d at 26, that aid must go to the primary violation itself, not any transaction that may be related to the violation. Here, the primary violation is the making of fraudulent statements in the OS. The Town's pledge of TPT Revenues did not substantially aid or make easier the underlying fraud; the pledge had nothing to do with misstatements in the OS, which concerned revenue projections and defects in the Bond Documents. The Revenues may have led to a better Fitch rating, thus increasing the likelihood of selling the Bonds, but Defendants' sales of the Bonds in and of themselves were not the primary violation. Thus, Plaintiffs have failed to create a genuine issue of material fact as to whether the Town substantially assisted the commission of the underlying fraud.

Kutak similarly argues that its actions did not constitute substantial aid to the primary actors' fraud. In Response, Plaintiffs assert that Kutak knew of the 2005 study and that Kutak "provided the Bond opinion without which the Bonds could not have been issued." Again, the primary violation is the making of fraudulent statements, not the sale of the Bonds. The facts alleged above, even if true, would not show a genuine issue of material fact as to whether Kutak substantially assisted in the underlying fraud; the first would only show Kutak's knowledge and the second would only show that Kutak increased the likelihood of persons purchasing the Bonds. The Court notes that Kutak moved for summary judgment only on the ground that Kutak did not provide substantial assistance to the fraud "involving the OS's financial projections or the Project's economic feasibility." (Doc. 783 at 42.) Kutak did not move for summary judgment on aiding and abetting fraud to the extent Plaintiffs' fraud theory is based on defects in the Bond Documents, and the Court makes no ruling on the viability of those claims. However, Kutak's Motion for Summary Judgment is granted on Plaintiffs' aiding and abetting claims that rely on the misleading projections in the OS for the same reason that the Town's Motion is granted.

V.     **The Town's Statutory Immunity**

Arizona provides that public entities are not liable for acts and omissions constituting either (1) the exercise of a judicial or legislative function or (2) the exercise of an administrative function involving the determination of a fundamental governmental policy. A.R.S. § 12-820.01. However, "[b]ecause the public policy of Arizona is to hold public entities liable for the acts and omissions of employees in accordance with the law and immunity is the exception," § 12-820.01 is narrowly construed. *Cnty. of La Paz v. Yakima Compost Co., Inc.*, 224 Ariz. 590, 603, 233 P.3d 1169, 1182 (Ct. App. 2010).

Here, the only claim remaining against the Town is Plaintiffs' claim for negligent misrepresentation. The Town did not seek summary judgment on the elements of negligent misrepresentation; rather, it sought to foreclose the claim on statute of limitations grounds. Despite the Town's decision to forego summary judgment on the elements, Plaintiffs address the elements in their Response, suggesting that they seek to hold the Town liable for failing to include information on its budgeting cycle in drafting the Development Agreement. (Doc. 886-1 at 128.) The discussion above regarding the failure to disclose an Arizona statute under the ASA casts doubt on the viability of such a claim,[28] but the Town did not move for summary judgment on this ground. The Town argues only that its decision to enter into the Development Agreement and pledge TPT Revenues qualify for statutory immunity; it does not address Allstate's contention that it negligently omitted information about its budgetary process. (*See* Doc. 920 at 10–11.) To the extent the Town would rather have the Court rule on the immunity issue, the statute and case law do not support a holding that the Town's omission constitutes either the creation, delineation, or regulation of rights, or fundamental governmental policymaking, that is protected by § 12-820.01. *Compare A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cnty.*, 222 Ariz. 515, 537, 217 P.3d 1220, 1242 (Ct. App. 2009) (holding

---

[28] The Court does not discount the possibility that the standard for negligent misrepresentation is different from the standard under the ASA, and that while disclosure of state laws is not required under the securities regime, it may be required in the exercise of reasonable care. However, that issue was not briefed before the Court.

only that entering into agreements and determining "whether to seek or provide the resources necessary for construction of the project in question" involve fundamental governmental policy immune from liability). Thus, the Town's Motion for Summary Judgment on the ground that its actions are statutorily immune is denied.

