**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re: Allstate Life Insurance Company Litigation | Lead Case No. CV-09-08162-PCT-GMS<br><br>Consolidated with:<br>No. CV-09-8174-PCT-GMS<br><br>**ORDER** |

Third-party Defendant/Cross-Defendant/Cross-Claimant Wells Fargo Bank, NA (Trustee), has moved for summary judgment[1] on the counterclaim asserted by Defendants/Third-party Plaintiffs/Counter-Claimants Robert W. Baird & Company, Inc., Southwest Securities, Inc., successor to M.L. Stern & Company LLC, and Edward D. Jones & Co. LP (the Underwriters). (Doc. 680.) Because this Motion raises issues distinct from those in the other motions for summary judgment in this case, the Court has filed this separate Order. The Motion is granted for the reasons specified below.

---

[1] The Court acknowledges that Wells Fargo has filed multiple motions for summary judgment in direct violation of the Case Management Order (CMO), which states: "No party shall file more than one motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure unless permission is first obtained, by joint telephone call, from the Court." (Doc. 257 ¶ 7(b).) Wells Fargo has acknowledged that it did not receive permission to file multiple motions for summary judgment. (Doc. 935 at 2.) The Court has elected to consider the instant Motion, but reserves the right to award attorneys' fees as a sanction for Wells Fargo's violation of the CMO.

**BACKGROUND**

The facts pertaining to this securities litigation are set forth in earlier orders. (Docs. 212, 655.) In short, this litigation was generated by a bond offering to finance the construction of the Events Center in the Town of Prescott Valley. This order pertains to a counterclaim of the Underwriters against the Trustee of the Independent Development Authority of the County of Yavapai (Issuer) for negligent misrepresentation.

In the Indenture, executed on November 1, 2005, Wells Fargo agreed to act as the Issuer's trustee in the issuance of $35 million in excise tax revenue bonds. (Doc. 684 ¶ 1; Doc. 850 ¶ 1.) The Trust Indenture established Wells Fargo as the Trustee and described its role in the bond process. (*Id.*) The Issuer assigned to the Trustee the Issuer's rights to all payments due under the Loan Agreement. (Doc. 684 ¶ 3; Doc. 850 ¶ 3.) The law firm of Kutak Rock LLC served as Bond Counsel in the transaction and drafted the Loan Agreement, Trust Indenture, and other related documents. (Doc. 684 ¶ 10; Doc. 850 ¶ 10.)

Prescott Valley Events Center, LLC, (Borrower) borrowed the funds generated by the Bonds to finance the construction of a 5,000-seat convention center in the Town of Prescott Valley, Arizona (Town). (Doc. 684 ¶ 2; Doc. 850 ¶ 2.) Earlier in the process of preparing to issue the Bonds, the Town had signed a Development Agreement that pledged certain tax revenues (TPT Revenues) to the Borrower if the net operating income of the Event Center proved insufficient to service the debt. (Doc. 684 ¶¶ 4, 7–8; Doc. 850 ¶¶ 4, 7–8.) The TPT Revenues were also intended to serve as security for the Bonds, and the Bond Documents established a lien on those revenues in favor of the Trustee. (Doc. 684 ¶ 27; Doc. 850 ¶ 27.) Under the terms of an Assignment Agreement, the Borrower assigned its right to receive the pledged TPT Revenues to the Trustee. (Doc. 684 ¶¶ 7–9; Doc. 850 ¶¶ 7–9.) Complications with accessing these TPT Revenues ultimately played a role in the inability to fully service the Bonds, as discussed below.

The Indenture set forth how the TPT Revenues would be accessed. Article VI of the Indenture addressed the "Pledged Revenues," which included net operating income,

certain TPT Revenues, and money on deposit in the relevant funds and accounts. (Doc. 852-27 at KUTAK000084.) Article VI also briefly described how the TPT Revenues would function as security for the Bonds. (*Id.* at KUTAK000089–90.) The TPT Revenues were contained in certain accounts, such as the Fain Escrow Account, Lockbox Account, and Town Escrow Account. (*Id.*) If the proceeds in one fund were insufficient to service the debt, then the revenues in another fund would come into play; if those were insufficient, a third fund could be triggered. (*Id.*) If those three funds ad seriatum failed to fill the debt service requirements, a fourth—Secondary Credit Support Area funds—was available if the Trustee applied to the Town pursuant to the Development Agreement. (*Id.* at KUTAK000090.) The Town, which was the source of the TPT Revenues, was not a party to the Indenture.

