1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    In Re: Allstate Life Insurance Company          Lead Case No. CV-09-08162-PCT-GMS
     Litigation
10                                                    Consolidated with:
                                                      No. CV-09-8174-PCT-GMS
11
                                                      **ORDER**
12

13

14

15          Third-party Defendant/Cross-Defendant/Cross-Claimant Wells Fargo Bank, NA

16   (Trustee) and Plaintiff/Counter-Defendant Allstate Life Insurance Company have moved

17   for summary judgment[1] on the counterclaim and third-party claim asserted against them

18   by Defendant/Third-party Plaintiff/Cross-Claimant Town of Prescott Valley. (Doc. 696.)

19   Because this Motion raises issues distinct from those in other motions for summary

20   judgment in this case, the Court has filed this separate Order. The Motion is denied as

21   moot in part and denied in part for the reasons specified below.

22   ///

23   _____

24        [1] Allstate and Wells Fargo have filed multiple motions for summary judgment in
     direct violation of the Case Management Order (CMO), which states: "No party shall file
25   more than one motion for summary judgment under Rule 56 of the Federal Rules of Civil
     Procedure unless permission is first obtained, by joint telephone call, from the Court."
26   (Doc. 257 ¶ 7(b).) Both Parties have acknowledged that they did not receive permission
     to file multiple motions for summary judgment. (Doc. 935 at 2.). While not generally
27   inclined to do so, the Court will rule on the multiple issues because the parties have spent
     time briefing them, the Court has spent time reviewing them, and the ultimate fact finder
28   and the parties have an interest in refining the disputes in this case.

**BACKGROUND**

The facts pertaining to this securities litigation are set forth in earlier orders. (Docs. 212, 655.) In short, this litigation was generated by a bond offering to finance the construction of an Event Center in the Town of Prescott Valley. This Order addresses two claims asserted by the Town. First, the Town asserted a third-party claim against Wells Fargo, the Trustee of the Independent Development Authority of the County of Yavapai (Issuer) "for such portions of the claims against the Town that arise from or are related to the Town's September 2009 payment under the Development Agreement and/or to such other debts and service amounts not paid to Bond holders notwithstanding future payments by the Town under the Development Agreement." (Doc. 95 ¶¶ 50–51.) Second, the Town counterclaimed against Allstate for intentional interference with contractual relations. Both claims rely on the same basic premise, namely that Allstate directed Wells Fargo to use certain revenues set apart for debt service to instead fund this litigation. Three agreements are central to the Town's claims.

On May 12, 2005, the Town entered into the Pre-Annexation Development Agreement with Prescott Valley Event Center LLC (Borrower), among other parties. (Doc. 697 ¶ 1; Doc. 869 ¶ 1.) The Trustee is not a party to the Development Agreement. (Doc. 697 ¶ 3; Doc. 869 ¶ 3.) The basic purpose of the Development Agreement was to chart the planning, funding, and construction of an Event Center. (Doc. 705-1, Ex. 1 at KUTAK001092–96.) The Development Agreement set forth a number of provisions that described how certain revenues would be used to service the debt raised by the Event Center financing. Specifically, the Borrower agreed that the operating revenue of the Event Center would be used, after deducting operating expenses and fees, to "pay all current debt service on the [Event Center] financing." (*Id.* at KUTAK001105.) If the operating revenue proved insufficient to pay all current debt service, the Borrower agreed that "any shortfall shall be paid first out of the funds held in the Fain Escrow Account, then from the Lockbox Account, and then from the Town Escrow Account." (*Id.*)

The Fain Escrow Account and Lockbox Account contained certain funds (TPT

Revenues) from the Town, and according to the Development Agreement, those funds could be used to pay any shortfall in the current debt service on the Event Center financing. (*Id.* at KUTAK001103.) The Town Escrow Account also contained TPT Revenues, and the provision that established this Account also specified that "[t]he funds in the Town Escrow Account shall be used to pay debt service on the [Event Center] financing if the Net Operating Revenues from the [Event Center], any funds in the Fain Escrow Account, and any funds in the Lockbox Account are insufficient to provide funds to pay debt service in any month." (*Id.* at KUTAK001112.) Finally, the Town agreed to establish a fourth backup fund that consisted of additional TPT Revenues from a Secondary Credit Support Area, to make up a certain percentage of any remaining "deficiency" in meeting debt service. (*Id.* at KUTAK001113.)