## VI.   Other State-Law Claims

Plaintiffs allege that the Underwriters, Global, Kozuback, FSG and PVSE, and the Town are liable under the Illinois Securities Act. (Doc. 886-1 at 100.) It also alleges that Stern is liable under the California Corporate Code. (*Id.* at 106.)

### A.   Illinois Securities Act

#### 1.   Six-Month Rule

The Illinois Securities Act ("ILSA") provides that any sale of a security that violates its provisions is "voidable at the election of the purchaser." 815 Ill. Comp. Stat. Ann. 5/13(A). However, the statute requires the purchaser to give notice of its election within six months of the time that the purchaser had knowledge that the sale was voidable. The six-month rescission period does not begin to run when "an investor might know of facts that would void his security purchase." *Hidell v. Int'l Diversified Invs.*, 520 F.2d 529, 539 (7th Cir. 1975). It begins to run, instead, when the investor "learns, possibly from his attorney, that those facts might have such a legal consequence." *Id.* "Knowledge that a sale of securities is voidable is a mixed question of law and fact." *Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2010 WL 1655089 at *11 (N.D. Ill. Apr. 22, 2010). "Illinois courts have been lenient in their interpretation of what constitutes knowledge of voidability." *Reshal Associates, Inc. v. Long Grove Trading Co.*, 754 F. Supp. 1226, 1236 (N.D. Ill. 1990). "A purchaser will not be held to know the voidable nature of his transaction if [he] learns only that the transaction went sour and that he has lost his investment." *Buehl v. Dayson*, 127 Ill. App. 3d 958, 965, 469 N.E.2d 403, 408 (1984).

The Underwriters, joined by Hocking, contend that they are entitled to summary judgment because Allstate failed to comply with the six-month rule.[29] Allstate notified Defendants of its election under ILSA on May 18, 2009. (Doc. 464 ¶ 267.) Thus, Allstate's claims under the Illinois Securities Act are barred unless Allstate did not acquire knowledge of the voidability of its purchase until after November 18, 2008.

The Underwriters point to the fact that Allstate's Cruse and Ceravolo began investigating problems with the Bonds in May 2008. (Docs. 702-9 (Cruse Dep.) at 437:1–438:2 (discussing when she began seriously investing the Bonds); 702-80 (email from Cruse stating that Ceravolo, an Allstate investment law attorney, needed to get involved); 702-4 (Ceravolo Dep.) at 233:4–234:5 (stating that he came to know about the Bond problem in April, May, or June of 2008 when Cruse contacted him about it and that soon thereafter he began "looking into it").) They also point to evidence that Allstate was contemplating and impliedly threatening litigation by July 2008. (Docs. 702-83; 702-89 (emails and letters setting out negotiation strategy).)

In Response, Plaintiffs concede that Allstate's notice of election was not timely as to their claims premised on defects in the Bond Documents. (Doc. 886-1 at 102.) Summary judgment is therefore granted on Allstate's ILSA claims regarding defects in the Bond Documents. Plaintiffs nevertheless assert that their notice was timely as to their claims based on misleading projections in the OS, which they argue they had no knowledge of until February 2009, when became aware of the substance of the 2005 ERA Report.

The Underwriters assert that the six-month rule does not distinguish between claims of different factual bases, and that the six months begin running at the time the plaintiff discovers *any* facts that may support a claim for rescission under § 5/13(a), and Plaintiffs make no argument that they had no right to rescission because of the defects in the bond documents. Plaintiffs rightly point out that this is an issue of first impression

---

[29] The Underwriters' argument is joined by Global and Kozuback (Doc. 720) and the Town (Doc. 763).

under the ILSA. However, the Underwriters' interpretation, while not backed up with any citations to case law, is supported by the language of the statute. Section 5/13(B) states that "[n]otice . . . shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable." It does not predicate the six-month rule on discovery of the facts underlying the claim, but rather on the purchaser's knowledge of the option of rescission. Indeed, Illinois courts have repeatedly stressed knowledge of voidability rather than knowledge of facts underlying the claim. *See Buehl*, 469 N.E.2d at 408 (holding that knowledge of the voidable nature of a purchaser's transaction is not the same as knowledge "that the transaction went sour and that he has lost his investment"); *Waldock v. M.J. Select Global, Ltd.*, No. 03 C 5293, 2005 WL 2978895 at *11 (holding that the six month period does not begin to run when the investor learns of the facts that would hold his purchase voidable but rather when he learns of the legal consequence of voidability). Thus, because Plaintiffs concede that Allstate's notice of election was not timely as to one of its theories, Plaintiffs have admitted that they were aware of the voidability of their Bond purchase before November 2008. The six-month rule begins running at the time "the purchaser [has] knowledge that the sale of the securities to him or her is voidable." Summary judgment is thus granted on Allstate's ILSA claims against the Underwriters and the Defendants that joined the Underwriters' argument on this ground.