The Underwriters hired the law firm of Stinson Morrison to draft the Bond Purchase Agreement. (Doc. 684 ¶ 22; Doc. 850 ¶ 22.) The Trustee was not a party to this agreement. (Doc. 684 ¶ 23; Doc. 850 ¶ 23.) The Bond Purchase Agreement required specific representations and warranties from the Issuer and the Borrower to the Underwriters before the Underwriters would purchase the Bonds. (Doc. 684 ¶ 22; Doc. 850 ¶ 22.) Among these were the opinions of counsel for various parties, along with specific representations. (Doc. 684 ¶¶ 28–39; Doc. 850 ¶¶ 28–39.)

The Trustee issued a Closing Certificate. (Doc. 687-5 (Baudry Decl. Ex. 2) at KUTAK000360–62.) In it, the Trustee warranted that "[t]he Trustee Documents constitute the valid and binding obligations of the Trustee, enforceable in accordance with their terms . . . ." (*Id.* at KUTAK000360.) In addition, the Certificate claimed that

> the execution of delivery of the Trustee Documents and the consummation of the transactions contemplated thereby, and the fulfillment of the terms and conditions thereof, do not contravene the charter or bylaws of the Trustee or conflict with or constitute a breach of or default under any law, administrative regulation, order, consent decree or any agreement or instrument applicable to the Trustee or its property.

(*Id.*)

In 2008[2] the net operating income was insufficient to service the Bonds, and the Trustee asked the Town to pay the TPT Revenues set forth in the Bond Documents. (Doc. 466 ¶¶ 247, 250.) The Town refused to make the payments without a specific, formal demand from the Trustee, but the Trustee could not timely obtain the information it needed to make the demand on the Town. (*Id.*) The Town, in turn, could not release the TPT Revenues under Arizona law absent the specific information the Trustee could not provide. (*Id.*) An administrative quandary thus developed that was not contemplated in any of the Bond Documents—the lack of detail about how the various funds would be accessed prevented any debt service on the Bonds. Wells Fargo alleges that "[a]s a result of negligent draftsmanship . . . the Town's obligation to pay sales tax revenues from the Entertainment District and Secondary Credit Support Area to pay debt service on the Bonds in the event of revenue shortfalls was rendered defective because no adequate mechanism existed for the Trustee to demand payment." (*Id.* ¶ 264.)

The Underwriters' counterclaim essentially alleges that Wells Fargo is to blame, at least in part, for the problem. The Underwriters claim that "[t]he Closing Certificate of Trustee, which Wells Fargo signed and provided to all parties to the offering, intending that they rely on its statements," negligently misrepresented that the Trust Indenture was legally effective. (Doc. 281 at ¶ 54). The Underwriters contend that the Trustee had an obligation to substantively review the Indenture to ensure that it was legally effective and "workable," and that, since the Trustee now seeks to hold the Underwriters liable for its negligent performance of this obligation, the Trustee should also be liable, in whole or in part, for any damages resulting from the Indenture's alleged inadequacies. (*Id.*)

/ / /
/ / /
/ / /

---

[2] The facts in this section are taken from Wells Fargo's Counterclaim, which the Underwriters do not contest for purposes of this Motion. (Doc. 466.) For purposes of the present motion then, the Court assumes the truth of the allegations described in this paragraph.

- 4 -

**DISCUSSION**

**I.    LEGAL STANDARD**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); see also L.R.Civ. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[ ] forth the specific facts, which the opposing party asserts,

including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party.").