The Trustee and the Issuer entered into an Indenture of Trust Agreement on November 1, 2005. (Doc. 697 ¶ 4; Doc. 869 ¶ 4.) The Town is not a party to the Indenture. (Doc. 697 ¶ 5; Doc. 869 ¶ 5.) Article VI of the Indenture pledged the operating income of the Event Center and any TPT Revenues received to pay debt service on the Bonds. (Doc. 705-2, Ex. 2 at KUTAK000084–90.) The Trustee agreed to establish a Revenue Fund to hold operating income and TPT Revenues and then to disburse those funds in a specific sequence to bondholders, certain expenses and fees, and then reserve funds. (*Id.*) The Indenture expressly incorporated those provisions of the Development Agreement that specified how, when, and for what purposes the Trustee could access and use the Lockbox Account, Fain Escrow Account, Town Escrow Account, and funds from the Secondary Credit Support Areas. (*Id.* at KUTAK000089–90.)

The Development Agreement allowed the Borrower, without prior consent or approval, "to assign to any lender providing financing to the [Borrower] and/or with respect to the [Event Center], as security for such financing, the rights of the [Borrower] under this Agreement." (Doc. 705-1, Ex. 1 at KUTAK001119–20.) Pursuant to that provision, the Borrower and Trustee executed an Assignment Agreement on December 1, 2005. (Doc. 697 ¶ 6; Doc. 860 ¶ 6.) The Town is not a party to the Assignment

Agreement. (Doc. 697 ¶ 8; Doc. 869 ¶ 8.) The Borrower specifically "assign[ed], transfer[ed] and convey[ed] unto the [Trustee], its successors and assigns, as security for payment of the Bonds and the payment, performance and observance of all of the [Borrower]'s duties and obligations with respect thereto, all of the [Borrower]'s rights in and to the Pledged TPTax Revenues and the receipt thereof under the Development Agreement." (Doc. 705-3, Ex. 3 at KUTAK000138.) The Assignment Agreement specifically provided, however, that the Trustee "shall not be obligated to perform or discharge . . . any obligation, duty or liability under the Development Agreement, or under or by reason of this Assignment Agreement, and all obligations, duties or liabilities of the [Borrower] arising out of or in respect to the Development Agreement herein assigned shall be the sole responsibility of the [Borrower]." (*Id.* at KUTAK000139.)

In October 2009, Allstate, a bondholder, instructed Wells Fargo to use available revenues, including TPT Revenues, to pay the legal fees they expected to incur in this action instead of making payment of debt service on the Bonds. (Doc. 875-3, Exs. 25–28.) The Town subsequently brought claims against both Allstate and the Trustee.

**DISCUSSION**

**I.    LEGAL STANDARD**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural*

*Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); see also L.R.Civ. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[ ] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party.").

## II.   ANALYSIS

Although Allstate and the Trustee have jointly moved for summary judgment, the Town's claims against them are not identical and will be considered separately.

### A.   Third-party Claim

The Town's claim against the Trustee is a third-party claim under Rule 14(a)(1) of the Federal Rules of Civil Procedure. Rule 14(a)(1) permits "[a] defending party [the Town]. . . [to] serve a summons and complaint on a nonparty [the Trustee] who is or may be liable to it for all or part of the claim against it."

The Town's Third-party Complaint does not specify the theory of liability that the Town invokes. Under the heading "Third-party Claim against the Trustee," the Town alleges only that "[t]he Trustee is or may be liable to the Town for such portions of the

claims against the Town that arise from or are related to the Town's September 2009 payment under the Development Agreement and/or to such other debts and service amounts not paid to Bond holders notwithstanding future payments by the Town under the Development Agreement." (Doc. 95 at 36.) In the body of the Third-Party Complaint, the Town alleges that "[t]he Trustee, as assignee of the rights of other parties to receive payments from the Town under the Development Agreement, is obligated to handle and disburse these amounts in accordance with that Agreement." (*Id.* at 30.) Thus, the most likely interpretation of the Town's claim against the Trustee is that it sounds in contract. Nevertheless, during the oral argument held before this Court on September 4, 2013, the Town conceded that it had no contract claim against the Trustee, and rather that its claim was one for common law indemnification. (Doc. 945 at 23:18–24:10.) The Town's claim for common law indemnification is the subject of a different Motion for Summary Judgment. (Doc. 691.) That Motion has been denied in a separate Order filed concurrently with this one. To the extent that the Town once alleged any claim against the Trustee sounding in contract, the Court takes its statements during argument as a withdrawal of such claims. Thus, because those claims are no longer in this lawsuit, the Trustee's Motion regarding those claims is denied as moot.