### 2.    Sale on Behalf of a Person

The ILSA holds only the following parties liable for violations of its terms: "the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer or salesperson who shall have participated or aided in any way in making the sale." 815 Ill. Comp. Stat. Ann. 5/13. It is a "restrictively structured statute" that "carefully lists and defines the specific classes of persons who may be subjected to liability." *Excalibur Oil, Inc. v. Sullivan*, 616 F. Supp. 458, 466 (N.D. Ill. 1985). Only "persons who regularly play central and specialized roles

in securities transactions and who, pursuant to Section 8, must themselves be registered with the Secretary of State" are liable under its terms. *Id.*

Allstate asserts that the Town is a party on behalf of whom the sale of Bonds was made; the Town argues that it is entitled to summary judgment because there is no evidence that the Bonds were sold on its behalf. (Doc. 712 at 10.) The Town cites to the OS, which describes the Bonds as "special, limited obligations of the issuer" rather than a municipal bond or credit of the Town or any other governmental subdivision. (Doc. 721-16 at KUTAK000664.) It further submits evidence that it did not receive any of the Bond proceeds and otherwise received no money from either the project or the Bonds. (Doc. 716 (Kauppi Decl.) at ¶ 6.) In Response, Plaintiffs simply state that "[t]he Bonds were issued on behalf of the Town because the Town viewed the Event Center as a signature project that would significantly enhance sales tax collections for the Town." (Doc. 886-1 at 105.) Plaintiffs cite to no portion of the CSOF or the record in making this assertion and thus have failed to create a genuine issue of material fact. Even if the assertion were supported by evidence, the fact that the Town would benefit from the increased tax revenue generated by sales in or around the Event Center does not show the Town to be a "person[] who regularly play[s] central and specialized roles in securities transactions." Thus, Plaintiffs have failed to overcome the Town's showing that it is not a party on whose behalf the Bonds were sold. The Town's Motion is granted on this ground.

## B.   California Corporate Code

Plaintiffs assert a claim against Stern for violation of § 25400 of the California Corporations Code, which prohibits any person, in connection with the sale or offer of a security, to make any false or misleading statement. They seek damages under § 25500 of the same Code, which requires a showing that the defendant willfully participated in the act or transaction that violated § 25400. *California Amplifier, Inc. v. RLI Ins. Co.*, 94 Cal. App. 4th 102, 112, 113 Cal. Rptr. 2d 915, 923 (2001). This requires "intent to defraud through a knowingly false statement." *Id.* The Underwriters assert that there is no evidence that Stern acted with such a high level of scienter. (Doc. 704 at 39.)

"Intent to defraud" means intent to "induce the investors' reliance on the misrepresentations." *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 240, 70 Cal. Rptr. 3d 199, 210 (2007). Such intent can be shown with evidence of distribution of the documents containing the misstatement and solicitation of investors. *Id.* Here, as discussed above, Plaintiffs have demonstrated that the Underwriters had knowledge of the 2005 Report, which contained information tending to show that the projections in the OS were inflated. *See* Section III.A.3.a, *supra*. Furthermore, it is undisputed that Stern sold at least some of the Bonds to the Plaintiffs in this case. This evidence combined is sufficient for a reasonable juror to infer that the Stern had knowledge of the misstatements or omissions in the OS and that it intended for purchasers to rely on those misstatements or omissions. Thus, there is a genuine issue of material fact as to whether Stern possessed the requisite high level of scienter for a violation of the California Corporate Code. The Underwriters' Motion for Summary Judgment on this ground is therefore denied.