## II. ANALYSIS

The Underwriters' negligent misrepresentation claim is founded on representations the Trustee made in its Closing Certificate. Because the Closing Certificate does not, no matter how broadly read, make any misrepresentations as to the ability of the Trustee to call upon the TPT revenues as security, and because the Underwriters point to no other representations to support their claim, summary judgment in favor of the Trustee is appropriate.

### A. Legal Principles

The Underwriters' claim is for negligent misrepresentation. Arizona imposes liability on "'[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions" for "pecuniary loss caused [to others] by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'" *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808, 813 (Ariz. 1987) (quoting Restatement (Second) of Torts § 552). The Underwriters claim that the Trustee's Certificate "supplie[d] false information for the guidance of others" and that Wells Fargo "fail[ed] to exercise reasonable care or competence in obtaining or communicating the information." *Id.*

While the claim is not one for breach of contract, the resolution of the Underwriters' counterclaim nevertheless depends on the interpretation of the Closing Certificate of Trustee and thus, as all Parties apparently agree, relies on the same interpretive principles. "The interpretation of a contract is a question of law" and is often appropriate to resolve at the summary judgment stage. *L. Harvey Concrete, Inc. v. Agro Const. & Supply Co.*, 939 P.2d 811, 813 (Ariz. Ct. App. 1997). A court "'must give effect to the contract as it is written, and the terms or provisions of the contract, where clear and

1  unambiguous, are conclusive. The intent of the parties, as ascertained by the language
2  used, must control the interpretation of the contract. It is not within the province or power
3  of the court to alter, revise, modify, extend, rewrite or remake an agreement.'" *Shattuck v.*
4  *Precision-Toyota, Inc.*, 566 P.2d 1332, 1334 (Ariz. 1977) (quoting *Goodman v. Newzona*
5  *Investment Co.*, 421 P.2d 318, 320 (Ariz. 1966)).

6      Wells Fargo relies on two arguments to justify summary judgment in its favor.
7  First, Wells Fargo argues that because the Certificate does not contain any warranties
8  relating to the compatibility of the Indenture with the Development Agreement or any
9  other Bond Document; it certifies only the Trustee's role in transaction and ability to
10 fulfill its obligations under Indenture. Because the Court concludes that the Closing
11 Certificate's representations are limited only to Wells Fargo's obligations and do not
12 warrant the overall "workability" of the transaction, the Court does not reach Wells
13 Fargo's second issue regarding the reliance on counsel.

### B.     The Closing Certificate of Trustee

15     The Underwriters' claim relies on the interpretation of § 1(b) of the Closing
16 Certificate. The Trustee made two specific representations in two separate paragraphs. In
17 the first paragraph, the Trustee certified that "[t]he Trustee Documents constitute the
18 valid and binding obligations of the Trustee." (Doc. 687-5 (Baudry Decl. Ex. 2) at
19 KUTAK000360.) This paragraph merely notes, by its plain terms, that the Trustee is
20 bound by the Trustee documents.  It makes no representations about the "workability" of
21 the arrangement between the underwriters, the Town, the Issuer and the borrower. There
22 is no warranty that the Trustee will ensure that each party involved in the bond
23 transaction is able to play their part. In fact, each party to the transaction made a very
24 similar representation. The Issuer made a warranty to the Underwriters concerning its
25 ability to perform under the Indenture. (Doc. 684 ¶¶ 37–38; Doc. 850 ¶¶ 37–38.) The
26 Borrower did the same. (Doc. 684 ¶¶ 39–40; Doc. 850 ¶¶ 39–40.) Each attested to the
27 enforceability of their obligations under the Indenture, but not the obligations of others.
28 To interpret a representation that "[t]he Trustee Documents constitute the valid and

binding obligations of the Trustee" to mean that the Trustee warranted the "workability" of the entire arrangement would wrest the plain language of the Certificate beyond its clear meaning. Section 1(b)'s first paragraph says only that the Underwriters can hold the Trustee to its duties under the Indenture. Consequently, the first representation in § 1(b) cannot support a claim of negligent misrepresentation.