### B.    Tortious Interference

The Town's counterclaim against Allstate, however, is for tortious interference. The Town claims that Allstate's instruction to the Trustee to divert the Town's TPT Revenue payments from debt service to the payment of legal fees was in violation of the Town's rights under the Development Agreement. Allstate is unable to show otherwise.

To successfully state a claim for intentional interference with contractual relations, the Town must show:

> (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of [Allstate]; (3) intentional interference inducing or causing a breach; (4) resultant damage to [the Town]; and (5) that [Allstate] acted improperly.
>
> *Snow v. Western Sav. & Loan Ass'n*, 152 Ariz. 27, 33, 730 P.2d 204, 211 (1986).

1   Thus, "[t]ort liability may be imposed upon a defendant who intentionally and improperly
2   interferes with the plaintiff's rights under a contract with another if the interference
3   causes the plaintiff to lose a right under the contract." *Id.* at 34.

4          The Development Agreement is clear that the TPT Revenues are intended solely to
5   "pay all current debt service on the PVCEC Financing." (Doc. 705-1, Ex. 1 at
6   KUTAK1105.) Sections 4.1.4, 4.2.7.2, 4.3.7.4, and 4.3.7.6 of the Development
7   Agreement, among others, establish that limited purpose. Each time the Development
8   Agreement describes an account that contains TPT Revenues, it states that the funds
9   "shall be used" to pay debt service. (Doc. 705-1, Ex. 1 at KUTAK001103,
10  KUTAK001105, KUTAK001112–13.) The "shall be used" language appears in sections
11  entitled "Obligations of Fain," "Obligations of GED and Developer [Borrower]," and
12  "Obligations of the Town." (*Id.*) Each time the language is used, it is in the context of
13  describing the purpose of the TPT Revenues. For example, in § 4.3.7.2 the Town agrees
14  to "establish a separate account" and "credit quarterly to the . . . Account" a certain
15  amount of TPT Revenues, but that same section states that the funds from that account
16  "shall be used to pay debt service on the [Event Center] financing" under the conditions
17  discussed above. (*Id.* at KUTAK001112.) Every time the Agreement discusses accessing
18  the TPT Revenues, it recites that those revenues are to be used for debt service. Thus the
19  Town had the obligation to make those funds available in the specific accounts, but the
20  Borrower had the right to access those funds only to service the debt and only if the
21  operating income was insufficient. Consequently, the Development Agreement
22  apparently conferred a right to access the TPT Revenues that was conditional on the
23  promise to use those funds only to service the bond debt if other funds proved
24  insufficient, and not a freewheeling right to the TPT Revenues and a separate obligation
25  to use those revenues to service the bond debt. Use of the TPT Revenues for any other
26  purpose arguably exceeds the scope of the right granted and would constitute a breach of
27  the Development Agreement.

28         Even if the Trustee is not independently liable for the Borrower's obligations

under the Development Agreement, the Borrower assigned its right to access the TPT Funds under the Development Agreement to the Trustee. Thus, the conditions for which the Trustee could access the funds were defined by the Development Agreement. Indeed, the Assignment Agreement states that the Borrower "assign[ed], transfer[ed] and convey[ed] unto the [the Trustee] . . . all of the [Borrower]'s rights in and to the Pledged TPTax Revenues and the receipt thereof under the Development Agreement." (Doc. 705-3, Ex. 3 at KUTAK000138.) Arguably, the Indenture also permitted the Trustee to use the TPT Revenues only for debt service if operating income was lacking.