## VIII.  Wells Fargo's Cross-Claims

### A.    Cross-Claim Against the Town

The Trustee asserts a breach of contract claim against the Town for allegedly paying less than the required debt service payment requested by the Trustee in April 2011. (Doc. 466 (Amended Counterclaim) at ¶ 288.) The Trustee asserts that the April payment was $542,255 less than the amount requested. (*Id.* at ¶ 269.)

The Town asserts that it is entitled to summary judgment because it has paid all of its obligations under the Development Agreement in full. (Doc. 712 at 16.) As the Town points out, the Development Agreement requires the Town to pay 2% of the TPT Revenues collected in the Entertainment District and the Secondary Credit Support Area ("SCSA"). (Doc. 721-11 (Development Agreement) § 4.3.7.) The April 2011 payment of $664,267 was the total of all owed percentages of tax revenues collected from the Events Center, the Entertainment District, and the SCSA. (Doc. 716 (Kauppi Decl.) at ¶¶ 11–12.) The Town further points to testimony by Michael Slade, Vice President of Wells Fargo,

that the Town was only required to pay what it collected out of the Entertainment District and the Secondary Credit Support Area, and that the Trustee had "no right to request . . . the Town . . . [to] pay 100 percent of the debt service payment on any particular payment due date." (Doc. 721-18 (Slade Dep.) at 101:20–102:20.) In their Response, Plaintiffs fail to address the Trustee's Cross-Claim against the Town. The Town has demonstrated that no genuine issue of material fact exists as to whether it breached a contract with its April 2011 payment of $644,267. Its Motion for Summary Judgment is therefore granted.

## B.    Cross-Claim Against Kutak

The Trustee asserts a cross-claim against Kutak for indemnification and/or contribution arising out of any liability to which the Trustee may be held under the Underwriters' claim for negligent misrepresentation against the Trustee. (Doc. 452 (Amended Third-Party Complaint and Cross-Claim) at 11.) Kutak asserts that the Trustee cannot hold it liable under either contribution or indemnification as a matter of law. (Doc. 783 at 42.) It relies heavily on the Court's November 18, 2011 Order dismissing the contribution and/or indemnity claims of the Underwriters and the Town. (*See* Doc. 433.)

Under Arizona law, a claim for contribution exists only for "if two or more persons become jointly or severally liable in tort for the same injury." A.R.S. § 12.2501(A). Arizona has largely abolished joint and several liability, *id.* § 12-2506, including for claims of economic damages. *Standard Chartered*, 945 P.2d at 354. The Underwriters' negligent misrepresentation claim, for which the Trustee seeks contribution from Kutak, is a claim for economic damages, and thus "the liability of each defendant . . . is several only and is not joint." A.R.S. § 12-2506(A). Plaintiffs do not address this argument in their Response. Kutak has demonstrated as a matter of law that contribution is not available against it, so the Court grants summary judgment on the Trustee's claim for contribution.

In its earlier Order of November 18, 2011, this Court noted that indemnity "is an all or nothing proposition" and "exists neither to apportion damages nor to balance relative degrees of fault, but to give full restitution to one who pays damages but is

without personal fault." (Doc. 433 at 10 (internal quotations omitted).) There, we dismissed the Town's claim for indemnification because of the inherent contradiction it posed: if the Town was found not to be at fault, it need not pursue indemnification, whereas if it was found to be at fault, indemnification would not be available to it because it cannot meet the element of being "without personal fault." (*Id.*) The same logic is applicable to the Trustee's claim for indemnification against Kutak. Plaintiffs do not attempt to contest this in their Response. Thus, the Court grants Kutak's Motion for Summary Judgment on the indemnification claim as well.

## IX.   Allstate's Election of Rescission

Allstate has requested the Court to issue seven rulings under its Motion for Determination as a Matter of Law: (1) Allstate may elect, and has elected, the statutory remedy of rescission for its ASA claims, (2) Allstate has satisfied the tender requirement, (3) Allstate does not need to prove loss causation to rescind under Sections 44-1991 (A)(1), (2), (3), or 44-1999 of the ASA, (4) the affirmative defense based on lack of loss causation is not available for claims under Sections 44-1991(A)(1), (A)(3), or 44-1999 of the ASA, (5) the affirmative defense based on lack of loss causation is not available for claims of rescission under 44-1991(A)(2), (6) Allstate may elect, and has elected, the remedy of rescission for its claims of common law fraud and aiding and abetting common law fraud, and (7) Allstate does not need to prove loss causation to rescind under its common law claims. (Doc. 706 at 12.)