The Underwriters concentrate most of their argument on the second representation in § 1(b), but that representation is likewise too narrow by its terms to support the interpretation the Underwriters assign to it. In full, the paragraph reads

> The execution and delivery by the Trustee of the Trustee Documents and the performance by the Trustee of its duties under the Trustee Documents have been duly authorized by all necessary corporate action on the part of the Trustee and the execution and delivery of the Trustee Documents *and the consummation of the transactions contemplated thereby, and the fulfillment of the terms and conditions thereof*, *do not* contravene the charter or bylaws of the Trustee or *conflict with or constitute a breach of or default under any law, administrative regulation, order, consent decree or any agreement or instrument applicable to the Trustee or its property.*

(Doc. 687-5 at KUTAK000360 (emphasis added).)

Where the first paragraph certified that the Underwriters could hold the Trustee to its obligations under the Indenture and other Trustee Documents, this paragraph certified the Trustee's ability to perform its obligations unhindered. The provision lists potential legal impediments to the Trustee's performance: the charter and bylaws of the Trustee, and "any law administrative regulation, order, consent decree or any agreement or instrument *applicable to the Trustee or its property*." (*Id.*) It is that last clause that most clearly defeats the Underwriters' attempt to ascribe a wider sweep to the Trustee's representation. It narrows the certification to those laws "applicable to the Trustee or its property." It says nothing about the obligations of the Town to provide security for the performance of the bonds.

The Trustee's central claim (which gave rise to the Underwriters' counterclaim) was its inability to receive the TPT Revenues due to certain state laws that hemmed in the Town. But those are not laws that constrain the Trustee's ability to fulfill its obligations;

rather, those laws impair the Trustee's ability to receive the revenues it had a right to receive under the Development Agreement, Indenture, and Assignment Agreement. Contractual arrangements are always about the obligations of one party and the rights of another. *See Providence Bank v. Billings*, 29 U.S. 514, 522 (1830) (recognizing that a contract confers rights on one party and imposes obligations on the other). The warranty in the second paragraph of § 1(b) concerns Wells Fargo's obligations, not its rights. The Town, not the Trustee, was unable to release the TPT Revenues due to state law constraints on its budgeting processes. Those state law constraints do not appear to have been contemplated by any party, but they are constraints on the Trustee's right to receive the needed TPT Revenues, not on its obligation to fulfill its duties under the Indenture.

In the Order on the Underwriters' Motion to Amend, the Court examined this language in § 1(b) and observed that the "language does not so clearly refer only to the Trustee's obligations under the Indenture, that the Court will preclude the Underwriters, at this stage, from discovering facts and circumstances that may shed some light on the intent of the parties." (Doc. 443 at 14–15.) In making that preliminary observation, however, the Court specifically cited and relied upon the Underwriters' claims that the Trustee "owed a duty to the Bondholders to insure that there existed an adequate notice procedure in place to enable the Town to timely budget and pay sales tax revenues," and that "a different part was assigned to provide certificates for each document involved in the Bond offering and that the Trustee was the party assigned to certify the Indenture." (*Id.* at 15.) The Underwriters have presented no evidence to support either of these allegations. In the absence of such evidence, there is no language of the Closing Certificate that makes an assertion that is reasonably susceptible to the interpretation it is given by the Underwriters.

The Underwriters' Bond Purchase Agreement specifically listed certain "representations, warranties, covenants and agreements" whose submission was a condition precedent to execution. (Doc. 687-6 at KUTAK402–04.) These documents included the Official Statement, Issuer Documents, Borrower Documents, opinion of

- 9 -

Bond Counsel, opinion of the Issuer's counsel, opinion of the Borrower's counsel, opinion of the Underwriters' counsel, certificates from the Issuer and Borrower, and

> additional legal opinions, certificates, instruments and other documents . . . to evidence the truth and accuracy . . . of the Issuer's and Borrower's representations, warranties, covenants and agreements . . . and of the statements and information contained in the Official Statement and the due performance or satisfaction by the Issuer and the Borrower . . . of all the agreements then to be performed and conditions then to be satisfied by them.