It is axiomatic that a party can assign no more than the contractual rights it has. *Stephens v. Textron, Inc.*, 619 P.2d 736, 739 (Ariz. 1980); *Bus. Fin. Servs., Inc. v. Butler & Booth Dev. Co.*, 711 P.2d 649, 651 (Ariz. Ct. App. 1985); Restatement (Second) of Contracts § 336, cmt b. Because the Borrower had no right to use the TPT Revenues for anything other than bond service, the Trustee had no right to use the TPT Revenues for anything other than bond service. Accordingly, the Trustee had no right to use the TPT Revenues to pay legal fees under the Assignment Agreement and quite possibly the Indenture. Its obligation was to exercise only those rights it received. Consequently, Allstate arguably induced a breach of the Development Agreement between the Town and the Borrower by inducing the Trustee to use the TPT Revenues to pay legal fees.

Although the Trustee was not in privity with the Town under the Development Agreement, as discussed above, that fact does not foreclose a tortious interference claim. A claim may lie where the interference (here, the instruction by Allstate to Wells Fargo) has some effect on the Town's rights in the contract, even if the interference was indirect, i.e., not with a party to the contract that was allegedly breached. The Arizona Supreme Court has emphasized that there are a number of ways to show interference:

> "There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract." . . . While the paradigm case of tortious interference with contract may be that of a tortfeasor who induces breach by enticing the contracting party not to perform or by preventing or disabling that party from being able to

perform, the Restatement emphasizes that liability attaches to any intentional interference, whether by inducement or otherwise. "The essential thing is the intent to cause the result."

*Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 494, 38 P.3d 12, 32 (2002) (quoting Restatement (Second) of Torts § 766 cmts. k, h) (internal citations omitted). Thus Allstate's instruction to the Trustee may have resulted in the breach of the borrower's obligation under the Development Agreement to use the TPT Revenues solely for debt service. Despite Allstate's assertion to the contrary, the fact that the Trustee was not a party to the Development Agreement is not fatal. The Town's claim is that Allstate's actions caused a breach of the Development Agreement and there is sufficient evidence of that fact to allow the claim to proceed.

Allstate has also claimed there is insufficient evidence of damages to allow the Town's claim to go to a jury. Damages are an essential component of a tortious interference claim. *See Snow*, 152 Ariz. at 33. The Trustee and Allstate attempt to negate any damages by making a "binding, unequivocal judicial admission that the Town has been and will be given credit for all TPT Revenue payments it has made in the past and will make in the future and that Plaintiffs are not seeking damages for those payments." (Doc. 696 at 6.) In other words, the Town will not be liable to either Allstate or the bondholders the Trustee represents for TPT revenues it has paid with the intent that those revenues be used for bond service, but which the Trustee has instead used to pay the legal fees for itself and Allstate.

Even if Allstate and the Trustee credit the Town with whatever TPT Revenues the Town has paid,[2] that may not resolve all the consequences to the Town of Allstate's

---

[2] The Town disputes whether Allstate and Wells Fargo have properly credited the Town with the TPT Revenues it paid. (Doc. 871 ¶¶ 29–39.) That dispute goes to the amount of the credit the Town should receive in the event it is found liable to Allstate or Wells Fargo, not whether the Town has suffered damage as a result of the actions of Allstate. Allstate has expressly claimed that the Town will not be required to pay anything that it has already paid as TPT Revenues.

direction to the Trustee to use TPT Revenues for legal expenses rather than paying the bondholders. There are genuine factual issues that remain as to how the Town may have been damaged by that alleged interference, including whether that instruction had a role in Fitch's downgrade of the bonds, the resulting change in the value of the Bonds, and the resulting initiation of any claims against the Town in this lawsuit. In light of these factual uncertainties, summary judgment is inappropriate.

## CONCLUSION

The Town has withdrawn any claims it has against the Trustee for third-party breach of contract. The counterclaim against Allstate for tortious interference, however, remains.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Summary Judgment is **denied as moot in part and denied in part**. (Doc. 696.) Summary judgment is denied on the Town's counterclaim against Allstate for tortious interference. Because the Town has withdrawn its third-party claim against Wells Fargo, the Motion on that ground is denied as moot.

Dated this 13th day of September, 2013.

*A. Murray Snow*

G. Murray Snow
United States District Judge