Allstate's request for a ruling that the affirmative defense of lack of loss causation is not available under Subsections (A)(1) and (A)(3), as well as under the derivative control person liability set out in § 44-1999, is denied as moot as Allstate has failed to set forth any evidence that would entitle it to relief under Subsections (A)(1) or (A)(3) or their complements in § 44-1999. *See* Section III.A.2, *supra*. For the same reason, any of its claims relating to Subsections (A)(1) and (A)(3) and control person liability deriving from those subsections is denied. Additionally, its request for a ruling that it need not prove loss causation to rescind under Subsection (A)(2) is addressed in the Court's

discussion of Subsection (A)(2) above; for the reasons set out in that section, its request for a ruling that the affirmative defense of lack of loss causation is not available is denied.

Allstate requests a ruling that it may elect rescission for both its ASA claims and its common law claims of fraud and aiding and abetting. The ASA expressly permits a party to seek to elect rescission for any claims brought pursuant to its terms. A.R.S. § 44-2001(A). A plaintiff may also seek to elect rescission in an action for common law fraud. *Parks v. Macro-Dynamics, Inc.*, 121 Ariz. 517, 521, 591 P.2d 1005, 1009 (Ct. App. 1979). Because Allstate's aiding and abetting claims are premised on their common law fraud claims, Allstate may also seek to elect rescission for those claims.[30] Allstate further seeks a ruling that it has already elected rescission. At the same time, however, it insists that it cannot be forced to make an election of remedies until the conclusion of trial, and apparently reserves the right elect between damages and rescission until then. (Doc. 921 at 10 ("Allstate's damages claims are only waived *if* it actually prevails on its rescission claims and elects the rescissionary recovery.") (emphasis added).) Allstate is apparently correct that a party cannot be forced to elect the remedy it will seek before the conclusion of trial. *Vinson v. Marton & Assoc.*, 159 Ariz. 1, 4, 764 P.2d 736, 739 (Ct. App. 1988) (citing *Edward Greenband Enters. v. Pepper*, 112 Ariz. 115, 117, 538 P.2d 389, 391 (1975).) Thus, this Court's holding that Allstate has or has not already elected rescission would have no effect on the rights of any litigants before it and amount to an impermissible advisory opinion. *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). The Court therefore denies Allstate's Motion to the extent it requests an advisory opinion.

Allstate further seeks a ruling that it has satisfied the tender requirement for rescission. It submits evidence that it tendered the Bonds to each of the Defendants in

---

[30] In Response to Allstate's Motion for Determination as a Matter of Law, Defendants raise numerous arguments that Allstate has waived or otherwise cannot meet the requirements for a rescission remedy. (*See* Doc. 851 at 2.) However, Allstate has not requested a ruling that it has met the requirements of rescission. Thus, Defendants' arguments are premature.

May 2009. (Doc. 708-1 (Notice of Election to Rescind) at FSG001227 ("By virtue of such election, Allstate hereby tenders the Bonds to each of you.").) Defendants oppose such a ruling, arguing that the Bonds have been irrevocably damaged by Allstate and Wells Fargo's action of diverting funds for debt service payments to litigation fees, causing Fitch to downgrade the rating of the Bonds. (Doc. 851 at 12–13.) Defendants cite Arizona case law stating that "restoration of parties to their status quo prior to contract is prerequisite to rescission." *Jennings v. Lee*, 105 Ariz. 167, 172, 461 P.2d 161, 166 (1969). While this is a legally correct statement, it goes to the requirements of rescission rather than the adequacy of tender. It may well be, as Defendants appear to suggest, that rescission will not be an available remedy for Allstate due to the damage that Allstate may have inflicted on the value of the bonds. In such a context, the Defendants' citation of  *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1210 (9th Cir. 2012) makes some sense. *Strategic*, however, dealt with whether the parties could be restored to their status quo prior to contract, and not whether tender had been appropriately made. In *Strategic*, "true rescission [was] neither feasible nor practical," and the Ninth Circuit evaluated the plaintiff's claims on the theory that it was entitled to "a rescissionary measure of damages" as opposed to rescission itself. *Id.* at 1208. Yet, Allstate has not sought a ruling that it has satisfied all the elements of rescission here, so Defendants' argument is premature.