(*Id.* at KUTAK000403.) This detailed list of key documents focuses almost exclusively on the obligations and representations of the Issuer and Borrower. Nowhere is the Trustee mentioned. There is, then, no evidence from which a trier of fact could conclude in light of the language used in the certification that the Trustee's role was a "master reviewer," as the Underwriters claim. While the Bond Purchase Agreement states that the Underwriters did rely on "the representations, warranties, covenants and agreements to be contained in the documents and instruments to be delivered on the date of delivery of the Bonds," which included the Trustee Documents, the Trustee Documents do not themselves contain any obligation to insure the functionality of all the various obligations of the parties to the bond offering.

Moreover, the certifications from other parties show that each party certified only its ability to carry out its own obligations, and not the ability of any other party to do so. Bond Counsel certified that the Indenture is binding on the Issuer as to its terms. (Doc. 684 ¶ 28; Doc. 850 ¶ 28.) Issuer and Issuer's Counsel attested that the Issuer Documents constitute binding obligations of the Issuer. (Doc. 684 ¶¶ 37–38; Doc. 850 ¶¶ 37–38.) Borrower and Borrower's Counsel represented that the Borrower Documents were enforceable obligations. (Doc. 684 ¶¶ 39–40; Doc. 850 ¶¶ 39–40.) The multitude of certifications and representations makes clear that each party would certify only its own performance.

Both the Trustee and the Underwriters have marshaled expert testimony to support their competing interpretations of the contract, but the existence of competing expert

interpretation of the contract does not suffice to preclude summary judgment where the language of the representation or alleged warranty is unambiguous. *Cf. L. Harvey Concrete*, 939 P.2d at 813; *Shattuck*, 566 P.2d at 1334. Here, the language of § 1(b) attests only to the ability of the Trustee to perform its own obligations under the Indenture and not to the overall "workability" of the arrangement.

The Underwriters contend that this reading of § 1(b) equates the representations in the first paragraph with the second paragraph and thereby renders one or the other superfluous. *See Scholten v. Blackhawk Partners*, 909 P.2d 393, 396 (Ariz. Ct. App. 1995) ("[A] contract should be construed to give effect to all its provisions and to prevent any of the provisions from being rendered meaningless."); *Phillips v. Flowing Wells Unified Sch. Dist. No. 8*, 669 P.2d 969, 970 (Ariz. Ct. App. 1983) ("A contract must be construed so that every part is given effect."). They are not. Each paragraph performs a separate function. The first affirms that the Trustee will be bound by its obligations and that the Underwriters—or any other party that is a recipient of the Closing Certificate—can hold the Trustee to those obligations. The second certifies that there are no legal hindrances specific to the Trustee that could prevent its ability to perform those obligations. Read in its entirety, § 1(b) makes two limited representations specific to the Trustee. Each representation has a specific role in the overall certification and therefore half of § 1(b) is not rendered superfluous.

Nothing in § 1(b) supports a claim that Wells Fargo warranted that the entire deal was "workable." There is no evidence to support the Underwriters' prior assertion that "a different party was assigned to provide certificates for each document involved in the Bond Offering and that the Trustee was the party assigned to certify the Indenture." (Doc. 433 at 15.) Instead, it appears that each party certified only their ability to fulfill their own obligations, but not the overall effectiveness of the agreement. That was the case with § 1(b) of the Closing Certificate. Because those statements cannot be read to make such a warranty, the Underwriters have not shown any false statement and summary judgment on their claim of negligent misrepresentation is appropriate.

## CONCLUSION

As a matter of law, the Closing Certificate of Trustee does not certify that the arrangement was "workable" from the perspective of all parties; just that the Trustee would be able to perform its obligations vis-à-vis the Underwriters. Because the Underwriters have not shown that the Trustee has made the statements they claim are false, summary judgment is appropriate.

**IT IS THEREFORE ORDERED** that Wells Fargo's Motion for Summary Judgment (Doc. 680) is **GRANTED**.

Dated this 13th day of September, 2013.

_G. Murray Snow_
United States District Judge