Nevertheless, the issue of whether rescission is an appropriate remedy here does not prevent the court from determining whether Allstate made a tender of its bonds. "A valid and viable offer of tender means that it is made in good faith, the party making the tender has the ability to perform, and the tender must be unconditional." *Park v. U.S. Bank Nat. Ass'n*, No. 10CV1546-WQH-WMC, 2011 WL 4102211 at *5 (S.D. Cal. Sept. 13, 2011). Defendants do not argue that Allstate's tender was made in bad faith, that it does not have the ability to perform, or that the tender was conditional.[31] They do not

---

[31] The Town asserted at oral argument that Allstate's tender of the Bonds was conditional. (Doc. 945 at 13:23–14:8.) However, it did not cite to the record in making

contest that Allstate still holds the Bonds and has been ready and willing to tender them since May 2009. Instead, their argument goes to whether Allstate will be able to fulfill the requirements of rescission. Because Allstate's evidence of its tender in May 2009 is undisputed, the Court grants its Motion for a ruling that it has tendered the Bonds, which is not tantamount to a ruling that it has established the prerequisites to seeking rescission.

Finally, Allstate requests a holding that it is not required to prove loss causation on its common law claims if it elects rescission. In *Grand II*, the Arizona Court of Appeals, at least as a general proposition, rejected the defendant's argument that the plaintiff had to "show causation to obtain rescission on its common law claims." 147 P.3d at 779. The court stated that there was "no reason to adopt a proximate cause rule for rescission where . . . the plaintiff was induced to enter the transaction by the defendant's fraud." *Id.* While this may be an applicable general rule in cases like *Grand II*, in which there is no issue as to whether the value of the security had been negatively impacted by plaintiffs or parties other than the Defendants, where there are such facts, this Court will not even assume, for the reasons stated above, that rescission is possible. Further, if there is a scenario in which rescission is possible, but damage has possibly been inflicted on the value of the bonds by persons other than the Defendants, it seems to the Court that either the Arizona Uniform Contribution Among Tortfeasors Act, A.R.S. § 12-2501 *et seq.*, or general principles of equity require when the Defendants have preserved the right, as they have here, that they be allowed to allege and ascertain who else may have damaged the value of their bonds and in what amount. Therefore, this Court will not determine, based on Allstate's request, that it is necessarily relieved from the defendants' ability to establish loss causation if it elects to seek rescission.

In sum, the Court grants Allstate's requests for rulings that it: (1) may seek to elect the statutory remedy of rescission for its ASA claims, (2) has satisfied the tender requirement, and (3) may seek to elect the remedy of rescission for its claims of common

---

this argument, and in any event failed to properly raise it in Response to Allstate's Motion for Determination of Law.

law fraud and aiding and abetting common law fraud. The Court denies Allstate's requests for rulings that: (1) it has elected the statutory remedy of rescission for its ASA claims; (2) the affirmative defense based on lack of loss causation is not available for claims of rescission under 44-1991(A)(2); (3) it need not prove loss causation if it seeks rescission under its common law claims; and (4) it has elected the remedy of rescission for its claims of common law fraud and aiding and abetting common law fraud. It further denies as moot Allstate's request for rulings that it need not prove loss causation and that the affirmative defense of lack of loss causation is not available under Sections 44-1991(A)(1) or (3) or 44-1999 (to the extent that the control person claim is based on violations of Sections 44-1991(A)(1) or (3)).

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motions for Summary Judgment (Docs. 681, 704, 712, 717, 718, 751, 783) are **GRANTED IN PART** and **DENIED IN PART** as follows:

- Summary judgment **GRANTED** on Plaintiffs' 10b-5 claims for lack of loss causation as to FSG, PVSE, Global, Kozuback, the Hocking Defendants, and Stern.
- Summary judgment is **DENIED** on Plaintiffs' 20(a) claims against FSG, PVSE, Global, and kozuback.
- Summary judgment is **GRANTED** on Plaintiffs' A.R.S. § 44-1991 claims against the Town for failure to show participation or inducement.
- Summary judgment is **GRANTED** on Plaintiffs' ASA claims under A.R.S. § 44-1991(A)(1) and (A)(3).
- Summary judgment is **DENIED** as to Plaintiffs' claims pursuant to § 44-1991(A)(2) against the Underwriters and any parties who joined them as to the argument that no actionable misrepresentation was made regarding the projections in the OS.
- Summary judgment is **DENIED** as to Plaintiffs' claims pursuant to § 44-1991(A)(2) against Kutak as to Bond Document defects relating to the Fain Escrow Account and

the Lockbox account, but **GRANTED** as to all other claims regarding Bond Document defects.

- Summary judgment is **DENIED** as to the Underwriters' claim that they are entitled to the A.R.S. § 44-2001(B) affirmative defense, but **GRANTED** as to Kutak's affirmative defense on Plaintiffs' ASA claims that are based on projections (Plaintiffs' ASA claims against Kutak based on defective drafting remain).

- Summary judgment is **DENIED** on Plaintiffs' § 44-1991(A)(2) claims on the ground that Defendants have demonstrated the affirmative defense of loss causation as to loss correlated to the first Fitch downgrade, but **GRANTED** as to loss correlated to the second Fitch downgrade.

- Summary judgment is **DENIED** on Plaintiffs' ASA claims as to the Underwriters' and Kutak's argument that there is no transaction causation.

- Summary judgment is **DENIED** as to Plaintiffs' § 44-1999 control person claims against FSG and PVSE and Global and Kozuback.

- Summary judgment is **DENIED** as to Plaintiffs' negligent misrepresentation claims against the Underwriters on the argument that no actionable misstatement occurred.

- Summary judgment is **DENIED** as to Plaintiffs' negligent misrepresentation claims against the Underwriters, FSG and PVSE, and the Hocking Defendants as to the argument that there was no reliance.

- Summary judgment is **DENIED** as to Plaintiffs' negligent misrepresentation claims against the Town as to the argument that the claim is time-barred.

- Summary judgment is **GRANTED** as to Plaintiffs' negligent misrepresentation claims against Kutak and the Hocking Defendants for failure to show loss causation.

- Summary judgment is **GRANTED** as to Plaintiffs' common law fraud claims against the Town, PVSE, and FSG, but **DENIED** as to Global and Hocking.

- Summary judgment is **GRANTED** as to Plaintiffs' aiding and abetting against the Town and Kutak.

- Summary judgment is **DENIED** as to the Town's argument that it is entitled to statutory immunity.
- Summary judgment is **GRANTED** as to Plaintiffs' Illinois Securities Act claims against the Underwriters, Hocking, Global and Kozuback, and the Town on the argument that no timely notice of rescission was given.
- Summary judgment is **GRANTED** as to Plaintiffs' Illinois Securities Act claims against the Town on the ground that it is not one of the parties that can be held liable under that Act.
- Summary judgment is **DENIED** as to Plaintiffs' California Corporate Code claims against the Underwriters as to the argument that Stern did not have the requisite high level of scienter.
- Summary judgment is **GRANTED** as to Wells Fargo's cross-claims against the Town and Kutak.

**IT IS FURTHER ORDERED** that Allstate's Motion for Determination as a Matter of Law (Doc. 706) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Underwriters' Motion to Exclude the Report and Testimony of William Rhoda (Doc. 679) is **DENIED**.

**IT IS FURTHER ORDERED** that the Defendants' remaining Motions in Limine (Docs. 709, 713, 774) are **DENIED WITHOUT PREJUDICE** as they were not necessary to deciding the Motions for Summary Judgment.

/ / /

/ / /

/ / /

/ / /

1    **IT IS SO ORDERED**.[32]

2    Dated this 13th day of September, 2013.

4

5                                    G. Murray Snow

6                         United States District Judge

---

[32] The Parties are advised that these are the last Motions that the Court will rule on and that they ought to contact the Court to schedule the final pre-trial conference.